Lesley Elizabeth Weaver (191305)
**BLEICHMAR FONTI & AULD LLP**
555 12th Street, Suite 1600
Oakland, CA 94607
Telephone: (415) 445-4003
Facsimile: (415) 445-4020
lweaver@bfalaw.com

*Counsel for Plaintiff Evanston Police Pension Fund*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVANSTON POLICE PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> MCKESSON CORPORATION, JOHN H. HAMMERGREN, and JAMES BEER, <br><br> Defendants. | Case No. 3:18-cv-06525 <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Evanston Police Pension Fund ("Plaintiff"), by and through its counsel, Bleichmar Fonti & Auld LLP ("BFA" or "Counsel"), alleges the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiff's information and belief are based on, among other things, the independent investigation of Counsel. This investigation includes, but is not limited to, a review and analysis of: (i) public filings by McKesson Corporation ("McKesson" or the "Company") with the Securities and Exchange Commission ("SEC"); (ii) transcripts of McKesson senior management's conferences with investors and analysts; (iii) press releases and media reports issued by and disseminated by the Company; (iv) analyst reports concerning McKesson; and (v) other public information and data regarding the Company.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or acquired McKesson common stock between October 24, 2013 and January 25, 2017 inclusive (the "Class Period"), against (i) McKesson; (ii) Chief Executive Officer John H. Hammergren ("CEO" or "Hammergren"); and (iii) former Chief Financial Officer James Beer ("CFO" or "Beer," collectively "Defendants"), and were damaged thereby, under the Securities Exchange Act of 1934 (the "Exchange Act").

2. McKesson delivers pharmaceutical and medical products and business services to retail pharmacies and institutional healthcare providers such as hospitals and health systems throughout North America and internationally. The majority of its income is derived from its business as a pharmaceutical wholesaler in which it purchases drugs in bulk directly from manufacturers and then sells and distributes those drugs to pharmacy networks, hospitals, and independent pharmacies.

3. Throughout the Class Period, Defendants participated in a price-fixing and anticompetitive scheme in the sale and distribution of generic pharmaceutical drugs with manufacturers and other wholesalers. On October 31, 2017, a group of State Attorneys General leading a years-long investigation into companies in the generic pharmaceuticals industry

published a press release that stated in relevant part: "[T]he states' investigation involves allegations of conspiracy and collusion within the entirety of the generic drug industry, and wholesalers, distributors and other customers are certainly players within the industry." Indeed, throughout the Class Period McKesson's touted its financial success and reported financial results that were false and misleading because they failed to disclose that they were unsustainable and premised on illegal activity.

4.     The Class Period begins on October 24, 2013, the day McKesson released its financial results for the second quarter of its fiscal year 2014 by filing a Current Report on Form 8-K and a Form 10-Q with the SEC reporting those results and touting the growth of its pharmaceutical distribution business.[1]

5.     By 2017, however, the investigation by governmental authorities was in full swing and caused the anticompetitive scheme to unravel. McKesson was no longer able to fix prices with drug manufacturers and other wholesalers. As a result, on January 25, 2017, the last day of the Class Period, McKesson announced disappointing financial results for the third quarter of fiscal year 2017. Defendant Hammergren told investors that the poor results were "a result of the generic pricing actions we began to implement late in our second quarter," as McKesson's "prices were ultimately set at a lower level than our initial expectations that were included in our previous guidance." On this news, McKesson's stock price declined by $12.55 per share, or 8.3%, to close at $138.55 on January 26, 2017, on unusually heavy trading volume.

6.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) McKesson and several of its industry peers colluded to fix the price of certain generic drugs; (ii) the collusive conduct constituted a violation of federal antitrust laws; (iii) consequently, McKesson's revenues during the Class Period were, in part, the result

---

[1] McKesson's fiscal year begins on April 1 of the prior calendar year, i.e., fiscal year 2014 began on April 1, 2013.

of illegal conduct and were therefore unsustainable; (iv) McKesson lacked effective internal controls over financial reporting; and (v) as a result, McKesson's public statements were materially false and misleading at all relevant times.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because McKesson's headquarters are located within this District and Defendants conducted substantial economic activity in the District.  As such, substantial acts in furtherance of the alleged fraud have occurred in this District.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.     Plaintiff Evanston Police Pension Fund provides and distributes pension funds for retired police officers of the city of Evanston, Illinois as well as the families of deceased police officers.  Plaintiff purchased McKesson common stock during the Class Period, as detailed in the Certification attached hereto and incorporated herein, and has been damaged thereby.

