1   ROBBINS GELLER RUDMAN
       & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA  94104
4   Telephone:  415/288-4545
    415/288-4534 (fax)
5   shawnw@rgrdlaw.com
           – and –
6   SPENCER A. BURKHOLZ (147029)
    LUKE O. BROOKS (212802)
7   RYAN A. LLORENS (225196)
    ANGEL P. LAU (286196)
8   JEFFREY J. STEIN (265268)
    ERIKA OLIVER (306614)
9   655 West Broadway, Suite 1900
    San Diego, CA  92101
10  Telephone:  619/231-1058
    619/231-7423 (fax)
11  spenceb@rgrdlaw.com
    lukeb@rgrdlaw.com
12  rllorens@rgrdlaw.com
    alau@rgrdlaw.com
13  jstein@rgrdlaw.com
    eoliver@rgrdlaw.com
14
    Lead Counsel for Lead Plaintiff
15
                 UNITED STATES DISTRICT COURT
16
                 NORTHERN DISTRICT OF CALIFORNIA
17
    EVANSTON POLICE PENSION FUND,          )   Case No. 3:18-cv-06525-CRB
18  Individually and on Behalf of All Others   )
    Similarly Situated,                    )   CLASS ACTION
19                                         )
                           Plaintiff,      )   CONSOLIDATED CLASS ACTION
20                                         )   COMPLAINT FOR VIOLATIONS OF THE
        vs.                                )   FEDERAL SECURITIES LAWS
21                                         )
    MCKESSON CORPORATION, et al.,          )
22                                         )
                           Defendants.     )
23  _____)   DEMAND FOR JURY TRIAL

24

25

26

27

28

1548720_1

1

# TABLE OF CONTENTS

2

**Page**

3  I.      NATURE OF THE ACTION AND OVERVIEW ............................................................1

4  II.     JURISDICTION AND VENUE ...............................................................................10

5  III.    PARTIES .......................................................................................................11

6  IV.     FACTUAL ALLEGATIONS ..................................................................................12

7          A.   A Brief Overview of the Generic Pharmaceutical Drug Market ..........................12

8          B.   McKesson Is One of Three Dominant Pharmaceutical Wholesalers in the
9               United States ...........................................................................................16

          C.   McKesson's Financial Results Were Lackluster Prior to the Class Period ...........16
10
          D.   Generics Inflation Drove McKesson's Profitability Rebound..............................18
11
          E.   Defendants Misled Investors About the Reasons for and Sustainability of
12              McKesson's Growth ...................................................................................22

13         F.   McKesson Facilitated and/or Allowed the Massive Price Hikes,
                Abandoning Its Obligation to the Company's Investors......................................24
14
           G.   McKesson's NorthStar Subsidiary Colluded in the Generics Market ..................31
15
           H.   The Generic Drug Market Structure Facilitated Collusion..................................37
16
                1.   High Level of Market Concentration......................................................37
17
                2.   Inelastic Demand ..............................................................................38
18
                3.   Commodity-Like Product ....................................................................39
19
                4.   No Viable Substitute ..........................................................................39
20
                5.   Barriers to Entry...............................................................................40
21
                6.   Information Sharing ...........................................................................40
22
           I.   The Schemes Involved Executives at McKesson's Highest Levels and
23              Were Large in Magnitude .............................................................................42

24         J.   Eventually Elevated Pricing Drew Governmental Scrutiny, Attracted
                Competitors, and Eroded Profits....................................................................44
25
           K.   Materially False and Misleading Statements Issued During the Class
26              Period .....................................................................................................48

27              1.   False and Misleading Statements Relating to Generic Drugs Price
                     Inflation..........................................................................................48
28

CONSOLIDATED CLASS ACTION COMPLAINT - 3:18-cv-06525-CRB

**Page**

       2.     False and Misleading Statements Relating to Financial Results ...............65

V.    ADDITIONAL EVIDENCE OF SCIENTER .....................................................................80

    A.    Defendants Signed Sarbanes-Oxley Certifications Attesting that They Personally Supervised McKesson's Controls and Procedures..............................80

    B.    Defendants' Compensation Structure Incentivized Fraud ...................................80

VI.   LOSS CAUSATION...........................................................................................................82

VII.  NO SAFE HARBOR ...........................................................................................................86

VIII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET.....................................................................................................................87

IX.   PLAINTIFF'S CLASS ACTION ALLEGATIONS.........................................................87

COUNT I ........................................................................................................................................89

COUNT II .......................................................................................................................................91

COUNT III ......................................................................................................................................92

X.    PRAYER FOR RELIEF .....................................................................................................93

XI.   JURY DEMAND ................................................................................................................94

1    This is a class action on behalf of persons and entities that purchased or otherwise acquired

2    McKesson Corporation ("McKesson" or the "Company") common stock between October 24, 2013

3    and January 25, 2017, inclusive (the "Class Period"), and were damaged thereby, against:

4    (i) McKesson; (ii) Chief Executive Officer John H. Hammergren ("CEO" or "Hammergren"); and

5    (iii) former Chief Financial Officer James Beer ("CFO" or "Beer") (collectively "Defendants"),

6    under the Securities Exchange Act of 1934 (the "Exchange Act").

7    Lead Plaintiff Pension Trust Fund for Operating Engineers ("Plaintiff"), by and through its

8    counsel Robbins Geller Rudman & Dowd LLP ("RGRD" or "Counsel"), alleges the following upon

9    personal knowledge as to itself and its own acts, and upon information and belief as to all other

10   matters.  Plaintiff's information and belief are based on, among other things, the independent

11   investigation of Counsel.  This investigation includes, but is not limited to, a review and analysis of:

12   (i) public filings by McKesson with the Securities and Exchange Commission ("SEC");

13   (ii) transcripts of McKesson senior management's conferences with investors and analysts;

14   (iii) consultation with industry experts; (iv) drug pricing, market share and supply information from

15   proprietary databases; (v) press releases and media reports issued about and disseminated by the

16   Company; (vi) analyst reports issued about McKesson; and (vii) other public information and data

17   regarding the Company.  Plaintiff believes that substantial evidentiary support will exist for the

18   allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

20   1.    This securities class action arises from the difference between what the Defendants

21   told investors was driving McKesson's financial success and the truth behind McKesson's

22   performance.  In particular, during the Class Period, Defendants made materially false and

23   misleading statements and omissions about McKesson's financial performance and its generics

24   business.  Defendants: (1) falsely attributed generic drug price inflation – a significant driver of

25   McKesson profitability growth – to nonexistent supply disruptions; (2) falsely represented that

26   McKesson was negotiating competitive prices for its customers, particularly the independent

27   pharmacies; (3) concealed that the Company's generic manufacturing subsidiary, NorthStar Rx

28   ("NorthStar") was part of an overarching generic pharmaceutical price-fixing conspiracy that is the

focus of investigations by Congress, the U.S. Department of Justice Antitrust Division ("DOJ"), and several state Attorneys General; and (4) failed to disclose that the Company's Class Period financial results were positively impacted by, and heavily reliant upon, collusive profits.  As a result of Defendants' false and misleading statements and omissions, McKesson stock traded at artificially inflated prices throughout the Class Period.

2.     McKesson delivers pharmaceutical and medical products and business services to retail pharmacies and institutional healthcare providers such as hospitals and health systems throughout North America and internationally.  The majority of its income is derived from its business as a pharmaceutical wholesaler in which it purchases drugs in bulk directly from manufacturers and then sells and distributes those drugs to pharmacy networks, hospitals and independent pharmacies.  McKesson is one of three wholesalers that control over 85% of the market.  A material part of the Company's profitability was also driven by the profits from its NorthStar subsidiary, which was a manufacturer of generic drugs.

3.     Prior to the Class Period, McKesson embarked on an acquisition binge, snapping up more than 44 companies between 2006 and 2013.  But McKesson's growth-by-acquisition strategy failed.  In the years leading up to the Class Period, the Company reported subpar results and between 2010 and 2013, McKesson's growth rate stagnated at 3%.  Under pressure to turn the Company around, Defendants resorted to fraud.

4.     On October 24, 2013, the first day of the Class Period, McKesson reported financial results for its second quarter of fiscal year 2014,[1] announcing unexpected positive results for the second quarter in a row and raising its full year guidance.  During the October 24, 2013 conference call, Defendants acknowledged that increases in generic drug pricing had driven McKesson's outperformance for the first half of fiscal 2014, but falsely claimed that those increases were due to supply disruptions.  Throughout the remainder of the Class Period, Defendants repeated this misrepresentation, frequently telling investors the generic inflation fueling McKesson's growth was

---

[1]   McKesson's fiscal year (or "FY") begins on April 1 of the prior calendar year.  For example, fiscal year 2014 (or "FY14") began on April 1, 2013.  The second quarter of fiscal year 2014 (or "2Q14") covered the period from July 1, 2013 to September 31, 2013.

1  caused by supply disruptions involving a small number of drugs and a small subset of manufacturers.

2  In truth, the outsized profit growth was driven by widespread anticompetitive activity.

3      5.      Investigations into suspicious price increases by 49 state Attorneys General (or

4  "AGs"), Congress and the DOJ have begun to reveal a broad, well-coordinated and long-running

5  series of schemes to fix prices for a number of generic drugs. As a result of their years-long

6  investigation, which involved the collection of numerous documents and phone and text records, the

7  state Attorneys General have described a wide-ranging and illegal conspiracy through which generic

8  drug manufacturers communicated – either in person, by telephone or by text message – and agreed

9  to collectively raise and/or maintain prices for generic drugs.  The overarching conspiracy rested on

10  "general rules of the road," whereby manufacturers did not take advantage of competitors' price

11  increases by lowering prices to gain market share, but instead allowed each competitor to have a

12  certain percentage of market share "based on the number of competitors in the particular drug

13  market, with a potential adjustment based on the timing of their entry."  Plaintiff States' Amended

14  Complaint, *In re Generic Pharms. Pricing Antitrust Litig.*, No. 17-3786 (16-MD-2724) (E.D. Pa.

15  Jun. 18, 2018) (ECF No. 15) ("AG Complaint" or "AG Cpt."), ¶¶90-91.  Although McKesson is not

16  yet named as a defendant in the AG Complaint, the collusion could not have succeeded without the

17  major wholesalers' acquiescence to the scheme.  Indeed, the state Attorneys General implicated the

18  wholesalers in their allegations and in an October 31, 2017 press release that states in relevant part:

19  "[T]he states' investigation involves allegations of conspiracy and collusion within the entirety of the

20  generic drug industry, and wholesalers, distributors and other customers are certainly players within

21  the industry."  In a December 9, 2018 *Washington Post* article, a Connecticut Assistant Attorney

22  General noted that the investigation was expanding, stating: "'This is most likely the largest cartel in

23  the history of the United States.'"  The AG Complaint includes evidence of collusive behavior by

24  manufacturers Heritage Pharmaceuticals, Inc. ("Heritage"), Mayne and Mylan and details

25  McKesson's involvement in and knowledge of that behavior leading to collusive drug price inflation.

26  *See* ¶¶73-77, herein.  The AG Complaint also sets forth detailed allegations of price-fixing and

27  allocation of market share for the drug leflunomide, which was manufactured by NorthStar. *See* ¶97,

28  herein.  The AGs' findings, along with empirical data and statistical analysis, provide substantial

1   evidence that NorthStar entered into collusive agreements to fix the prices of and allocate the market

2   for at least six generic drugs with the defendants named in the AG Complaint.

3           6.      As the chart below shows, as a result of the collusive activity, the Company's income

4   skyrocketed during the Class Period:



16          7.      McKesson benefited from the wide-ranging generic drug price inflation in at least

17  four ways: (1) collusive price-fixing profits from its subsidiary NorthStar; (2) increased profits from

18  the collusive price increases by the manufacturers in the form of higher "discount" payments;

19  (3) markups on the collusive drugs; and (4) through the sale of inventory purchased at lower prices.

20  These collusive profits contributed substantially to McKesson's profitability and inflated its stock

21  price.

22          8.      Defendants used McKesson's generic manufacturing subsidiary NorthStar as a source

23  of collusive revenue.  Defendants publicly touted NorthStar as a material contributor to McKesson's

24  financial outperformance, but misled investors about the reasons for its success.  Beginning in early

25  2015, NorthStar began to collude with its competitors to increase generic drug prices and allocate

26  markets in order to decrease competition and artificially inflate revenues.  In particular, NorthStar

27  entered into agreements to fix the prices of, or allocate the market for, at least six generic drugs.

28  There is no non-collusive explanation for these sudden, synchronized price increases – there was no

1   supply shortage, production problem, or sudden increase in demand for these drugs during this

2   period, and no competitor left the market.  Moreover, the markets for these drugs are highly

3   susceptible to collusion – they are dominated by only a few companies, and this high level of market

4   concentration makes collusion easy.  The market for each of the drugs featured several other

5   characteristics that facilitated collusion:  demand for the drugs was inelastic, with increases or

6   miniscule reductions in the quantities sold even after massive and sudden price hikes; all of the drugs

7   were commodity-like products – generic drugs whose only distinguishing factor for purchasers was

8   price; none of the drugs had a viable substitute; all of the drugs had high barriers to entry; and

9   information sharing and price discovery were common.

10      9.      While artificially inflating prices through NorthStar, Defendants also falsely touted

11   McKesson's role as a zealous negotiator of generic drug prices on behalf of its wholesale business

12   customers, particularly independent pharmacies.  Defendants equated McKesson to the "corporate

13   office" of independent pharmacies – purporting to advocate on behalf of these small community-

14   based businesses by aggregating purchasing scale for them so they could "buy competitively and

15   remain competitive in their marketplace."  Defendants falsely assured investors that McKesson

16   leveraged its ability to deliver market share to generics manufacturers to "buy at scale in an

17   extremely efficient way and . . . pass through the benefits of those drug prices to those independent

18   stores who are obviously competing locally against much bigger chains."  But rather than use its

19   massive market power to negotiate for lower prices, McKesson acquiesced to the higher prices for its

20   own benefit.  As prices rose, McKesson's profits rose with them because as a wholesaler, the

21   Company was paid a "markup" on the higher list price by the pharmacies and a "discount" or

22   payment by the manufacturers as a percentage of the list price of the drug – the higher the price, the

23   higher the "discount" and "markup" McKesson would pocket.  Thus, although the Company publicly

24   asserted that it worked for its customers to drive down prices, the Company was incentivized to do –

25   and in fact did – precisely the opposite.

26      10.     For example, the AG Complaint describes a collusive scheme between two generic

27   drug manufacturers, Heritage and Mayne, to allocate the market for the drug doxycycline hyclate

28   ("Doxy DR").   AG Cpt., ¶225.   The evidence shows that after Mayne submitted a bid for

1   McKesson's business, Mayne was informed that Heritage was strategically aligned with McKesson

2   and that McKesson would not move its business from Heritage.  *Id*., ¶¶226-228, 236.  Still, Mayne

3   pursued its bid for McKesson's Doxy DR business in April 2014, but McKesson refused to shift

4   even part of its business away from Heritage.  *Id*., ¶228.  Mayne continued to pursue McKesson's

5   Doxy DR business through subsequent bids but never won McKesson's business.  Instead, as part of

6   the overarching "rules of the road" governing the conspiracy, Heritage ceded Doxy DR market share

7   to Mayne by walking away from another customer in exchange for Mayne's removal of its new

8   Doxy DR bid to McKesson.  The scheme to prop up prices for Doxy DR could not have worked

9   without McKesson's  support – rather than use its market power to drive prices down by soliciting

10  and accepting competing bids, McKesson kept its business with Heritage and maintained higher

11  pricing.  As a result of Heritage's collusive activities, including those relating to Doxy DR, its CEO

12  Jeffrey Glazer and President Jason Malek pleaded guilty to price-fixing and market allocation

13  charges on January 9, 2017 and January 10, 2017, respectively.  They also entered into settlement

14  agreements with the AGs on May 24, 2017 to cooperate with the states' investigations, including

15  providing "all pre-existing information, documents or other tangible evidence," market data and

16  information, and all facts relating to the investigations without the service of subpoena.

17      11.     The reduced bidding, or dropping of lower price bids by manufacturers for

18  McKesson's coveted business, was a major red flag that anti-competitive behavior was the reason for

19  high drug prices.  As the Connecticut Assistant Attorney General, Michael E. Cole, stated: "'Rather

20  than the wholesalers being the gatekeeper, it was the fox guarding the henhouse . . . .  The

21  wholesalers should be the sentinel here.'"  McKesson had the market power to force manufacturers

22  into rational pricing, it had the obligation to its customers to do so, and Defendants repeatedly told

23  investors that McKesson's focus was on lowering costs for its core customers – the independent

24  pharmacies.  But McKesson's conflicts of interest drove it to facilitate, or at the very least,

25  knowingly permit, the massive price increases, despite repeatedly telling investors the Company's

26  strategy was to drive down prices for its customers' benefit.

27      12.     Defendants knew that McKesson's growth during the Class Period was due to

28  unsustainable collusive behavior that inflated generic drug prices.  In fact, Defendants acknowledged

1   throughout the Class Period that the increase in generic drug prices was material to McKesson's

2   financial performance.  Defendants' statements to investors and their access to industry-wide generic

3   pricing information establishes that the Individual Defendants possessed direct personal knowledge

4   of the generic drug pricing environment and the true reasons for the higher pricing, including the

5   highly unusual coordinated NorthStar price hikes alleged herein.  For example, Beer told investors

6   during McKesson's June 25, 2014 investor day that in projecting generics sales growth, he

7   "extensively analyze[d] both the inflationary elements in the market place, plus the brand to generic

8   conversion that are taking place, usage and demand.  And we obviously analyzed all of the

9   information."  Defendants had continuous access to detailed drug-by-drug data gathered from both

10   customers' purchases and manufacturers' pricing to track profits from the collusive price increases.

11   Defendants often touted the "huge data analytics machine within McKesson where we provide data

12   and analytics to products, market share, customer bases that is extremely valuable to the

13   manufacturer."  In return, all manufacturers were required to submit data using the electronic data

14   interchange's standardized format.  McKesson's data exchange module was set up to be compatible

15   to the enterprise planning system commonly used by manufacturers.  Through its module, McKesson

16   collected data submitted by manufacturers, which included drug-by-drug information such as

17   pricing, quantity and sales.  List prices were loaded into McKesson's OneStop platform, with price

18   change notifications required to be sent to McKesson at least one day prior to the effective date of

19   the price change.  As described in a recent February 1, 2019 *Washington Post* article:

20          With generics making up about 90 percent of all prescriptions filed in the
21   United States, the scope of anti-competitive activity would be hard for wholesalers to
     miss, say economists.

22          "If they're looking carefully, it ought to raise a flag," said Karen Van Nuys, a
23   professor at the University of Southern California Schaeffer Center for Health Policy
     and Economics.  "I think they are conflicted if they are profiting from it, and that
24   makes it more complicated . . . for them to blow the whistle."

25          13.     Moreover, when specifically asked by securities analysts about the causes and

26   sustainability of the generic price increases driving McKesson's rebound, Defendants provided false

27   exculpatory explanations – attributing them to a non-existent materials shortages and/or a loss of

28   competitors. These false excuses provide further evidence of Defendants' consciousness of guilt – if

1  the price increases truly had been for non-collusive, legitimate and independent reasons, Defendants

2  would have had no reason to invent reasons for why they were done.

3      14.   Defendants had to conceal that collusive generic drug price increases were the

4  primary contributor to McKesson's massive boost in Class Period profits, so they repeatedly

5  attributed the massive price hikes driving the Company's rebound to normal market forces – in

6  particular, the effect of supply shortages.  This lie was critical because even the appearance of price

7  gouging or collusion could draw public outrage, law enforcement scrutiny, and civil and criminal

8  liability.  Further, market realization that the price increases were not the result of supply disruptions

9  would have drawn immediate outrage from the independent pharmacies McKesson was supposed to

10  serve.  Had Defendants revealed that the price increases were not the result of supply disruptions,

11  analysts, investors and the independent pharmacies would have known that McKesson was not, as it

12  repeatedly represented, operating in the marketplace to reduce costs for its customers, dramatically

13  increasing the risk of demands by the independent pharmacies for pricing concessions and/or

14  outright customer defections.  Had McKesson disclosed the true facts behind its core business

15  strategy of capitalizing on ever-increasing prices instead of working to drive them down, investors

16  would have valued McKesson very differently from a company that was outperforming while at the

17  same time serving its core function of driving pricing down for its customers.

18      15.   McKesson's stock price almost doubled during the Class Period, as Defendants

19  reported double-digit earnings per share ("EPS") growth due to collusive generic drug price

20  increases.  When the facts started coming out about McKesson's true operational and financial

21  results and its growth rate going forward, McKesson's stock price collapsed.

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19





20      16.     Evidence from the AG Complaint shows that the collusive behavior continued

21   through at least the fall of 2015 despite governmental investigations beginning in the fall of 2014.

22   With the government closing in, the collusive behavior was curtailed and the generic drug price

23   increases began to abate in late 2015/early 2016.  However, although the generic price inflation had

24   abated, Defendants told investors that reduced price inflation would not negatively impact

25   McKesson's double-digit EPS growth rates for FY17.  In fact, Defendants said that even with

26   "nominal" price inflation, McKesson had "de-risked" and had "limited" risk to its FY17 EPS targets.

27
28

17.     Yet, the opposite was true.  In October 2016 and January 2017, when McKesson reported its 2Q17 and 3Q17 results, the impact of the collapse of collusive pricing for generic drugs crushed McKesson's financial results.  On October 27, 2016, after the market close, McKesson reported that its EPS would be materially lower by $1.60-$1.90 per share – due primarily to pricing issues in its generic drug business.  McKesson's stock price declined 22.67% the next day on this news.  On November 3, 2016, the DOJ announced a sweeping investigation into suspected price collusion, and the price of McKesson stock declined 4.59%.  Finally, on January 26, 2017, the price of McKesson stock collapsed another $12.55 per share, or 8.3% to $138.55 per share on news released the night before that its financial results were below expectations due to the pressure of reduced generic drug pricing.  In all, McKesson's stock price declined from a Class Period high of over $240 per share to $138.55 per share – or 42%.

18.     McKesson's top executives benefitted from the fraud, selling approximately $473 million worth of McKesson common stock at inflated prices.  McKesson's CEO (Hammergren) personally dumped $287 million worth of McKesson common stock during the Class Period at prices inflated by Defendants' fraud.  All of Hammergren's Class Period sales were made while in possession of material adverse non-public information and contemporaneously with Plaintiff's and/or other Class members' purchases of McKesson common stock.  McKesson executives also benefitted in the form of increased compensation as a result of the inflated profits reported by McKesson.  After McKesson's stock price declined to its true value at the end of the Class Period, both Hammergren and CFO Beer left the Company.

19.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the value of the Company's common stock as the true conditions were disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

20.     The claims asserted herein arise under §§10(b), 20(a) and 20A of the Exchange Act (15 U.S.C. §§78j(b), 78t(a) and 78t-1), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and §27 of the Exchange Act (15 U.S.C. §78aa).

22.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because McKesson's headquarters are currently located within this District and Defendants conducted substantial economic activity in the District.  As such, substantial acts in furtherance of the alleged fraud have occurred in this District.

23.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**III.     PARTIES**

24.     Lead Plaintiff Pension Trust Fund for Operating Engineers is a multi-employer pension plan within the meaning of §3(37) of ERISA, 29 U.S.C. §§1002(37), that provides retirement benefits to employees such as heavy equipment operators, mechanics and drillers in Northern California, Northern Nevada, Utah and Hawaii.  As detailed in its certification (ECF Nos. 30-2, 30-3) and incorporated herein, Plaintiff purchased McKesson common stock on the NYSE during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  Plaintiff maintains its principal place of business at 1600 Harbor Bay Parkway, Alameda, California 94502.

25.     Defendant McKesson is incorporated in Delaware and its corporate headquarters are in San Francisco, California.  Effective April 1, 2019, the Company will relocate its corporate headquarters to Las Colinas, Texas.  McKesson's common stock trades on the NYSE under the ticker symbol "MCK."

26.     Defendant Hammergren was, at all relevant times, McKesson's CEO and Chairman, roles he had served in since 2001 and 2002, respectively.  Hammergren resigned on March 31, 2019.

27.     Defendant Beer was McKesson's Executive Vice President and CFO at all relevant times from October 9, 2013 until the end of the Class Period.  Beer announced his resignation on December 18, 2017.

28.     Defendants Hammergren and Beer are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions at McKesson, possessed the power and authority to control the contents of McKesson's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

29.     Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions that were being made were then materially false and/or misleading.

## IV.     FACTUAL ALLEGATIONS

### A.     A Brief Overview of the Generic Pharmaceutical Drug Market

30.     Generic pharmaceutical drugs – drugs that are pharmaceutically equivalent in dosage, form, route of administration, strength or concentration and have the same active ingredients as the reference-listed brand name drug – save consumers and our healthcare system tens of billions of dollars annually because they introduce competition into a market where none previously existed. When a high-priced branded drug comes off patent, generic drugs offer the prospect of lower prices and greater access to healthcare for all consumers in the United States.  In a January 31, 2012 report, the Government Accounting Office noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."

31.     Generic drugs have long been referred to as one of the few "bargains" in the U.S. healthcare system and historically healthcare experts have said that cost savings from the growing number of generic drugs have gone a long way toward keeping the lid on overall increasing healthcare costs.  This was the way the generic drug market was intended to work, and has generally worked, since the implementation of the Hatch-Waxman Act in 1984.

32.     Generic drugs are commodity products – standardized products that wholesalers such as McKesson can purchase from multiple manufacturers; thereby, driving price competition among drug makers.  In a normally functioning market, the generic drug manufacturers compete for market share, and if one manufacturer raises prices, the others will lower prices to capture its customers.

33.     Recently, however, that price dynamic changed for a large number of generic drugs.  Prices for dozens of generic drugs have uncharacteristically risen – some have skyrocketed – for no apparent reason, sparking outrage from public officials, payers and consumers across the country whose costs have doubled, tripled or in some cases increased up to 1,000% or more.  On January 8, 2014, the CEO of the National Community Pharmacist Association wrote a letter to Congress requesting an oversight hearing to determine the causes of the "huge upswings in generic drug prices."  The growing outrage and public reports of unexplained price increases caused the State of Connecticut to commence an investigation in July of 2014, which was followed shortly thereafter by a Congressional inquiry and a reported criminal grand jury investigation by the DOJ in November 2014.

34.     As part of its own investigation, Congress requested that the U.S. Government Accountability Office ("GAO") undertake an independent audit of the generic drugs that the federal government purchased by means of the Medicare Part D program.  The GAO performed its audit from June 2015 through August 2016 in accordance with generally accepted government auditing standards, requiring that the "evidence obtained provide[d] a reasonable basis for [the GAO's] findings and conclusions based on [its] audit objectives."[2]  Publicly released on September 12, 2016, the GAO's conclusions were significant, finding hundreds of unexplained "extraordinary price increases" – defined as a particular drug increasing over 100% within a 12-month period – and finding that some drug prices increased more than 1000%.  Similarly, the AGs alleged that "the prices for a large number of generic pharmaceutical drugs skyrocketed throughout at least 2013 and 2014. According to one report, "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014.""  AG Cpt., ¶110.

---

[2]     GAO, *Report to Congressional Requesters: Generic Drugs Under Medicare* (Aug. 2016), https://www.gao.gov/assets/680/679022.pdf

35.     McKesson and the generic drug manufacturers have argued publicly that the significant price increases were due to a myriad of benign factors, such as supply disruptions, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines.  What regulators have found through their investigations, however, is that "the reason underlying many of these price increases is much more straightforward, and sinister – collusion among generic drug market participants.  Prices of many generic pharmaceuticals were and remain artificially inflated through collusive bid rigging and market allocation agreements designed to prevent price wars from occurring when key competitive opportunities arise in the marketplace."  AG Cpt., ¶8.

36.     As detailed in the AG Complaint – filed by the Attorneys General of 47 states and the District of Columbia and Puerto Rico following a lengthy investigation into generic drug price increases – wholesalers, distributors and generic drug manufacturers operate through their respective senior leadership and marketing and sales executives in a manner that fosters and promotes collusion through routine and direct interaction.  Manufacturers exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements.  AG Cpt., ¶¶77-88.  McKesson routinely held conferences each year and invited generic manufacturers to attend.  *Id.*, ¶77.  The overarching conspiracy rested on "general rules of the road," whereby manufacturers did not take advantage of another competitor's price increase by lowering prices to gain market share, but instead allowed each competitor to have a certain percentage of market share "based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry."  *Id.*, ¶¶90-91.  The anticompetitive agreements are further refined and coordinated at regular "'industry dinners,'" "'girls nights out,'" lunches, parties, and numerous and frequent telephone calls, emails and text messages.  *Id.*, ¶¶9, 81-88.

37.     According to the AGs' motion for a separate government track filed on November 14, 2017, the states developed the AG Complaint based on the cooperation of the former CEO and the former President of Heritage and a review of "a legion of documents, emails, phone records and text

1   messages."[3]  Heritage's former CEO Jeffery Glazer ("Glazer") and former President Jason Malek

2   ("Malek") entered into settlement agreements with the state Attorneys General on May 24, 2017 and

3   agreed to cooperate with the Attorneys General's investigations, including providing "all pre-

4   existing information, documents or other tangible evidence," market data and information, and all

5   facts relating to the investigations without the service of subpoena.  The Attorneys General anticipate

6   filing additional complaints, and "such future actions will be based on evidence that does not focus

7   as centrally on Heritage as this complaint does."  *Id.* at 4 n.6.