13.     Defendant McKesson is incorporated in Delaware and its corporate headquarters are in San Francisco, California.  McKesson's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MCK."

14.     Defendant Hammergren has been the Chairman and CEO of McKesson since 2002.

15.     Defendant Beer is the former Executive Vice President and CFO of McKesson, and served as CFO throughout the Class Period.

16.     Defendants Hammergren and Beer are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions at McKesson, possessed the power and authority to control the contents of McKesson's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

17.     Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Beginning in 2014, extraordinary generic drug price hikes began to garner industry wide attention. In January 2014, the Chief Executive Officer of the National Community Pharmacists Association wrote to Congress stating that "[o]ver the last six months … many of our members across the U.S. … have seen huge upswings in generic drug prices," and called for a Congressional investigation.

19.     On or around July 8, 2014, the Attorney General of Connecticut began investigating generic drug price increases and began issuing subpoenas to generic drug manufacturers.

20.     In October 2014, Congress sent letters to more than a dozen generic drug manufacturers requesting information concerning the pricing of certain generic drugs.

21.     By November 2014, the Department of Justice ("DOJ") convened a grand jury and began to issue its own subpoenas to generic drug manufacturers.

22.     As part of its investigation, Congress requested that the U.S. Government Accountability Office ("GAO") undertake an audit of the generic drugs that the federal government purchased under the Medicare Part D program. On September 12, 2016, the GAO published its report ("the GAO Report"). The GAO found hundreds of unexplained price increases over 100%.  The price of some drugs had even increased more than 1000%.

23.     On November 3, 2016, *Bloomberg* published an article titled "U.S. Charges in Generic Drug Probe to Be Filed By Year End," which revealed that "U.S prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion" as the "antitrust investigation by the Justice Department begun about two years ago, now spans more than a dozen companies and about two dozen drugs."

24.     On December 14, 2016, the DOJ announced that it had charged the former CEO and President of Heritage Pharmaceuticals Inc. for their roles in conspiracies to fix prices, rig bids, and allocate customers for certain generic drugs.

25.     The following day, December 15, 2016, the Connecticut Attorney General announced that he, and 19 other State Attorneys General, had filed a federal lawsuit for antitrust violations against six major drug companies. Currently, the Attorneys General of nearly every U.S. state has joined the action.

**Materially False and Misleading Statements Issued During the Class Period**

26.     On October 24, 2013, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the second quarter of its fiscal year 2014

(the "Q2 2014 8-K").  McKesson (i) reported second quarter GAAP earnings per diluted share of $1.74; (ii) reported Adjusted Earnings per diluted share from continuing operations of $2.27; and (iii) provided Adjusted Earnings per diluted share from continuing operations guidance for fiscal year 2014 of $8.40 to $8.70.

27.     McKesson also reported quarterly gross profits of $2 billion on revenues of $33 billion, $28.1 billion of which came from its U.S. Pharmaceutical Distribution and Services business unit – the drug wholesaler division.  The total reported revenue represented an 11% increase over the same period in the prior fiscal year.

28.      On the same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q2 2014 8-K and reporting its financial and operating results for the second quarter of its fiscal year 2014 (the "Q2 2014 10-Q").

29.     The Q2 2014 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Hammergren and Beer, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

30.     On January 30, 2014, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the third quarter of its fiscal year 2014 (the "Q3 2014 8-K").  McKesson (i) reported third quarter GAAP earnings per diluted share from continuing operations of $0.67; (ii) reported Adjusted Earnings per diluted share from continuing operations of $1.45; and (iii) provided Adjusted Earnings per diluted share from continuing operations guidance for fiscal year 2014 of $8.05 to $8.20.