8         38.    Glazer and Malek pleaded guilty to price-fixing charges on January 9, 2017 and

9   January 10, 2017, respectively.  Sentencing is scheduled for September 26, 2019.  The DOJ stated

10  that its "criminal investigation into the generic pharmaceuticals industry is ongoing and broad-

11  ranging, and it has already implicated numerous corporations and individuals.   Additional

12  corporations and individuals may be implicated as the investigation continues to develop."

13        39.    Michael Cole, head of the Connecticut AG's office, further suggested that

14  wholesalers like McKesson are possible future subjects of the Attorneys General's probe.   As

15  reported by NPR on March 7, 2018:

16          "In a market that has only three or four really large distribution organizations,
        they are sometimes tempted to maximize their own profits in a way that does not
17        always 100 percent reflect the best interest of their clients," [Ronny] Gal says.

18          This is what investigators are looking at now.  In their complaint, they
        suggest – but don't allege – that the price-fixing conspiracy also involved drug
19        distributors.  Prosecutors are sending more subpoenas and planning a new complaint.

20          "***It could be more generic manufacturers, it could be more drugs, it could
        be more entities in the distribution chain.  It could be all of that***," Cole, of the
21        Connecticut attorney general's office, says.

22        40.    On December 11, 2018, commenting on a *Washington Post* article about how the

23  price-fixing investigation had expanded to at least 300 drugs, Connecticut Attorney General George

24  Jepsen's spokesperson stated:  "'As Attorney General Jepsen has stated in the past, the current

25  litigation is just the tip of the iceberg in terms of the scope of the industry wide investigation . . . .

26

27        3    Memorandum of Law in Support of Motion by the Plaintiff States for a Separate Government
    Track, *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-MD-02724 (E.D. Pa. Nov. 14, 2017)
28  (ECF No. 525-2), at 4 n.6, 7.

1    While we anticipate further action in the future, we are focused on our investigation and pending

2    litigation at this time.'"

3       **B.    McKesson Is One of Three Dominant Pharmaceutical Wholesalers in the United States**

4

5       41.    Founded in 1833, McKesson is the largest wholesale distributor of prescription drugs

     in the United States.  The three leading wholesalers – McKesson, AmerisourceBergen, and Cardinal

6

7    Health – dominate close to 85% of the market and have maintained stable relative market shares for

     over a decade:

8



Wholesalers Market Share

9

10

11

12

13

14

15

16

17       42.    As a wholesaler, McKesson purchases prescription drugs from manufacturers and

18   sells them to customers such as independent pharmacies, healthcare providers, and national retail

19   chains.  In the process, it provides distribution services to manufacturers by delivering the products

20   to customers.

21       **C.    McKesson's Financial Results Were Lackluster Prior to the Class Period**

22

23       43.    With its market share vis-à-vis the other two big wholesalers relatively constant over

24   time, McKesson sought to grow profitability through acquisitions, but saw only mediocre results.

25   For the seven years prior to the Class Period, McKesson embarked on an acquisition spree acquiring

26   44 companies.  But the Company remained stagnant as operating profit growth in the distribution

27

28

solutions segment[4] was a meager 3% on a compounded annual growth rate basis in the four years prior to the Class Period:



**Distribution Solutions Segment
Fiscal Year Operating Profit**

44. During McKesson's May 7, 2013 4Q13 earnings call, Defendants announced that the Company expected a "significant pivot" in financial performance in the upcoming FY14. Analysts were surprised after seeing years of 3% growth, and sought clarification during the call. One analyst stated "[t]he Street was looking for about 2.6% revenue growth in fiscal '14. My sense is that steep pivot and significant rebound are more than 3% growth." In response, Hammergren stated that "much of our view on revenue growth is driven just by the growth our customers are going to . . . see this year, and the lack of a dilutive effect of significant generic launches."

45. Within two months, during its annual investor day, McKesson pre-announced that 1Q14 earnings would be "unusually strong," driven by "manufacturing economics." Indeed, during the 1Q14 earnings call on July 25, 2013, Hammergren announced "strong growth across our portfolio of generic pharmaceuticals, driven in part by favorable pricing," resulting in a 25% gross profit increase for the quarter. Analysts were again surprised at McKesson's outperformance and

---

[4]   McKesson reports financial results for two business segments – the distribution solutions segment and the technology solutions segments. During the Class Period, the distribution solutions segment included pharmaceutical distribution and services and medical-surgical distribution and services. The distribution solutions segment, which includes the U.S. pharmaceuticals distribution business, accounted for close to 98% of McKesson's revenues during the Class Period.

1   asked Hammergren for "a little bit more detail[ ] as to what you're seeing at the manufacturer level

2   that is maybe translating into such decent margins for you guys?"  Hammergren responded that "we

3   are [a] little dependent on how . . . those generic manufacturers behave over time.  And I think it is

4   really too early to make an industry call relative to trends."

5        **D.**    **Generics Inflation Drove McKesson's Profitability Rebound**

6        46.    On October 24, 2013, the first day of the Class Period, Hammergren had to provide

7   investors with an explanation for the "significant [growth] pivot," as the distribution solutions

8   segment's operating profit had spiked again in 2Q14.  Hammergren falsely attributed the 18%

9   increase to generic drug price inflation driven by supply disruption, stating "we continue to

10   experience favorable pricing on certain products in our generics portfolio, principally driven by a

11   few products where there has been supply disruption."

12        47.    On the same day, Defendants raised McKesson's full year 2014 guidance with the

13   expectation that the supply disruptions would continue into the remainder of FY14.  Based on the

14   continuation of generic drug price increases purportedly driven by supply issues, together with

15   McKesson's 1Q14 and 2Q14 outperformance, Defendants raised the Company's full year adjusted

16   earnings per diluted share from a range of $8.05 to $8.35 to a higher range of $8.40 to $8.70.

17        48.    Throughout the Class Period, Defendants continued to attribute McKesson's strong

18   performance to generic drug price inflation.

19        49.    On February 25, 2014, Beer announced that, "[o]n the distribution – pharmaceutical

20   distribution side, the generics business has been particularly strong this past year, seeing benefits out

21   of both the pricing environment but also the raw volume of the number of our customers who have

22   taken more of their volume through our channels and so forth."  Gross profit for the distribution

23   solutions segment grew 27% in 3Q14.

24        50.    On June 25, 2014, Beer told investors:  "In terms of manufacturer economics, both on

25   the branded side and on the generic side of the business, this translates through into benefits for us

26   around price increases."  On May 12, 2014, he had announced that 4Q14 "Distribution Solutions

27   adjusted gross profit increased 30% for the full year on a 13% increase in segment revenues,

28   resulting in a 31-basis-point improvement in our adjusted gross profit margin year over year."

51.     On July 31, 2014, Beer announced 1Q15 results and stated, "as John mentioned, this quarter we recorded solid growth across our portfolio of generic and branded pharmaceuticals, driven in part by the timing of certain generic and brand price increases, which came earlier in the fiscal year than we had originally planned.  On a constant-currency basis, revenues increased 15%."

52.     On September 9, 2014, Beer stated that "[i]t has certainly been an important financial driver in the last few quarters.  What we said at the outset of the year when we gave our annual guidance was that we expected high single digit growth from generic price increases or importantly, generics that are beyond their exclusivity period so a little more mature than the brand new brands to generic conversion drugs.  We see this playing out thus far so we are very much speaking to that view for the full year."

53.     On March 3, 2015, Beer gave a preview of McKesson's upcoming guidance: "We give guidance as to our expectations for the key drivers of our overall business model for the fiscal year, and one of those drivers will, again, be generic price inflation."

54.     On May 13, 2015, he repeated that "we talked about a few of the factors in our guide yesterday.  Obviously generic price increases were an increasingly important factor during fiscal 2015 and I think that will be the case again in 2016."

55.     On September 16, 2015, Beer explained that "generic inflation, as you know, is one of several assumptions that we define, we list out when we give our guide for each year.  And then we update all of you each quarter as we go along on those assumptions.  So anything that's on that list is going to be important, obviously."

56.     During the January 11, 2016 investor conference, Hammergren summed up McKesson's performance over the prior several years as driven by generic drugs price inflation: "It's one thing to have price inflation in the generic focus, it's another thing to capture value for our shareholders when that inflation occurs. And we did a marvelous job of accomplishing that over the last several years, and benefited from it."  Indeed, from the time of Hammergren's announcement of a "significant pivot" in May 2013 to the announcement of 2015 year-end earnings, McKesson's stock price more than doubled:



57.     McKesson's "significant pivot" in profitability was made possible by massive generic drug price hikes, and its wholesale business benefited from the price increases in three ways: (1) selling inventory at inflated list prices; (2) generating revenues with markups tied to the inflated list prices; and (3) collecting higher discounts from manufacturers based on the inflated list prices. With inventory purchased before the price hike, McKesson would receive all three benefits. Even if McKesson purchased the drug at the inflated price, McKesson still benefited from higher markups and discounts. The Company simply purchased generic drugs from manufacturers at inflated prices and passed them through to the pharmacies while taking an ever-larger "discount" for itself as prices rose.

58.     The following illustration of a generic drug whose price was artificially increased by 372% demonstrates how dramatically price hikes impacted McKesson's gross profit and gross margin. The illustration assumes McKesson sets it markup to independent pharmacies at 2% and discount at 17% of the list price. [5]

---

[5]     According to research published by the USC School of Pharmacy, the average wholesaler gross margin on generic drugs was approximately 18.5%. *See* Neeraj Sood, *et al.*, *Flow of Money Through the Pharmaceutical Distribution System,* USC Sch. of Pharm. (June 6, 2017).

| Illustration of 372% Generics Price Increase on McKesson's Gross Profit and Gross Margin | | | | |
|---|---|---|---|---|
| Component | Base Case | Effect of 372% Price Increase Assuming MCK's Existing Inventory Is Sold | Effect of 372% Price Increase Assuming MCK Purchases and Sells New Inventory | Calculations |
| [A] List Price | $100.00 | $472.00 | $472.00 | Price Set by Manufacturer |
| [B] MCK's Customer Pays 2% Markup on the List Price to MCK | $2.00 | $9.44 | $9.44 | [A] * +2% |
| [C] MCK's Revenue @ List Price Plus 2% Markup to List Price | $102.00 | $481.44 | $481.44 | [A] + [B] |
| [D] MCK Receives 16.9% Discount on List Price from Manufacturer | ($16.90) | ($16.90) | ($79.77) | Base Case: $100.00 * -16.9% Existing Inventory: $100.00 * -16.9% New Inventory: $472.00 * -16.9% |
| [E] MCK's Cost @ List Price Less 16.9% Discount from Manufacturer | $83.10 | $83.10 | $392.23 | Base Case: $100.00 - $16.90 Existing Inventory: $100.00 - $16.90 New Inventory: $472.00 - $79.77 |
| [F] MCK Gross Profit | $18.90 | $398.34 | $89.21 | [C] - [E] |
| [G] MCK Gross Margin | 18.5% | 82.7% | 18.5% | [F] ÷ [C] |
| [H] Change in MCK's Gross Profit From Base Case | N/A | $379.44 | $70.31 | Base Case: N/A Existing Inventory: $398.34 - $18.90 New Inventory: $89.21 - $18.90 |
| [I] Percentage Change in MCK's Gross Profit From Base Case | N/A | 2008% | 372% | Base Case: N/A Existing Inventory: $379.44 ÷ $18.90 New Inventory: $70.31 ÷ $18.90 |

59.     In the base case scenario (shown in column two), in which there is no price inflation, the wholesaler's gross profit is $18.90, or the difference between McKesson's $102 revenue and the wholesaler's $83.10 cost of sales.  McKesson's gross margin for this generic drug is 18.5%.

60.     When the drug price is artificially increased by 372%, McKesson's gross profit dramatically increases.  When McKesson sold existing inventory that was purchased at the $100 base case price at the new price inflated by 372% (shown in column 3), McKesson profited in three ways: (1) $372 from the inflation of the list price; (2) $9.44 from the 2% markup on the inflated list price; and (3) $16.90 from the 16.9% manufacturer's discount from the list price.  In that scenario, McKesson's gross profit increases from $18.90 for the base case to $398.34 – a $379.44 increase in the gross profit, or 2008%.  McKesson's gross margin also increases from 18.5% for the base case to 82.7%.

61.     In the scenario where McKesson purchased new inventory at the inflated $472 list price (shown in Column 4), it sold the new inventory purchased from manufacturers at $481.44 with the 2% markup, generating $9.44 from the markup.  McKesson also received a discount of $79.77 from the 16.9% discount on the inflated price of $472.  Together, the $9.44 markup and the $79.77

1    discount generated gross profit of $89.21.  Thus, McKesson's gross profit increased from $18.90 for

2    the base case to $89.21 – amounting to a $70.31 increase.  The gross profit increased by 372% and

3    the wholesaler's gross margin remained at 18.5% for this particular generic drug.

4          62.    Given the immediate and immense effect of massive price hikes on profitability,

5    McKesson was highly incentivized to facilitate and/or allow price increases, which drove the

6    Company's "significant pivot" in profitability.  Indeed, as Beer had acknowledged on January 27,

7    2016, the generic drugs that were driving McKesson's profitability were "inflated to a very high

8    degree."

9          **E.    Defendants Misled Investors About the Reasons for and Sustainability
               of McKesson's Growth**

10         63.    Analysts, in an effort to determine the sustainability of McKesson's financial

11   outperformance, sought explanations for the generic drug price inflation, because for commodity

12   products such as generic drugs, manufacturers typically compete on price and cannot substantially

13   increase prices without losing sales and market share.  This is because in a properly functioning

14   market, wholesalers like McKesson and other buyers would use that competition to drive prices

15   down.  However, during the Class Period, McKesson did not use its leverage to reduce prices

16   because it was incentivized to increase prices in order to grow its own profits.  In order to conceal

17   this from investors, customers and other market actors, Defendants continuously misrepresented the

18   true source of the Company's profitability by repeatedly claiming that the generic drug price

19   inflation was caused by supply disruptions on a small number of products:

20       • Hammergren on October 24, 2013: "In the second quarter, we continue to experience
           favorable pricing on certain products in our generics portfolio, principally driven by
21         a few products where there has been supply disruption."

22       • Hammergren on November 12, 2013, in response to an analyst's question about
           drivers of "a fantastic fiscal second quarter": "I might also mention clearly there
23         ha[ve] been some supply issues associated with generics in the market and some of
           those supply issues might have caused more price inflation on certain products than
24         might have otherwise existed in a normal steady state."

25       • Hammergren on January 13, 2014, in response to an investor's question on drivers of
           generics inflation: "It is not all the manufacturers and it is not all the product. It is in
26         a very small area and we think a lot of that price opportunity has been delivered to the
           manufacturers because of issues associated with the supply."
27

28

- Beer on September 9, 2014, in response to an analyst's inquiry of McKesson's view of generics inflation in the marketplace: "So it is very much supply disruption driven in our view and of course, we are seeing that happen in a relatively small proportion of the generic manufacturers and within those manufacturers, a relatively small proportion of their molecules, their drugs. Where we do see a price increase occurring around a molecule, it can sometimes be quite high. So that is the situation that we are seeing play out around generic price inflation."

- Beer on June 24, 2015, in response to an analyst's question on drivers and trends of generics inflation: "[W]e continue to see the underlying drivers as some sort of supply disruption whether it's the FDA backlog, whether it's the FDA actions around a particular manufacturer's planned or line, or whether it's an individual manufacturer taking a decision around their own capacity, consistent with our own capital return goals."

64.     Defendants not only claimed that the supply disruption was causing the massive price increases, but also assured investors that it would persist:

- Beer on May 20, 2014, in response to an analyst's question on whether he was seeing resolution of supply disruption: "And we would also continue to expect that those drugs prices would be increasing as a result of some sort of supply disruption. . . . But we would continue to expect those supply disruptions to really be the driving force underpinning those expected price increases."

- Beer on June 11, 2014, in response to an analyst's question on drivers and sustainability of generics inflation: "I think what has been driving it in this past year, fiscal 2014, and what we are expecting to continue into 2015, is really some measure of supply disruption."

- Beer on January 13, 2015: "So, some sort of driver of supply disruption and as we see things today, we don't expect that to change."

- Beer on March 3, 2015, in response to an analyst's question on whether he would consider manufacturers failing FDA inspections a transitory phenomenon: "I think the FDA has a significant challenge ahead of itself to be able to, in essence, assure the quality of the drugs being produced in all the different countries and different plants around the world. So I wouldn't necessarily say or necessarily assume that the FDA issues that I refer to are transitory."

- Beer on June 9, 2015, in response to an analyst's question on continuation of an inflation environment: "[W]e've talked about there being really three drivers of the generic price increases in the last couple of years or so. And at the heart really it's some sort of supply disruption that has been driving those price increases . . . . And we don't see anything particularly different out into the future in any of those three regards . . . ."

- Beer on June 24, 2015, in response to an analyst's question on the driver of generics inflation and how it was trending: "[W]e continue to see the underlying drivers as some sort of supply disruption whether it's the FDA backlog, whether it's the FDA actions around a particular manufacturer's planned or line, or whether it's an individual manufacturer taking a decision around their own capacity, consistent with our own capital return goals. So we don't see any change in that dynamic."

65.     In truth, as set forth below, it was coordinated price hikes – and not supply disruption – that caused the generics inflation and drove McKesson's profit growth.  Further, the number of drugs that had price increases was not "small," but instead comprised at least 84 high-volume generic drugs that garnered more than $33.1 billion in sales during the Class Period:[6]



McKesson's market share was 23%.  As shown at ¶¶58-62 above, the generic drugs with price increases that were "quite large in percentage terms" generated multiplier effects on profits.

### F.     McKesson Facilitated and/or Allowed the Massive Price Hikes, Abandoning Its Obligation to the Company's Investors

66.     During the Class Period, McKesson wielded significant power in controlling generic manufacturers' access to pharmacies and customers who bought generic drugs.  McKesson unabashedly touted that power: "[I]f you think about it, when you come to McKesson as a manufacturer, we give them access to over 100,000 customer locations."  McKesson was supposed

---

[6]     Appendix 1, attached hereto, is a non-exhaustive list of high volume generic drugs that had price increases of 50% or more and/or were artificially inflated through market allocation during the Class Period.  At the time of the price hike, these drugs had no supply or production issues to justify the price increase.  There were no clinical investigator inspections, no drug safety labelling changes, no post-market requirements and commitments studies required by the FDA to assess possible serious risks associated with the drug, no FDA notification of drug shortages, no change in formulation, and no new patents that caused the price inflation.  Drug manufacturers are required by the Food and Drug Administration Safety Innovation Act of 2012 to report potential drug shortages to the FDA.

1  to use that power to negotiate lower drug prices for its customers.  Hammergren told investors this

2  was the Company's strategy around generic drugs – "we can create an opportunity for customers to

3  benefit from sourcing their generics 100% through McKesson we can bring that market share into

4  the market with the manufacturers and deliver real value to both our manufacturing partners as well

5  as our pharmacy customers."

6        67.    For customers such as the independent pharmacies – which tend to be small

7  community-based businesses that are unlikely to directly negotiate with and purchase from generics

8  manufacturers – McKesson purportedly used its OneStop Generics Program ("OneStop") to

9  aggregate their purchase volume and drive prices down.  OneStop is an on-line platform developed

10  by McKesson to enable pharmacies to purchase all forms of generic drugs.  On January 13, 2015,

11  Hammergren described the platform as a driver of McKesson's success by enabling aggregation of

12  volume to create combined market share to derive "better value" to customers:

> [O]ur one-stop generic portfolio of products, where we take the aggregate value or volumes I should say of our customer's purchases and go to the marketplace to create value for the manufacturers has been growing at a very significant rate, in excess of 20% since FY03 and this ability for us to bring combined market share to our manufacturing partners and in turn deliver better value to our retail and hospital customers has been an important aspect of our success in the last ten years.

        68.    Analysts gave credence to Defendants' representations that the Company used its

customers' market power to drive competition among manufacturers, resulting in cost effective

generic drugs for its customers.  As stated by an analyst on October 16, 2014:

> Focused on driving pricing synergies from a limited number of competitively identified suppliers, OneStop provides a cost effective, single source generics option for the company's institutional and retail distribution clients.  Virtually every generic pharmaceutical option can be purchased at McKesson OneStop by the company's customers.

        69.    As a middleman between generic drug manufacturers and the independent

pharmacies, McKesson purportedly negotiated the list prices, also known as the wholesale

acquisition costs, on behalf of its customers.  It purchased generic drugs from the manufacturers at

list price and sold them to independent pharmacies at list price plus a markup.  Separately,

McKesson negotiated and extracted discounts from the manufacturers as part of its service.  Both the

discounts and markups were based off of the list prices.

70.     In practice, McKesson used its access to market share, which came from the aggregated purchase volumes of its customers, to extract substantial payments from the manufacturers in the form of discounts set as a percentage of the higher list prices.  With the primary focus of extracting profits for the itself rather than keeping drug prices low, McKesson was interested in higher pricing combined with higher discounts and markups to boost its own revenues and profitability.

71.     During the Class Period, manufacturers implemented lockstep increases to the list prices on a multitude of drugs.  Manufacturers also maintained inflated generic drug prices through various anticompetitive agreements, including market allocation schemes.  McKesson knew about and, in some cases, participated in, the massive price hikes and collusive market allocation schemes.  Although McKesson had the power to slow or altogether prevent the rampant generic drug price inflation, and despite the fact that Defendants told investors that McKesson was using its customers' aggregated volume as leverage to reduce prices, the Company failed to do so, and chose instead to profit from the schemes.  Section IV.D. above describes how McKesson benefited from the massive price hikes.

72.     In the process, McKesson also benefitted from the manufacturers' allocation of market share to ensure that the cooperating manufacturers also received their "fair share."  As stated in the AG Complaint, "'[f]air share' is an approximation of how much market share each [manufacturer] is entitled to, based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry."  AG Cpt., ¶90.  When manufacturers "'play[] nice in the sandbox,'" they would be entitled to their "'fair share.'"  *Id*., ¶104.  "'Fair share'" and "'playing nice in the sandbox'" were terms of art within the industry and also used not only among generics manufacturers "in discussions with each other in order to reach agreement regarding allocation of market share and pricing, but also with their customers."  *Id*., ¶105.  McKesson's own manufacturer, NorthStar, received its "'fair share,'" as did McKesson as a wholesale customer.

73.     Without McKesson's participation, the "'fair share'" market allocation would not be possible.  For example, as outlined in the AG Complaint, for the generic drug Doxy DR,

1   McKesson's participation in the co-conspirators' market allocation scheme was crucial to the

2   manufacturers' agreements.  McKesson had maintained a strong relationship and strategic alliance

3   with conspirator Heritage since at least 2013.  On the basis of that relationship, Heritage became

4   McKesson's primary supplier of Doxy DR on June 27, 2013, and maintained that status until at least

5   June 18, 2018.  In the interim five years, at least one of Heritage's competitors, Mayne, submitted

6   multiple unsuccessful bids to win McKesson's business.  Heritage told Mayne that McKesson, as

7   part of its strategic alliance with Heritage, would not move its business.  Notwithstanding the

8   warning, Mayne bid for McKesson's Doxy DR business in April 2014, but McKesson refused to

9   shift even part of its business away from Heritage.  Ultimately, Heritage's CEO Jeffrey Glazer and

10  President Jason Malek were convicted and pleaded guilty to entering into "continuing agreement,

11  understanding, and concert of action" with co-conspirators "to allocate customers, rig bids, and fix

12  and maintain prices for doxycycline hyclate sold in the U.S."  The guilty pleas included Glazer's and

13  Malek's illegal agreements used to win and retain McKesson's business for Doxy DR.

14          74.     The details of the collusive activity surrounding Doxy DR, and McKesson's role, are

15  laid out in the AG Complaint.  *See* Ex. A at 49-61.[7]  In particular, as detailed in the AG Complaint,

16  in April 2013, less than two months after obtaining FDA approval for the drug, Heritage took

17  Mylan's place as McKesson's primary supplier of Doxy DR by leveraging its "'strong business

18  relationship'" with McKesson and agreeing not to pursue other Mylan accounts.  On May 8, 2013,

19  Heritage's CEO Glazer called Mylan's President Rajiv Malik ("Malik") to agree on a "'fair share'"

20  of 30% of the market for Heritage.  Glazer told Malik that Heritage could achieve the 30%

21  "'significant market penetration'" through its "'strong business relationship'" with McKesson and

22  another customer.  After Malik agreed to "'play fair'" and concede the McKesson business in

23  exchange for an agreement that Heritage would not pursue other Mylan accounts, Heritage's

24  President Malek met with a senior executive from McKesson during the June 2, 2013 and June 5,

25  2013 Healthcare Distribution Management Association conference to discuss Doxy DR and other

26  potential product opportunities.  In less than two weeks, on June 18, 2013, a McKesson senior

27

28  _____

    [7]    Exhibit A is an excerpt from the AG Complaint.

1    manager emailed Lance Wyatt of Mylan informing him of an "'unsolicited bid'" received by

2    McKesson for Doxy DR and gave Mylan three days to submit a bid to retain its business.  Pursuant

3    to its agreement with Heritage, Mylan did not submit a bid.  On June 27, 2013, McKesson signed a

4    distribution agreement with Heritage that made Heritage McKesson's primary supplier for Doxy DR.

5           75.    Less than eight months later, Heritage's competitor Mayne entered the Doxy DR

6    market, and desperate to gain market share, submitted competing bids to McKesson without any

7    success because of McKesson's strong strategic alliance with Heritage.  As alleged in the AG

8    Complaint, Gloria Peluso-Schmid ("Peluso-Schmid") – a Director of National Accounts at generics

9    manufacturer Mayne – attempted to take McKesson's business from Heritage when Mayne entered

10   the market for the generics drug Doxy DR in February 2014.  AG Cpt., ¶225.  On April 9, 2014,

11   Peluso-Schmid of Mayne informed Heritage's National Account Manager Anne Sather ("Sather")

12   during a three-minute phone call that Mayne had put an offer to McKesson for Doxy DR.  *Id*., ¶226.

13   Sather, after her conversation with Malek, texted Peluso-Schmid to inform Mayne that her "'"boss

14   said since we are strategically aligned with [McKesson and Econdisc] they will probably not

15   move."'"  *Id*.  Peluso-Schmid  responded with desperation: "Need volume.  Need one Large

16   account."  But, despite Mayne's desperate bid for business, McKesson did not accept the competing

17   bid.  *Id*., ¶228.  Despite the fact that there was new competition in the market actively seeking

18   McKesson's business, the price of Doxy DR did not move.

19          76.    Mayne tried for the business again in November 2014.  *Id*., ¶228.  Ultimately, in order

20   to maintain the inflated price, Heritage decided to cede Doxy DR market share to Mayne by walking

21   away from another customer in exchange for Mayne's removal of its new Doxy DR bid to

22   McKesson.  CEO Glazer confirmed in an internal email that "Heritage was 'walking away from one

23   [customer, Econdisc,] so pricing would stabilize'" and that Heritage "'wanted to give [Mayne]

24   market share so they stop eroding' the price of Doxy DR."  *Id*., ¶236.  Thus, Mayne did not bid for

25   McKesson's business based on the understanding that McKesson was with Heritage and would not

26   move its business.  Ultimately, McKesson and another retailer made up 80% of Heritage's Doxy DR

27   sales.

28

77.     McKesson, Heritage and Mayne all benefited from the scheme in the Doxy DR market.  As the AG Complaint concluded, "[a]s a result of Heritage's unlawful agreement with Mayne, pricing for Doxy DR has been substantially higher than it would have been in a competitive market."  AG Cpt., ¶241.  Because McKesson's profits were largely derived from discounts, McKesson extracted a larger discount because of the high list prices for Doxy DR than it would have obtained from the lower list price that would have resulted from a competitive market.  Heritage and Mayne also profited from the higher list prices.  Further, as alleged in the AG Complaint, Heritage also recognized that generics price increases ultimately impacted distributors' executive compensation and noted "'[t]hese increases help customers w/ Annual Incentives.'"  *Id.*, ¶75.

78.     While McKesson and the manufacturers propped up prices for their mutual benefit, the scheme had devastating effects on the Company's customers, particularly the independent pharmacies.  Unlike large chains or supermarkets such as CVS, Walgreen and Wal-Mart, independent pharmacies are smaller entities unlikely to directly negotiate with and purchase from generics manufacturers.  Independent pharmacies purchased generic drugs from wholesalers, such as McKesson, almost exclusively.  As Hammergren acknowledged, "independents became much more dependent on our assistance in helping them do a good job of sourcing product and delivering it to their stores," and such customers were "relying more and more on our generic capabilities and now depending on us to source the right products at the right price for them."  McKesson and the manufacturers exploited the independent pharmacies' dependence and reliance through collusive pricing.

79.     Nevertheless, Defendants repeatedly, and falsely, represented to investors that the Company used its leverage to negotiate competitive pricing on behalf of its customers:

- Beer on May 13, 2015: "[W]e buy at scale in an extremely efficient way and are able to pass through the benefits of those drug prices to those independent stores who are obviously competing locally against much bigger chains."

- Walchirk, President of McKesson's U.S. Pharmaceutical Group, on June 24, 2015: "[W]e continue to drive tremendous growth in our OneStop program, really because of a number of different factors.  Certainly competitive price position . . . [a]nd certainly, we continue to access a wide range of manufacturers across the generics environment, and that flexibility from a sourcing standpoint again allows us to make sure we have a competitive price in the marketplace."

- Hammergren on July 29, 2015: "[W]e have to stay extremely disciplined and diligent around making sure that our customers are also benefiting through our action in the supply chain. That's been our priority and will remain our priority."