31.     McKesson also reported gross profits of $1.8 billion on revenues of $34.3 billion, $29.3 billion of which came from its U.S. Pharmaceutical Distribution and Services business unit.  The reported revenue represented a 10% increase over the same period in the prior fiscal year.

32.     On the same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q3 2014 8-K and reporting its financial and operating results for the third quarter of its fiscal year 2014 (the "Q3 2014 10-Q").

33.     The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Hammergren and Beer, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

34.     On May 12, 2014, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the fourth quarter and fiscal year 2014 (the "2014 8-K").  McKesson (i) reported GAAP earnings per diluted share from continuing operations of $1.56 for the quarter and $5.83 for the fiscal year; (ii) reported Adjusted Earnings per diluted share of $2.55 for the quarter and $8.35 for the fiscal year; and (iii) provided Adjusted Earnings per diluted share guidance for fiscal year 2015 of $10.40 to $10.80.

35.     McKesson also reported annual gross profit of $8.3 billion on revenues of $137.6 billion, $123.9 billion of which came from its North American Pharmaceutical Distribution and Services business unit. The reported revenue represented a 13% increase over fiscal year 2013.

36.     On May 14, 2014, McKesson filed an Annual Report on Form 10-K with the SEC reiterating the financial results previously announced in the 2014 8-K and reporting its financial and operating results for the fourth quarter and full fiscal year 2014 (the "2014 10-K").

37.     In the 2014 10-K, McKesson also stated that its "Code of Conduct" was "applicable to all employees, officers, and directors" and available on the Company's website.

38.     McKesson's Code of Conduct in effect at the time of the filing of the 2014 10-K expressly stated "This Code applies globally to all employees, officers, and directors – regardless of position or tenure. We also seek business partners who share our values and commitment to doing business with integrity."

39.     Regarding "Fair Competition," the Code of Conduct stated:

We value a marketplace in which McKesson competes to sell superior services and quality products at fair prices. Laws in many of the places where we do business are intended to protect fair an open competition. ***To comply with these laws you should not discuss coordinate, or agree with a competitor to fix prices, split or "fix" bids, refuse to deal with (or boycott) a supplier or customer, or otherwise limit distribution channels.***

40.     The 2014 Form 10-K contained signed certifications pursuant to SOX by Defendants Hammergren and Beer, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

41.     On July 31, 2014, McKesson filed a Current Report Form 8-K with the SEC announcing the Company's financial results for the first quarter of its fiscal year 2015 (the "Q1 2015 8-K").   McKesson (i) reported first quarter GAAP earnings per diluted share from continuing operations of $1.78; (ii) reported Adjusted Earnings per diluted share from continuing operations of $2.49; and (iii) provided Adjusted Earnings per diluted share guidance for fiscal year 2015 of $10.50 to $10.90.

42.     McKesson also reported gross profits of $2.8 billion on revenues of $44.1 billion, $34.4 billion of which came from its North American Pharmaceutical Distribution and Services business unit.  The reported revenue represented a 37% increase over the same period in the prior fiscal year.

43.     On the same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q1 2015 8-K and reporting its financial and operating results for the first quarter of its fiscal year 2015 (the "Q1 2015 10-Q").

44.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Hammergren and Beer, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

45.     On October 28, 2014, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the second quarter of its fiscal year 2015 (the "Q2 2015 8-K").  McKesson (i) reported second quarter GAAP earnings per diluted share from continuing operations of $2.05; (ii) reported Adjusted Earnings per diluted share from continuing operations of $2.79; and (iii) provided Adjusted Earnings per diluted share guidance for fiscal year 2015 of $10.50 to $10.90.

46.     McKesson also reported gross profits of $2.9 billion on revenues of $44.8 billion, $35.1 billion of which came from its North American Pharmaceutical Distribution and Services business unit.  The reported revenue represented a 36% increase over the same period in the prior fiscal year.