- Hammergren on November 10, 2015: "We've been working to bring our value to our customer base, our ability to aggregate scale and help our customers buy at a competitive rate."

- Beer on January 27, 2016: "Many of our independent customers have continued to join us in the generic procurement side, and have become more and more reliant on McKesson's ability to help them reduce their cost and improve their performance."

- Beer on September 13, 2016: "So the reason[s] that Health Mart has grown nicely over recent years, and consistently so, have been many. But I think you can summarize them around bringing to the independent pharmacy attractive drug pricing. So that feeds back into the One Stop program, our sourcing volumes, our capability to buy drugs at attractive prices and share that pricing with the independent pharmacy."

- Hammergren on November 8, 2016: "We have done a really good job, I think of evolving our value proposition, particularly to our independent pharmacy customer base as we continue to grow our capabilities and help them perform better as independent stores. As you know, we aggregate them together, we help them get into narrow networks, we help them contract with all of the providers or payers, I should say, and we help them purchase generics in a very competitive – on a very competitive basis."

80.     Contrary to their statements, Defendants exploited McKesson's customers and patients' generic drug needs to benefit the Company by collecting higher and higher discounts for itself as the list prices increased and/or were prevented from falling. The lockstep price increases occurred while market share remained steady. The price increases were not due to a raw material shortage, spike in production costs or restrictive regulations, which are often associated with a rise in prices.

81.     As Connecticut Assistant Attorney General Michael E. Cole stated: "'Rather than the wholesalers being the gatekeeper, it was the fox guarding the henhouse . . . . The wholesalers should be the sentinel here.'" Similarly, the Attorneys General announced that "the states' investigation involves allegations of conspiracy and collusion within the entirety of the generic drug industry, and wholesalers . . . are certainly players within the industry."

82.     McKesson's extraction of outsized profits from ever-increasing generic drug prices was not sustainable due to increasing political pressure and scrutiny from government authorities and market participants (which constrained manufacturers' ability to increase list prices). This caused

1    generic drug prices to stagnate and decline.  In addition, as McKesson's customers realized that sky-

2    high generic drug prices were due to artificial forces rather than the natural forces (*i.e.*, supply

3    disruptions) McKesson had attributed them to, they demanded significant price concessions.

4          83.    While the role of McKesson in the supply chain is well known, the size of the

5    discounts and other fees it extracted from manufacturers for access to market share are carefully

6    guarded secrets.  Drug manufacturers and McKesson depend on the lack of transparency to conduct

7    their business.  As characterized by former CFO James Campbell: "In our business, our policy is we

8    don't talk about specific customers or manufacturing relationships . . . ."  Even sales volume is kept

9    tightly under wraps.  As Beer stated on September 30, 2014: "We haven't spoken about the scale of

10   generic volumes either from Celesio or from other parts of our business.  We don't disclose that."

11   Hammergren told investors that McKesson does not disclose the details of its negotiations with

12   manufacturers, but assured investors that the Company was highly attuned to the market, stating that

13   "we are extremely intimate globally to these manufacturers, we understand what they are doing

14   around the world on a real-time basis."

15         84.    The secretive nature of McKesson's discounts and fees kept its shareholders in the

16   dark.  Defendants' false statements misled investors about the true nature and sustainability of its

17   profitability and obscured the risk that the Company would not meet its financial forecasts.  Without

18   knowing the true amount of discounts and the true causes of generic drug price inflation, investors

19   were not able to determine the likelihood that McKesson would maintain its growth.

20         **G.    McKesson's NorthStar Subsidiary Colluded in the Generics Market**

21         85.    During the Class Period, McKesson also used its wholly-owned subsidiary,

22   NorthStar, to drive margin expansion by engaging in collusive activities in the generic drug market.

23         86.    NorthStar is a private label generic drug manufacturer that has been owned by

24   McKesson since 2002.  The Company designated NorthStar as an entity that could expand its thin

25   distribution margin by "go[ing] up the chain a little bit if you will, and captur[ing] some of the

26   manufacturing margin."

27         87.    In addition to expanding McKesson's profit margin, the Company stated that "an

28   important part" of the NorthStar strategy was to enable to the Company to reach "further back in the

1  supply chain to have really . . . more impact and leverage and control" over generic products.

2  During the Class Period, Hammergren stated that NorthStar had enabled McKesson to gain a "closer

3  relationship with the [generic] manufacturers" and served as a vehicle through which "all of

4  McKesson" received reconnaissance on the generics market:

5          The visibility we get through Northstar enhances our view of the
         opportunities that exist globally for us as well as some of the challenges that may
6          exist, whether it's plant closures, limited supply of raw materials, or other issues that
         may come along. That Northstar experience helps inform all of McKesson from a
7          sourcing perspective in a very positive way.

8          88.    While the Company did not specifically disclose NorthStar's financial results,

9  Defendants frequently discussed the significance of NorthStar and its role in driving McKesson's

10  profitability:

11      •   Hammergren on January 13, 2014: NorthStar "has been an important part and a
            meaningful contributor to our overall profitability."
12
        •   Mark Walchirk, President of U.S. Pharmaceutical, on June 25, 2014: "We continue
13            to invest in NorthStar.  We continue to bring and introduce new molecules, new
            product families to NorthStar.  And this has also been I think a very important part of
14            our success in the generics space."

15      •   Paul Julian, Group President of McKesson Distribution Solutions, on June 25, 2014:
            "NorthStar has been very successful for us in the United States. I would say it has
16            succeeded [sic] our expectations."

17      •   Hammergren on July 31, 2014: "Even our standard RX business has been supported
            by robust growth really across the board.  And the continued uptake of our generic
18            portfolio, the strength of NorthStar; our ability to continue to bring market share to
            our customer base; and the strength of On[e]Stop, our generic program in our
19            markets continues to remain very strong.  So I really feel like the businesses in North
            American pharmaceuticals are performing very well."
20
        •   Walchirk on June 24, 2015:  "[W]e are above a decade now of our NorthStar private
21            label.  That's been an important growth vehicle for us in generics."

22      •   Julian on June 25, 2014: "[W]e have 12,000 pharmacies that are virtually looking to
            McKesson to enable them to be successful . . . they are buying our private label
23            offerings, they are on our generics program."

24          89.    In fact, NorthStar was so successful and profitable that McKesson duplicated it in

25  Canada and Europe.

26          90.    Throughout the Class Period, McKesson represented to investors that NorthStar

27  operated in a competitive market, and the Company was cognizant of NorthStar's role as a

28  competitor to its manufacturing partners:

- Beer on March 3, 2015: "Where Northstar has tended to develop is around the more mature molecules where you tend to have more players participating in that molecule. And, obviously, we are interested in ways in which we can continue to grow the Northstar business, but we are also very cognizant of its relationship vis-a-vis the broader relationships that we have with our generic manufacturing partner[s]. So I think it's an important balancing act that we play there between our own internal efforts, if you will, and the broader relationships with the general manufacturers where we are using their own names rather than our own."

- Beer on September 16, 2015: "[W]e need to be thoughtful about the balance between growing that private label set of offerings and the relationships that we have with our various manufacturing partners. So there's always going to be a certain amount of balancing act there. Traditionally, NorthStar has focused on the more mature molecules. We tend to have more competitors."

91.     In truth, NorthStar's profitability and success were driven by collusive activities. Plaintiff's investigation to-date has revealed that at least six drugs sold by NorthStar have indicia of collusion during the Class Period: amitriptyline, baclofen, digoxin, enalapril, fluocinonide, and leflunomide.

92.     NorthStar implemented extraordinary price hikes on leflunomide and baclofen without any meaningful effect on its market share and entered the market following massive collusive price increases and gained market share on amitriptyline, digoxin, enalapril and fluocinonide without impacting prices. The market participants did not undercut each other's prices to gain market share – as would be expected in a functioning, non-collusive market involving commodity-like products. The price hikes were in the competitors' self-interest only if they all agreed to act in tandem.

93.     Through their investigations, the Attorneys General found that the conspiratorial conduct in the generic drug market was "pervasive and industry-wide and the schemes identified herein are part of a larger, overarching understanding about how generic manufacturers fix prices and allocate markets to suppress competition." AG Cpt., ¶11. The overarching understanding applied whether the scheme involved allocation of market share or an agreement to fix prices. *Id.*, ¶¶8, 14. According to the AG Complaint, "[t]his overarching agreement is widespread across the generic drug industry and is broader than the Defendants named in this Complaint." *Id.*, ¶92.

94.     The overarching conspiracy rested on "general rules of the road" that were put in place over a decade ago – that each competitor was entitled to a certain percentage of market share

1    "based on the number of competitors in the particular drug market, with a potential adjustment based

2    on the timing of their entry." *Id.*, ¶¶90-91.  In general, the earlier entrant was entitled to additional

3    market share.  *Id.*  In practice, a generic manufacturer with more than its fair share of the market

4    would walk away from a customer by instigating a price increase to allow its competitor seeking to

5    obtain its fair share to bid slightly below the increased pricing.  *Id.*, ¶99.  After the market reached an

6    equilibrium, the manufacturers then agreed on not competing on prices or significantly raising prices

7    in coordination.  *Id.*  At the equilibrium state, manufacturers did not take advantage of another

8    competitor's price increase by bidding lower prices, as doing so would be "viewed as 'punishing' a

9    competitor for raising prices – which [was] against the rules."  *Id.*, ¶106.

10          95.     Adherence to the "general rules of the road" by all competitors was crucial to

11    maintaining high prices, because even a single deviant could lead to competition and lower prices.

12    *Id.*, ¶107.  Even for a new entrant to the market seeking to attain market share, "an underlying code

13    of conduct," widespread in the industry, was adhered to that allowed the new entrant and existing

14    manufacturers to determine "a generally agreed-upon standard of 'fair share' in order to avoid

15    competing and keep prices high."  *Id.*, ¶¶14, 100.

16          96.     NorthStar and its co-conspirators' anti-competitive behavior left behind a series of

17    collusive markers that are consistent with the "general rules of the road."  The uniform price hikes

18    were marked by high correlation, with low volatility of drug prices post-collusion and high stability

19    of market share.  These characteristics were inconsistent with competitive markets.  The correlation

20    of the manufacturers' price moves was so high and statistically significant that the probability of

21    obtaining such heightened correlation by chance is less than 1%.  After the price hikes, the volatility

22    of pricing and market share substantially declined – indicating stability that was uncharacteristic of a

23    competitive market where manufacturers would compete on pricing to gain market share.

24          97.     NorthStar's collusive drug leflunomide, for example, was one of the generic drugs

25    slated for a "'big price increase'" during Heritage's April 22, 2014 "'Price Increase Discussion'"

26    teleconference.  AG Cpt., ¶¶268-269.  As alleged in the AG Complaint (*see* Ex. A at 90-92), in

27    implementing the price increase strategy, Heritage's former President Jason Malek – who recently

28    pleaded guilty to criminal charges for price fixing – took the lead and contacted Teva to reach an

agreement to increase prices. *Id.*, ¶382. Nisha Patel of Teva agreed that "if Heritage did raise the price of Leflunomide . . . , Teva would follow with its own price increase or, at least, would not challenge Heritage's price increase by seeking to underbid and take Heritage's accounts." *Id*. When Teva left the market in May 2014, Malek implemented a strategy to divide the market and decided that he "'may give some to [A]potex and follow our strategy as discussed.'" *Id.*, ¶384. Heritage's Matthew Edelson placed three phone calls to Debbie Veira of Apotex. By May 2014, Heritage and Apotex reached an agreement "to avoid competition and increase prices on Leflunomide." *Id.*, ¶385. Apotex took a price increase in May 2014, and Heritage took an increase in July 2014. *Id.*, ¶¶387-388.

98.   A second dramatic price increase on leflunomide was taken by McKesson's NorthStar, Heritage and Apotex in 2015. By the end of July 2015, NorthStar implemented a 372% price increase and took the drug from $1.11 per unit to close to $5.20 per unit. Heritage and Apotex followed shortly and also brought prices to a similar $5.20 per unit. NorthStar's and Heritage's price increases logged in at a correlation of 84% and were so statistically significant that the probability of obtaining such heightened correlation by chance is less than 1%.



Leflunomide Tablets: WAC Price per Unit

99.   NorthStar's massive price hike on leflunomide was against its economic interest and irrational in a market dominated by larger players such as Heritage and Apotex. Without an overarching agreement among the three co-conspirators, Apotex could lower its price incrementally

1    and take NorthStar's market.  Heritage, on the other hand, was unlikely to move against NorthStar

2    because Heritage was "'strategically aligned'" with McKesson, with McKesson protecting

3    Heritage's market share in Doxy DR from Heritage's competitor.  AG Cpt., ¶226.  As such, the only

4    explanation for the feasibility of NorthStar's sudden and dramatic price move was collusion.

5         100.    From June 7, 2015 to June 10, 2015, the Healthcare Distribution Alliance held its

6    annual  Business and Leadership Conference in San Antonio, Texas, providing an opportunity for

7    McKesson, Heritage and Apotex to collude.  All of the co-conspirators that reached agreements to

8    fix prices and allocate the market for leflunomide were present at the conference.  McKesson's

9    President of U.S. Pharmaceuticals, Mark Walchirk, served on the board and executive committee of

10   the alliance.  Hammergren attended the conference – along with Malek and Matthew Edelson of

11   Heritage, Debbie Veira of Apotex, and Nisha Patel of Teva.

12        101.    After the dramatic price hikes by McKesson's NorthStar, Heritage and Apotex, price

13   and market share stabilized for leflunomide, suggesting that the co-conspirators stopped competing

14   for market share.  Price volatility after the hike was virtually non-existent – dropping from an

15   average of 87% to 0.9% or less for all three companies.  The volatility of NorthStar's market share

16   dropped from 10.8% pre-collusion to a low 0.3% post-collusion.  Similarly, Apotex's market share

17   volatility dropped from 11.6% to 4.8%.  The significant price and market share stability post-

18   collusion further evidences the co-conspirators' agreement "to avoid competition and increase prices

19   on Leflunomide."  AG Cpt., ¶385.

20        102.    Similar characteristics of price and market share stability were evident for the other

21   NorthStar collusive drugs after dramatic price hikes.  Baclofen price volatility was 0.5% or less for

22   all co-conspirators after NorthStar's November 2015 price increase, with market share volatility

23   ranging from 0.3% to 9%.  Amitriptyline price volatility was 1% or less for all of the co-conspirators

24   after NorthStar entered the market in April 2015 at a collusive price level, with market share

25   volatility ranging from 0.3% to 3.2%.  Digoxin price volatility was 0.3% to 0.7% for all of the co-

26   conspirators after NorthStar entered the market in November 2016 at a collusive price level, with

27   market share volatility ranging from 0.3% to 1.9%.  Enalapril price volatility was 0.2% to 4.2% after

28   NorthStar entered the market in October 2015 at a collusive price level, with market share volatility

1    ranging from 0.3% to 1.4%.  Fluocinonide price volatility was 0% to 2.1% after NorthStar entered

2    the market in January 2017 at a collusive price level, with market share volatility ranging from 0.6%

3    to 3%.  All of the drugs had substantially higher price and market share volatility prior to their

4    collusive price hikes.

5         103.    As with leflunomide, many of NorthStar's co-conspirators in its other collusive price

6    hikes were also named as defendants in the AG Complaint.  Among NorthStar's co-conspirators

7    were: (1) Teva for baclofen, enalapril and fluocinonide; (2) Par for baclofen; (3) Mylan for

8    amitriptyline; (4) Sandoz for amitriptyline; (5) Lannett for digoxin; and (6) Sun for enalapril and

9    fluocinonide.

10        **H.    The Generic Drug Market Structure Facilitated Collusion**

11        104.    The drugs that generated collusive profits for McKesson and NorthStar all had

12   markets that were highly conducive to anticompetitive activities.  Their markets involved: (1) a high

13   level of market concentration; (2) near perfectly inelastic demand; (3) the commoditized-nature of

14   generic drugs; (4) no viable substitute; (5) significant barriers to entry; and (6) the ease of

15   information sharing.

16        **1.    High Level of Market Concentration**

17        105.    The market for the collusive drugs was vulnerable to coordinated activities because

18   fewer firms were involved in the negotiation and collusive revenues were high for each firm.

19        106.    The Herfindahl-Hirschman Index ("HHI") is a widely accepted market concentration

20   measurement and is used by antitrust enforcement agencies, such as the FTC and the DOJ, for

21   assessing market competitiveness.  An HHI score of 0 is indicative of perfect competition and an

22   HHI score of 10,000 is indicative of a monopoly.  The DOJ and FTC's Horizontal Merger

23   Guidelines classify a market as unconcentrated when HHI is below 1,500, moderately concentrated

24   when HHI is between 1,500 and 2,500, and highly concentrated when HHI exceeds 2,500.

25        107.    The HHI score is calculated by squaring the market share of each firm competing in

26   the market and then summing the resulting numbers.  For example, in a market consisting of three

27   companies with market shares of 10%, 40% and 50%, the HHI is 4,200 (100 + 1,600 + 2,500).

28

108.    As indicated in the chart below, the HHI scores for the drugs that have so far been implicated in the AGs' investigation and by Plaintiff's investigation were close to or well exceeded 2,500 prior to the collusive activities and were thus all considered highly concentrated.

| Collusive Drugs | HHI |
|---|---|
| Amitriptyline | 4,298 |
| Baclofen | 3,679 |
| Digoxin | 3,819 |
| Enalapril | 2,795 |
| Fluocinonide | 4,796 |
| Leflunomide | 4,757 |
| Acetazolamide | 3,555 |
| Doxy DR | 3,187 |
| Doxycycline Monohydrate | 2,496 |
| Fosi-HCTZ | 2,427 |
| Glipizide-Metformin | 2,668 |
| Glyburide | 5,007 |
| Glyburide-Metformin | 4,945 |
| Meprobamate | 3,334 |
| Nimodipine | 5,048 |
| Nystatin | 3,378 |
| Paromomycin | 5,333 |
| Theophylline | 6,842 |
| Verapamil | 3,602 |
| Zoledronic Acid | 4,280 |

### 2.    Inelastic Demand

109.    Elasticity of demand ("Ed") is measured by the change in quantity of goods sold relative to the change in price.  When Ed is zero, demand is perfectly inelastic as there is no change in the quantity of goods sold despite a large increase in price.  Inelastic demand encourages cartel behavior, as a significant increase in price has minimal effect on quantity demanded by consumers.  As such, the cartel can maximize profit because price increases will directly translate into revenues.

110.    At the time of the collusive price fixing, the markets for the drugs were characterized by nearly perfect inelastic demand with Ed measured at close to zero.  For example:

| | Elasticity of Demand | % Change in Price | $ Change in Quantity Demanded | Elasticity |
|---|---|---|---|---|
| Amitriptyline | 0.024 | 268% | 6% | Highly Inelastic |
| Baclofen | 0.019 | 197% | 4% | Highly Inelastic |
| Digoxin | -0.004 | 593% | -8% | Highly Inelastic |
| Enalapril | -0.038 | 106% | -4% | Highly Inelastic |
| Fluocinonide | -0.016 | 395% | -6% | Highly Inelastic |
| Leflunomide | -0.012 | 117% | -1% | Highly Inelastic |
| Doxy DR | -0.001 | 3240% | -3% | Highly Inelastic |

| Glyburide | -0.137 | 96% | -13% | Highly Inelastic |
| Nystatin | 0.040 | 88% | 3% | Highly Inelastic |
| Verapamil | -0.126 | 31% | 4% | Highly Inelastic |

### 3.    Commodity-Like Product

111.    A commodity-like product is a standardized product where price is the only distinguishing factor for purchasers.  During the Class Period, each of the collusive drugs was AB-rated by the FDA, which indicates each drug is bioequivalent to its respective branded version.  In addition, the FDA's Orange Book shows that NorthStar's versions are therapeutically equivalent to other manufacturers' generic versions of the same drugs.  As stated in its Orange Book, the "FDA believes that products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."  As such, pharmacists are able to substitute one manufacturer's version of a drug for another.

112.    For commodity-like products such as these, all of the manufacturers must raise prices for the collusion to be viable.  Price hikes by one manufacturer without the co-conspirators' agreement to join the heightened price levels would enable competitors to take market share away by simply setting prices below the manufacturer's price point.  Thus, the coordinated massive price hikes could only be sustainable with the cooperation of an agreement among the co-conspirators.

### 4.    No Viable Substitute

113.    The lack of a viable substitute encourages cartel behavior because consumers cannot replace the product with a cheaper alternative after significant price hikes.  For example:

- Baclofen is one of two recognized first-line treatments for spasticity induced by multiple sclerosis according to the U.K. National Institute of Health and Care Excellence.  Patients who cannot tolerate gabapentin – the alternative first-line treatment – or those for whom gabapentin proves ineffective have little to no viable choice.

- Digoxin is the prescription of choice for doctors when it comes to heart medication, as none of the molecules that are comparable to it are prescribed in any significant volumes.  In addition, since at least 2002, digoxin has been listed as a World Health Organization "essential medicine" that is crucial to "the priority health care needs of the population."

- Fluocinonide .05% is a prominent high potency (Group II) corticosteroid and is one of "the mainstay[s] of therapy for psoriasis."  Jonathan D. Ference, PharmD. and

Allen R. Last, M.D., *Choosing Topical Corticosteroids*, 79 American Family Physician 2, at 135 (Jan. 15, 2009).

- Doxy DR is a protein synthesis inhibitors tetracycline antibiotic used to treat gonorrhea, periodontitis, intestinal infections, and chlamydia.  It is one of the World Health Organization's "essential medicine" that is crucial to "the priority health care needs of the population."

- Amitriptyline is an antidepressant that regulates the brain's natural substances to maintain mental balance.  It is one of the World Health Organization's "essential medicine" that is crucial to "the priority health care needs of the population."

- Verapamil is used to treat angina, high blood pressure, and various heart disease conditions.  It is one of the World Health Organization's "essential medicine" that is crucial to "the priority health care needs of the population."

### 5.    Barriers to Entry

114.    Collusion is more effective in markets with high barriers to entry because new competitors cannot easily enter the market and undercut the agreed-upon price.

115.    A competitor attempting to enter the generic drug market faces the barrier of both time and costs.  The generic drug approval process created a significant barrier to entry in the markets for each of the 20 drugs alleged above.  Approval of an Abbreviated New Drug Application by the FDA takes an average of 36 months.  Upon approval, the manufacturing facility is subject to regulatory oversight and compliance expenses.

116.    A high barrier to entry to the markets for each of the collusive drugs enabled the anticompetitive activities to be sustained over an extended period.

### 6.    Information Sharing

117.    According to the AGs, manufacturers and wholesalers used opportunities at conferences and trade shows "to discuss and share competitively-sensitive information concerning upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts." AG Cpt., ¶79.  In fact, "[m]any customers of the [manufacturers], including but not limited to . . . large wholesalers or distributors like [Amerisource Bergen], Cardinal, HD Smith, McKesson and Morris & Dickson . . . hold multi-day conferences throughout the year in various locations throughout the United States.  Generic manufacturers [alleged to be Defendants] from across the United States are invited to attend."  *Id.*, ¶77.

118.    In addition, industry associations, such as the Healthcare Distribution Alliance ("HDA") (formerly known as the Healthcare Distribution Management Association ("HDMA")), which represents wholesalers and distributions like McKesson, also hold regular conferences where industry participants such as generic drug manufacturers and McKesson meet to discuss industry issues.

119.    McKesson's senior executives always held leadership roles in the HDA.  Mark Walchirk – President of McKesson's U.S. pharmaceuticals business – sat on the board of directors of the HDA and its executive committee during the Class Period.  Prior to Walchirk, Paul Julian – Executive Vice President and Group President – also held similar roles.  McKesson's co-conspirators Mylan and Upsher-Smith attended a June 1, 2014 to June 4, 2014 HDMA Business and Leadership Conference.  Teva, Apotex, Heritage, Impax, Lannett, Mylan, Par, Sandoz, Sun, and Upsher-Smith attended a June 7, 2015 to June 10, 2015 conference, along with Hammergren and Julian.  These conferences provided opportunities for McKesson and the generic manufacturers to collude.

120.    Similarly, the Association for Accessible Medicines (formerly known as the GPhA) is "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."  The GPhA provides an additional forum for frequent in-person meetings and opportunities to collude.

121.    Furthermore, as customers of generic manufacturers, Defendants were frequently in contact with their co-conspirators.  Defendants touted to investors their close relationships at the highest levels of the generic drug companies.  For example, Hammergren stated that it was the senior level executives' responsibility to build relationships with manufacturers and touted:  "Our management team has done a great job of . . . building our relationships with our manufacturer partners across the globe."  Hammergren stated on January 11, 2016: "And this team does an excellent job I think of managing the relationships of the generic manufacturing partners, and also understanding the lay of the land in terms of what might be happening from a policy perspective within these manufacturers."  And, on January 30, 2014, he stated that "the real strength is really

coming still out of our generics business . . . .   And clearly, the position we have with those manufacturers continues to improve.  We have really built very positive trusting relationships."  At the annual investor day in 2015, Defendants noted "the willingness of manufacturers at the most – the highest levels of the organizations to sit down and talk to us."  Consistent with the AG's findings (AG Cpt., ¶10), the widespread industry-wide collusive conduct involved executives at "the highest levels of the organizations."

### I.   The Schemes Involved Executives at McKesson's Highest Levels and Were Large in Magnitude

122.   During the Class Period, Defendants were in the enviable position of possessing real-time and detailed knowledge of every aspect of the generic drug market.  Defendants touted their "huge analytics machine within McKesson."  This machine captured information relating to generic drug pricing, the specific manufacturers, the specific markets for generic drugs, "what goes through distribution," and "what goes through retail."  The tentacles of McKesson's analytics not only reached manufacturers' and customers' information, but also extended further and further back the supply chain to raw materials and the active pharmaceutical ingredients arena through the Company's subsidiary NorthStar.  On January 30, 2014, Hammergren acknowledged his use of NorthStar as a reconnaissance vehicle: "The visibility we get through Northstar enhances our view of the opportunities that exist globally for us as well as some of the challenges that may exist, whether it's plant closures, limited supply of raw materials, or other issues that may come along. That Northstar experience helps inform all of McKesson from a sourcing perspective in a very positive way."  Defendants used the analytics to manage pricing and profitability.  As stated by Hammergren during the January 30, 2014 earnings call, "by managing our pricing carefully," Defendants achieved the "very positive drop" to McKesson's gross profit line.  This was important because "margin expansion is a priority."

123.   Using the "analytics machine," Hammergren maintained laser-like focus on generics inflation, its causes and drivers, and the manufacturers' pricing power.  While representing to investors on January 13, 2014 that manufacturers had "behaved responsibly" in the generics marketplace affected by supply issues, Hammergren further stated that, given that "[g]enerics will

1   play a role in" McKesson's fiscal 2015 performance, "our assessment of the generic pricing power

2   will continue to be important."  By asserting that drug makers were responsible and highlighting his

3   ongoing evaluation of generic drugs pricing power, Hammergren assured investors of his diligence

4   and evaluation of the causes of the price increases.

5         124.    Indeed, during the Class Period, Hammergren and Beer kept vigilant watch on every

6   element of the generics market.  On October 24, 2013, Hammergren attributed McKesson's success

7   in attaining the significant pivot in growth to diligence in diving into the details of the generics

8   business model.  He told investors that he had "been able to look carefully at the generic purchasing

9   patterns . . . on a country-by-country basis" to quantify "[w]hat goes through distribution, what's

10   controlled spend, what goes through retail, etc."  He emphasized that nothing could compare to

11   "really getting inside the business model, and that's the magic on how we've been able to continue

12   to grow our program as evidence in the results this quarter."

13         125.    On June 29, 2016, Hammergren explained that Defendants' perspective on pricing

14   was "very well informed" because "we are extremely intimate globally to these manufacturers, we

15   understand what they are doing around the world on a real-time basis."  He further touted on

16   November 8, 2016 that, with McKesson's sourcing initiative, he was endowed with the ability "to

17   look at generic manufacturers across the globe" with an "opportunity to see how price is behaving in

18   various markets, from a generic perspective."

19         126.    Using information generated on a real-time basis, Hammergren and Beer assessed

20   generics pricing in detail through quarterly and annual financial modeling and forecasting.  On

21   June 25, 2014, Beer explained to investors that, in projecting sales growth, he "extensively analyzed

22   both the inflationary elements in the market place," along with usage and demand.  He emphasized

23   that he "obviously analyzed all of the information" and assured investors that he "will continue to

24   monitor pricing trends in the market and will provide updates as we communicate our quarterly

25   results going forward."  Hammergren further emphasized on July 31, 2014 that "our generic price

26   inflation models the full fiscal year."  On June 11, 2014, Beer represented that he came up with

27   financial estimates by "tapping into the sourcing knowledge that we have put as a centerpiece of our

28

1  business strategy. And by that, I mean our knowledge of the specific manufacturers, the specific

2  markets for those drugs."

3       127.    Indeed, Defendants had continuous access to real-time, detailed drug-by-drug data

4  gathered from both customers' purchases and manufacturers pricing to track profits from the

5  collusive price increases.  Defendants had at their fingertips, a "huge data analytics machine within

6  McKesson where we provide data and analytics to products, market share, customer bases that is

7  extremely valuable to the manufacturer."  In return, all manufacturers were required to submit data

8  using the electronic data interchange's standardized format.  McKesson's data exchange module was

9  set up to be compatible with the enterprise planning system commonly used by manufacturers.