47.     On the same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q2 2015 8-K and reporting its financial and operating results for the second quarter of its fiscal year 2015 (the "Q2 2015 10-Q").

48.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Hammergren and Beer, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

49.     On February 5, 2015, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the third quarter of its fiscal year 2015 (the "Q3 2015 8-K").  McKesson (i) reported third quarter GAAP earnings per diluted share from continuing operations of $2.01; (ii) reported Adjusted Earnings per diluted share from continuing operations of $2.89; and (iii) provided increased fiscal year 2015 guidance for Adjusted Earnings per diluted share of $10.80 to $10.95.

50.     McKesson also reported gross profits of $2.9 billion on revenues of $47 billion, $37.4 billion of which came from its North American Pharmaceutical Distribution and Services business unit.  The reported revenue represented a 37% increase over the same period in the prior fiscal year.

51.     On the same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q3 2015 8-K and reporting its financial and operating results for the third quarter of its fiscal year 2015 (the "Q3 2015 10-Q").

52.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Hammergren and Beer, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

53.     On May 12, 2015, McKesson filed a Current Report on Form 8-K with the SEC reporting the Company's financial results for the fourth quarter and fiscal year 2015 (the "2015 8-K").  McKesson (i) reported GAAP earnings per diluted share from continuing operations of $1.69 for the quarter and $7.54 for the fiscal year; (ii) reported Adjusted Earnings per diluted share of $2.94 for the quarter and $11.11 for the fiscal year; and (iii) provided Adjusted Earnings per diluted share guidance for fiscal year 2016 of $12.20 to $12.70.

54.     McKesson also reported annual gross profit of $11.4 billion on revenues of $179 billion, $143.7 billion of which came from its North American Pharmaceutical Distribution and Services business unit.  The reported revenue represented a 30.3% increase over fiscal year 2014.

55.     On the same day, McKesson filed an Annual Report on Form 10-K with the SEC reiterating the financial results previously announced in the 2015 8-K and reporting its financial and operating results for the fourth quarter and full fiscal year 2015 (the "2015 10-K").

56.     In the 2015 10-K, McKesson also stated that its "Code of Conduct" was "applicable to all employees, officers, and directors" and was available on the Company's website.

57.     McKesson's Code of Conduct in effect at the time of the filing of the 2015 10-K expressly stated "This Code applies globally to all employees, officers, and directors – regardless of position or tenure. We also seek business partners who share our values and commitment to doing business with integrity."

58.     Regarding "Fair Competition," the Code of Conduct stated:

We value a marketplace in which McKesson competes to sell superior services and quality products at fair prices. Laws in many of the places where we do business are intended to protect fair an open competition. ***To comply with these laws you should not discuss coordinate, or agree with a competitor to fix prices, split or "fix" bids, refuse to deal with (or boycott) a supplier or customer, or otherwise limit distribution channels.***

59.     The 2015 Form 10-K contained signed certifications pursuant to SOX by Defendants Hammergren and Beer, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

60.     On July 29, 2015, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the first quarter of its fiscal year 2016 (the "Q1 2016 8-K").   McKesson (i) reported first quarter GAAP earnings per diluted share from continuing operations of $2.50; (ii) reported Adjusted Earnings per diluted share of $3.14; and (iii) provided Adjusted Earnings per diluted share guidance for fiscal year 2016 of $12.36 to 12.86.

61.     McKesson also reported gross profits of $2.8 billion, on revenues of $47.5 billion, $39.5 billion of which came from its North American Pharmaceutical Distribution and Services business unit.  The reported revenue represented a 9% increase over the same period in the prior fiscal year.

62.     On the same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q1 2016 8-K and reporting its financial and operating results for the first quarter of its fiscal year 2016 (the "Q1 2016 10-Q").

63.     The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Hammergren and Beer, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

64.     On October 29, 2015, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the second quarter of its fiscal year 2016 (the "Q2 2016 8-K").  McKesson (i) reported second quarter GAAP earnings per diluted share from continuing operations of $2.65; (ii) reported Adjusted Earnings per diluted share of $3.31; and (iii) provided increased Adjusted Earnings per diluted share guidance for fiscal year 2016 of $12.50 to $13.00.