10  Through its module, McKesson collected data submitted by manufacturers, which included drug-by-

11  drug information such as pricing, quantity, and sales.  List prices were loaded into McKesson's

12  OneStop platform, with price change notifications required to be sent to McKesson at least one day

13  prior to the effective date of the price change.

14       128.    Defendants told investors that they knew the underlying forces driving the generics

15  inflation and affirmed that the generic drug manufacturers were behaving responsibly in the face of

16  supply disruption.  Defendants assured investors that the market was competitive and McKesson's

17  negotiating power along with Defendants' continual assessment of generics pricing power ensured

18  competitive pricing for its customers.  Defendants spoke frequently and repeatedly about supply

19  disruption driving the generic drug price inflation that contributed significantly to McKesson's

20  profitability.  Defendants repeatedly affirmed that their pricing analyses and forecasts were backed

21  by McKesson's data machine.  As such, armed with real-time, detailed knowledge of every aspect of

22  the generics market, Defendants knew, or were reckless in not knowing, that McKesson's financial

23  results were driven by unsustainable collusive activities.

24     **J.**      **Eventually Elevated Pricing Drew Governmental Scrutiny, Attracted**
               **Competitors, and Eroded Profits**

25

26       129.    As governmental scrutiny increased on the widespread and dramatic generics price

27  hikes, Hammergren falsely affirmed that manufacturers were acting "responsibly" and the generics

28

         - 44 -

1  market was "competitive" and dismissed the scrutiny as election-year discourse.  He also assured

2  investors that McKesson did not have to worry about being "attacked directly by regulators":

- Hammergren on January 13, 2014: "They [manufacturers] have behaved responsibly in an environment where there are fewer of them in the marketplace and we have been able to optimize our performance in that."

- Hammergren on July 29, 2015: "I think we see, as do you that the question of generic inflation has sometimes been driven by the ability for the price to actually benefit the generic manufacturers, or otherwise stick in the marketplace.  So to the extent that the consolidation provides some of that opportunity, that would be a positive.  I think that the market remains competitive.  I think these consolidations will help eliminate cost."

- Hammergren on October 29, 2015: "Pharmaceutical pricing trends have become the frequent subject of news headlines as we get deeper into this presidential election cycle.  The observation I would make is that this pharmaceutical pricing discussions tend to ebb and flow over time."

- Hammergren on November 10, 2015: "[C]learly, there's lot of noise in Washington. The political landscape continues to evolve in front of us.  And during these election cycles, clearly there's also lots of noise and concern about where the industry might be positively or negatively impacted, depending on who arrives at the finish line in the end."

- Hammergren on January 27, 2016:

  I would say that political discourse that's taking place, and the Congressional inquiries relative to pricing practices, I think are obviously, going to have people at least pausing perhaps to consider whether now is the right time to take a price increase.

  There obviously are other circumstances related to pricing associated with a supply disruption availability, new product launches.  There's all kinds of things that probably play into the calculus there.  I would say that I think the political discussion certainly clearly, and the media discussion probably has some impact; but to speculate on how much would be difficult.

- Hammergren on May 4, 2016: "[W]e're not oblivious to the conversation[] that is going on in the media and with the current political activity, and we're certainly not oblivious to the investigations and conversations that have been going on from a congressional perspective into these areas.  I think our assumptions are reasonable and they are based on our historical work with the manufacturers and certainly buffered by what we see as the current climate.  So I would say as we stated today, we believe the assumptions are realistic and are likely to occur in the way we have laid them out in our fiscal 2017 guidance."

- Hammergren on June 29, 2016:

  We think our margin structures are such that we won't be attacked directly by regulators and that our view is that the service and support we provide continues to support the business opportunities that are in front of us.

We're also very – we do a lot of work in Washington, obviously these candidates are going to come in with their own perspectives. But the people that we believe will be incumbents and returning to the Hill we have a very close working relationship with and a trusted relationship over decades that have been built. And to the extent that those people remain in their current positions on both sides of the aisle we think we have constructive dialogues about not only how to affect the quality and the cost of healthcare in this country but perhaps what next steps need to be taken to change some of the things that are underway that aren't working as well.

130.    In truth, Hammergren knew that the generic drug price inflation was not driven by supply disruption and manufacturers were not behaving responsibly in a competitive fashion. Hammergren admitted that NorthStar provided him with visibility in the manufacturing landscape, including issues stemming from raw materials supply and plant closures.  For example, on January 30, 2014, he assured investors that "[t]he visibility we get through NorthStar enhances our view of the opportunities that exist globally for us as well as some of the challenges that may exist, whether it's plant closures, limited supply of raw materials, or other issues that may come along. That Northstar experience helps inform all of McKesson from a sourcing perspective in a very positive way."  NorthStar provided Defendants with "a closer relationship with the manufacturers and pull the product all the way through to the marketplace."   Ultimately, NorthStar's close relationship with manufacturers and reconnaissance of the manufacturing landscape were so effective that it took part in the anticompetitive activities and helped McKesson "capture some of the manufacturing margin" from collusion.

131.    As intensified governmental scrutiny slowed pricing inflation, on January 11, 2016, Hammergren announced an $0.85 per share negative impact for FY17, largely due to "weakness in generic pharmaceutical pricing trends."  Furthermore, Beer announced that "consistent with our current experience, we now expect only a nominal benefit from generic pharmaceutical pricing trends in FY17."  When analysts asked how to apportion the $0.85 between generics pricing versus customer contracts, Beer stated that generics pricing was "a very substantial item."

132.    With the announcement of the $0.85 per share negative impact and assumption of "nominal benefit" from generics inflation in FY17, Hammergren falsely proclaimed that he had "derisked" McKesson's earnings from generics inflation: "As it relates to what we expect in FY17,

1   included in our guidance, we've indicated that we have really a nominal level of generic inflation. So

2   you should read that as, that even if generic inflation was to drop completely to zero across the

3   board, that our FY17 assumptions basically include that from a perspective is that we have limited

4   risk now in that plan preliminarily." Furthermore, "[h]aving set our FY17 objectives with a nominal

5   rate of benefit from price trends in generics, we think we have derisked our FY17 thinking in that

6   area."

7        133.   In truth, McKesson's exposure to generics inflation was not de-risked, the Company

8   was still heavily reliant on inflated prices that were at high risk, as inflated profitability from inflated

9   pricing drew increased competition targeting the Company's independent pharmacy book of

10   business.  During the 2Q17 earnings call on October 27, 2016, Beer announced another $1.60 to

11   $1.90 per share negative impact to earnings – "[o]ur revised outlook includes the impacts of

12   competitive customer pricing and softness in brand inflation that John just discussed.  We expect

13   these two headwinds to drive a combined reduction of between approximately $1.60 and $1.90 to

14   our fiscal 2017 adjusted EPS."   And generics pricing competition represented the bulk of the

15   reduction.

16        134.   On January 25, 2017, McKesson announced that 3Q17 gross profit had declined 8%

17   and operating profit had dropped 23% due to "the increased competitive customer pricing activity

18   we discussed last quarter, the timing of branded manufacturer inflation, and the expected weaker

19   profit contribution from generic manufacturer inflation trends."  Beer further indicated that "as John

20   discussed, while our pricing of generic pharmaceuticals in our independent pharmacy channel has

21   helped us retain share, our pricing is now set at a level lower than our previous expectations.  As a

22   result, we expect the profit contribution from these customers will be reduced versus our previous

23   guidance."

24

25

26

27

28

**K.**      **Materially False and Misleading Statements Issued During the Class Period**

   **1.**      **False and Misleading Statements Relating to Generic Drugs Price Inflation**

135.      On October 24, 2013, McKesson hosted its 2Q14 earnings call with participation by Hammergren and Beer.  During the call, Hammergren made the following materially false and misleading statements:

[Hammergren:] ***Based on our performance for the first half of the fiscal year and our improved outlook for the year, we are raising our full year guidance and now expect to achieve adjusted earnings per diluted share from continuing operations of $8.40 to $8.70***.

   ***. . . Distribution solutions revenue grew 11% for the quarter and adjusted operating profit grew 18%.  Within our distribution solutions segment our US pharmaceutical business had another quarter of outstanding results*** . . . .

   ***. . . In the second quarter, we continue to experience favorable pricing on certain products in our generics portfolio, principally driven by a few products where there has been supply disruption***.

136.      On November 12, 2013, Hammergren presented at the Credit Suisse Healthcare Conference and made the following materially false and misleading statements:

[Glen Santangelo, Analyst, Credit Suisse:]  You just came off a fantastic fiscal second quarter, raised guidance again for the second time, the magnitude of the beats has been a little bit startling for folks and everyone's trying to understand how is McKesson putting up these big gross margin beats.  Maybe if you could talk about some of the underlying drivers of the strength in the core pharmaceutical distribution business and the question that I get a lot is the sustainability of those underlying trends and how you think about that through the balance of the fiscal year?

                    *          *          *

[Hammergren:] ***I think that our ability to not only create that value with our customers but pull through additional value for them over time remains and that's part of what was evidenced in the quarter.  I might also mention clearly there has been some supply issues associated with generics in the market and some of those supply issues might have caused more price inflation on certain products than might have otherwise existed in a normal steady state***.

137.      On January 13, 2014, Hammergren presented at the J.P. Morgan Healthcare Conference and made the following materially false and misleading statements:

[Hammergren:] So the question was drug price inflation, generic drug price inflation, and how do we view the rest of this year and do we see it continuing and what are the drivers of it.

*But you should be aware of the fact that this is driven in a very small slice of the generic portfolio.*

*It is not all the manufacturers and it is not all the product. It is in a very small area and we think a lot of that price opportunity has been delivered to the manufacturers because of issues associated with the supply. They have behaved responsibly in an environment where there are fewer of them in the marketplace and we have been able to optimize our performance in that.*

138. On January 30, 2014, McKesson hosted its 3Q14 earnings call with participation by Hammergren and Beer. During the call, Defendants made the following materially false and misleading statements:

[Hammergren:] *Distribution Solutions continues to deliver strong operating performance. In the third quarter, revenue grew 10%, and adjusted operating profit grew 37%.*

*Within our Distribution Solutions segment, our US Pharmaceutical business had another quarter of outstanding results. Direct distribution and services revenues increased 11% for the quarter.*

*In the third quarter, we continued to experience price inflation in a relatively small subset of our generics portfolio. Consistent with the expectations we outlined in the second quarter, inflation in our fiscal third-quarter moderated from what we had experienced in the second quarter.*

\* \* \*

[Beer:] *Distribution Solutions adjusted gross profit increased 27% for the quarter on 10% revenue growth, resulting in a 65 basis point improvement in our adjusted gross profit margin. In addition to the PSS acquisition, our third-quarter gross profit in Distribution Solutions benefited from continued favorable performance within our generics pharmaceutical business.*

\* \* \*

[Hammergren:] [T]he real strength is really coming still out of our generics business. Our One Stop revenues were up nicely. The share of wallet we are getting from *our customers who are relying more and more on our generic capabilities and now depending on us to source the right products at the right price for them*, has been very helpful.

\* \* \*

That is what delivers a great business and a great business model. I see no reason to believe that we can't continue to focus on gross margins as a top priority. I don't see any negative mix change occurring in our Business, and generics continue to be a propellant across the board if you think about our sourcing.

139. On May 12, 2014, Hammergren and Beer hosted McKesson's 4Q14 earnings call. During the call, Defendants made the following materially false and misleading statements:

[Beer:]***Adjusted gross profit increased 35% for the quarter and 26% for the full year, to $8.6 billion, primarily driven by strong execution in our distribution businesses, market growth***[8] and our acquisitions of Celesio and PSS.

\*      \*      \*

***Overall, this year's earnings per share benefited significantly from the strong performance in our US pharmaceutical business. Specifically, the favorable performance across our entire portfolio of generic pharmaceutical offerings***.

140.    The statements in ¶¶135-139 were materially false and misleading or omitted material facts.  In particular:

(a)      Defendants' statements above that generic drug price inflation was driven by "few" or a "small subset" of products with "supply disruption" and "supply issues" were materially false and misleading when made because the price hikes driving McKesson's financial results were implemented on drugs for which no supply disruption had in fact occurred.  As described in the AG Complaint and confirmed by Plaintiff's investigation and statistical analysis, dozens of price hikes were the result of collusive behavior.  In addition, by May 2014, at least 31 drugs had experienced price increases of more than 50% without any supply disruption, and at least another three drugs were found by the AGs to have been propped up by market allocation schemes.  These 34 drugs had annual sales of more $4.7 billion.

(b)      Defendants' statements above concerning McKesson creating value and sourcing products at "the right price" for  its customers in the face of generic drug price inflation were materially false and misleading when made because instead of negotiating lower prices for its customers, McKesson: (i) participated in or acquiesced to the price hikes instituted by the manufacturers; and (ii) used its aggregated customer purchase volume as leverage to collect higher discounts from generic drug manufacturers for itself.

(c)      Defendants' statements above concerning McKesson's revenues and profitability were materially false and misleading when made because McKesson's financial results

---

[8]    "Market growth" was defined in the 2014 Form 10-K as "reflecting growing drug utilization and price increases."  *See* ¶171.

1    were materially impacted by unsustainable generic drug price hikes, including price increases driven

2    by collusive activities.

3           (d)    Defendants' statements above concerning guidance were materially false and

4    misleading when made because the guidance was unrealistic, lacked a reasonable basis, and failed to

5    account for the unsustainability of McKesson's growth.

6           141.   On May 20, 2014, Beer participated in the UBS Global Healthcare Conference and

7    made the following materially false and misleading statements:

> [Beer:] Well we would continue, *as was the case last year, to expect that the price increases would be driven by a relatively small proportion of the overall portfolio of generic drugs that we distribute.  And we would also continue to expect that those drugs prices would be increasing as a result of some sort of supply disruption.  And there can be different types of those disruptors, whether it's the FDA going in to a particular plant and shutting it down for some period of time, whether it is a specific manufacturer deciding to close down a product line within their operation for their own return on investment needs.  It can be different things.*
>
> *But we would continue to expect those supply disruptions to really be the driving force underpinning those expected price increases.*

8           142.   On June 11, 2014, Beer participated in the Goldman Sachs Healthcare Conference

9    and made the following materially false and misleading statements:

> [Bob Jones, Analyst, Goldman Sachs:]  Another big topic that I think people think a lot about in this environment is price inflation, and specifically generic price inflation.  You know, your guidance called for high single digit generic price inflation.  I was just wondering if you could share a little bit.
>
> What do you think has been driving generic price inflation or even in some cases the lack of deflation relative to what I think we grew accustomed to years ago?  And how sustainable do you think that is, as we not only look out to this year but for the next several years for the industry?
>
> [Beer:] *I think what has been driving it in this past year, fiscal 2014, and what we are expecting to continue into 2015, is really some measure of supply disruption.  The causes of those supply disruptions can differ. Sometimes they will be FDA driven where the FDA comes in and shuts down the plant for one reason or another.*
>
> *Other supply disruptions will be driven by where a specific manufacturer deciding to make a decision about a plant of theirs or a line within a plant for purposes of their own capital return needs.  So it can be driven by a variety of factors.  But at the heart of it is our view that it is a supply disruption that is driving the price increase, and we are seeing these price increases on a very small proportion of the overall set of pharmaceuticals that we distribute.*

*And that was the case again in fiscal 2014, where we saw double-digit type growth in prices year over year.  We expect that to continue to be the case in fiscal 2015, where we expect a lesser percentage growth rate, high single digits is what we said.  But those you are alluding to, still that is significantly higher than what we've seen in the last several years prior to fiscal 2014.*

143.    On June 25, 2014, McKesson hosted its annual investor day with participation by Hammergren, Beer and senior executives of the Company.  During the conference, Defendants made the following materially false and misleading statements:

[Paul Julian, EVP and MDS Group President, McKesson Corporation:]  *We had generated significant operating cash flow on our US Pharma business . . . .  And as you'll hear later on, we continue to expand our operating margins in our largest core business which is US Pharmaceutical.*

\*         \*         \*

[Beer:]  *Well, looking back over the last several years, the distribution segment team has driven an impressive 5% compound annual growth rate at the top line.  And they have been able to leverage that into a 14% CAGR at the operating profit line.*

\*         \*         \*

*In terms of manufacturer economics, both on the branded side and on the generic side of the business, this translates through into benefits for us around price increases.*

144.    On July 31, 2014, Hammergren and Beer hosted McKesson's 1Q15 earnings call and made the following materially false and misleading statements:

[Hammergren:]  *Within our US pharmaceutical business, we also experienced solid growth across our portfolio of generic and brand pharmaceuticals, driven in part by the timing of certain generic and brand price increases*, which came earlier in the fiscal year than we had originally planned.  It is important to note, however, that our full-year expectations for both brand and generic inflation remain unchanged.

\*         \*         \*

[Beer:] In addition, as John mentioned, *this quarter we recorded solid growth across our portfolio of generic and branded pharmaceuticals, driven in part by the timing of certain generic and brand price increases, which came earlier in the fiscal year than we had originally planned.  On a constant-currency basis, revenues increased 15%.*

145.    On September 9, 2014, Beer participated in the Morgan Stanley Healthcare Conference and made the following materially false and misleading statements:

[Beer:] *It has certainly been an important financial driver in the last few quarters.  What we said at the outset of the year when we gave our annual*

*guidance was that we expected high single digit growth from generic price increases or importantly, generics that are beyond their exclusivity period so a little more mature than the brand new brands to generic conversion drugs.* We see this playing out thus far so we are very much speaking to that view for the full year.

In Q1 we saw a little bit of *acceleration of some of those price increases* both on the brand and the generic side coming a little earlier than we expected but very much reaffirming the full year view of high single digit growth rates year over year. That is a little bit less than what we saw last year where it was double digit growth rate but still in a broader historical context, quite strong.

*Our experience continues to be that we are seeing these price increases where there is some sort of supply disruption occurring in the market for that molecule and that occurring broadly for two reasons. Either the FDA has gone into a plant, shut it down, shut down a line within a plant for some period of time or alternatively, we are seeing some generic manufacturers making decisions to shut down a line for one type of a molecule, perhaps switch that capacity into an alternative molecule that they judge can give a better return on their capital invested for their investors.*

*So it is very much supply disruption driven in our view and of course, we are seeing that happen in a relatively small proportion of the generic manufacturers and within those manufacturers, a relatively small proportion of their molecules, their drugs. Where we do see a price increase occurring around a molecule, it can sometimes be quite high. So that is the situation that we are seeing play out around generic price inflation.*

146. On September 30, 2014, Beer participated in the Leerink Partners Services Roundtable and made the following materially false and misleading statements:

[Beer:] *We continue to see the product inflation being driven by supply shortages of really a couple of flavors either where the FDA is taking some action around enforcement that is shutting down a line or a plant at a particular manufacturer. Or the other flavor really being where a manufacturer has for their own financial return reasons, their own resource allocation priorities, elected to do likewise to shut down a plant, maybe a line, maybe reduce capacity on a line, some flavor of that sort of activity that reduces the overall supply of a drug from that one source providing opportunity for other sources to raise prices.*

*Now it's important, I think, to note that we continue to see this occurring on a really small minority of the generic pharmaceuticals with which we work. So a small minority of the manufacturers, and then within that subset, them taking a small minority of the pharmaceuticals that they manufacture.*

*That said, sometimes the price increases that do occur can be quite large in percentage terms in a particular molecule. So we are continuing to see that play out as we have discussed in recent quarters.*

147. On October 28, 2014, McKesson hosted its 2Q15 earnings call with participation by Hammergren and Beer. During the call, Defendants made the following materially false and misleading statements:

[Beer:] *Distribution Solutions adjusted gross profit increased 58% for the quarter on 37% revenue growth, resulting in an 80 basis point improvement in our adjusted gross profit margin, driven by our acquisition of Celesio and market growth*.

\*       \*       \*

*As a reminder, for the full year our expectations for branded and generic drug price inflation remain unchanged* . . . .

\*       \*       \*

[Robert Jones, Analyst, Goldman Sachs:]  I guess just my follow up around generic purchasing, there is some chatter or concern in the marketplace that maybe some of the synergies that were originally mapped out on paper relative to these purchasing consortiums might not be translating at the actual negotiations level with generic manufacturers.  I'm just wondering if you could comment around how your negotiations have progressed as you've gone out to the generic manufacturers around buying better with more scale, and any change relative to the original or previous expectations that you laid out around the procurement benefit?

\*       \*       \*

[Hammergren:] *We continue to build our book of business which adds significant value to the manufacturing partners that are part of our solution going forward, and deliver significant value to the customers that have availed themselves of not only the price points that are available through McKesson because of our scale*, but also to the service offering that we make available to our customers that take them out of the logistics business that is clearly more superior coming from McKesson. So I would say that we remain extremely optimistic, and *the data that we're seeing continues to positively reinforce the decisions we've made around generic sourcing*.

148.     On January 13, 2015, Hammergren and Beer participated in the J.P. Morgan Healthcare Conference and made the following materially false and misleading statements:

[Hammergren:]  *One of the highlights is our ability to help our customers do a better job in sourcing generics. . . . [T]he Health Mart independent pharmacy franchise which now numbers in excess of 3,500 stores where they also have provided us the responsibility for negotiating their product purchases* as well as many other aspects of optimizing the performance of the Health Mart pharmacies.

\*       \*       \*

[Beer:]  *We very much feel as though we're right on track with the guide that we offered right at the start of the fiscal year for high single digit generic price inflation for drugs outside of the exclusivity period.  And so we're very much continuing to see some sort of supply disruption at the root of these price increases, whether it's from a government related action, whether it's shutting down a line or a plant or backlog of approvals or whether it's a manufacturer taking a decision on their own to reallocate their capital.  So, some sort of driver of supply disruption and as we see things today, we don't expect that to change*.

149.     On February 5, 2015, McKesson hosted its 3Q15 earnings call, with participation by Hammergren and Beer.  During the call, Defendants made the following materially false and misleading statements:

> [Beer:] ***Distribution Solutions adjusted gross profit increased 63% for the quarter on 38% revenue growth, resulting in an 87 basis point improvement in our adjusted gross profit margin, driven by our acquisition of Celesio and to market growth***.

*         *         *

> [George Hill, Analyst, Deutsche Bank:] I guess, John, noticeably absent from the commentary this call was thoughts on generic drug price inflation.  A few of your peers have talked about motivating generic drug price inflation.  I thought you might give us an update on what the customer's is saying?

> [Hammergren:] ***Our view on generic price inflation is basically in line with how we viewed the year as we came into the year.  We said that we felt it was going to be generally flat with last year, perhaps slightly down compared to prior year. I think our view has remained consistent and remains consistent as we think about what we have accomplished in the first three quarters and what we have in front of us***.

150.     On March 3, 2015, Beer participated in the Cowen Health Care Conference and made the following materially false and misleading statements:

> [Unidentified Participant:] But maybe the one that's probably on top of mind a lot of people is generic inflation.  A lot of commentary may be at the start of the earnings season that kind of suggests that things had slowed down, now starting to hear more commentary on things maybe picking back up.  How do you guys see the inflation environment currently, and what are sort of the puts and takes on how could that help investors think about what to expect going forward?

> [Beer:] Certainly, when we started our fiscal year we indicated that we expected to see generic inflation in the high single-digit percentage growth rate levels year over year.  So a little bit less than what we had seen in fiscal 2014, but fell in advance in the higher levels than we had seen historically down through the years.  And we are now into our fourth quarter of fiscal 2015, and we are generally seeing things track along pretty much as we had expected. ***We continue to see some sort of supply disruption at the heart of these increases in generic prices, whether it is as a result of the FDA shutting down the line as a manufacturer, whether it's the FDA just being behind on applications, the new generics, or whether it's a manufacturer taking a decision to shift the way they invest their capital from one line, from one product, one molecule to another based on their own return-on-capital needs.  So that's a set of points, really, that's been pretty consistent throughout this fiscal year for us.  So no particular change from what we expected right at the start***.

*         *         *

> [Beer:]  And so I think the FDA has a significant challenge ahead of itself to be able to, in essence, assure the quality of the drugs being produced in all the different

countries and different plants around the world. ***So I wouldn't necessarily say or necessarily assume that the FDA issues that I refer to are transitory***.

151.   On May 12, 2015, Hammergren and Beer hosted McKesson's 4Q15 earnings call and made the following materially false and misleading statements:

[Beer:] For the full year, adjusted gross profit increased 36% to $11.8 billion, primarily driven by our acquisition of Celesio and market growth, including strong execution in our distribution businesses.

\*       \*       \*

For the full year, adjusted net income from continuing operations totaled $2.7 billion and our adjusted earnings per diluted share from continuing operations was $11.11. ***Overall, this year's adjusted earnings per share benefited significantly from our mix of business, specifically the favorable performance across our entire portfolio of generic pharmaceutical offerings*** and the contribution from our acquisition of Celesio.

\*       \*       \*

Let's now turn to the segment results which can be found on Schedules 3A and 3B.   On a constant currency basis, Distribution Solutions total revenues increased 23% for the quarter and increased 33% for the full year. ***Revenue growth was driven primarily by our acquisition of Celesio and market growth in our North America pharmaceutical distribution and services business***.

During FY16, we anticipate Distribution Solutions revenues will increase by a mid single digit percentage over the prior year, driven by expected market growth and our mix of business.  North American distribution business revenues increased 18% on a reported basis and 19% on a constant currency basis for the quarter.

\*       \*       \*

As we look ahead to FY16, ***we expect continued growth in segment-adjusted operating profit, driven by the contribution from our generic business***, specifically from expanded one-stop sales, and the breadth and depth of our global sourcing efforts.  In addition, we expect branded pricing trends to be consistent with the prior year and ***anticipate generic drug pricing trends slightly below those observed in FY15***.

\*       \*       \*

[Glen Santangelo, Analyst, Credit Suisse:] Thanks and good evening.  I also want to follow up with one quick question on the guidance.  It seems like one of the components of your guidance you talk about maybe lower pricing on the generic side in FY16 versus FY15.  It's nice to have a conference call that's not dominated about generic price inflation.  But, John, I'm curious, could you give us your perspective in terms of what you're seeing there?  And are you actually seeing any changes in the market or do you just believe it's prudent to assume some level of normalization? Thanks.

[Hammergren:] Glen, I think you hit the same word I was going to use and that was prudent. ***I think we've seen a very robust cycle of generic inflation, at***

*least as we view it, and clearly we expect it to continue.  We expect it to moderate slightly as we give our guidance for next year*.

152.  The statements in ¶¶141-151 were materially false and misleading or omitted material facts.  In particular:

(a)  Defendants' statements above that generic drug price inflation was driven by "small" number of products or molecules with  "supply disruption" or "supply shortages" were materially false and misleading when made because the price hikes driving McKesson's financial results were implemented on drugs for which no supply disruption had in fact occurred.  As described in the AG Complaint and confirmed by Plaintiff's investigation and statistical analysis, dozens of price hikes were the result of collusive behavior.  In addition, by May 2015, at least 70 drugs had experienced price increases of more than 50% without any supply disruption, and at least another three drugs were found by the AGs to have been propped up by market allocation schemes. These 73 drugs had annual sales of more $11.8 billion.

(b)  Defendants' statements above concerning McKesson sourcing products at "the right price" for its customers, its ability to help its customers, and its "responsibility for negotiating their product purchases" were materially false and misleading when made because instead of negotiating lower prices for its customers, McKesson: (i) participated in or acquiesced to the price hikes instituted by the manufacturers; and (ii) used its aggregated customer purchase volume as leverage to collect higher discounts from generic drug manufacturers for itself.

(c)  Defendants' statements above concerning McKesson's revenues and profitability were materially false and misleading when made because McKesson's financial results were materially impacted by unsustainable generic drug price hikes, including price increases driven by collusive activities.

(d)  Defendants' statements above concerning guidance were materially false and misleading when made because the guidance was unrealistic, lacked reasonable basis, and failed to account for the unsustainability of McKesson's growth.

153.  On May 13, 2015, Beer participated in the Bank of America Merrill Lynch Health Care Conference and made the following materially false and misleading statements:

[Beer:] Turning to FY2016, we were very pleased to be able to issue full-year guidance – in essence, 12% to 16% EPS growth on a constant currency basis. Again, coming off already strong FY2015 results; we are calling for continued growth and strength right across the Distribution Solutions business. ***Again, our generics business is very important to us and in very good condition***.

\*      \*      \*

[Robert Willoughby, Analyst, BofA Merrill Lynch:]  In the high end and the low end of the guidance range, what gets you to that high end, what gets you to the low end of the range?

[Beer:] Well, we talked about a few of the factors in our guide yesterday. ***Obviously generic price increases were an increasingly important factor during fiscal 2015 and I think that will be the case again in 2016.  What we're expecting is generally generic drug pricing – might be price increases might be a little softer than we experienced in fiscal 2015.  To the extent that that's a conservative guide then I think we can drift towards the north end of the range.  To the extent that that's too aggressive a guide, and those price increases don't come through to the same degree, then I would expect to be towards the lower end of that range.  So I think that's one important factor***.

\*      \*      \*

Well it's an important component of the overall customer mix and one of the very significant values that we bring to those independent pharmacies that sign up for the Health Mart banner, if you will, is the one-stop program. ***And that is our generic formulary which we buy at scale in an extremely efficient way and are able to pass through the benefits of those drug prices to those independent stores who are obviously competing locally against much bigger chains***.

154.   On June 9, 2015, Beer participated in the Goldman Sachs Healthcare Conference and made the following materially false and misleading statements:

[Robert Jones, Analyst, Goldman Sachs:] I guess if we take a step back and look out longer-term, and I think, again, this probably applies more to the generic inflation, but ***do you think that we will continue to operate in an inflationary environment with generics as we think out two, three, five years down the road, or is this eventually a commodity business that, as you guys see it, would revert back to what it's done historically, which is deflate***?