65.     McKesson also reported gross profits of 2.8 billion on revenues of $48.7 billion, $40.6 billion of which came from its North American Pharmaceutical Distribution and Services business unit.  The reported revenue represented a 10% increase over the same period in the prior fiscal year.

66.     On the same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q2 2016 8-K and reporting its financial and operating results for the second quarter of its fiscal year 2016 (the "Q2 2016 10-Q").

67.     The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Hammergren and Beer, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

68.     On January 27, 2016, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the third quarter of its fiscal year 2016 (the "Q3 2016 8-K").  McKesson (i) reported third quarter GAAP earnings per diluted share from continuing operations of $2.71; (ii) reported Adjusted Earnings per diluted share of $3.18; and (iii) provided Adjusted Earnings per diluted share guidance for fiscal year 2016 of $12.60 to $12.90.

69.     McKesson also reported gross profits of $2.9 billion on revenues of $47.9 billion, $39.6 billion of which came from its North American Pharmaceutical Distribution and Services business unit.  The reported revenue represented a 3% increase over the same period in the prior fiscal year.

70.     On the same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q3 2016 8-K and reporting its financial and operating results for the third quarter of its fiscal year 2016 (the "Q3 2016 10-Q").

71.     The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Hammergren and Beer, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

72.     On May 4, 2016, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the fourth quarter and fiscal year 2016 (the "2016 8-K").  McKesson (i) reported GAAP earnings per diluted share from continuing operations of $1.97 for the quarter and $9.84 for the fiscal year; (ii) reported Adjusted Earnings per diluted share of $2.44 for the quarter and $12.08 for the fiscal year; and (iii) provided Adjusted Earnings per diluted share guidance for fiscal year 2017 of $13.30 to $13.80.

73.     McKesson also reported annual gross profit of $11.4 billion on revenues of $190.9 billion, 158.5 billion of which came from its North American Pharmaceutical Distribution and Services business unit.  The reported revenue represented a 6.6% increase over fiscal year 2015.

74.     On May 5, 2016, McKesson filed an Annual Report on Form 10-K with the SEC reiterating the financial results previously announced in the 2016 8-K and reporting its financial and operating results for the fourth quarter and full fiscal year 2016 (the "2016 10-K").

75.     In the 2016 10-K, McKesson also stated that its "Code of Conduct" was "applicable to all employees, officers, and directors" and was available on the Company's website.

76.     McKesson's Code of Conduct in effect at the time of the filing of the 2015 10-K expressly stated "This Code applies globally to all employees, officers, and directors – regardless of position or tenure. We also seek business partners who share our values and commitment to doing business with integrity."

77.     Regarding "Fair Competition," the Code of Conduct stated:

We value a marketplace in which McKesson competes to sell superior services and quality products at fair prices. Laws in many of the places where we do business are intended to protect fair an open competition. ***To comply with these laws you should not discuss coordinate, or agree with a competitor to fix prices, split or "fix" bids, refuse to deal with (or boycott) a supplier or customer, or otherwise limit distribution channels.***

78.     The 2016 Form 10-K contained signed certifications pursuant to SOX by Defendants Hammergren and Beer, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

79.     On July 27, 2016, McKesson filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for the first quarter of its fiscal year 2017 (the "Q1 2017 8-K").   McKesson (i) reported first quarter GAAP earnings per diluted share from continuing operations of $2.88; (ii) reported Adjusted Earnings per diluted share of $3.51; and (iii) provided increased Adjusted Earnings per diluted share guidance for fiscal year 2016 of $13.43 to $13.93, excluding charges from a Cost Alignment Plan.

80.     McKesson also reported gross profits of $2.9 billion on revenues of $49.7 billion, $41.2 billion of which came from its North American Pharmaceutical Distribution and Services business unit.   The reported revenue represented a 5% increase over the same period in the prior fiscal year.

81.     On that same day, McKesson filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q1 2017 8-K and reporting its financial and operating results for the first quarter of its fiscal year 2017 (the "Q1 2017 10-Q").