[Beer:] Well, ***we've talked about there being, really, three drivers of the generic price increases in the last couple of years or so, and at the heart, really, it's some sort of supply disruption that has been driving those price increases***.

***And so there's three themes are really the FDA backlog, which doesn't appear to be getting shorter.  The FDA taking some action that closes down a line or a plant at a particular manufacturer.  Or a generic manufacturer making a decision on their own to shut a line or a plant for their own capital allocation, their own return needs.  And we don't see anything particularly different out into the future in any of those three regards, but it's hard to predict***.

155.     On June 24, 2015, McKesson hosted its annual investor day with participation by Hammergren, Beer and other senior executives.  During the conference, Defendants made the following materially false and misleading statements:

[Mark Walchirk, President, US Pharmaceutical, McKesson Corporation:] *And certainly, we continue to access a wide range of manufacturers across the generics environment, and that flexibility from a sourcing standpoint again allows us to make sure we have a competitive price in the marketplace*, industry-leading service levels, et cetera.

And finally, it is amazing to think that *we are above a decade now of our Northstar private label.  That's been an important growth vehicle for us in generics.  And we continue to launch new molecules, we continue to source new manufacturers to work with us in Northstar, and we certainly have a good opportunity to continue to grow that in the coming years*.

\*          \*          \*

[Dave Larsen, Analyst, Leerink Partners:] Can you just talk about generic inflation?  What is driving it?  And how is it trending relative to your expectations?

\*          \*          \*

[Beer:] *And we continue to see the underlying drivers as some sort of supply disruption whether it's the FDA backlog, whether it's the FDA actions around a particular manufacturer's planned or line, or whether it's an individual manufacturer taking a decision around their own capacity, consistent with our own capital return goals*.

*So we don't see any change in that dynamic.  As John said, it's expecting – directionally it will hold a little bit less of the pricing dynamic this year versus last.  And that was a reflection of the fact that we saw a little bit of softening sequentially in the last couple of quarters of fiscal 2015*.

156.     On July 29, 2015, Hammergren and Beer hosted McKesson's 1Q16 earnings call and Hammergren made the following materially false and misleading statements:

[David Larsen, Analyst, Leerink Partners:] Can you comment on the TEVA and Allergan transaction?  Is that material or not with respect to generic inflation?  Our checks indicate that as the generic industry consolidates, sometimes manufacturers raise price because they can.  Just any thought here would be helpful.  Thanks.

[Hammergren:] Well, we clearly have a very strong working relationship with both TEVA and Allergan.  *I think we see, as do you that the question of generic inflation has sometimes been driven by the ability for the price to actually benefit the generic manufacturers, or otherwise stick in the marketplace.  So to the extent that the consolidation provides some of that opportunity, that would be a positive.  I think that the market remains competitive.*  I think these consolidations will help eliminate cost.  But I also think that McKesson's position in the market will continue to afford us an opportunity to work with these very large companies in a very positive way for both parties.

1                                          *          *          *

2          [George Hill, Analyst, Deutsche Bank:] First a quick one, are there any
   situations where generic drug prices inflate where you don't benefit?

3                                          *          *          *

4  [Hammergren:] *I think it's probably better said that we try to optimize our value to*
5  *the generic companies in a way where we benefit and they benefit. But at the same*
   *time, we have to stay extremely disciplined and diligent around making sure that*
6  *our customers are also benefiting through our action in the supply chain. That's*
   *been our priority and will remain our priority*.

7          157.    On September 16, 2015, Beer participated in the Morgan Stanley Healthcare

8  Conference and made the following materially false and misleading statements:

9          [Beer:] *Well, we've been very pleased with our progress around NorthStar*
10 and then also have the Sivem equivalent offering up in Canada. So in multiple
   environments, *we've been very successful and on the front foot – the leading edge,*
11 *if you will, of this dynamic. I think there's absolutely more opportunity for growth*
   *down both the NorthStar and Sivem path*.

12         *And that said, we need to be thoughtful about the balance between growing*
13 *that private label set of offerings and the relationships that we have with our*
   *various manufacturing partners. So there's always going to be a certain amount*
14 *of balancing act there. Traditionally, NorthStar has focused on the more mature*
   *molecules. We tend to have more competitors. So that's an important*
15 *consideration, as we think how to further progress activity at NorthStar, but very*
   *comfortable with their progress and pleased about their growth opportunities*.

16         158.    On October 29, 2015, Hammergren and Beer hosted McKesson's 2Q16 earnings call

17 and Beer made the following materially false and misleading statement:

18         [Beer:] Distribution Solutions adjusted gross profit of $2.6 billion decreased
19 1% on reported basis and increased 4% on a constant currency basis to $2.7 billion.
   *Adjusted gross profit was impacted by growth and demand from our largest*
20 *customers and weaker generic pricing trends compared to the prior year* . . . .

21         159.    On November 10, 2015, Hammergren presented at the Credit Suisse Healthcare

22 Conference and made the following materially false and misleading statements:

23         [Hammergren:] Let me talk a little bit about our North American
24 pharmaceutical distribution business in particular. Clearly, our distribution
   businesses in the US have grown very strongly . . . .

25                                         *          *          *

26         *We have been focused heavily on sourcing in our business for some time,*
   *and that sourcing value has been delivered both in terms of our NorthStar private*
27 *label in the pharmaceutical side*, but also our Medical-Surgical business . . . .

28

*We've been working to bring our value to our customer base, our ability to aggregate scale and help our customers buy at a competitive rate.*

160.    On January 11, 2016, Hammergren and Beer hosted a conference call to discuss McKesson's preliminary fiscal 2017 outlook and made the following materially false and misleading statements:

[Hammergren:] *As it relates to what we expect in FY17, included in our guidance, we've indicated that we have really a nominal level of generic inflation. So you should read that as, that even if generic inflation was to drop completely to zero across the board, that our FY17 assumptions basically include that from a perspective is that we have limited risk now in that plan preliminarily.*

\*        \*        \*

[Garen Sarafian, Analyst, Citigroup:] Okay, fair enough. And I guess if I could just have a follow-up to that.  Is there any better way to describe your level of conservatism in generic inflation assumptions for next year relative to the past?

[Hammergren:] It's down quite significantly from what we experienced in FY15, and certainly way down from what we experienced in the first half of FY16. And it's really consistent with what we are experiencing right now and will experience in the fourth quarter, which we think is a real – *basically a nominal rate of inflation for generics*.  And, James, you might have something to add.

[Beer:] Yes, *I'd just add that our assumption around generic price inflation is actually at a rate lower than what was, if you will, the run rate prior to the more recent years where we'd seen a significant increase in this economic effect.*

[Hammergren:] *To roll back several years ago.*

[Beer:] *Yes.*

\*        \*        \*

[Hammergren:] I don't think there's any change in the fundamental competitiveness, structure or attractiveness of McKesson going forward.  Other than the fact that *we did a superior job I believe in our generic activity, and benefited significantly from our teams focused on taking advantage of the available opportunities.  It's one thing to have price inflation in the generic focus, it's another thing to capture value for our shareholders when that inflation occurs.  And we did a marvelous job of accomplishing that over the last several years, and benefited from it.  Now that that opportunity set is waning, it doesn't matter how good our team is at exercising their skill set against the opportunity.  There's just not enough inflation left in the system for us to benefit from it, and that's a big portion of the challenge that we face as we think about next year.*

*Having set our FY17 objectives with a nominal rate of benefit from price trends in generics, we think we have derisked our FY17 thinking in that area.*

161.    On January 27, 2016, Hammergren and Beer hosted McKesson's 3Q16 earnings call and Beer made the following materially false and misleading statements:

[Beer:] Distribution Solutions' adjusted gross profit of $2.5 billion decreased 3% on a reported basis, and increased 1% on a constant-currency basis, to $2.6 billion.

Overall, the third-quarter adjusted gross profit reflected our mix of business, including a growing proportion of specialty pharmaceuticals, *a weaker profit contribution from generic pricing trends when compared to the prior year* . . . .

\*     \*     \*

*Many of our independent customers have continued to join us in the generic procurement side, and have become more and more reliant on McKesson's ability to help them reduce their cost and improve their performance*.

162.     On May 4, 2016, Hammergren and Beer hosted McKesson's 4Q16 earnings call and Hammergren made the following materially false and misleading statements:

[Hammergren:] *However, on a small group of generic drugs, as we have in the past, we expect we will continue to experience price increases*.

*When we talk about generic inflation at McKesson, we are specifically referring only to the small subset of generics that experience a price increase. As we think about fiscal 2017 we expect a nominal contribution from those generic pharmaceuticals that will increase in price.*

\*     \*     \*

I know that customer consolidation, which impacted us in fiscal 2016, has caused some to question the scale and competitiveness of McKesson's generic pharmaceutical sourcing. To me there is no better proof point than some of the examples I just walked you through, while we continue to expand our customer relationships, win new customers, deliver strong growth in our one-stop proprietary generics program, and *rapidly expand the number of independent pharmacies who see real value to their bottom line by joining Health Mart*.

163.     The statements in ¶¶153-162 were materially false and misleading or omitted material facts. In particular:

(a)     Defendants' statements above that the generic drug market "remains competitive" and that generic drug price inflation was driven by "small group of generic drugs" or "supply disruption" were materially false and misleading when made because the price hikes driving McKesson's financial results, including NorthStar's collusive price hikes, were implemented on drugs for which no supply disruption had in fact occurred. As described in the AG Complaint and confirmed by Plaintiff's investigation and statistical analysis, dozens of price hikes were the result of collusive behavior. In addition, NorthStar derived collusive profits for McKesson from its collusive behavior. Finally, by May 2016, at least 79 drugs had experienced price increases of more than 50%

1    without any supply disruption, and at least another four drugs were found by the AGs to have been

2    propped up by market allocation schemes.  These 83 drugs had annual sales of more $14.8 billion.

3          (b)    Defendants' statements above concerning McKesson's ability to help

4    customers reduce costs and improve performance and McKesson being "extremely disciplined and

5    diligent" to ensure its customers were "benefiting through our action in the supply chain," helping

6    "customers buy at a competitive rate," passing through "the benefits of" drug prices to its customers,

7    and attaining "competitive price in the marketplace" were materially false and misleading when

8    made because, instead of negotiating lower prices for its customers, McKesson: (i) participated in or

9    acquiesced to the price hikes instituted by the manufacturers; and (ii) used its aggregated customer

10   purchase volume as leverage to collect higher discounts from generic drug manufacturers for itself.

11         (c)    Defendants' statements above concerning NorthStar having many competitors

12   in the market and about its growth and success were materially false and misleading when made

13   because: (i) NorthStar was in collusive relationships with generics manufacturers to hike prices for

14   generic drugs; and (ii) NorthStar's profitability was driven by anticompetitive activities.

15         (d)    Defendants' statements above concerning McKesson's revenues and

16   profitability were materially false and misleading when made because McKesson's financial results

17   were materially impacted by unsustainable generic drug price hikes, including price increases driven

18   by collusive activities.

19         (e)    Defendants' statements above concerning guidance, or derisking or having

20   "limited risk" in the guidance, were materially false and misleading when made because the

21   guidance and its assumptions were unrealistic, lacked a reasonable basis, and failed to account for

22   the unsustainability of McKesson's growth.

23       164.    On June 29, 2016, McKesson hosted its annual investor day with participation by

24   Hammergren, Beer and other senior executives.  During the call, Defendants made the following

25   materially false and misleading statements:

26           [Hammergren:] So let me talk a little bit about the three big themes that we
        think are on your minds.  **Clearly generics continues to be a very important part of**

27           **McKesson's profitability profile and our strategy.**  I know some of you believe that
        we're in the waning phases of generics, but we think we are continuing to see great

28           opportunities in generics.

*Our generic strategy is really led through our ability to attract customers into our platform of sourcing. And if we can create an opportunity for customers to benefit from sourcing their generics 100% through McKesson we can bring that market share into the market with the manufacturers and deliver real value to both our manufacturing partners as well as our pharmacy customers.*

\*   \*   \*

[Mark Walchirk, President, U.S. Pharmaceutical, McKesson Corporation:] *NorthStar continues to be a great growth vehicle for us where actually it's not new anymore, it's over 10 years. We continue to grow our NorthStar portfolio. Obviously, the channels that we continue to expand and give us more of an opportunity to grow this portfolio.*

*And so as we think about the generics business going forward, we certainly are confident in our ability to continue to grow our scale and to bring tremendous value to our customers and certainly also to McKesson and to the manufacturers.*

\*   \*   \*

[Hammergren:] *As it relates to our negotiation with manufacturers, I don't want to get necessarily into the details. But you can imagine that as Paul said earlier given that we are extremely intimate globally to these manufacturers, we understand what they are doing around the world on a real-time basis*, not only in terms of the negotiating teams we have at a country level but also our global team in London.

We have a perspective that I think is very well informed. *And one of the things that we have a responsibility to do on a regular basis is to make sure that the product pricing we're giving to our customers is extremely competitive.*

165.    On September 13, 2016, Beer participated in the Morgan Stanley Global Healthcare Conference and made the following materially false and misleading statements:

[Ricky Goldwasser, Analyst, Morgan Stanley:] I think between your reported earnings and your analyst day – you've already kind of grown Health Mart at double digit rate and above market. So one, what's driving the growth? Where are you taking share? And second, is this an example of an asset that you can show the manufacturer as you have these conversations and is this unique for McKesson?

\*   \*   \*

[Beer:] *So the reason that Health Mart has grown nicely over recent years, and consistently so, have been many. But I think you can summarize them around bringing to the independent pharmacy attractive drug pricing. So that feeds back into the One Stop program, our sourcing volumes, our capability to buy drugs at attractive prices and share that pricing with the independent pharmacy.*

166.    The statements in ¶¶164-165 were materially false and misleading or omitted material facts. In particular:

1         (a)      Defendants' statements above concerning how McKesson, through its

2   generics program, provided "real value" to the bottom line of its independent pharmacy customers

3   and gave customers "extremely competitive" or "attractive" pricing were materially false and

4   misleading when made because instead of negotiating lower prices for its customers, McKesson: (i)

5   participated in or acquiesced to the price hikes instituted by the manufacturers; and (ii) used its

6   aggregated customer purchase volume as leverage to collect higher discounts from generics

7   manufacturers for itself.

8         (b)      Defendants' statements above concerning NorthStar's growth and success

9   were materially false and misleading when made because: (i) NorthStar was in collusive

10  relationships with generics manufacturers to hike prices for generic drugs; and (ii) NorthStar's

11  profitability was driven by anticompetitive activities.

12        (c)      Defendants' statements above concerning McKesson's revenues and

13  profitability were materially false and misleading when made because McKesson's financial results

14  were materially impacted by unsustainable generic drug price hikes, including price increases driven

15  by collusive activities.

16        **2.**      **False and Misleading Statements Relating to Financial Results**

17        167.      The revenues and profit figures McKesson announced during the Class Period, listed

18  in the charts in ¶¶168-181 below, were materially false and misleading, as were the Company's

19  reasons for the increases in sales and profits.  Defendants certified that McKesson's financial

20  information was fairly presented in all material respects as to financial condition, results of

21  operations, and cash flows without disclosing that revenues and profitability were materially

22  impacted by unsustainable generic drug price hikes, including price increases driven by collusive

23  activities.  In addition, McKesson's undisclosed inflation of its sales and profit through NorthStar's

24  collusive price fixing inflated its financial results below, constituted a violation of U.S. antitrust

25  laws, and exposed the Company to significant risk of prosecution by state and federal authorities,

26  along with the attendant negative financial and reputational harm.  Moreover, Defendants' guidance

27  was unrealistic, lacked reasonable basis, and failed to account for the unsustainability of McKesson's

28  growth.

168.    Each of the Forms 10-Q and Forms 10-K below contained certifications pursuant to the Sarbanes-Oxley Act of 2002 signed by Hammergren and Beer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of fraud – or lack thereof.

169.    On October 24, 2013, McKesson reported its 2Q14 financial results in its 2Q14 Form 8-K, signed by Beer, and 2Q14 Form 10-Q, signed and certified by Hammergren and Beer:

| | Quarter Ended Sept. 30, | | Six Months Ended Sept. 30, | |
|---|---|---|---|---|
| (Dollars in millions) | 2013 | 2012 | 2013 | 2012 |
| Total Revenues | $32,954 | $29,755 | $65,162 | $$60,454 |
| Distribution Solutions Revenues | $32,169 | $29,026 | $63,572 | $58,986 |
| North America pharmaceutical distribution and services | $28,069 | $25,744 | $55,549 | $52,392 |
| | | | | |
| Gross Profit | $2,009 | $1,683 | $3,929 | $3,244 |
| Distribution Solutions | $1,623 | $1,339 | $3,143 | $2,554 |
| | | | | |
| Operating Profit | $798 | $713 | $1,536 | $1,303 |
| Distribution Solutions | $685 | $621 | $1,304 | $1,121 |
| Distribution Solutions Profit Margin | 2.13% | 2.14% | 2.05% | 1.90% |

Revenues for 2014 increased compared to the same periods a year ago primarily due to our Distribution Solutions segment, which accounted for approximately 98% of our consolidated revenues.

[*Distribution Solutions*]

Direct distribution and services revenues increased primarily due to market growth, which includes growing drug utilization and price increases, our mix of business, new customers, a shift of revenues from sales to customers' warehouses and one additional sales day. These increases were partially offset by price deflation associated with brand to generic drug conversions.

\*       \*       \*

Gross profit and gross profit margin increased for the second quarter and first six months of 2014 compared to the same periods a year ago for both of our segments.

[*Distribution Solutions*]

Distribution Solutions segment's gross profit margin increased primarily due to our acquisition of PSS World Medical, an increase in buy margin, increased sales of higher margin generic drugs and a lower proportion of revenues within the segment attributed to sales to customers' warehouses. These increases were partially offset by a decrease in sell margin and a charge related to the LIFO method of accounting for inventories. Buy margin primarily reflects volume and timing of compensation from branded and generic pharmaceutical manufacturers. Our Distribution Solutions segment's gross profit margin for the first six months of 2014 was also favorably affected by the receipt of $7 million and for the second quarter and first six months of 2013 the receipt of $19 million, representing our share of settlements of antitrust class action lawsuits brought against drug manufacturers.

\*       \*       \*

[*Segment Operating Profit*]

Operating profit margin for our Distribution Solutions and Technology Solutions segments benefited for the second quarter and first six months of 2014 from an increase in gross profit margin, partially offset by higher operating expenses as a percentage of revenues.

170.    On January 30, 2014, McKesson reported its 3Q14 financial results in its 3Q14 Form 8-K, signed by Beer, and 3Q14 Form 10-Q, signed and certified by Hammergren and Beer:

| | Quarter Ended Dec. 31, | | Nine Months Ended Dec. 31, | |
|---|---|---|---|---|
| *(Dollars in millions)* | 2013 | 2012 | 2013 | 2012 |
| Total Revenues | $34,306 | $31,099 | $99,468 | $91,553 |
| Distribution Solutions Revenues | $33,522 | $30,361 | $97,094 | $89,347 |
| North America pharmaceutical distribution and services | $29,275 | $26,854 | $84,824 | $79,246 |
| | | | | |
| Gross Profit | $1,840 | $1,645 | $5,769 | $4,889 |
| Distribution Solutions | $1,499 | $1,287 | $4,642 | $3,841 |
| | | | | |
| Operating Profit | $589 | $617 | $2,125 | $1,920 |
| Distribution Solutions | $552 | $525 | $1,856 | $1,646 |
| Distribution Solutions Profit Margin | 1.65% | 1.73% | 1.91% | 1.84% |

Revenues for 2014 increased compared to the same periods a year ago primarily due to our Distribution Solutions segment, which accounted for approximately 98% of our consolidated revenues.

\*          \*          \*

Gross profit and gross profit margin increased for the third quarter and first nine months of 2014 compared to the same periods a year ago primarily as a result of growth in our Distribution Solutions segment.

[*Distribution Solutions*]

Distribution Solutions segment's gross profit margin increased primarily due to our acquisition of PSS World Medical, increased sales of higher margin generic drugs, an increase in buy margin and a lower proportion of revenues within the segment attributed to sales to customers' warehouses. These increases were partially offset by a charge related to the LIFO method of accounting for inventories and a decrease in sell margin. Buy margin primarily reflects volume and timing of compensation from branded and generic pharmaceutical manufacturers. Our Distribution Solutions segment's gross profit margin for the third quarter and first nine months of 2014 was also favorably affected by the receipt of $27 million and $34 million and for the third quarter and first nine months of 2013 the receipt of $8 million and $27 million, representing our share of settlements of antitrust class action lawsuits brought against drug manufacturers.

\*          \*          \*

[*Segment Operating Profit*]

Operating profit margin for our Distribution Solutions segment decreased for the third quarter of 2014 and increased for the first nine months of 2014. Operating profit margin for our Distribution Solutions segment in 2014 was impacted by increased gross profit margin and higher operating expenses as a percentage of revenues associated with our acquisition of PSS.

171.    On May 12, 2014, McKesson reported its 4Q14 financial results in its 4Q14 Form 8-K, signed by Beer, and on May 14, 2014, in its 2014 Form 10-K, signed and certified by Hammergren and Beer:

| | Quarter Ended March. 31, | | Year Ended March 31, | |
|---|---|---|---|---|
| *(Dollars in millions)* | 2014 | 2013 | 2014 | 2013 |
| Total Revenues | $38,141 | $30,516 | $137,609 | $122,609 |
| Distribution Solutions | $37,332 | $29,699 | $134,426 | $119,046 |

| Revenues | | | | |
|---|---|---|---|---|
| North America pharmaceutical distribution and services | $31,122 | $28,638 | $123,930 | $115,443 |
| | | | | |
| Gross Profit | $2,540 | $1,959 | $8,309 | $6,848 |
| Distribution Solutions | $2,125 | $1,594 | $6,767 | $5,435 |
| | | | | |
| Operating Profit | $723 | $583 | $2,848 | $2,503 |
| Distribution Solutions | $605 | $549 | $2,461 | $2,195 |
| Distribution Solutions Profit Margin | 1.62% | 1.85% | 1.83% | 1.84% |

[*From May 12, 2014  Form 8-K*]

McKesson Corporation (NYSE:MCK) today reported that revenues for the fourth quarter ended March 31, 2014 were $38.1 billion, up 25% compared to $30.5 billion a year ago. On the basis of U.S. generally accepted accounting principles ("GAAP"), fourth-quarter earnings per diluted share from continuing operations was $1.56 compared to $1.11 a year ago.

For the fiscal year, McKesson had revenues of $137.6 billion compared to $122.1 billion a year ago. Full-year GAAP earnings per diluted share from continuing operations was $5.83 compared to $5.62 a year ago.

\*       \*       \*

Distribution Solutions revenues were up 26% for the fourth quarter and up 13% for the full year compared to the prior year. North America pharmaceutical distribution and services revenues, which include results from U.S. Pharmaceutical, McKesson Canada and McKesson Specialty Health, were up 9% for the fourth quarter, primarily reflecting market growth and growth from existing customers. For the full year, North America pharmaceutical distribution and services revenues were up 7% compared to the prior year.

\*       \*       \*

[*Distribution Solutions*]

In the fourth quarter, Distribution Solutions GAAP operating profit was $605 million and GAAP operating margin was 1.62%. Fourth-quarter adjusted operating profit was $905 million and the adjusted operating margin was 2.42%. For the full year, GAAP operating profit was $2.5 billion and GAAP operating margin was 1.83%. For the full year, adjusted operating profit was $3.2 billion, up 30% from the prior year, and the adjusted operating margin was 2.39%, up 31 basis points year-over-year.

[*Segment Operating Profit*]

"Distribution Solutions had another outstanding year with strong performance across the segment. We continue to deliver tremendous value for our customers through the combination of our industry-leading service, our depth of experience in the healthcare supply chain and our global sourcing expertise," said Hammergren.

\*       \*       \*

**Fiscal Year 2015 Outlook**

"Our Fiscal 2015 guidance reflects solid growth across our broad portfolio of businesses and McKesson's share of the results of Celesio.  McKesson expects Adjusted Earnings per diluted share between $10.40 and $10.80 for the fiscal year ending March 31, 2015," Hammergren concluded.

**Key Assumptions for Fiscal Year 2015 Outlook**

The Fiscal 2015 outlook is based on the following key assumptions …:

\*       \*       \*

- Price trends on generic drugs outside an exclusivity period are expected to be in the high single digits in Fiscal 2015, a decline from the price trends experienced in Fiscal 2014.

[*From May 14, 2014  Form 10-K*]

Revenues for 2014 increased 13% to $137.6 billion from 2013 and revenues for 2013 of $122.1 billion approximated 2012. Increases in our revenues were primarily driven by our Distribution Solutions segment, which accounted for approximately 98% of our consolidated revenues.

*Distribution Solutions*

North America pharmaceutical distribution and services revenues increased in 2014 compared to 2013 primarily due to market growth, reflecting growing drug utilization and price increases, and our mix of business. These increases were partially offset by price deflation associated with brand to generics drug conversion. North America revenues for 2013 approximated 2012 primarily due to market growth and our mix of business, partially offset by price deflation associated with brand to generic drug conversions, the loss of customers and fewer sales days.

\*       \*       \*

Distribution Solutions segment's gross profit margin increased in 2014 compared to 2013 primarily due to our business acquisitions, growth in sales of higher margin generic drugs, and an increase in buy margin. Buy margin primarily reflects volume and timing of compensation we receive from pharmaceutical manufacturers. These increases were partially offset by a decrease in sell margin and charges related to the LIFO method of accounting for inventories, as further described below. Additionally, gross profit was impacted by a $50 million charge for the reversal of a fair value step-up of inventory acquired as part of the Celesio acquisition. Gross profit margin increased in 2013 compared to 2012 primarily due to higher sales of generic drugs, business acquisitions, an increase in buy margin and antitrust settlement receipts, and a lower proportion of revenues within the segment attributed to lower-margin sales to customers' warehouses. These increases were partially offset by a decrease in sell margin.

\*       \*       \*

[*Segment Operating Profit*]

Operating profit margin for our Distribution Solutions segment in 2014 was flat compared to 2013, primarily reflecting an increase in gross profit margin and the $191 million impairment charge on an equity investment incurred in 2013, partially offset by higher operating expenses as a percentage of revenues, which includes the effects of our acquisitions. Operating profit margin for our Distribution Solutions segment decreased in 2013 compared to 2012 primarily due to the $191 million impairment charge on an equity investment and higher operating expenses as a percentage of revenues, which included the effects of our acquisitions. These 2013 increases were partially offset by an increase in gross profit margin.

\*       \*       \*

**2015 Outlook**

Information regarding the Company's 2015 outlook is contained in our Form 8-K dated May 13, 2014.

172.    On July 31, 2014, McKesson reported its 1Q15 financial results in its 1Q15 Form 8-K, signed by Beer, and 1Q15 Form 10-Q, signed and certified by Hammergren and Beer:

| | Quarter Ended June 30, | | | |
|---|---|---|---|---|
| (*Dollars in millions*) | 2014 | 2013 | | |
| Total Revenues | $44,058 | $32,239 | | |
| Distribution Solutions Revenues | $43,290 | $31,403 | | |
| North America pharmaceutical distribution and services | $34,304 | $32,293 | | |
| | | | | |
| Gross Profit | $2,797 | $1,930 | | |
| Distribution Solutions | $2,458 | $1,520 | | |
| | | | | |
| Operating Profit | $816 | $746 | | |
| Distribution Solutions | $748 | $619 | | |
| Distribution Solutions Profit Margin | 1.73% | 1.97% | | |

Revenues for the first quarter of 2015 increased 37% to $44.1 billion compared to the same period a year ago primarily due to our Distribution Solutions segment, which accounted for approximately 98% of our consolidated revenues.

[*Distribution Solutions*]

North America pharmaceutical distribution and services revenues increased in the first quarter of 2015 primarily due to our mix of business and market growth, reflecting growing drug utilization and price increases. These increases were partially offset by price deflation associated with brand to generics drug conversion. International pharmaceutical distribution and services revenues of $7.6 billion in the first quarter of 2015 represent revenues from

Celesio, acquired in the fourth quarter of 2014. Medical-Surgical distribution and services revenues increased primarily due to market growth.

\*       \*       \*

Gross profit increased 45% to $2.8 billion and as a percentage of revenue, gross profit margin increased 36 bp in the first quarter compared to the same period a year ago. These increases primarily reflect an increase in our Distribution Solutions operating segment, including our acquisition of Celesio.

*Distribution Solutions*

Distribution Solutions segment's gross profit margin increased primarily due to our acquisition of Celesio and growth in our North American distribution and services business which reflects sales of higher margin generic drugs and an increase in buy margin, partially offset by a decrease in sell margin. Buy margin includes volume and timing of compensation from pharmaceutical manufacturers.

\*       \*       \*

*[Segment Operating Profit]*

Operating profit margin for our Distribution Solutions segment decreased in the first quarter of 2015 primarily due to higher operating expenses as a percentage of revenues, partially offset by an increase in gross profit margin. Operating profit margin for Technology Solutions segment decreased in the first quarter of 2015 primarily due to a non-cash pre-tax charge of $34 million recorded in connection with the reclassification of the workforce business within our International Technology business from discontinued operations to continuing operations.