82.     The Q1 2017 10-Q contained signed certifications pursuant to SOX by Defendants Hammergren and Beer, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

83.     On October 27, 2016, after the close of trading, McKesson filed a Current Report on Form 8-K filed with the SEC announcing certain of the Company's financial results for the second quarter of its fiscal year 2017 (the "Q2 2017 8-K").  McKesson (i) reported quarterly GAAP earnings per diluted share from continuing operations of $1.35; (ii) reported Adjusted Earnings per diluted share of $2.94; and (iii) provided guidance for Adjusted Earnings per diluted share to $12.25 to $12.85.

84.     McKesson also reported gross profit of $2.8 billion on revenues of $50 billion, $41.3 billion of which came from its North American Pharmaceutical Distribution and Services business unit.  The reported revenue represented a 2% increase over the same period in the prior fiscal year.

85.     On October 27, 2016, McKesson also filed a Form 10-Q with the SEC reiterating the financial results previously announced in the Q2 2017 8-K and reporting its financial and operating results for the second quarter of its fiscal year 2017 (the "Q2 2017 10-Q).

86.      The Q2 2017 10-Q contained signed certifications pursuant to SOX by Defendants Hammergren and Beer, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

87.     The statements referenced in ¶¶ 26 to 86 were materially false and misleading when made because: (i) McKesson and several of its industry peers colluded to fix the price of certain generic drugs; (ii) the collusive conduct constituted a violation of federal antitrust laws; (iii) consequently, McKesson's revenues during the Class Period were, in part, the result of illegal conduct and were therefore unsustainable; (iv) McKesson lacked effective internal controls over financial reporting; and (v) as a result, McKesson's public statements were materially false and misleading at all relevant times.

88.     After the close of trading on January 25, 2017, the last day of the Class Period, McKesson announced disappointing financial results for the third quarter of its fiscal year 2017. On a Current Report filed on a Form 8-K filed with the SEC announcing the Company's financial

1  results for the third quarter of 2017 (the "Q3 2017 8-K"), McKesson disclosed an Adjusted

2  Earnings per diluted share of $3.05, a 4% decrease from the same period in the prior fiscal year.

3  Significantly, McKesson also reported lower than expected North American Pharmaceutical

4  Distribution and Services business unit revenue of $41.7 billion.

5       89.    On the same day, McKesson filed a Form 10-Q with the SEC reiterating the

6  financial results previously announced in the Q3 207 8-K and reporting its financial and operating

7  results for the third quarter of its fiscal year 2017 (the "Q3 2017 10-Q").  The poor financial

8  results were due to the materialization of the risk that the price fixing scheme would unravel and

9  lead to materially lower revenues and profits.  As a result of this news, McKesson's common

10  stock price per share dropped from $151.10 at the close of trading on January 25, 2017, to

11  $138.55 on January 26, 2017, on heavy trading volume and the Class was damaged thereby.

12  **POST CLASS PERIOD EVENTS**

13       90.    On October 31, 2017, a press release published by the State Attorneys General in

14  connection with their latest proposed amended complaint stated the Attorneys General were

15  continuing to investigate companies in the industry beyond those already identified. The press

16  release specifically stated, "[T]he states' investigation involves allegations of conspiracy and

17  collusion with the entirety of the generic drug industry, and wholesalers, distributors and other

18  customers are certainly players within the industry."

19       91.    On December 18, 2017, McKesson announced that Defendant Beer would leave

20  the Company "to pursue a new opportunity."

21  **LOSS CAUSATION**

22       92.    During the Class Period, as detailed herein, Defendants made materially false and

23  misleading statements and omissions, and engaged in a scheme to deceive the market.  This

24  artificially inflated the price of McKesson common stock and operated as a fraud or deceit on the

25  Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed

26  to the market on January 25, 2017, as alleged herein, the price of McKesson common stock fell

27  precipitously, as the prior artificial inflation came out of the price.  As a result of its purchases of

28

McKesson common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

93.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired McKesson common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of McKesson and their families and affiliates.