173.    On October 28, 2014, McKesson reported its 2Q15 financial results in its 2Q15 Form 8-K, signed by Beer, and 2Q15 Form 10-Q, signed and certified by Hammergren and Beer:

| | Quarter Ended September 30, | | Six Months Ended September 30, | |
|---|---|---|---|---|
| *(Dollars in millions)* | 2014 | 2013 | 2014 | 2013 |
| Total Revenues | $44,758 | $32,985 | $88,816 | $65,224 |
| Distribution Solutions Revenues | $43,988 | $32,169 | $87,278 | $63,572 |
| North America pharmaceutical distribution and services | $35,148 | $30,702 | $69,452 | $60,748 |
| | | | | |
| Gross Profit | $2,923 | $2,021 | $5,720 | $3,951 |
| Distribution Solutions | $2,540 | $1,624 | $4,998 | $3,144 |
| | | | | |
| Operating Profit | $918 | $805 | $1,734 | $1,551 |
| Distribution Solutions | $793 | $685 | $1,541 | $1,304 |
| Distribution Solutions Profit Margin | 1.80% | 2.13% | 1.77% | 2.05% |

Revenues for 2015 increased compared to the same period a year ago primarily due to our Distribution Solutions segment, which accounted for approximately 98% of our consolidated revenues.

*Distribution Solutions*

North America pharmaceutical distribution and services revenues increased primarily due to our mix of business and market growth. Market growth reflects growing drug utilization, which includes newly launched drugs, and price and volume increases. In 2015, our revenues benefited from two recently launched drugs for the treatment of Hepatitis C. These increases were partially offset by price deflation associated with brand to generic drug conversion. International pharmaceutical distribution and services revenues represent revenues from Celesio, which was acquired in the fourth quarter of 2014. Medical-Surgical distribution and services revenues increased primarily due to market growth.

\*       \*       \*

Gross profit and gross profit margin increased for the second quarter and first six months of 2015 compared to the same periods a year ago primarily due to an increase in our Distribution Solutions operating segment, including our acquisition of Celesio.

*Distribution Solutions*

Distribution Solutions segment's gross profit increased in the second quarter and first six months of 2015 primarily due to our acquisition of Celesio and growth in our other Distribution Solutions businesses. These increases were partially offset by higher LIFO inventory charges. Gross profit margin increased for the second

quarter and first six months of 2015 primarily due to our acquisition of Celesio, partially offset by our mix of business in our other Distribution Solutions businesses. The segment's gross profit margin for the second quarter of 2015 primarily reflects a decrease in sell margin and higher LIFO charges, partially offset by the sale of higher margin generic drugs. The segment's gross profit margin for the first six months of 2014 reflects a decrease in sell margin and higher LIFO charges, partially offset by an increase in buy margin. Buy margin includes volume and timing of compensation from pharmaceutical manufacturers. The segment's gross profit margin in 2015 was also negatively impacted by the revenues associated with the recently launched drugs for the treatment of Hepatitis C, which have lower margins.

\*       \*       \*

[*Segment Operating Profit*]

Operating profit for our Distribution Solutions segment increased in 2015 due to growth in our businesses and our acquisition of Celesio. Operating profit margin for the segment decreased in 2015 primarily due to our acquisition of Celesio and our mix of business. Operating profit and operating profit margin were also negatively impacted by higher LIFO related charges in 2015, partially offset by lower charges related to our AWP litigation.

174.    On February 5, 2015, McKesson reported its 3Q15 financial results in its 3Q15 Form 8-K, signed by Beer, and 3Q15 Form 10-Q, signed and certified by Hammergren and Beer:

| | Quarter Ended Dec. 31, | | Nine Months Ended Dec. 31, | |
|---|---|---|---|---|
| (Dollars in millions) | 2014 | 2013 | 2014 | 2013 |
| Total Revenues | $47,005 | $34,336 | $135,821 | $99,560 |
|     Distribution Solutions Revenues | $46,250 | $33,522 | $133,528 | $97,094 |
|       North America pharmaceutical distribution and services | $37,398 | $32,060 | $106,850 | $92,808 |
| | | | | |
| Gross Profit | $2,942 | $1,850 | $8,662 | $5,801 |
|     Distribution Solutions | $2,571 | $1,499 | $7,569 | $4,642 |
| | | | | |
| Operating Profit | $896 | $599 | $2,630 | $2,150 |
|     Distribution Solutions | $785 | $552 | $2,326 | $1,856 |
| Distribution Solutions Profit Margin | 1.70% | 1.65% | 1.74% | 1.91% |

Revenues for 2015 increased compared to the same period a year ago primarily due to our Distribution Solutions segment, which accounted for approximately 98% of our consolidated revenues.

[*Distribution Solutions*]

North America pharmaceutical distribution and services revenues increased primarily due to market growth and our mix of businesses. Market growth reflects growing drug utilization, which includes newly launched drugs, and price and volume increases. In 2015, our revenues benefited from recently launched drugs for the treatment of Hepatitis C. These increases were partially offset by price deflation associated with brand to generic drug conversions. International pharmaceutical distribution and services revenues represent revenues from Celesio, which was acquired in the fourth quarter of 2014. Medical-Surgical distribution and services revenues increased primarily due to market growth.

\*       \*       \*

Gross profit and gross profit margin increased for the third quarter and first nine months of 2015 primarily due to an increase in our Distribution Solutions segment. Gross profit margin for 2015 also reflects an increase in gross profit margin from our Technology Solutions segment as further discussed below.

*Distribution Solutions*

Distribution Solutions segment's gross profit increased in the third quarter and first nine months of 2015 primarily due to our acquisition of Celesio and growth in our other Distribution Solutions businesses. Gross profit margin increased in 2015 primarily due to our acquisition of Celesio and higher buy margin reflecting higher volume and price increases of pharmaceutical products. These increases were partially offset by a decrease in sell margin primarily driven by higher sales volume and the increased sales associated with the recently launched drugs for the treatment of Hepatitis C, which have lower margins. The gross profit margin for the third quarter and first nine months of 2014 was favorably affected by the receipt of $27 million and $34 million, representing our share of settlements of antitrust class action lawsuits brought against drug manufacturers.

| * | * | * |

*Segment Operating Profit:*

Distribution Solutions: Operating profit for our Distribution Solutions segment increased in 2015 primarily reflecting growth in our businesses and our acquisition of Celesio. Operating profit margin for the third quarter of 2015 increased primarily due to our mix of businesses, partially offset by our acquisition of Celesio. Operating profit margin for the first nine months of 2015 decreased primarily due to our acquisition of Celesio, partially offset by our mix of businesses.

175.    On May 12, 2015, McKesson reported its 4Q15 financial results in its 4Q15 Form 8-K, signed by Beer, and 2015 Form 10-K, signed and certified by Hammergren and Beer:

| (Dollars in millions) | Quarter Ended March 31, | | Year Ended March 31, | |
|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 |
| Total Revenues | $44,925 | $37,832 | $179,045 | $137,392 |
|    Distribution Solutions Revenues | $44,149 | $36,968 | $175,976 | $134,062 |
|       North America pharmaceutical distribution and services | $36,861 | $31,121 | $143,711 | $123,929 |
| | | | | |
| Gross Profit | $2,917 | $2,551 | $11,411 | $8,352 |
|    Distribution Solutions | $2,536 | $2,103 | $9,937 | $6,745 |
| | | | | |
| Operating Profit | $847 | $770 | $3,485 | $2,920 |
|    Distribution Solutions | $714 | $616 | $3,047 | $2,472 |
| Distribution Solutions Profit Margin | 1.62% | 1.67% | 1.73% | 1.84% |

[*From May 12, 2015  Form 8-K*]

McKesson Corporation (NYSE:MCK) today reported that revenues for the fourth quarter ended March 31, 2015 were $44.9 billion, up 19% compared to $37.8 billion a year ago. On the basis of U.S. generally accepted accounting principles ("GAAP"), fourth-quarter earnings per diluted share from continuing operations was $1.69 compared to $1.72 a year ago. Fourth-quarter GAAP earnings from continuing operations include a pre and post-tax charge of $150 million, or 64 cents per diluted share, related to a previously disclosed settlement agreement in principle with the U.S. Drug Enforcement Administration (DEA) and the U.S. Department of Justice (DOJ) regarding McKesson's monitoring and reporting of controlled substances orders.

For the fiscal year, McKesson had revenues of $179.0 billion compared to $137.4 billion a year ago, up 30% year-over-year. Full-year GAAP earnings per diluted share from continuing operations was $7.54 compared to $6.08 a year ago, up 24% year-over-year.

* * *

Distribution Solutions revenues were up 19% on a reported basis and 23% on a constant currency basis for the fourth quarter. For the full year, Distribution Solutions revenues were up 31% on a reported basis and 33% on a constant currency basis compared to the prior year.

* * *

[*Distribution Solutions*]

In the fourth quarter, Distribution Solutions GAAP operating profit was $714 million and GAAP operating margin was 1.62%. Fourth-quarter adjusted operating profit was $1.1 billion and adjusted operating margin was 2.43%. For the full year, GAAP operating profit was $3.0 billion and GAAP operating margin was 1.73%. For the full year, adjusted operating profit was $4.2 billion, up 30% on a reported basis and 31% on a constant currency basis from the prior year, and adjusted operating margin was 2.38%.

[*Segment Operating Profit*]

"Distribution Solutions had another outstanding year with strong performance across the segment. We continue to deliver tremendous value for our customers by developing solutions that help drive better business health. We are proud to be a global leader in healthcare services while remaining grounded in our tradition of operational excellence in everything we do," said Hammergren.

* * *

**Fiscal Year 2016 Outlook**

"Our Fiscal 2016 guidance reflects strong growth across our broad portfolio of businesses. McKesson expects Adjusted Earnings per diluted share of $12.20 to $12.70 for the fiscal year ending March 31, 2016, representing 12% to 16% growth year-over-year on a constant currency basis," Hammergren concluded.

**Key Assumptions for Fiscal Year 2016 Outlook**

The Fiscal 2016 outlook is based on the following key assumptions …:

*          *          *

- Price trends on generic drugs outside an exclusivity period, in the U.S. market, are expected to be slightly below those we experienced in Fiscal 2015.

[*From May 12, 2015 Form 10-K*]

Revenues for 2015 increased 30% to $179.0 billion from 2014 and revenues for 2014 increased 12% to $137.4 billion from 2013. Increases in our revenues were primarily driven by our Distribution Solutions segment, which accounted for approximately 98% of our consolidated revenues.

*Distribution Solutions*

North America pharmaceutical distribution and services revenues increased over the last two years primarily due to market growth and our mix of business. Market growth reflects growing drug utilization, which includes newly launched drugs and price increases. In particular, our 2015 revenues benefited from newly launched drugs for the treatment of Hepatitis C. These increases were partially offset by price deflation associated with brand to generic drug conversions.

*          *          *

Distribution Solutions gross profit margin increased over the last two years primarily reflecting our business acquisitions and higher buy margin within our North American distribution business, partially offset by a decrease in sell margin primarily driven by higher sales volume, and an increase in LIFO-related inventory charges. Buy margin primarily reflects volume and timing of compensation we receive from pharmaceutical manufacturers. Gross profit margin for 2015 was also unfavorably affected by the increased sales associated with newly launched drugs for the treatment of Hepatitis C. Gross profit margin for 2014 was also favorably affected by growth in sales of higher margin generic drugs.

*          *          *

*Segment Operating Profit:*

. . . Operating profit increased over the last two years primarily reflecting growth in our business and our *business* acquisitions. Operating profit margin for 2015 decreased from 2014 primarily due to our acquisition of Celesio and the unfavorable impact from the newly launched drugs for Hepatitis C, partially offset by our other mix of business. Operating profit margin in 2014 was flat compared to 2013 primarily reflecting an increase in gross profit margin and the $191 million impairment charge on an equity investment incurred in 2013, partially offset by higher operating expenses as a percentage of revenues, which included the effects of our acquisitions. In 2015, 2014 and 2013, operating profit and operating profit margin were also impacted by $150 million, $68 million and $72 million of reserve adjustments for estimated probable losses related to our controlled substance distribution claims and Average Wholesale Price litigation.

*          *          *

**2016 Outlook**

Information regarding the Company's 2016 outlook is contained in our Form 8-K dated May 12, 2015.

176.     On July 29, 2015, McKesson reported its 1Q16 financial results in its 1Q16 Form 8-K, signed by Beer, and 1Q16 Form 10-Q, signed and certified by Hammergren and Beer:

| | Quarter Ended June 30, | | | |
|---|---|---|---|---|
| *(Dollars in millions)* | 2015 | 2014 | | |
| Total Revenues | $47,546 | $43,476 | | |
| Distribution Solutions Revenues | $46,810 | $42,708 | | |

| | 2016 | 2015 | | |
|---|---|---|---|---|
| North America pharmaceutical distribution and services | $39,532 | $34,304 | | |
| | | | | |
| Gross Profit | $2,848 | $2,732 | | |
| Distribution Solutions | $2,493 | $2,393 | | |
| | | | | |
| Operating Profit | $1,068 | $808 | | |
| Distribution Solutions | $910 | $740 | | |
| Distribution Solutions Profit Margin | 1.94% | 1.73% | | |

Revenues for the first quarter of 2016 increased 9% to $47.5 billion compared to the same period a year ago primarily due to our Distribution Solutions segment, which accounted for approximately 98% of our consolidated revenues. Excluding foreign currency exchange rate fluctuations of approximately 4%, revenues increased 13%.

*Distribution Solutions*

North America pharmaceutical distribution and services revenues for the first quarter of 2016 increased primarily due to market growth, which reflects growing drug utilization (price and volume increases, as well as newly launched drugs), and expanded business with existing customers. These increases were partially offset by price deflation associated with brand to generics drug conversions.

\*       \*       \*

Gross profit increased 4% for the first quarter of 2016 compared to the prior period. Excluding foreign currency exchange rate fluctuations of approximately 5%, gross profit increased 9% due to an increase in our Distributions Solutions and Technology Solutions operating segments. Gross profit margin decreased due to our Distribution Solutions segment.

*Distribution Solutions*

Distribution Solutions segment's gross profit for the first quarter of 2016 increased 4% compared to the prior year. Excluding foreign currency exchange rate fluctuations of approximately 6%, gross profit increased 10% primarily due to higher revenues from our North America pharmaceutical distribution businesses and $59 million of cash proceeds representing our share of antitrust legal settlements, which were recorded as a reduction to cost of sales.

\*       \*       \*

*Segment Operating Profit*

Distribution Solutions: Operating profit in the first quarter of 2016 increased primarily due to higher gross profit and lower operating expenses. Results for the first quarter of 2016 include $59 million of cash proceeds representing our share of antitrust legal settlements. Operating profit margin increased primarily reflecting a decrease in operating expenses as a percentage of revenues, partially offset by a decrease in gross profit margin.

177.    On October 29, 2015, McKesson reported its 2Q16 financial results in its 2Q16 Form 8-K, signed by Beer, and 2Q16 Form 10-Q, signed and certified by Hammergren and Beer:

| | Quarter Ended September 30, | | Six Months Ended September 30, | |
|---|---|---|---|---|
| (Dollars in millions) | 2015 | 2014 | 2015 | 2014 |
| Total Revenues | $48,761 | $44,160 | $96,307 | $87,636 |
| Distribution Solutions Revenues | $48,040 | $43,390 | $94,850 | $86,098 |
| North America pharmaceutical distribution and services | $40,603 | $35,147 | $80,135 | $69,451 |
| | | | | |
| Gross Profit | $2,844 | $2,864 | $5,692 | $5,596 |
| Distribution Solutions | $2,458 | $2,481 | $4,951 | $4,874 |
| | | | | |
| Operating Profit | $1,072 | $915 | $2,140 | $1,723 |
| Distribution Solutions | $926 | $790 | $1,836 | $1,530 |
| Distribution Solutions Profit Margin | 1.93% | 1.82% | 1.94% | 1.78% |

Revenues for the second quarter and first six months of 2016 increased 10% compared to the same periods a year ago. Excluding unfavorable foreign currency effects of 4% and 3%, revenues increased 14% and 13% for the second quarter and first six months of 2016 primarily due to our Distribution Solutions segment, which accounted for approximately 99% of our consolidated revenues.

*Distribution Solutions*

North America pharmaceutical distribution and services revenues for the second quarter and first six months of 2016 increased primarily due to market growth, which reflects growing drug utilization (price and volume increases, as well as newly launched drugs), and our business mix, which includes increased volume with existing customers. These increases were partially offset by price deflation associated with brand to generics drug conversions.

\*      \*      \*

Gross profit for the second quarter of 2016 decreased 1% and for the first six months of 2016 increased 2% compared to the same periods a year ago. Excluding unfavorable foreign currency effects of 5%, gross profit increased 4% and 7% for the second quarter and first six months of 2016 primarily due to an increase in our Distribution Solutions segment. Gross profit margin for the second quarter and first six months of 2016 decreased primarily due to a decline within our Distribution Solutions segment.

*Distribution Solutions*

Distribution Solutions segment's gross profit for the second quarter of 2016 decreased 1% and for the first six months of 2016 increased 2% compared to the same periods a year ago. Excluding unfavorable foreign currency effects of 5%, gross profit increased 4% and 7% for the second quarter and first six months of 2016 primarily due to increased sales volume within our North America businesses. Gross profit for the first six months of 2016 also included $59 million of cash proceeds representing our share of antitrust legal settlements, which were recorded as a reduction to cost of sales.

\*      \*      \*

*Segment Operating Profit*

Distribution Solutions: Operating profit margin for the segment increased in 2016 compared to the same periods a year ago primarily due to lower operating expenses, partially offset by a decline in gross profit margin. Additionally, operating profit margin for 2016 includes a $51 million pre-tax gain from the sale of our ZEE Medical business and for the first six months of 2016, $59 million of cash proceeds representing our share of antitrust legal settlements.

178.    On January 27, 2016, McKesson reported its 3Q16 financial results in its 3Q16 Form 8-K, signed by Beer, and 3Q16 Form 10-Q, signed and certified by Hammergren and Beer:

|  | Quarter Ended December 31, | | Nine Months Ended December 31, | |
|---|---|---|---|---|
| *(Dollars in millions)* | 2015 | 2014 | 2015 | 2014 |
| Total Revenues | $47,899 | $46,484 | $144,206 | $134,120 |
| Distribution Solutions Revenues | $47,205 | $45,729 | $142,055 | $131,827 |
| North America pharmaceutical distribution and services | $39,615 | $37,397 | $119,750 | $106,848 |
| | | | | |
| Gross Profit | $2,872 | $2,898 | $8,564 | $8,494 |
| Distribution Solutions | $2,511 | $2,527 | $7,462 | $7,401 |
| | | | | |
| Operating Profit | $1,028 | $915 | $3,168 | $2,638 |
| Distribution Solutions | $906 | $803 | $2,742 | $2,333 |
| Distribution Solutions Profit Margin | 1.92% | 1.76% | 1.93% | 1.77% |

Revenues for the third quarter and first nine months of 2016 increased 3% and 8% compared to the same periods a year ago. Excluding unfavorable foreign currency effects of 2%, revenues increased 5% and 10% for the third quarter and first nine months of 2016 primarily due to our Distribution Solutions segment, which accounted for approximately 99% of our consolidated revenues.

*Distribution Solutions*

North America pharmaceutical distribution and services revenues for the third quarter and first nine months

of 2016 increased primarily due to market growth and our mix of business including expanded business with existing customers. These increases were partially offset by customer losses. Market growth includes growing drug utilization, newly launched drugs, price increases and price deflation, including deflation associated with brand to generic drug conversions.

\*　　　\*　　　\*

Gross profit for the third quarter and the first nine months of 2016 remained relatively unchanged compared to the same periods a year ago.  Excluding unfavorable foreign currency effects of 3% and 4%, gross profit increased 2% and 5% for the third quarter and first nine months of 2016 primarily due to an increase within our Distribution Solutions segment. Gross profit margin for the third quarter and first nine months of 2016 decreased primarily due to a decline within our Distribution Solutions segment.

*Distribution Solutions*

Distribution Solutions segment's gross profit for the third quarter and first nine months of 2016 remained relatively unchanged compared to the same periods a year ago. Excluding unfavorable foreign currency effects of 4% and 5%, gross profit increased 3% and 6% for the third quarter and first nine months of 2016 primarily due to increased sales volume within our North America business, benefits from our global procurement arrangements and lower LIFO expenses, as further discussed below. Additionally, gross profit for the third quarter and first nine months of 2016 includes $17 million and $76 million of net cash proceeds representing our share of antitrust legal settlements against certain drug manufacturers, which were recorded as a reduction to cost of sales.

\*　　　\*　　　\*

*Segment Operating Profit*

Distribution Solutions: Operating profit and operating profit margin for the segment increased in 2016 compared to the same periods a year ago primarily due to lower operating expenses. Operating profit margin for the first nine months of 2016 also benefited from a $52 million pre-tax gain from the sale of our ZEE Medical business.

179.　　On May 4, 2016, McKesson reported its 4Q16 financial results in its 4Q16 Form 8-K, signed by Beer, and on May 5, 2016, in its 2016 Form 10-K, signed and certified by Hammergren and Beer:

| | Quarter Ended March 31, | | Year Ended March 31, | |
|---|---|---|---|---|
| *(Dollars in millions)* | 2016 | 2015 | 2016 | 2015 |
| Total Revenues | $46,678 | $44,925 | $190,884 | $179,045 |
| Distribution Solutions Revenues | $45,944 | $44,149 | $187,999 | $175,976 |
| North America pharmaceutical distribution and services | $38,719 | $36,861 | $158,469 | $143,711 |
| | | | | |
| Gross Profit | $2,852 | $2,917 | $11,416 | $11,411 |
| Distribution Solutions | $2,486 | $2,536 | $9,948 | $9,937 |
| | | | | |
| Operating Profit | $904 | $847 | $4,072 | $3,485 |
| Distribution Solutions | $811 | $714 | $3,553 | $3,047 |
| Distribution Solutions Profit Margin | 1.77% | 1.62% | 1.89% | 1.73% |

[*From May 4, 2016  Form 8-K*]

McKesson Corporation (NYSE:MCK) today reported that revenues for the fourth quarter ended March 31, 2016 were $46.7 billion, up 4% compared to $44.9 billion a year ago. On a constant currency basis, revenues increased 5% over the prior year. On the basis of U.S. generally accepted accounting principles ("GAAP"), fourth-quarter earnings per diluted share from continuing operations was $1.97 compared to $1.69 a year ago. Fourth-quarter Adjusted Earnings per diluted share was $2.44, down 17% compared to the prior year.

For the fiscal year, McKesson had revenues of $190.9 billion, up 7% compared to $179.0 billion a year ago. On a constant currency basis, revenues increased 9% over the prior year. Full-year GAAP earnings per diluted share from continuing operations was $9.84 compared to $7.54 a year ago, up 31% year-over-year. Full-year Adjusted Earnings per diluted share was $12.08, up 9% compared to the prior year.

\*　　　\*　　　\*

CONSOLIDATED CLASS ACTION COMPLAINT - 3:18-cv-06525-CRB

Distribution Solutions revenues were $45.9 billion for the quarter, up 4% on a reported basis and 5% on a constant currency basis. For the full year, Distribution Solutions revenues were $188.0 billion, up 7% on a reported basis and 9% on a constant currency basis, compared to the prior year.

\*          \*          \*

[*Distribution Solutions*]

Fourth-quarter Distribution Solutions GAAP operating profit was $811 million and GAAP operating margin was 1.77%. On a constant currency basis, fourth-quarter adjusted operating profit was $970 million and adjusted operating margin was 2.09%.

[*Segment Operating Profit*]

For the full year, Distribution Solutions GAAP operating profit was $3.6 billion and GAAP operating margin was 1.89%. On a constant currency basis, full-year adjusted operating profit was $4.4 billion, up 5% compared to the prior year, and adjusted operating margin was 2.28%. Distribution Solutions fourth quarter and full-year results include $161 million in pre-tax charges related to the Cost Alignment Plan.

\*          \*          \*

**Fiscal Year 2017 Outlook**

For the fiscal year ending March 31, 2017, McKesson expects $13.30 to $13.80 per diluted share, which excludes approximately 12 to 15 cents in expected charges from Adjusted Earnings related to the Cost Alignment Plan.

"Our Fiscal 2017 outlook balances solid growth across our businesses and growth from capital deployment, with the negative impact from customer consolidation and generic pharmaceutical pricing trends in the United States," concluded Hammergren.

**Key Assumptions for Fiscal Year 2017 Outlook**

The Fiscal 2017 outlook is based on the following key assumptions ...:

- Distribution Solutions revenue growth is expected to increase by high-single digits driven by market growth and acquisitions.

\*          \*          \*

- We expect a nominal contribution to our Fiscal 2017 results from generic pharmaceuticals that increase in price.

[*From May 5, 2016 Form 10-K*]

Market growth reflects growing drug utilization, which includes newly launched drugs and price increases ....

\*          \*          \*

Revenues increased 7% and 30% in 2016 and 2015 compared to the same periods a year ago. Excluding unfavorable foreign currency effects of 2%, revenues increased 9% in 2016. These increases were primarily driven by our Distribution Solutions segment, which accounted for approximately 98% of our consolidated revenues.

*Distribution Solutions*

North America pharmaceutical distribution and services revenues increased over the last two years primarily due to market growth, expanded business with existing customers and our mix of business. These increases were partially offset by customer losses. Market growth reflects growing drug utilization, which includes newly launched drugs and price increases, partially offset by price deflation associated with brand to generic drug conversions. Additionally, our 2015 revenues benefited from newly launched drugs for the treatment of Hepatitis C.

\*          \*          \*

Distribution Solutions segment's gross profit was flat in 2016 and increased in 2015. Excluding unfavorable foreign currency effects of 4%, gross profit increased 4% in 2016. Gross profit margin decreased in 2016 primarily due to a lower sell margin within our North America distribution business driven by increased customer sales volume with some of our largest customers, partially offset by higher buy margin including benefits from our global procurement arrangements, lower LIFO-related inventory charges and $76 million in cash receipts representing our share of antitrust legal settlements. Additionally, this business has been experiencing weaker generic pharmaceutical pricing trends, which are expected to continue in 2017. Buy margin primarily reflects volume and timing of compensation we receive from pharmaceutical manufacturers, including the effects of price increases of

both branded and generic drugs.

*     *     *

*Segment Operating Profit*

Operating profit increased over the last two years primarily due to growth in our business and for 2015 due to our business acquisitions. Operating profit margin for 2016 increased due to lower operating expenses as a percentage of revenues, partially offset by a decline in gross profit margin. Operating profit and operating profit margin in 2016 includes $161 million of pre-tax charges associated with the Cost Alignment Plan, lower LIFO charges, and a $52 million pre-tax gain on the sale of our ZEE Medical *business*. Operating profit margin for 2015 decreased primarily due to our acquisition of Celesio and the unfavorable impact from the newly launched drugs for Hepatitis C, partially offset by our other mix of business. In 2015 and 2014, operating profit and operating profit margin includes $150 million and $68 million of reserve adjustments for estimated probable losses related to our controlled substance distribution claims and AWP litigation.

*     *     *

**2017 Outlook**

Information regarding the Company's 2017 outlook is contained in our Form 8-K dated May 5, 2016.

180.    On July 27, 2016, McKesson reported its 1Q17 financial results in its 1Q17 Form 8-K, signed by Beer, and 1Q17 Form 10-Q, signed and certified by Hammergren and Beer:

| | Quarter Ended June 30, | | | |
|---|---|---|---|---|
| *(Dollars in millions)* | 2016 | 2015 | | |
| Total Revenues | $49,733 | $47,546 | | |
| Distribution Solutions Revenues | $49,009 | $46,810 | | |
| North America pharmaceutical distribution and services | $41,211 | $39,532 | | |
| | | | | |
| Gross Profit | $2,907 | $2,848 | | |
| Distribution Solutions | $2,513 | $2,493 | | |
| | | | | |
| Operating Profit | $1,096 | $1,068 | | |
| Distribution Solutions | $928 | $910 | | |
| Distribution Solutions Profit Margin | 1.89% | 1.94% | | |

Revenues for the first quarter of 2017 increased 5% compared to the same period a year ago primarily due to our Distribution Solutions segment, which accounted for approximately 99% of our consolidated revenues.

*Distribution Solutions*

North America pharmaceutical distribution and services revenues for the first quarter of 2017 increased primarily due to market growth, increased sales associated with our acquisitions of Vantage and Biologics and expanded business with existing customers. These increases were partially offset by customer losses.

*     *     *

Gross profit for the first quarter of 2017 increased 2% compared to the same period a year ago due to growth in both of our operating segments: Distribution Solutions and Technology Solutions. Gross profit margin for the first quarter of 2017 decreased primarily due to a decline within our Distribution Solutions segment.

*Distribution Solutions*

Distribution Solutions segment's gross profit for the first quarter of 2017 increased compared to the same period a year ago primarily due to increased sales volume within our North America business, benefits from our global procurement arrangements, our recent acquisitions and lower LIFO expenses, as further discussed below. Additionally, gross profit for the first quarters of 2017 and 2016 included $142 million and $59 million of cash receipts representing our share of antitrust legal settlements, which were recorded as a reduction to cost of sales.