94.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of June 30, 2018, there were approximately 200 million shares of McKesson stock outstanding, owned by at least thousands of investors.

95.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

        A.  Whether Defendants violated the Exchange Act;

        B.  Whether Defendants omitted and/or misrepresented material facts;

        C.  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

        D.  Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

        E.  Whether the price of McKesson's common stock was artificially inflated;

        F.  Whether Defendants' conduct caused the members of the Class to sustain damages; and

        G.  The extent of damage sustained by Class members and the appropriate measure of damages.

96.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

97.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

98.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

99.     McKesson's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue from liability.

100.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of McKesson who knew that the statement was false.

101.    None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

102.    At all relevant times, the market for McKesson's common stock was an efficient market for the following reasons, among others:

> A.   McKesson stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

> B.   As a regulated issuer, McKesson filed periodic public reports with the SEC;

C.  McKesson regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.  McKesson was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

103.   As a result of the foregoing, the market for McKesson common stock promptly digested current information regarding McKesson from all publicly available sources and reflected such information in the price.  Under these circumstances, all purchasers of McKesson's common stock during the Class Period suffered similar injury through their purchase of McKesson common stock at artificially inflated prices and the presumption of reliance applies.

104.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

105.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

106.   During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase McKesson common stock at artificially inflated prices.

107.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the

1    statements not misleading; and (iii) engaged in acts, practices, and a course of business which

2    operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort

3    to maintain artificially high market prices for McKesson common stock in violation of Section

4    10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

5        108.    Defendants, individually and in concert, directly and indirectly, by the use, means

6    or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

7    continuous course of conduct to conceal adverse material information about the Company's

8    financial well-being, operations, and prospects.

9        109.    During the Class Period, Defendants made the false statements specified above

10   which they knew or recklessly disregarded to be false or misleading in that they contained

11   misrepresentations and failed to disclose material facts necessary in order to make the statements

12   made, in light of the circumstances under which they were made, not misleading.

13       110.    Defendants had actual knowledge of the misrepresentations and omissions of

14   material fact set forth herein, or recklessly disregarded the true facts that were available to them.

15   Defendants engaged in this misconduct to conceal McKesson's true condition from the investing

16   public and to support the artificially inflated prices of the Company's common stock.

17       111.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity

18   of the market, they paid artificially inflated prices for McKesson's common stock.  Plaintiff and

19   the Class would not have purchased the Company's common stock at the prices they paid, or at

20   all, had they been aware that the market prices had been artificially inflated by Defendants'

21   fraudulent course of conduct.

22       112.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and

23   the other members of the Class suffered damages in connection with their respective purchases

24   of the Company's common stock during the Class Period.

25       113.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange

26   Act and Rule 10b-5 promulgated thereunder.

27

28

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

114.   Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

115.   The Individual Defendants acted as controlling persons of McKesson within the meaning of Section 20(a) of the Exchange Act.   By virtue of their high-level positions participation in and/or awareness of the Company's operations, direct involvement in the day-to day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about McKesson, the Individual Defendants had the power and ability to control the actions of McKesson and its employees.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

116.   **WHEREFORE**, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

117.   Plaintiff demands a jury trial.

Dated: October 25, 2018

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

/s/ *Lesley Elizabeth Weaver*
Lesley Elizabeth Weaver

555 12th Street, Suite 1600
Oakland, CA 94607
Telephone: (415) 445-4003
Facsimile: (415) 445-4020
lweaver@bfalaw.com

Javier Bleichmar (*pro hac vice* to be filed)
Joseph A. Fonti (*pro hac vice* to be filed)
Wilson M. Meeks III (*pro hac vice* to be filed)
7 Times Square, 27th Floor
New York, New York 10036
Telephone:  (212) 789-1340
Facsimile:  (212) 205-3960
wmeeks@bfalaw.com
jbleichmar@bfalaw.com
jfonti@bfalaw.com

*Counsel for Plaintiff Evanston Police Pension Fund*

CLASS ACTION COMPLAINT