*     *     *

*Segment Operating Profit*

1

| Distribution Solutions: Operating profit increased for the segment in 2017 compared to the same period a year ago. Operating profit margin for the first quarter of 2017 decreased primarily due to lower gross profit margin. |

2

3    181.    On October 27, 2016, McKesson reported its 2Q17 financial results in its 2Q17 Form

4  8-K, signed by Beer, and 2Q17 Form 10-Q, signed and certified by Hammergren and Beer:

5

|  | Quarter Ended September 30, | | Six Months Ended September 30, | |
|---|---|---|---|---|
| *(Dollars in millions)* | 2016 | 2015 | 2016 | 2015 |
| Total Revenues | $49,957 | $48,761 | $99,690 | $96,307 |
| Distribution Solutions Revenues | $49,277 | $48,040 | $98,286 | $94,850 |
| North America pharmaceutical distribution and services | $41,375 | $40,603 | $82,586 | $80,135 |
|  |  |  |  |  |
| Gross Profit | $2,756 | $2,844 | $5,663 | $5,692 |
| Distribution Solutions | $2,396 | $2,458 | $4,909 | $4,951 |
|  |  |  |  |  |
| Operating Profit | $677 | $1,072 | $1,773 | $2,140 |
| Distribution Solutions | $851 | $926 | $1,779 | $1,836 |
| Distribution Solutions Profit Margin | 1.73% | 1.93% | 1.81% | 1.94% |

Revenues for the second quarter and first six months of 2017 increased 2% and 4% compared to the same periods a year ago primarily due to our Distribution Solutions segment, which accounted for approximately 99% of our consolidated revenues.

*Distribution Solutions*

North America pharmaceutical distribution and services revenues for the second quarter and first six months of 2017 increased primarily due to market growth, increased sales associated with our acquisitions including Vantage and Biologics and expanded business with existing customers. These increases were partially offset by customer losses.

\*        \*        \*

Gross profit and gross profit margin for the second quarter and first six months of 2017 decreased compared to the same periods a year ago primarily due to a decline in our Distribution Solutions segment.

*Distribution Solutions*

Distribution Solutions segment's gross profit and gross profit margin for the second quarter and first six months of 2017 decreased compared to the same periods a year ago due to weaker pharmaceutical pricing trends, the competitive pricing environment and lower compensation from a branded pharmaceutical manufacturer from our U.S. Pharmaceutical distribution business. These decreases were partially offset by our acquisitions, benefits from our global procurement arrangements and lower LIFO inventory charges. Gross profit for 2017 also reflects the impact of previously announced customer consolidation activity. Additionally, gross profit for the first six months of 2017 and 2016 included $142 million and $59 million of cash receipts for our share of antitrust legal settlements. For the second quarters of 2017 and 2016, LIFO inventory adjustments were a credit of $43 million and an expense of $91 million, and for the first six months of 2017 and 2016, expenses of $4 million and $182 million.

\*        \*        \*

*Segment Operating Profit*

Distribution Solutions: Operating profit and operating profit margin decreased for the second quarter and first six months of 2017 compared to the same periods a year ago primarily due to lower gross profit. Operating profit for the first six months of 2017 reflected higher cash receipts representing our share of antitrust legal settlements. Operating expenses for the second quarter and first six months of 2016 included a $52 million pre-tax gain from the sale of our ZEE Medical business.

182.    The financial results and the reasons given for the results in ¶¶168-181 were

materially false and misleading when made because McKesson's financial results were materially

impacted by unsustainable generic drug price hikes, including price increases driven by collusive activities.  In addition, Defendants' statements above concerning guidance were materially false and misleading when made because the guidance was unrealistic, lacked reasonable basis, and failed to account for the unsustainability of McKesson's growth.

## V.      ADDITIONAL EVIDENCE OF SCIENTER

### A.      Defendants Signed Sarbanes-Oxley Certifications Attesting that They Personally Supervised McKesson's Controls and Procedures

183.    Throughout the Class Period, Defendants Hammergren and Beer repeatedly certified that they personally supervised and participated in the evaluation of McKesson's financial controls and procedures, and that the Company's financial disclosures fairly and accurately presented its financial condition.  Further, McKesson's many misleading Form 10-Q and 10-K reports were always accompanied by earnings calls during which all of the Individual Defendants described the favorable, but inaccurate, financial results (several examples of such calls are set forth above).

### B.      Defendants' Compensation Structure Incentivized Fraud

184.    During the Class Period, the Individual Defendants profited handsomely from the scheme to inflate generic drug prices at the expense of McKesson's investors, customers and consumers.  At the core of McKesson's compensation structure was a McKesson-created metric, the adjusted earnings per share ("Adjusted EPS"), that incentivized the scheme.

185.    A significant portion of Hammergren's and Beer's stock and cash awards was based on the Adjusted EPS – a measure that enabled Hammergren's and Beer's compensation to benefit from fraudulent activities and be protected from the resulting negative earnings impact.  The Adjusted EPS was put into place in 2012 and allowed the Board to make upward adjustments to the conventional accounting measure EPS.  The Adjusted EPS artificially inflated the EPS by adding back to earnings the amounts set aside for items such as litigation reserves.  Reversing out from earnings the negative impact of expenses and settlements relating to investigations or litigations allowed Hammergren and Beer to implement the scheme to boost profits without the need to worry about the potential litigation-related negative impact to earnings.

186.   After instituting the Adjusted EPS measure, the Board revised the cash awards metric under the Long Term Incentive Plan from cumulative EPS to a 3-year compound annual growth rate of the Adjusted EPS.  The revised metric took effect in FY14 – from April 1, 2013 to March 31, 2014.

187.   McKesson's Adjusted EPS metric affected both stock and cash awards.  The Adjusted EPS determined 75% of the stock awards payout, and the Adjusted EPS 3-year growth rate determined 75% of the cash awards payout.

188.   In order to maximize their benefits under the Adjusted EPS and the Adjusted EPS 3-year growth rate metric that took effect for FY14, Defendants needed a quick and dramatic earnings spike to boost McKesson's earnings.  Because McKesson's earnings growth rate was a lackluster 3% prior to the Class Period,  in order to offset the pre-Class Period earnings drag, Defendants took advantage of massive generic drug price increases resulting from collusive activities to achieve a "significant pivot" to profitability in FY14.  Massive price hikes had the most immediate and significant effects on profitability.  And Defendants benefited from years of the earnings growth with an ever-increasing number of collusive and price-hiked drugs during the Class Period.

189.   By achieving immediate and outsized profitability, Hammergren and Beer also benefited from high multipliers applied to their target stock and cash awards.  During the Class Period, McKesson's senior executives, including Defendants, received as much as 216% of their target stock awards and 200% of their target cash awards as a result of the fraud:

| Fiscal Year | Stock Award Multiplier | Cash Award Multiplier |
|---|---|---|
| 2014 | 158%-216% | 200% |
| 2015 | 140%-210% | 200% |
| 2016 | 134%-168% | 200% |
| 2017 | 108%-135% | 120% |

190.   As a result of the generic drug price inflation scheme, Defendants reaped rewards that were multiples of their base compensation.  During the Class Period, Hammergren made $64.8

million from cash and stock awards, amounting to 9.6 times his base salary.  Similarly, Beer made $18.3 million from cash and stock awards, 6.5 times his base salary.

191.    Indeed, Hammergren was consistently one of the highest paid executives in the United States and the world.  As detailed in the Company's annual proxies, McKesson paid Hammergren in excess of $93.6 million from FY14 through FY17:

|  | Salary | Stock Award | Options Awards | Cash Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| FY 2014 | $1,680,000 | $7,732,173 | $4,401,579 | $10,843,200 | $375,823 | $25,032,775 |
| FY 2015 | $1,680,000 | $7,316,951 | $5,057,353 | $10,422,000 | $368,251 | $24,844,555 |
| FY 2016 | $1,680,000 | $7,317,049 | $5,057,023 | $9,233,600 | $361,966 | $23,649,638 |
| FY 2017 | $1,680,000 | $5,896,178 | $5,896,024 | $6,036,000 | $588,397 | $20,096,599 |
| Total: | $6,720,000 | $28,262,351 | $20,411,979 | $36,534,800 | $1,694,437 | $93,623,567 |

192.    Beer reaped over $27.7 million from FY14 through FY17:

|  | Salary | Stock Award | Options Awards | Cash Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| FY 2014 | $382,051 | $7,770,120[9] | $1,270,015 | $605,169 | $1,602,508[10] | $11,629,863 |
| FY 2015 | $800,000 | $1,587,902 | $1,096,968 | $1,344,000 | $11,123 | $4,839,993 |
| FY 2016 | $813,333 | $1,659,003 | $1,162,005 | $2,454,213 | $41,176 | $6,129,730 |
| FY 2017 | $840,167 | $1,328,150 | $1,328,022 | $1,554,195 | $85,096 | $5,135,630 |
| Total: | $2,835,551 | $12,345,175 | $4,857,010 | $5,957,577 | $1,739,903 | $27,735,216 |

# VI.    LOSS CAUSATION

193.    The market for McKesson's common stock was open, well-developed and efficient at all relevant times.  Throughout the Class Period, McKesson's common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public.  Plaintiff and other members of the Class purchased or otherwise acquired McKesson common stock relying upon the integrity of the market price for McKesson's common stock and market information relating to McKesson, and have been damaged thereby.

---

[9]    Beer's 2014 stock awards included a $5.5 million restricted stock units and $1 million special restricted units granted at the inception of his employment at McKesson.

[10]    Beer's other compensation included a $1,593,500 signing bonus.

194.    When the relevant truth became known and/or the materialization of the risk that had been concealed by Defendants occurred, the price of McKesson's common stock declined immediately and precipitously as the artificial inflation was removed from the market price of the stock, causing substantial damage to Plaintiff and the Class.

195.    As detailed herein, during the Class Period, Defendants made false and misleading statements and engaged in a scheme that artificially inflated McKesson's price.  Defendants: (1) falsely attributed generic drug price inflation – a significant driver of McKesson profitability growth – to nonexistent supply disruptions; (2) falsely represented that McKesson was negotiating competitive prices for its customers, particularly the independent pharmacies; (3) concealed that the Company's generic manufacturing subsidiary, NorthStar, was part of an overarching generic pharmaceutical price-fixing conspiracy that is the focus of investigations by Congress, the DOJ, and several state Attorneys General; and (4) failed to disclose that the Company's Class Period financial results were positively impacted by, and heavily reliant upon, collusive profits.  As a result of Defendants' false and misleading statements and omissions, McKesson's stock traded at artificially inflated prices throughout the Class Period.  McKesson's extraction of outsized profits from ever-increasing generic drug prices was not sustainable due to increasing political pressure and scrutiny from government authorities and market participants (which constrained manufacturers' ability to increase list prices).  Eventually, these pressures caused generic drug prices to stagnate and decline. The government investigations resulted in lawsuits by the state AGs and McKesson's customers.  In addition, as McKesson's customers realized that sky-high generic drug prices were due to artificial forces rather than the natural forces (*i.e.*, supply disruptions) McKesson had attributed them to, they demanded significant price concessions.  As this information and its impact on McKesson's financial results entered the market through a series of partial disclosures, the price of McKesson stock significantly dropped, as the artificial inflation came out of the price over time.  As a result of their purchases of McKesson stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

196.    The increased governmental actions caused the collusive behavior to abate and the impact began to hit McKesson's financial results.  On January 11, 2016, McKesson announced

1   weaker than expected generic drug pricing trends for 3Q16 and 4Q16, and for FY17, estimating an

2   $0.85 per diluted share year-over-year impact, with Defendants stating that "the majority of that

3   $0.85 is being driven by generic price increase changes."  Instead of high single-digit generic drug

4   price inflation, McKesson expected "nominal" inflation for FY17.  Hammergren explained that the

5   revised "nominal" inflation expectation was driven by "a subset of generic drug manufacturers

6   making "a decision, for whatever reason, not to have as much price change in their portfolio as they

7   did in first half of this year and obviously in FY15."  On this news, McKesson's stock price declined

8   from $182.39 per share to $163.55 per share, or 10.33%, on huge volume of 9 million shares traded.

9   The S&P 500 Healthcare Index (identified as one of McKesson's market/industry indices in the

10  Company's Form 10-K) increased 0.09%.  However, Defendants continued their scheme and limited

11  McKesson's stock price decline by falsely stating that the Company had "limited risk" and

12  "derisked" the FY17 estimates even with nominal inflation.  McKesson's stock price remained

13  inflated because Defendants continued to conceal the full impact of their fraudulent scheme from

14  investors.

15      197.   On October 27, 2016, after the market closed, McKesson announced in its 2Q17

16  Form 8-K that the "[s]econd-quarter results were impacted by a softer pricing environment in our

17  U.S. Pharmaceutical business within Distribution Solutions," with "gross profit and gross profit

18  margin for the second quarter and first six months of 2017 decreased compared to the same periods a

19  year ago due to weaker pharmaceutical pricing trends" and competitive pricing environment from

20  the U.S. distribution business.  The Form 8-K further stated that "[t]he company is updating its

21  outlook from the previous range of $13.42 to $13.93 per diluted share to a new range of $12.35 to

22  $12.85 per diluted share for the fiscal year ending March 31, 2017."  During the earnings call that

23  evening, Beer elaborated that the Company-wide adjusted gross profit for the second quarter was

24  down 6% driven in part by "expected weaker profit contribution from generic inflation trends" and

25  "increased competitive customer pricing activity."  Beer stated that competitive pricing had a large

26  negative impact on the $1.60 to $1.90 per diluted share reduction to EPS in FY17.  In response to an

27  analyst's question regarding in "which market sub-segments are you seeing the pricing pressure the

28

1  most," Hammergren stated "the most acute area right now is in our independent segment."  The

2  collapse of the collusive behavior had a direct impact on McKesson's earnings.

3       198.    On the next day, the stock closed at $124.11 per share, down 22.7% from the prior

4  day's close, with trading volume at 17 times that week's average trading volume.  The S&P 500 was

5  nearly flat that day, down 0.3% from prior day's close, and the S&P 500 Healthcare Index declined

6  only 2.18%.  McKesson's stock price remained inflated, however, because Defendants continued to

7  conceal the full impact of their fraudulent scheme from investors.

8       199.    Less than a week later, on November 3, 2016, news articles came out announcing

9  U.S. prosecutors' upcoming charges in the generic drug price-fixing probe and widespread scrutiny

10  on aggressive generics drug pricing.  *Bloomberg* announced that U.S. prosecutors planned to file

11  charges in a generic drug price-fixing probe by the end of the year.  The article pointed out that the

12  investigation was viewed as similar to the DOJ's long-running probe into auto-parts cartels, where

13  charges were eventually brought against 46 companies and 65 individuals.  *Reuters* reported that

14  McKesson was affected by the intense scrutiny on aggressive price hikes by generics manufacturers

15  and that its profit margins had benefited from the inflated generics pricing and suffered from the

16  subsequent pricing erosion when drug makers "reined in price hikes this year."  News of the

17  upcoming charges and sweeping investigations caused McKesson's stock price to decline from a

18  close of $135.83 per share on November 2, 2016 to a close of $129.59 per share on November 3,

19  2016, a decline of 4.59%.  The S&P 500 was nearly flat that day, with a decline of 0.4%, while the

20  S&P 500 Healthcare Index declined only 1.03%.  McKesson's stock price remained inflated,

21  however, because Defendants continued to conceal the full impact of their fraudulent scheme from

22  investors.

23       200.    On January 25, 2017, after the market closed, Beer announced during McKesson's

24  3Q17 earnings call that "Distribution Solutions' adjusted gross profit, excluding unusual items, was

25  down 8% on a constant currency basis for the quarter," driven in part by "expected weaker profit

26  contribution from generic manufacturer inflation trends" and "increased competitive customer

27  pricing activity we discussed last quarter."  Hammergren further revealed that "prices were

28

1  ultimately set at a lower level than our initial expectations that were included in our previous

2  guidance" in order to "retained our independent stores."

3      201.    Analysts reacted with disbelief, with UBS stating in its January 26, 2017 report that

4  "McKesson's quarter was not quite as positive as the initial headlines read, with continued pricing

5  pressures . . . the key question remains the pacing of operating profit growth over the next 12-18

6  months, particularly with elevated focus on drug price changes (both branded/generic)."  Similarly,

7  on the same day, Deutsche Bank noted that McKesson's results were "disappointing once dissected,"

8  with the earnings beat "driven entirely by a lower tax rate and a lower share count."  Further, the

9  analyst emphasized that "[s]ell side pricing on generics was detailed to be worse than previously

10  communicated, draining a profit pool for wholesalers that is unlikely to be refilled."

11      202.    McKesson's stock price dropped 8.3% on January 26, 2017 to $138.55 per share from

12  a closing price of $151.10 per share on January 25, 2017.  The S&P 500 was flat that day, declining

13  0.1%, while the S&P 500 Healthcare Index declined only 0.71%.

14      203.    Each disclosure of adverse facts that removed inflation from McKesson's stock price

15  was connected to Defendants' material false statements and omissions and the fraudulent conduct

16  alleged herein.  The timing and magnitude of McKesson's price declines negate any inference that

17  the loss suffered by Plaintiff and other Class members was caused by changed market conditions,

18  macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent

19  conduct.  As a direct result of Defendants' wrongful acts and omissions, and the precipitous decline

20  in the market value of McKesson, Plaintiff and the Class have suffered significant losses and

21  damages.

22  **VII.   NO SAFE HARBOR**

23      204.    McKesson's verbal "Safe Harbor" warnings accompanying its oral forward-looking

24  statements ("FLS") issued during the Class Period were ineffective to shield those statements from

25  liability.

26      205.    The Defendants are also liable for any false or misleading FLS pleaded because, at

27  the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

28  authorized and/or approved by an executive officer of McKesson who knew that the FLS was false.

1

## VIII.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

2

3
206.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

4

5
• Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

6
• the omissions and misrepresentations were material;

7

8
• McKesson's stock traded in an efficient market, was liquid and traded with moderate to heavy volume during the Class Period;

9
• the Company's stock was traded on the NYSE and was covered by multiple analysts;

10
• the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

11

12
• Plaintiff and members of the Class purchased, acquired and/or sold McKesson stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

13

14
207.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

15

16
208.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

17

18

19

## IX.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

20
209.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired McKesson stock during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein and their immediate families, the officers and directors of the Company, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

21

22

23

24

25

26

27

28

210.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, McKesson's stock was actively traded on the NYSE in an efficient market.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by McKesson or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

211.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of  federal law that is complained of herein.

212.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

213.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of McKesson;

- whether the Individual Defendants caused McKesson to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the price of McKesson stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

214.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

215.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

216.    This Count is asserted against all Defendants and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

217.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to that they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class; made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members as alleged herein; (ii) artificially inflate and maintain the market price of McKesson stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire McKesson stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

218.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the

1   market for McKesson stock.  Such reports, filings, releases and statements were materially false and

2   misleading in that they failed to disclose material adverse information and misrepresented the truth

3   about McKesson's business practices.

4        219.   By virtue of their positions at McKesson, Defendants had actual knowledge of the

5   materially false and misleading statements and material omissions alleged herein and intended

6   thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants

7   acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such

8   facts as would reveal the materially false and misleading nature of the statements made, although

9   such facts were readily available to Defendants.  Said acts and omissions of Defendants were

10  committed willfully or with reckless disregard for the truth.  In addition, each of the Defendants

11  knew or recklessly disregarded that material facts were being misrepresented or omitted as described

12  above.

13       220.   Information showing that Defendants acted knowingly or with reckless disregard for

14  the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or

15  directors of McKesson, the Individual Defendants had knowledge of the details of McKesson's

16  internal affairs.

17       221.   The Individual Defendants are liable both directly and indirectly for the wrongs

18  complained of herein.  Because of their positions of control and authority, the Individual Defendants

19  were able to and did, directly or indirectly, control the content of the statements of McKesson.  As

20  officers and/or directors of a publicly held company, the Individual Defendants had a duty to

21  disseminate timely, accurate, and truthful information with respect to McKesson's business

22  practices.  As a result of the dissemination of the aforementioned false and misleading reports,

23  releases and public statements, the market price of McKesson stock was artificially inflated

24  throughout the Class Period.  In ignorance of the adverse facts concerning McKesson's business and

25  financial condition that were concealed by Defendants, Plaintiff and the other members of the Class

26  purchased or otherwise acquired McKesson stock at artificially inflated prices and relied upon the

27  price of the stock, the integrity of the market for the stock and/or upon statements disseminated by

28  Defendants, and were damaged thereby.

222.     During the Class Period, McKesson stock traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of McKesson stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of McKesson stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of McKesson stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and the other Class members.

223.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

224.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's stock during the Class Period, upon the disclosure of the facts alleged herein.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against All Defendants

225.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

226.     During the Class Period, the Individual Defendants participated in the operation and management of McKesson, and conducted and participated, directly and indirectly, in the conduct of McKesson's business affairs.  Because of their senior positions, they knew the adverse non-public information about McKesson's business practices.

227.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to McKesson's financial

1    condition and results of operations, and to correct promptly any public statements issued by

2    McKesson which had become materially false or misleading.

3        228.    Because of their positions of control and authority as senior officers, the Individual

4    Defendants were able to, and did, control the contents of the various reports, press releases and

5    public filings that McKesson disseminated in the marketplace during the Class Period concerning

6    McKesson's results and operations.   Throughout the Class Period, the Individual Defendants

7    exercised their power and authority to cause McKesson to engage in the wrongful acts complained of

8    herein.   McKesson, in turn, controlled the Individual Defendants and all of its employees.

9    Defendants, therefore, were "controlling persons" within the meaning of §20(a) of the Exchange

10   Act.  In this capacity, they participated in the unlawful conduct alleged that artificially inflated the

11   market price of McKesson stock.

12       229.    By reason of the above conduct, the Defendants are liable pursuant to §20(a) of the

13   Exchange Act.

14                                    **COUNT III**

15                      **For Violation of Section 20A of the Exchange Act**
                              **Against Defendant Hammergren**

16

17       230.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set

18   forth herein.  Count III is brought pursuant to §20A of the Exchange Act against Hammergren, on

     behalf of Plaintiff and members of the Class who were damaged by Hammergren's insider trading.

19
         231.    As detailed herein, Hammergren was in possession of material non-public
20
     information concerning McKesson.  Hammergren took advantage of his possession of material non-
21
     public information regarding McKesson to obtain millions of dollars in insider trading profits during
22
     the Class Period.
23
         232.    Defendants Hammergren's sales of McKesson common stock (set forth below and in
24
     Appendix 2 hereto) were made contemporaneously with Plaintiff's purchases of McKesson common
25
     stock (set forth below and in Plaintiff's certification (ECF No. 30-2)) during the Class Period.
26
         233.    For example, Hammergren sold the following shares of McKesson common stock for
27
     total proceeds in excess of $38.8 million:
28

| Date of Sale | Amount | Price |
|---|---|---|
| 11/20/15 | 11,346 | $190.00 |
| 12/01/15 | 101,833 | $190.06 |
| 05/10/16 | 101,833 | $170.71 |

234.    During the Class Period, Plaintiff purchased the following shares of McKesson common stock contemporaneously with Hammergren's stock sales listed above:

| Date of Purchase | Amount | Price |
|---|---|---|
| 11/20/15 | 2,820 | $188.88 |
| 12/10/15 | 2,806 | $188.91 |
| 05/16/16 | 374 | $172.42 |

235.    Plaintiff and members of the Class who purchased shares of McKesson common stock contemporaneously with sales by Hammergren suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

1

## XI.     DEMAND FOR TRIAL BY JURY

2

Plaintiff hereby demands a trial by jury.

3

DATED:  April 9, 2019

ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

4

5

6

7

8

ROBBINS GELLER RUDMAN
   & DOWD LLP
SPENCER A. BURKHOLZ
LUKE O. BROOKS
RYAN A. LLORENS
ANGEL P. LAU
JEFFREY J. STEIN
ERIKA OLIVER

9

10

11

12

13

s/ Luke O. Brooks
LUKE O. BROOKS

14

15

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

16

17

Lead Counsel for Lead Plaintiff

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX 1**

| | | | | |
|---|---|---|---|---|
| 1 | Acetazolamide Tablets | 43 | Glyburide Tablets |
| 2 | Acyclovir Oral Suspension | 44 | Hydroxychloro Sulfate Tablets |
| 3 | Albuterol Sulfate Syrup | 45 | Ketoconazole Cream |
| 4 | Allopurinol Tablets | 46 | Ketoconazole Tablets |
| 5 | Amitriptyline HCL Tablets | 47 | Ketoprofen Capsule |
| 6 | Baclofen Tablets | 48 | Ketorolac Tromethamine Tablet |
| 7 | Benazepril Hydrochloro Tablets | 49 | Leflunomide Tablets |
| 8 | Bumetanide Tablet | 50 | Lidocaine Ointment |
| 9 | Carbamazepine Chewable Tablets | 51 | Memprobamate Tablets |
| 10 | Carbamazepine Tablets | 52 | Meperidine HCL Tablet |
| 11 | Cefaclor SR Tablet | 53 | Methadone HCL Oral Suspension |
| 12 | Cephalexin Oral Suspension | 54 | Mexiletine Capsule |
| 13 | Chlordiazepoxide-Clidinium Caps | 55 | Nadolol Tablet |
| 14 | Chlorothiazide Tablet | 56 | Naproxen Sodium Tablets |
| 15 | Ciprofloxacin HCL Tablet | 57 | Nefazodone Tablet |
| 16 | Clobetasol External Cream | 58 | Nimodipine Capsules |
| 17 | Clobetasol Ointment | 59 | Nortriptyline HCL Capsule |
| 18 | Clobetasol Prop Emol Cream | 60 | Nystatin Tablets |
| 19 | Clobetasol Solution | 61 | Omeprazole-Bicarb Capsules |
| 20 | Clobetasol Topical Gel | 62 | Oxybutynin Chloride Tablet |
| 21 | Clotrimazole Topical Solution | 63 | Paromomycin Capsules |
| 22 | Cromolyn Sodium Inhalant Neb Sn | 64 | Penicillin V Potass Tablet |
| 23 | Cyproheptadine HCL Tablet | 65 | Penicillin V Pottass Oral Sol |
| 24 | Danazol Capsule | 66 | Phenobarbital Tablets |
| 25 | Dicloxacillin Capsule | 67 | Pravastatin Sodium Tablets |
| 26 | Digoxin Tablets | 68 | Prazosin Capsule |
| 27 | Diltiazem HCL Tablet | 69 | Propranolol HCL SR Capsules |
| 28 | Doxycycline Hyclate DR Tablet | 70 | Propranolol Hcl Tablets |
| 29 | Doxycycline Monohydrate Tablet | 71 | Silver Nitrate Topical Solution |
| 30 | Enalapril Tablets | 72 | Sulfamethoxazole-TMP Suspension |
| 31 | Estradiol Tablets | 73 | SulfamethoxazoleTri Tablet |
| 32 | Fluocinonide External Cream | 74 | SulfamethoxazoleTri Vials Inj |
| 33 | Fluocinonide External Gel | 75 | Tetracycline HCL Capsule |
| 34 | Fluocinonide External Ointment | 76 | Theophylline SR Tablets 300mg |
| 35 | Fluoxetine HCL Oral Solution | 77 | Theophylline SR Tablets 450mg |
| 36 | Flutamide Capsule | 78 | Thiothixene Capsule |
| 37 | Fosinopril Tablet | 79 | Trazodone Tablet |
| 38 | Gentamicin Eye Drops | 80 | Tretinoin External Cream |
| 39 | Glimepiride Tablet | 81 | Ursodiol Capsules |
| 40 | Glipizide-Metformin Tablets | 82 | Verap SR Tablets |
| 41 | Glyburide Metformin HCL Tablets | 83 | Verapamil SR Capsules |
| 42 | Glyburide Micronized Tablet | 84 | Zoledronic Acid IV |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX 2**

**John Hammergren's Sales of McKesson Stock During the Class Period**

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 5/27/2014 | 183.33 | 62,798 | $11,512,757 |
| 5/28/2014 | 183.30 | 62,798 | $11,510,873 |
| 10/6/2014 | 197.36 | 95,800 | $18,907,088 |
| 10/7/2014 | 195.50 | 4,200 | $821,100 |
| 11/24/2014 | 209.00 | 10,000 | $2,090,000 |
| 11/24/2014 | 209.28 | 90,000 | $18,835,200 |
| 12/8/2014 | 214.00 | 10,000 | $2,140,000 |
| 12/8/2014 | 214.05 | 2,200 | $470,910 |
| 12/19/2014 | 214.00 | 10,000 | $2,140,000 |
| 12/19/2014 | 214.05 | 700 | $149,835 |
| 1/7/2015 | 214.00 | 77,100 | $16,499,400 |
| 1/22/2015 | 219.00 | 157 | $34,383 |
| 1/23/2015 | 219.00 | 9,843 | $2,155,617 |
| 1/23/2015 | 219.18 | 13,094 | $2,869,943 |
| 1/26/2015 | 219.00 | 12,385 | $2,712,315 |
| 1/27/2015 | 219.02 | 1,321 | $289,325 |
| 1/28/2015 | 219.53 | 63,200 | $13,874,296 |
| 5/26/2015 | 238.97 | 30,062 | $7,183,916 |
| 5/27/2015 | 238.85 | 30,000 | $7,165,500 |
| 5/28/2015 | 238.22 | 30,000 | $7,146,600 |
| 10/12/2015 | 190.51 | 101,835 | $19,400,586 |
| 11/20/2015 | 190.00 | 11,346 | $2,155,740 |
| 11/23/2015 | 190.00 | 21,089 | $4,006,910 |
| 11/24/2015 | 190.01 | 24,098 | $4,578,861 |
| 12/1/2015 | 190.06 | 101,833 | $19,354,380 |
| 1/4/2016 | 194.11 | 101,833 | $19,766,804 |
| 4/4/2016 | 159.00 | 45,300 | $7,202,700 |
| 4/25/2016 | 176.81 | 101,833 | $18,005,093 |
| 5/10/2016 | 170.71 | 101,833 | $17,383,911 |
| 5/23/2016 | 179.33 | 18,718 | $3,356,699 |
| 5/24/2016 | 182.06 | 18,709 | $3,406,161 |
| 5/25/2016 | 183.67 | 18,711 | $3,436,649 |
| 9/6/2016 | 184.22 | 100,500 | $18,514,110 |
| 9/12/2016 | 180.77 | 100,500 | $18,167,385 |
| **Total** | | | **$287,245,048** |

EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE:  GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | **MDL 2724**<br>**16-MD-2724** |
| | **HON. CYNTHIA M. RUFE** |
| **THIS DOCUMENT RELATES TO:** | |
| | **Civil Action No.** |
| *State Attorneys General Litigation* | **17-3768** |
| THE STATE OF CONNECTICUT; | |
| THE STATE OF ALABAMA; | |
| THE STATE OF ALASKA; | |
| THE STATE OF ARIZONA; | |
| THE STATE OF ARKANSAS; | **June 15, 2018** |
| THE STATE OF CALIFORNIA; | |
| THE STATE OF COLORADO; | |
| THE DISTRICT OF COLUMBIA; | **PLAINTIFF STATES'** |
| THE STATE OF DELAWARE; | **CONSOLIDATED AMENDED** |
| THE STATE OF FLORIDA; | **COMPLAINT** |
| THE STATE OF HAWAII; | |
| THE STATE OF IDAHO; | |
| THE STATE OF ILLINOIS; | |
| THE STATE OF INDIANA; | |
| THE STATE OF IOWA; | **Non-Public Version:** |
| THE STATE OF KANSAS; | **Filed Under Seal** |
| THE COMMONWEALTH OF KENTUCKY; | |
| THE STATE OF LOUISIANA; | |
| THE STATE OF MAINE; | |
| THE STATE OF MARYLAND; | |
| THE COMMONWEALTH OF MASSACHUSETTS; | |
| THE STATE OF MICHIGAN; | |
| THE STATE OF MINNESOTA; | |
| THE STATE OF MISSISSIPPI; | |
| THE STATE OF MISSOURI; | |
| THE STATE OF MONTANA; | |
| THE STATE OF NEBRASKA; | |
| THE STATE OF NEVADA; | |
| THE STATE OF NEW HAMPSHIRE; | |
| THE STATE OF NEW JERSEY; | |
| THE STATE OF NEW MEXICO; | |
| THE STATE OF NEW YORK; | |
| THE STATE OF NORTH CAROLINA; | |

THE STATE OF NORTH DAKOTA;
THE STATE OF OHIO;
THE STATE OF OKLAHOMA;
THE STATE OF OREGON;
THE COMMONWEALTH OF
    PENNSYLVANIA;
THE COMMONWEALTH OF PUERTO RICO;
THE STATE OF RHODE ISLAND;
THE STATE OF SOUTH CAROLINA;
THE STATE OF TENNESSEE;
THE STATE OF UTAH;
THE STATE OF VERMONT;
THE COMMONWEALTH OF VIRGINIA;
THE STATE OF WASHINGTON;
THE STATE OF WEST VIRGINIA;
THE STATE OF WISCONSIN;
THE STATE OF WYOMING;

       v.

ACTAVIS HOLDCO U.S., INC.;
ACTAVIS PHARMA, INC.;
ASCEND LABORATORIES, LLC;
APOTEX CORP.;
AUROBINDO PHARMA USA, INC.;
CITRON PHARMA, LLC;
DR. REDDY'S LABORATORIES, INC.;
EMCURE PHARMACEUTICALS, LTD.;
GLENMARK PHARMACEUTICALS, INC.;
HERITAGE PHARMACEUTICALS, INC.;
LANNETT COMPANY, INC.;
RAJIV MALIK;
MAYNE PHARMA INC.;
SATISH MEHTA;
MYLAN PHARMACEUTICALS, INC.;
PAR PHARMACEUTICAL COMPANIES, INC.;
SANDOZ, INC.;
SUN PHARMACEUTICAL INDUSTRIES, INC.;
TEVA PHARMACEUTICALS USA, INC.;
ZYDUS PHARMACEUTICALS (USA), INC.

179.    This agreement between Heritage and Dr. Reddy's was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### d. *Doxy DR*

#### i.    The Heritage/Mylan Agreement.

180.    Doxycycline Hyclate Delayed Release ("Doxy DR"), also known by the brand-name Doryx®, is a tetracycline-class antimicrobial indicated as adjunctive therapy for severe acne.

181.    Heritage entered the market for Doxy DR on or about July 2, 2013.  The only other generic manufacturer selling Doxy DR at that time was Defendant Mylan.

182.    Even before Heritage began selling Doxy DR, representatives of the company began to communicate with Mylan in an effort to divide the market and refrain from competing with each other on price.  Because Mylan was the only manufacturer of Doxy DR in the generic market at that time, pricing for the drug was still very profitable.

183.    In April 2013, Malek and then-Heritage CEO Jeffrey Glazer traveled to India and met with two executives of Heritage's parent company, Defendant Emcure, to discuss, among other things, their plans to enter the Doxy DR market and to coordinate how Heritage and Mylan could minimize competition between them.  It was decided that Defendant Satish Mehta ("Mehta"), the CEO of Emcure, would reach out first to a high-level counterpart at Mylan, Defendant Rajiv Malik ("Malik"), in order to facilitate subsequent communications between Glazer and Malek and their Mylan counterparts.

184.    In early May, Heritage employees at many levels began to reach out to their counterparts at Mylan to discuss Doxy DR.

49

185.    On May 3, 2013, Malek asked N.O. to set up a call between Malek and his counterpart, the Vice President of Sales at Mylan. The next day, N.O. provided Malek with contact information for J.N., a Vice President and Executive Director at Mylan. Malek promptly connected with J.N. through the website LinkedIn.

186.    Similarly, on May 7, 2013, Glazer emailed Defendant Malik, President and Executive Director at Mylan. Glazer stated: "Rajiv:  Would like to schedule a time for a call to catch up and discuss some recent Heritage news.  Please let me know when you are available and we'll pencil it in."  Malik responded with a phone number where he could be reached in England, and the two spoke the next day.

187.    During that phone call, Glazer explained to Malik that Heritage had strong business relationships with two of Mylan's Doxy DR customers – a large wholesaler and a large retail pharmacy – and that Heritage intended to pursue Mylan's business at those two accounts. Heritage's goal was to achieve significant market penetration – the two customers discussed represented approximately thirty-percent (30%) of the market – without aggressive (low) pricing.

188.    Malik responded that Mylan would "play fair" and agreed to give up the two accounts to Heritage. Malik specifically cited Heritage's prior agreement to allow Mylan to enter the market for another drug without competition as a reason that Mylan would cede share to Heritage in this instance. The competitors understood that this agreement would allow Heritage to gain market share without eroding the lucrative Doxy DR pricing in the market at that time. Malik told Glazer that he would let others at Mylan know of the plan.

189.    Over the coming months, Mylan gave up those two customers to Heritage in accordance with the agreement.

### I.    The Large Wholesaler Account ("Wholesaler A")

190.    In June 2013, Malek met at an HDMA conference in Orlando with a senior executive from Wholesaler A to discuss potential product opportunities, including Doxy DR. Very shortly thereafter, Heritage submitted a detailed product proposal to the wholesaler. Over the succeeding days, Malek reiterated the company's keen interest in entering into a supply agreement with Wholesaler A for Doxy DR.

191.    During that same period, Heritage and Mylan executives continued to discuss the market allocation scheme. For example, on June 11, 2013, M.A., a National Account Manager at Mylan called N.O. and the two spoke for nearly ten (10) minutes. Immediately following that call, N.O. called Malek to report his conversation and left him a voicemail. The two connected fifteen (15) minutes later and spoke for seven (7) minutes.

192.    On June 18, 2013, a senior manager at Wholesaler A emailed L.W., a National Account Manager at Mylan, informing him that he had received an unsolicited bid for Doxy DR from a new entrant. The manager asked that Mylan submit a bid to retain the business by close of business on June 21, 2013. This process is a customary practice in the industry and is often referred to as a "Right of First Refusal" ("ROFR"). An ROFR is often included as a term in supply contracts between manufacturers and their customers, giving the incumbent manufacturer the right to beat a competitor's price and retain the business.

193.    In keeping with the agreement Mylan had reached with Heritage to cede Wholesaler A's business, Mylan did not exercise its ROFR and failed to submit a counter bid to retain the Doxy DR business at the wholesaler.

51

194.    On June 27, 2013, having received no bid from Mylan, Wholesaler A entered into a distribution agreement with Heritage for Heritage to serve as Wholesaler A's primary supplier of Doxy DR.

195.    To date, Heritage has maintained the Doxy DR business at Wholesaler A without any competition from Mylan.

## II.    The Large Retail Pharmacy Account ("The Pharmacy")

196.    On July 8, 2013, Heritage submitted a product proposal letter to The Pharmacy seeking to obtain its Doxy DR business. The next morning, on July 9, 2013, The Pharmacy rejected Heritage's bid because the proposed pricing was too high.

197.    On July 11, 2013, Heritage e-mailed a revised bid to The Pharmacy and lowered its proposed pricing in a continued effort to obtain the Doxy DR business.

198.    At the same time that Heritage was attempting to secure an agreement with The Pharmacy, both Heritage and its parent company Emcure continued to communicate with Mylan to keep its competitor updated on the company's efforts. In particular, Heritage wanted to make sure that Mylan was still committed to the agreement and would cede the very important large retail pharmacy account to Heritage if challenged. To further this effort, Defendant Mehta of Emcure spoke to Defendant Malik of Mylan on July 18, 2013. Shortly thereafter, V.T., the President of Corporate Development and Strategy at Emcure, emailed Glazer stating "Satish spoke to Rajiv. Call me when free."

199.    After speaking to V.T., Glazer e-mailed Malik asking whether the Mylan President had time that day for a call. Malik responded that he could call Glazer later in the evening. That evening, Malik called Glazer and left a voicemail. Fifteen minutes later, Glazer called Malik back and the two spoke for 4 minutes.

52

200.     During the call, Glazer conveyed Heritage's strategy and position to Malik about The Pharmacy as well as Doxy DR in general. Glazer told Malik directly that Mylan's reaction to Heritage's bid with The Pharmacy would "set the tone of whether this is a high priced item or more erosion." As set forth more fully below, Mylan's reaction was to cede the business to Heritage and avoid price erosion. After speaking to Glazer, Malik immediately spoke to certain Mylan employees.

201.     On August 6, 2013, M.A. of Mylan called N.O. and the two spoke for nearly thirteen (13) minutes.

202.     On August 15, 2013, an executive at The Pharmacy contacted G.T., a National Account Manager at Mylan, to inform him that The Pharmacy had received an unsolicited bid for the Doxy DR business. The executive gave Mylan a very short turnaround time to submit a counter bid to retain the business.

203.     In accordance with the agreement between Mylan and Heritage, Mylan submitted a bid for Doxy DR but lowered its price by only $10, knowing that this price adjustment would not be enough to retain the business.

204.     Later that day, The Pharmacy contacted G.T. notifying him that Mylan's price reduction was not enough to retain the Doxy DR business and offered Mylan a second opportunity to lower its pricing. G.T. responded that he would let The Pharmacy know by the next morning if Mylan intended to submit a revised bid.

205.     Mylan declined to submit a revised bid to retain the Doxy DR business at The Pharmacy. As a result, in September 2013 The Pharmacy awarded the agreement to Heritage to serve as the retailer's primary supplier of Doxy DR.

206.    To date, Heritage has maintained the Doxy DR business at The Pharmacy without encountering any further competition from Mylan.

### III.    Other Customer Accounts

207.    Even after Heritage obtained the Doxy DR business at the two former Mylan accounts, the competitors continued to coordinate their efforts to maintain artificially high prices for Doxy DR. In furtherance of that goal, on several occasions, Heritage walked away and/or refrained from competing with Mylan for the Doxy DR business at other customer accounts so as not to upset the market share understanding between the two companies.

208.    For example, on November 25, 2013, after Mylan sought to protect its business with another large account, Malek sent an email to N.O. asking "can you reach out?" N.O. responded: "I have tried with [M.A., Director of National Accounts at Mylan] and nothing. Will try again."

209.    That same day, Malek also emailed Glazer, saying that "Mylan is trying to protect [the one large account at issue]. We should reach out to rajiv [*sic.*], we need one more account and we are done." Glazer's response made clear the purpose of the agreement with Mylan (maintain high prices) and questioned whether Heritage should take any action that would disrupt that agreement: "We need to look at our market share, current biz and pricing with and without [the one large account at issue] and make a decision. You don't want them retaliating and lowering prices at other accounts."

210.    After conducting the evaluation, Heritage determined not to risk altering the Doxy DR market-share balance between the two companies and, thus, declined to further pursue the Doxy DR business at the large retailer.

211.    Similarly, in February 2014, a new competitor, Defendant Mayne (formerly Midlothian Labs), entered the Doxy DR market.

212.    Shortly thereafter, Heritage was solicited by a large wholesaler requesting a bid for Doxy DR. A.S. learned from the wholesaler that Mayne had provided an unsolicited bid for the Doxy DR business, which prompted the wholesaler to approach the incumbent supplier, Mylan, to see if Mylan would match the price in order to retain the contract. Because the unsolicited Mayne bid essentially re-opened the bid process, the wholesaler asked Heritage if it would like to bid on the Doxy DR as well.

213.    In discussing the issue internally, Malek conceded that Heritage had the Doxy DR supply to fulfill the contract, but wanted "to be careful." Providing a bid would be perceived as an attack on Mylan's business and could have resulted in retaliation. A.S. agreed, adding that "we may want to allow Midlothian to have [the large wholesaler's business] since we have [a different, very large wholesale account], and others, already."

214.    The next day A.S. responded to the wholesaler and declined to provide a bid. The reason A.S. gave to the customer for the inability to provide the bid was that Heritage might not have enough supply to fulfill a contract with the wholesaler. A.S.'s explanation, however, was a lie, because three days later, she solicited a different customer – a pharmacy chain – and asked if Heritage could bid for that company's Doxy DR business, saying "we have the opportunity to add another customer."

215.    Finally, in August 2014, Heritage refused to bid for the Doxy DR business on an RFP issued by yet another Mylan customer. After deciding against submitting a proposal, Malek sent an internal email to N.O. titled "doxy dr." In the email Malek stated "[f]eel free to let your contact at mylan know we are not bidding on the rfp . . . ."

55

216.    As a result of Heritage's unlawful agreement with Mylan, pricing for Doxy DR has been substantially higher than it would have been in a competitive market.

217.    This agreement between Heritage, Emcure and Mylan was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### ii.    The Heritage/Mayne Agreement

218.    Defendant Mayne entered the market for Doxy DR in or about February 2014. Even before launching the product, Mayne approached Heritage to discuss its plans. For example, on January 7, 2014, G.S., a Director of National Accounts at Mayne, spoke by phone with A.S., a National Accounts Manager at Heritage, for 12 minutes.

219.    As a result of that conversation, Mayne's initial strategy was to avoid bidding on Heritage customers and to instead target Mylan, which at the time had roughly 60% of the Doxy DR market. That strategy was not entirely successful, however. In an internal Mayne email discussion on February 21, 2014, after learning from a wholesaler that Mylan had retained its business with that wholesaler, C.S., Executive Vice President of Generic Products at Mayne, gave G.S. his understanding of the situation based on his experience in the industry: "How I read this is Mylan has given up several large customers to Heritage and they are not giving any more. We need to go after business at Heritage also." G.S. replied "Perhaps. . . ."

220.    G.S. continued to communicate with A.S. about Doxy DR. They spoke by phone on March 13, 2014 and again four days later on March 17, 2014 for 17 minutes. Later that day, in an email to Malek and others at Heritage entitled "Midlothian intel on Doxy DR," A.S. recounted their latest conversation, as well as her current understanding with G.S.:

> I just spoke with [G.S.] of Midlothian (Mayne Pharma) about
> Doxy DR. She is the "one-man" show for that company -- she has

56

all accounts including GPOs. She has not been able to get much share on the product yet, so she says.

She did not bid OneStop, we have that customer.
She did not bid Optisource, we have that customer, and she was aware that Rick had no interest in switching.
She has been shut down at WalMart (Walmart said they couldn't go back to Mylan to reduce price again after we bid); and she was shut down at Rite Aid, Cardinal and ABC -- stating Mylan does not seem to want to give up any share. I shared info that we chose not to bid at Cardinal when asked.

She will be bidding it on the HD Smith RFP.
She will be targeting M&D now. She may go after NC Mutual but the usage is very small there.
She already has some GPO business and they already have Publix and WinnDixie business. (Important for tracking reports).
They are no where near a contract with WAG yet so she feels like that is not an option.

She is feeling pressure from the Mayne Pharma folks to get some share on this product asap. I let her know what accounts we had locked up -- and I got the impression she would not target those folks.

221.    Malek responded: "[t]hanks for the notes below. How well do you know [G.S.]?" A.S.'s response was "I know her pretty well from over the years in the industry."

222.    Only two weeks later, however, Heritage learned that Mayne had made an unsolicited bid for Doxy DR to one of Heritage's large retail pharmacy accounts. On March 31, 2014, Malek emailed A.S. stating that Mayne "[t]ook a shot at our doxy dr [at the large pharmacy account]. Can you reach out?" A.S. responded: "Yes - I can."

223.    The next day, on April 1, 2014, A.S. spoke with G.S. for 27 minutes. Immediately thereafter, A.S. sent a text message to Malek stating "[s]poke with [G.S.] of Midlothian. Said she had to go to [the large pharmacy customer]. Just got declined at Walgreens and went back a second time to cardinal and got declined again." Malek responded that Heritage "can't walk from [the large pharmacy customer]. Tell her to try Walmart."

57

224.   G.S. called A.S. again the next day and they spoke for 11 minutes. Malek also emailed the CEO Glazer, stating "[w]e are going to have to take doxy dr 30% lower at [the large pharmacy customer]. They don't pick up the phone for less than 20% difference. In this case, we spoke with Midlothian and they have struck out completely on getting share. They have gone to wag [Walgreens] and cah [Cardinal Health] twice and mylan won't budge. Please let me know your thoughts."

225.   A.S. and G.S. spoke again on April 9, 2014 for 3 minutes. A.S. then reported the conversation to Malek and N.O.: "Just got a call from [G.S.] at Midlothian and she said she has offers in to [McKesson] One Stop and Econdisc."

226.   The next day, A.S. and G.S. exchanged a series of text messages:

> (1:14pm) A.S.: "Hi! It is [A.S.]! Just getting back to you on our discussion yesterday. I don't have either account but my boss said since we are strategically aligned with both they will probably not move. We will protect. Sorry – I know it is not the news you wanted to hear."

> (1:16pm) G.S.: "Thanks. Had he given up CVS we would not have gone after the other two. We'll just keep going back as soon as we can."

> (1:18pm) A.S.: "I am bummed for you. I am keeping my ears open to understand the landscape too. I will let you know what I find out. Best bets are the RFPs that are out now."

> (1:19pm) G.S.: "Need volume. Need one Large account."

227.   Mayne continued to look for a large account over the next several months. Heritage did walk away from one account in May, 2014 when Mayne underbid Heritage's price. Upon learning of the unsolicited bid from Mayne, K.F., Associate Director of Pricing and Contracts at Heritage, asked Malek, "[l]et me know what you want me to do on this. Would like

58

to keep, but at the same time, Midlothian will keep going after accounts." To that, Malek responded, "[w]e will walk."

228.    In November 2014, Mayne again put in offers to McKesson One Stop and Econdisc. On November 20, 2014, M.E. sent an email to Malek and others at Heritage stating "Midlothian has taken another shot at our business on the Doxy 150mg at Econdisc and we have to respond to this in a timely manner."

229.    The next morning, A.S. sent a text message to G.S. stating "Happy Friday! Do you have a minute to talk about Econdisc?" G.S. responded, "Yes. Call me." A.S. then called G.S. and the two spoke for 15 minutes.

230.    A.S.'s notes reflect that when they spoke, she asked G.S. what her goals were with respect to Doxy DR.  G.S. responded that Mayne was looking for market share; she told A.S. that Mayne had to get a "big customer like Econdisc."  G.S. told A.S. that she had also submitted an offer to McKesson 10 days ago.  A.S. floated the idea that Heritage may be willing to walk from Econdisc if Mayne would agree not to price Doxy DR aggressively, and if Mayne would also agree to withdraw its offer to McKesson.

231.    Immediately after speaking with G.S., A.S. sent an email to Malek with a subject line "spoke with [G.S.]" and stating "[c]an discuss any time."

232.    After conveying to Malek what she had discussed with G.S., A.S. and G.S. exchanged several voicemails and text messages over the course of the day.

233.    Later in the afternoon on November 21, 2014, N.O. sent an email to Malek and others at Heritage, stating "Midlothian coming after us @ McKesson.  Will discuss with you on Monday."  Malek immediately forwarded the email to A.S. who responded, "[G.S.] and I played phone tag after I had spoken to you for the second time so we will definitely connect Monday."

59

234.    On November 24, 2014, A.S. and G.S. connected by phone and spoke for six (6) minutes. After speaking with G.S., A.S. emailed Malek stating "Just spoke with her ... can you call me anytime?" Within a half hour, after speaking with Malek, A.S. made a formal offer to G.S. by text message: "If you retract McK[esson] - we will give up Econ[disc]. I can talk anytime."

235.    The next day, November 25, 2014, Malek emailed A.S. asking "[d]id you speak with [G.S.]?" A.S. responded "Yes -- told her exactly what we talked about. She is on vacation this week but was going to try to rescind McKesson. . . ." Malek ended the conversation by saying "[s]ounds like we know what we need to do."

236.    In internal email communications in the weeks following this agreement, Heritage CEO Glazer confirmed that Heritage was "walking away from one [customer] so pricing would stabilize" and that Heritage "wanted to give Midlothian market share so they stop eroding" the price for Doxy DR.

237.    A.S. and G.S. continued to communicate throughout December 2014, by text message and even in person at the American Society of Health-System Pharmacists ("ASHP") conference on December 9, 2014.

238.    When Econdisc put the Doxy DR business out to bid again in January 2015, Heritage made sure that it bid a higher price than Mayne (a "cover bid"), which fulfilled Heritage's end of the agreement by "walking" from Econdisc. As one Heritage employee described it in March 2015, "[w]e basically walked from Doxy DR" at Econdisc.

239.    This anticompetitive agreement between Heritage and Mayne continued until at least December, 2015, and the effects were felt for much longer. For example, in September, 2015, Heritage was approached by a large nationwide pharmacy chain requesting a bid on Doxy

DR. A.S., initially excited about the opportunity, confirmed internally that Heritage had the capacity to bid. Malek cautioned, however, that "[w]e need to know why this is out to bid and find out who the incumbent is" before providing a response.

240.    After finding out that the incumbent supplier was Mayne, A.S. reached out to G.S. by text message. G.S. confirmed that Mayne had no supply issues and that the pharmacy chain was simply shopping for a better price. In accordance with their agreement not to compete with each other and avoid price erosion, Heritage refused to provide a bid. That same day, A.S. sent another text message to G.S. reiterating Heritage's intent to abide by the agreement, stating: "Confirming we are not bidding." G.S. responded: "Thank you."

241.    As a result of Heritage's unlawful agreement with Mayne, pricing for Doxy DR has been substantially higher than it would have been in a competitive market.

242.    This agreement between Heritage and Mayne was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### 2. Agreements to Fix Prices

243.    In addition to reaching agreements with competitors to allocate markets for a number of different generic drugs, Defendants routinely and as part of their regular course of business, sought and obtained agreements with competitors to fix and raise prices.

244.    This was often done by "socializing" a competitor to a price increase. This process involved a generic manufacturer reaching out to its competitors to first raise the possibility of a price increase, and then getting an assurance from the competitors of a willingness or agreement to engage in a price increase of some sort – or an assurance that the competitor would cooperate and not seek to take advantage of the manufacturer's price increase

378. On August 20, 2014, A.S. exchanged text messages with S.K. at Sun. During this text message exchange, A.S. described agreements that Heritage had reached with Actavis to increase prices of both Glyburide/Metformin and Verapamil:

> S.K.: "Have you heard anything about an Actavis price increase"
>
> A.S.: "I heard they were on board with it. What item specifically?"
>
> S.K.: "I don't know. I am just hearing about an increase but no details. What product have you heard about"
>
> A.S.: "We were communicating on Glyburide/Metformin and Verapamil"

379. This agreement between Heritage, Teva, Aurobindo and Actavis was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### vi. Leflunomide

380. Leflunomide, also known by the brand name Arava®, is an immunosuppressive disease-modifying antirheumatic drug used to treat active moderate-to-severe rheumatoid arthritis and psoriatic arthritis.

381. As of April 2014, Heritage was a dominant player in the market for Leflunomide, holding a 61% share. Its main competitors at that time were Defendants Apotex and Teva.

382. Jason Malek was responsible for communicating with Teva about Leflunomide price increases. Malek spoke with N.P., his contact at Teva, on April 15, 2014 for more than seventeen (17) minutes, and they discussed Heritage's intention to raise the price of Leflunomide and other drugs. During that phone call, N.P. agreed that if Heritage did raise the price of Leflunomide (and/or the other drugs), Teva would follow with its own price increase or, at least, would not challenge Heritage's price increases by seeking to underbid and take Heritage's

90

accounts.  Malek and N.P. spoke several more times over the next several months and confirmed

the agreement to raise prices, and Malek updated N.P. on the progress of the Heritage increases.

383.    M.E. was responsible for communicating with Defendant Apotex about

Leflunomide.  On May 2, 2014, M.E. placed his first-ever phone call to D.V., a Sales Manager at

Apotex.  They spoke for more than thirteen (13) minutes.

384.    On May 6, 2014, A.S. sent an email to Malek about several topics, one of which

was Leflunomide.  Heritage had recently learned that Teva might be leaving the market for

Leflunomide.  A.S. commented that "the Teva discontinuation of Leflunomide has everyone in a

fuss!  Wow – can we take more share???"  Malek responded that, with regard to Leflunomide,

"we may give some to apotex and follow our strategy we discussed.  Will have clarity by

tomorrow."

385.    That same day, M.E. had two (2) more phone calls with D.V.  Shortly after those

calls M.E. also sent an email to Malek, noting that Apotex "has taken another shot at our

Leflunomide . . . I am waiting for a callback from the VP of Apotex before we do anything."

Malek replied to M.E.'s email and confirmed the strategy he mentioned to A.S., telling M.E.

"Let's walk from leflunomide."  B.H., the Vice President of Sales at Apotex, then called M.E.

and left a voicemail.  M.E. returned her call and they spoke for more than nine (9) minutes,

followed by another call shortly after that for almost eight (8) minutes.  M.E. and B.H. followed

up those phone conversations with two more the next day, May 7, 2014.  Upon information and

belief, during these conversations Heritage and Apotex agreed to avoid competition and increase

prices on Leflunomide.

386.    On May 8, 2014, Malek sent an email to the Heritage sales team asking each of

them to confirm which competitors they had been able to speak to because Heritage needed "to

move forward with the plan asap." M.E. responded immediately that he had spoken "with everyone" and he was only waiting for feedback from one competitor with regard to the drug Meprobamate.

387.    On May 9, 2014, Heritage held another internal call about "Price Increases." Leflunomide was still on the list of drugs slated for a price increase. On May 27, 2014, Heritage learned that Apotex took a price increase on Leflunomide. When M.E. passed this information along to Malek, Malek confirmed that "we are going to increase."

388.    Heritage began sending out Price Increase Notices to its customers for Leflunomide in late June. By July 9, 2014, Heritage had been able to successfully increase prices to at least fifteen different customers nationwide.

389.    Teva began to exit the market for Leflunomide in or around July 2014, and therefore did not ultimately raise its price, despite its initial agreement to follow the Heritage price increase.

390.    This agreement between Heritage, Teva and Apotex was part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry.

### vii.   *Nystatin*

391.    Nystatin, also known by the brand name Mycostatin®, among others, is a medication used to fight fungal infections.

392.    In 2013 and 2014, Heritage's two main competitors for Nystatin were Teva and Sun, through its division Mutual Pharmaceuticals ("Mutual").

393.    Communications between Heritage, Teva and Mutual/Sun about Nystatin preceded Heritage's "Price Increase Discussion" in April 2014.

92

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 9, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Luke O. Brooks
LUKE O. BROOKS

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  lukeb@rgrdlaw.com

1548720_1

# Mailing Information for a Case 3:18-cv-06525-CRB Evanston Police Pension Fund v. McKesson Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,7223240420@filings.docketbird.com

- **Jaime Allyson Bartlett**
  jbartlett@sidley.com,sfefilingnotice@sidley.com,tberninzoni@sidley.com,dgiusti@sidley.com,jamie-bartlett-0904@ecf.pacerpro.com,enorwood@sidley.com,rwechkin@sidley.com

- **Sara B. Brody**
  sbrody@sidley.com,ddelarocha@sidley.com,sfdocket@sidley.com,sara-brody-9555@ecf.pacerpro.com

- **Luke O Brooks**
  lukeb@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Spencer A. Burkholz**
  SpenceB@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Angel Puimei Lau**
  alau@rgrdlaw.com,8467512420@filings.docketbird.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com,scaesar@rgrdlaw.com

- **Tricia Lynn McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net

- **Lesley Elizabeth Weaver**
  lweaver@bfalaw.com,emily-aldridge-5965@ecf.pacerpro.com

- **Robin Eve Wechkin**
  rwechkin@sidley.com,robin-wechkin-9585@ecf.pacerpro.com,sfefilingnotice@sidley.com,sfdocket@sidley.com,mhanhan@sidley.com,enorwood@sidley.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,1101510420@filings.docketbird.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)