1  Sara B. Brody (130222)
   sbrody@sidley.com
2  Jaime A. Bartlett (SBN 251825)
   jbartlett@sidley.com
3  Sarah A. Hemmendinger (SBN 298659)
   SIDLEY AUSTIN LLP
4  555 California Street, Suite 2000
   San Francisco, CA  94104
5  Telephone: (415) 772-1200

6  Robin Wechkin (admitted *pro hac vice*)
   rwechkin@sidley.com
7  SIDLEY AUSTIN LLP
   701 Fifth Avenue, Suite 4200
8  Seattle, WA 98104
   Telephone: (206) 262-7680
9
   *Attorneys for Defendants McKesson Corporation,*
10 *John H. Hammergren and James Beer*

11                UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                     SAN FRANCISCO

14
   EVANSTON POLICE PENSION FUND,          Case No.  3:18-cv-06525-CRB
15 Individually and on Behalf of All Others
   Similarly Situated,                    **DEFENDANTS MCKESSON
16                                         CORPORATION, JOHN H.
                Plaintiff,                 HAMMERGREN AND JAMES BEER'S
17                                         MOTION TO DISMISS**
          vs.
18                                         Honorable Charles R. Breyer
   MCKESSON CORPORATION, JOHN H.
19 HAMMERGREN, and JAMES BEER,            Date:  October 18, 2019
                                          Time: 10:00 a.m.
20              Defendants.                Courtroom 6, 17th Floor

21

22

23

24

25

26

27

28

### NOTICE OF MOTION AND MOTION TO DISMISS

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Please take notice that on October 18, 2019 at 10:00 a.m., defendants McKesson Corporation, John Hammergren and James Beer (Defendants) will bring for hearing this motion to dismiss, before the Honorable Judge Charles R. Breyer in Courtroom 6, 17th Floor, 450 Golden Gate Avenue, San Francisco, California, 94102.

As set forth in the attached memorandum, the Court should dismiss this action in its entirety under Rule 12(b)(6) because Lead Plaintiff Pension Trust Fund for Operating Engineers (Plaintiff) has failed to state a claim on which relief may be granted.

Plaintiff asserts a claim against all three Defendants under Section 10(b) of the Securities Exchange Act (Exchange Act), 15 U.S.C. § 78j(b).  Plaintiff fails, however, to plead that claim with the particularity required by the Private Securities Litigation Reform Act.  Specifically, Plaintiff has (1) failed to plead with particularity that McKesson was involved in or knew about any alleged underlying antitrust violation; (2) failed to plead with particularity that any Defendant made a materially false or misleading statement; (3) failed to establish a clear and compelling inference of deliberate fraud; and (4) failed to plead loss causation with particularity.

Plaintiff also asserts a control person claim against all three Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  This claim fails because Plaintiff has not established a primary violation under Section 10(b).

Plaintiff finally asserts a claim against John Hammergren under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.  This claim fails because Plaintiff has not established a predicate insider trading violation.

This motion is based on the attached memorandum, the Request for Judicial Notice, the Declaration of Robin Wechkin and all attached exhibits, and such argument as may be presented before or after the hearing on this matter.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 1

II.   BACKGROUND ......................................................................................... 3

      A.    McKesson's Public Statements About Generic Drug Pricing...................... 3

      B.    The AGs' Antitrust Claims Against Manufacturers .................................... 6

III.  DISCUSSION............................................................................................... 7

      A.    The PSLRA's Heightened Pleading Standards Apply To Plaintiff's
            Allegations Of Falsity, Wrongdoing And Scienter ...................................... 7

      B.    Plaintiff's Claims Fail On Falsity Grounds Because Plaintiff Has Not Pled
            With Particularity That McKesson Joined, Facilitated Or Knew About The
            Manufacturers' Alleged Conspiracy............................................................ 8

      C.    Plaintiff's Claims Fail On Falsity Grounds Because Plaintiff Has Not Shown
            That Any Category Of Challenged Statements Was Rendered False Or
            Misleading By Virtue Of Alleged Price-Fixing .......................................... 14

            1.    Supply disruption ........................................................................... 15

            2.    Value to customers ......................................................................... 17

            3.    NorthStar ........................................................................................ 19

            4.    Financial results ............................................................................. 20

      D.    Plaintiff Fails To Plead Facts Supporting A Strong Inference Of Scienter . 22

      E.    Plaintiff Has Not Established Loss Causation............................................. 29

      F.    Plaintiff's Section 20A Claim Also Fails.................................................... 34

IV.   CONCLUSION ........................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AST Research Sec. Litig.*,
   887 F. Supp. 231 (C.D. Cal. 1995) ................................................................. 35

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006) ............................................................ 8, 21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................... 9, 13

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
   691 F. App'x 389 (9th Cir. 2017) ......................................................................... 9

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   1996 WL 167350 (N.D. Ill. 1996), *rev'd on other grounds*, 123 F.3d 599 (7th Cir.
   1997) .................................................................................................................. 10

*City of Dearborn Heights v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ................................................................... 25, 27, 34

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
   906 F.2d 432 (9th Cir. 1990) ............................................................................. 13

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
   934 F. Supp. 2d 1219 (C.D. Cal. 2013) ............................................................... 7

*In re Countrywide Fin. Corp. Sec. Litig.*,
   2009 WL 943271 (C.D. Cal. Apr. 6, 2009) ......................................................... 35

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ......................................................... 34, 35

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ........................................................................... 19

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ........................................................................... 30

*Fleming v. Impax Labs., Inc.*,
   2018 WL 4616291 (N.D. Cal. Sept. 7, 2018) .............................................. *passim*

*Gamm v. Sanderson Farms, Inc.*,
   2018 WL 1319157 (S.D.N.Y. Jan. 19, 2018) ....................................................... 8

*Gammel v. Hewlett-Packard Co.*,
   905 F. Supp. 2d 1052 (C.D. Cal. 2012) ..................................................................... 26

*Hefler v. Wells Fargo & Co.*,
   2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ........................................................... 35

*Huang v. Higgins*,
   2019 WL 1245136 (N.D. Cal. Mar.18, 2019)..................................................... 30, 31

*In re Immucor, Inc. Sec. Litig.*,
   2011 WL 2619092 (N.D. Ga. June 30, 2011) .............................................................. 8

*In re ITT Educ. Servs. Sec. & S'holder Deriv. Litig.*,
   859 F. Supp. 2d 572 (S.D.N.Y. 2012) ...................................................................... 16

*In re J.P. Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005) ........................................................................ 8

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008).................................................................................... 9

*Kovtun v. VIVUS, Inc.*,
   2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) ......................................................... 26

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016).................................................................................. 32

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014)............................................................................... 30, 32

*In re Marsh & McLennan Cos., Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ................................................................. 20, 21

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) .................................................................................................. 15

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008).................................................................................. 28

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013)................................................................................ 32

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018).................................................................................... 30

*In re Mirant Corp. Sec. Litig.*,
   2009 WL 48188 (N.D. Ga. Jan. 7, 2009)..................................................................... 8

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) .................................................................................................. 9

iii

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015)............................................................................13, 14

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ........................................................... 11

*Neubronner v. Milken*,
  6 F.3d 666 (9th Cir. 1993) ......................................................................................... 34

*In re NVidia, Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014)..............................................................................22, 29

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015)............................................................................................... 22

*In re Online Travel Co. Hotel Booking Antitrust Litig.*,
  997 F. Supp. 2d 526 (N.D. Tex. 2014) ...................................................................... 13

*In re Paypal Holding, Inc. S'holder Deriv. Litig.*,
  2018 WL 466527 (N.D. Cal. Jan. 18, 2018) ............................................................. 16

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014)..............................................................................17, 26

*Ret. Fund v. Apollo Grp.*,
  774 F.3d 598 (9th Cir. 2014)..................................................................................... 29

*Rheumatology Diagnostics Lab. Inc. v. Aetna, Inc.*,
  2013 WL 5694452 (N.D. Cal. Oct. 18, 2013)............................................................. 9

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012)...........................................................................8, 17, 26, 28

*Rok v. Identiv*,
  2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ........................................................ *passim*

*Rok v. Identiv, Inc.*,
  2016 WL 4205684 (N.D. Cal. Aug. 10, 2016)........................................................... 25

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2015) ....................................................................... 20

*Superior Offshore Int'l, Inc. v. Bristow Grp.*,
  738 F. Supp. 2d 505 (D. Del. 2010) .......................................................................... 13

*In re Text Messaging Antitrust Litig.*,
  782 F.3d 867 (7th Cir. 2015)...................................................................................... 13

*Utesch v. Lannett Co.*,
  316 F. Supp. 3d 895 (E.D. Pa. 2018)......................................................................... 25

*In re Vitamins Antitrust Litig.*,
   320 F. Supp. 2d 1 (D.D.C. 2004) ............................................................................ 10

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
   328 F. Supp. 3d 963 (N.D. Cal. 2018) ................................................................... 34

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .................................................................................. 28

**Statutes**

15 U.S.C. § 78t–1(a) (Section 20A of the Securities Exchange Act) ........................3, 34, 35

15 U.S.C. § 78u-4(b) (Section 10(b) of the Securities Exchange Act) ......................... *passim*

15 U.S.C. § 78u-5 (Section 21E of the Securities Exchange Act) .................................. 21

**Other Authorities**

17 C.F.R. § 240.10b5 (Rule 10b-5) .................................................................................. 17

17 C.F.R. § 240.10b5-1 (Rule 10b5-1) .......................................................................28, 34

Fed. R. Civ. P. 12(f) ......................................................................................................... 7

1

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

2      McKesson is a major wholesaler and distributor of generic and branded drugs.  In 2013 and

3  2014, a number of drug manufacturers increased the list prices of certain generic products.

4  McKesson tracked these pricing trends and updated the market, quarter by quarter, on the impact of

5  the manufacturers' drug price increases on McKesson's business of purchasing and distributing

6  drugs to its customers.  By 2015, generic price inflation had moderated and McKesson regularly

7  briefed investors on this development as well.  After McKesson announced in January 2016 that it

8  expected only nominal price increases in generic drugs in the year to come, its stock price fell.

9      Plaintiff seeks to recover for that drop, as well as for declines in late 2016 and early 2017

10  following McKesson's reports of financial challenges unrelated to generic drug price inflation.

11  Plaintiff seeks to represent a class of purchasers of McKesson's common stock between October

12  2013 and January 2017.

13      At the core of Plaintiff's complaint is a different complaint, filed by multiple state attorneys

14  general against drug manufacturers that increased prices in 2013 and 2014 (the AG Complaint).  The

15  AGs accuse the manufacturers of conspiring to inflate prices and of making false statements, both to

16  the public and to wholesalers, to mask their illegal conduct.  Critically, the AG Complaint on which

17  Plaintiff relies, which was filed in June 2018, contains no charges against McKesson and no factual

18  allegations suggesting that McKesson was involved in any wrongdoing.  Plaintiff seeks to discount

19  this highly significant fact by stating darkly that McKesson has not been charged by government

20  regulators "yet," and by speculating that McKesson may later become the target of a government

21  probe.  But this has not happened.  One month after Plaintiff filed its amended complaint in this

22  action, the AGs filed a new 466-page complaint adding copious detail about the alleged price-fixing

23  conspiracy based on the fruits of their ongoing investigation – and again containing no suggestion

24  that McKesson conspired with manufacturers or otherwise committed any wrongdoing.

25      Plaintiff's complaint is nevertheless built on the premise that McKesson participated in or

26  facilitated the manufacturers' alleged price-fixing conspiracy.  The complaint fails because Plaintiff

27  has not come close to pleading the alleged wrongdoing even under *Twombly*'s plausibility standard,

28  much less with the heightened particularity required by the Private Securities Litigation Reform Act.

For the most part, Plaintiff steers clear of particulars about McKesson and the specific drugs it distributes, relying instead on the AGs' broadly ranging charges against the manufacturers. Plaintiff provides specific pricing information for only one drug with which McKesson was involved, leflunomide. The facts Plaintiff alleges with respect to leflunomide, however, show only that two manufacturers matched, after a period of several months, the list price published by a subsidiary of McKesson. This scarcely supports an inference that McKesson was conspiring with the manufacturers. Plaintiff also provides information about bidding for a second drug, Doxy DR, but the facts Plaintiff alleges – drawn entirely from the AG Complaint – relate solely to discussions among the manufacturers. They do not suggest that McKesson joined, facilitated or was even aware of the manufacturers' alleged conspiracy.

Because Plaintiff has failed to plead with particularity the wrongdoing on which its claims depend, the complaint fails at the outset. It also fails for several additional reasons.

First, Plaintiff's allegations of illegal conduct are meaningless in the context of a Section 10(b) claim unless Plaintiff can show that the purported wrongdoing rendered McKesson's public statements materially false or misleading. Plaintiff challenges four categories of statements, but to the extent those statements relate to generic drug price inflation at all, Plaintiff fails to allege facts showing that they were false or misleading. Perhaps the plainest example comes from Plaintiff's attack on McKesson's financial statements, which Plaintiff claims were misleading because McKesson allegedly made money by engaging in illegal price fixing. Plaintiff does not specify any inaccuracies in the financial statements; nor does Plaintiff contend that the challenged revenue and earnings figures failed to accurately reflect McKesson's financial performance. Courts routinely dismiss challenges to financial statements on similar facts.

Plaintiff's claims are also deficient on scienter grounds. Plaintiff fails to allege facts showing that the two individual defendants (McKesson's former Chief Executive Officer and Chief Financial Officer) were aware of the pricing and bidding information on which Plaintiff's claims are based, much less that they were aware of purported price *fixing*. Plaintiffs' boilerplate contentions about compensation and the "magnitude" of the alleged fraud add nothing to the analysis.

Plaintiff's loss causation allegations are similarly defective. On the first of the four

2

purported corrective disclosure dates Plaintiff cites, McKesson reported diminished generic drug pricing trends, but neither McKesson (in its announcement) nor Plaintiff (in the complaint) links the reduced trends with any purportedly unlawful activity on McKesson's part.  On the next two alleged corrective disclosure dates, McKesson provided no new information about generic drug price inflation at all, let alone information relevant to the alleged price fixing.  On the fourth date, two media outlets published reports about government investigations of generic drug manufacturers – but not of McKesson.  The law is settled that the announcement of an investigation even of a securities defendant is not, without more, sufficient to establish loss causation at the pleading stage.

Finally, Plaintiff seeks to assert a claim under Section 20A against McKesson's former CEO. That claim fails for the simple reason that Plaintiff has not pled a predicate insider trading violation. The Court should dismiss Plaintiff's claims in their entirety.

## II.    BACKGROUND

### A.    McKesson's Public Statements About Generic Drug Pricing

McKesson purchases and distributes branded and generic pharmaceuticals, medical supplies and healthcare information technologies to a wide variety of customers, including national and regional chains, independent pharmacies and institutional healthcare providers.  Consolidated Amended Complaint (CAC) ¶ 2.  McKesson's Distribution Solutions segment, which offers customers a variety of programs and products for pharmaceutical distribution, accounts for approximately 98 percent of McKesson's annual revenue.  *Id.* ¶ 43 n.4.

During a May 2013 earnings call – shortly before the beginning of Plaintiff's purported class period – McKesson forecast a revenue "pivot" for the coming fiscal year.  (McKesson's fiscal year ends March 31.)  *Id.* ¶ 44 & Ex. 1 at 8.[1]  McKesson noted that when generic drugs enter the market, this has a deflationary effect on revenue over time, as generic drugs are sold at lower prices than their branded equivalents.  *Id.* at 8.  McKesson had experienced a deflationary effect of this sort in fiscal 2013 (ended March 31, 2013), as a record number of generic drugs were launched in that period.  For fiscal 2014, McKesson predicted a "significant revenue growth return" as generic

---

[1] "Ex. _" citations in this brief refer to the exhibits to the concurrently-filed declaration of Robin Wechkin.  Page number citations refer to pagination in the original documents.

launches slowed. *Id.* at 8. McKesson also explained to investors that while branded drugs contribute more to its revenue than comparable generic drugs, generic drugs may be more profitable; they "certainly are a good thing financially . . . as [McKesson's] economics are better on generic drugs." *Id.* at 8.

In the next quarter – and, indeed, throughout the purported class period – McKesson advised investors of developments in generic drug pricing. In its July 2013 earnings call, McKesson noted that manufacturers were raising prices on certain generic drugs but cautioned that "it's really too early to make an industry call relative to trends." Ex. 2 at 14. McKesson also noted that pricing trends were "dependent on how those generic manufacturers behave over time." *Id.* at 14. For the remainder of fiscal 2014 (ended March 31, 2014), McKesson reported greater than expected inflation in generic drug prices and revised earnings guidance. Ex. 3 at 4. McKesson also reported that generic drug price inflation moderated in the second half of fiscal 2014. Ex. 4 at 11, 18.

In May 2014, McKesson provided guidance for fiscal 2015 (ended March 31, 2015). McKesson explained that its guidance was based in part on the assumption that generic price inflation would be below what it had been in fiscal 2014, but still well above historical norms. Ex. 4 at 11, 18. McKesson also cautioned that this was only an assumption – one that "certainly could be wrong" as "the manufacturers don't typically tell us what they're going to do." *Id.* at 18. For the remainder of fiscal 2015, McKesson reported generic drug inflation in line with its assumptions. Ex. 6 at 4; Ex. 7 at 7; Ex. 8 at 13.

In May 2015, McKesson again provided annual guidance and disclosed its underlying assumption that generic price trends would be slightly below those the market had seen in the preceding year. Ex. 9 at 9. McKesson referred to the "robust cycle of generic inflation" the market had been experiencing and predicted that the trend would moderate over the year. *Id.* at 18.

As fiscal 2016 progressed, McKesson reported that generic pricing trends were lower than it had forecast. McKesson explained in July 2015 that "fewer manufacturers [were] taking increases on fewer drugs," and cautioned investors that "[t]he level, nature and timing of generic pricing trends remain difficult to predict." Ex. 10 at 7, 16. In October 2015, the Company again noted generic inflation trends below expectations and projected weak trends for the remaining two quarters

4

of fiscal 2016.  Ex. 11 at 6, 8.  McKesson again cautioned investors about the difficulty of forecasting generic price inflation, explaining that it lacked "insight from what the manufacturers are planning to do in their businesses."  *Id.* at 22.  On January 11, 2016, having reported moderation or weakening of generic inflation trends for nearly two years, McKesson announced that over the next year, it expected generic price increases to have only a "nominal impact" on its financial results.  Ex. 12 at 8.  Plaintiff alleges that McKesson's stock price fell in response to this announcement.  CAC ¶ 196.

McKesson repeated its "nominal contribution" guidance in May 2016.  Ex. 13 at 4.  Over the next three quarters, McKesson reported generic pricing trends consistent with that guidance.  Ex. 14 at 7 (stating in July 2016 that quarterly gross profits "reflected the anticipated weaker profit contribution from generic pricing trends"); Ex. 15 at 3 (stating in October 2016 that "generic price inflation has been largely in line with our original assumption"); Ex. 17 at 14 (stating in January 2017 that the decline in generic inflation "has continued to be in line with our expectations, very similar to the story of the last couple of conference calls").

McKesson also discussed two new adverse developments in its October 2016 and January 2017 earnings calls.  First, inflation trends for *branded* pharmaceuticals were below expectations.  Ex. 15 at 3; Ex. 17 at 4.  And second, one of McKesson's competitors had significantly undercut McKesson's existing pricing, which required McKesson to offer price concessions to its customers in response.[2]  Ex. 15 at 4; Ex. 17 at 4.  McKesson reported in October 2016 that while it believed the concessions were appropriate, it could not be certain that its customers would find them sufficient.  Ex. 15 at 4.  The Company reported in January 2017 that it had succeeded in retaining or winning back its customers, but that the prices it had offered were lower than expectations reflected in previous guidance.  Ex. 17 at 4, 12.  Plaintiff asserts that McKesson's stock price fell in response to both the October 2016 and the January 2017 announcements.  CAC ¶¶ 133-34.

---

[2] As Plaintiff notes, McKesson has two large competitors in the distribution business, AmerisourceBergen Corporation and Cardinal Health, Inc.  CAC ¶ 41.  McKesson also faces competition from specialty wholesalers, self-warehousing chains, manufacturers engaged in direct distribution and customers who at times fulfill their own sourcing needs.

B.      **The AGs' Antitrust Claims Against Manufacturers**

While McKesson was monitoring the rise and fall of generic drug price inflation and advising investors of the impact of pricing trends on its financial performance, the generic manufacturers who set drug prices in the first instance offered their own analyses.  As Plaintiff notes, drawing on the AG Complaint, manufacturers stated publicly that rising prices were the result of supply chain disruptions.  CAC ¶ 35; Ex. 25 (hereinafter AG Com.) ¶ 8.

As Plaintiff also notes, government authorities have for years been probing this explanation and otherwise investigating certain drug manufacturers' pricing actions.  On the state side, the Connecticut Attorney General commenced an investigation in 2014, and in December 2016, together with 19 other state attorneys general, filed an antitrust complaint against six generic drug manufacturers.  *See* AG Com. at 1.  That action, which is part of multidistrict litigation pending in the Eastern District of Pennsylvania, has now grown to include 49 states asserting antitrust claims against 18 defendants.  *Id.*  The state AGs accuse the manufacturers, among other things, of making untrue statements about the reasons for generic drug price increases – both public statements and private statements to wholesalers such as McKesson.  *E.g.*, AG Com. ¶¶ 8, 214, 628, 685.  Indeed, in a series of allegations on which Plaintiff specifically draws, the state AGs claim that employees at Heritage Pharmaceuticals lied to a wholesaler about Heritage's reasons for declining to bid on a contract for the antibiotic Doxy DR.  According to the AGs, Heritage falsely told the wholesaler that it did not have sufficient supply to fulfill the contract, while the real reason was that Heritage had decided to yield a portion of the market to a competitor.  CAC ¶¶ 74-75; AG Com. ¶ 214.

Plaintiff banks heavily on the AG Complaint, but the most notable aspect of that complaint for purposes of this action is that *the AGs have not named McKesson as a defendant or otherwise accused the Company of participating in or facilitating the alleged conspiracy.*  To the contrary, as just discussed, wholesalers in McKesson's position are cast as victims of the manufacturers' false explanations.  While Plaintiff describes the AGs' price-fixing allegations in detail – including an alleged scheme with "rules of the road" and "fair share" allocations of the market, bound together by agreements formed at "girls' nights out" and similar venues – these allegations do not implicate McKesson.  To the extent the Court permits Plaintiff to rely in meeting its pleading burden on

6

allegations made in a different complaint, filed by different parties against different defendants, those allegations undermine the inferences Plaintiff is required to support.[3]

The same is true of the federal enforcement activities Plaintiff cites. Plaintiff claims that the "truth" about McKesson's involvement in the manufacturers' alleged price-fixing conspiracy emerged on November 3, 2016, when *Bloomberg Law* published an article that listed manufacturers who had received Department of Justice subpoenas, and that cited sources predicting that DOJ would file charges against manufacturers by year-end. CAC ¶ 199. But the sources did not predict that McKesson would be charged; indeed, McKesson was not named in the *Bloomberg* article at all and has not been charged in the two and a half years since it was published. Ex. 18.

Plaintiff further notes that two former executives at Heritage – with which Plaintiff accuses McKesson of conspiring – pled guilty to federal price-fixing charges in January 2017, when they committed to cooperate with the DOJ. CAC ¶ 10. But again, nearly two and a half years later, this has led to no charges against McKesson. To the extent the government activity on which Plaintiff relies is relevant at all, it undercuts Plaintiff's claims, showing that after a multi-year investigation and the cooperation of the very parties Plaintiff claims conspired with McKesson, federal and state regulators have taken no action against the defendants in this case.

## III.   DISCUSSION

### A.   The PSLRA's Heightened Pleading Standards Apply To Plaintiff's Allegations Of Falsity, Wrongdoing And Scienter

Under the Private Securities Litigation Reform Act (PSLRA), securities plaintiffs must "state

---

[3] Other courts have rejected attempts by plaintiffs to state a claim based on allegations in other complaints, noting that "[a]s a general rule, paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)." *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1226 (C.D. Cal. 2013) (internal quotation marks and citations omitted) (collecting authorities). Plaintiff here seeks to use the AG Complaint in a notably aggressive and novel way, asking the Court to consider not only what is alleged but also what might be alleged later. *E.g.*, CAC ¶ 5 ("McKesson is not *yet* named as a defendant in the AG Complaint") (emphasis added); *id.* ¶ 39 (the "head of the Connecticut AG's office . . . further suggested that wholesalers like McKesson are *possible future subjects* of the Attorneys General's probe") (emphasis added). Plaintiff cannot meet its pleading burden by means of such speculation – particularly as the AGs' new 446-page complaint, like its predecessor, contains no allegations of wrongdoing by McKesson. E.D. Pa. Case No. 2:19-cv-2407 Dkt. No. 1 (filed May 10, 2019).

1    with particularity both the facts constituting the alleged violation and the facts evidencing scienter."

2    *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876-77 (9th Cir. 2012) (citing *Tellabs, Inc. v.*

3    *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).  To adequately allege falsity, plaintiffs must

4    "specify each statement alleged to have been misleading [and] the reason or reasons why the

5    statement is misleading."  15 U.S.C. § 78u-4(b)(1).  To plead scienter, plaintiffs must "state with

6    particularity facts giving rise to a strong inference that the defendant acted with the required state of

7    mind." 15 U.S.C. § 78u-4(b)(2).

8          Critically, in cases such as this one, where Section 10(b) plaintiffs claim that defendants'

9    statements were false in light of purported antitrust or other violations, plaintiffs must satisfy the

10   PSLRA's heightened pleading standard with respect to both the challenged statements and the

11   allegation that defendants engaged in the allegedly illegal conduct in the first place.  *Gamm v.*

12   *Sanderson Farms, Inc.*, 2018 WL 1319157, at *3 (S.D.N.Y. Jan. 19, 2018) (in Section 10(b) case,

13   "[w]here the [p]laintiffs' underlying allegation . . . [is] that [a defendant] participated in an antitrust

14   conspiracy, the [p]laintiffs must plead the facts of the alleged conspiracy with particularity")

15   (citations and internal quotation marks omitted; brackets in the original); *In re Immucor, Inc. Sec.*

16   *Litig.*, 2011 WL 2619092, at *4 (N.D. Ga. June 30, 2011) ("Where false or misleading statements

17   are based on the failure to disclose illegal activity, the allegations about the underlying illegal

18   activity must also be stated with particularity").[4]  Plaintiff has not met these standards.

19          B.      **Plaintiff's Claims Fail On Falsity Grounds Because Plaintiff Has Not Pled With
                    Particularity That McKesson Joined, Facilitated Or Knew About The
20                  Manufacturers' Alleged Conspiracy**

21          Plaintiff claims that McKesson was involved in the generic drug manufacturers' alleged

22   price-fixing scheme in two ways.  In its role as a wholesaler, Plaintiff claims, McKesson "facilitated

23   and/or allowed massive price hikes."  CAC ¶ 66 (capitalization altered).  And through its subsidiary

24   _____

25   [4] Other decisions are similar.  *E.g.*, *In re Mirant Corp. Sec. Litig.*, 2009 WL 48188, at *17-19 (N.D.
     Ga. Jan. 7, 2009) (dismissing securities claims where plaintiffs failed to plead with particularity that
26   defendants improperly manipulated energy markets); *In re J.P. Morgan Chase Sec. Litig.*, 363 F.
     Supp. 2d 595, 632 (S.D.N.Y. 2005) (dismissing where plaintiffs failed to plead with particularity that
27   defendants committed underlying statutory violations); *In re Axis Capital Holdings Ltd. Sec. Litig.*,
     456 F. Supp. 2d 576 (S.D.N.Y. 2006) (dismissing where plaintiffs failed to plead with particularity
28   that defendants committed underlying antitrust violations).

NorthStar, which functions in some respects as a manufacturer, Plaintiff claims that McKesson directly "collude[d] with its competitors to increase generic drug prices."  *Id.* ¶ 8.

These allegations fall far short of establishing an underlying violation with the heightened particularity required by the PSLRA.  Indeed, Plaintiff has not sufficiently alleged even under normal pleading standards that McKesson participated in the manufacturers' alleged conspiracy in violation of Section 1 of the Sherman Act.  Under those standards, antitrust plaintiffs must plead "enough factual matter (taken as true) to suggest that an agreement was made."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Antitrust plaintiffs must also establish that each defendant made a "conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quotations and citation omitted).  Conclusory assertions are insufficient; plaintiffs must specify *facts* pertaining to the alleged agreement.[5]

Plaintiff provides none of these baseline facts.  The complaint is long, but much of it is filler.  Plaintiff borrows extensively from the AGs' complaint, providing lengthy descriptions of the generic drug industry and the alleged manufacturer conspiracy.  CAC ¶¶ 30-40, 93-95, 104-116.  Plaintiff also includes a lengthy hypothetical calculation of the benefits a wholesaler might realize when drug prices rise.  *Id.* ¶¶ 58-62.  And Plaintiff provides a long list of drugs for which prices allegedly rose by more than 50 percent.  *Id.* ¶ 65 & App. 1.  But virtually none of this is tied to McKesson.  Plaintiff pleads no facts showing that McKesson colluded with manufacturers with respect to the listed drugs.

Plaintiff does seek to provide information about particular drugs in two limited instances.  First, Plaintiff seeks to show that in its wholesaler role, McKesson facilitated illegal conduct with

---

[5] *See, e.g.*, *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008); *Bona Fide Conglomerate, Inc. v. SourceAmerica,* 691 F. App'x 389, 391 (9th Cir. 2017) (affirming dismissal of Sherman Act Section 1 claim where plaintiffs failed to "explain where and when any such agreement was consummated" or "to specify who was involved in reaching that arrangement or when the arrangement was reached"); *Rheumatology Diagnostics Lab. Inc. v. Aetna, Inc.,* 2013 WL 5694452, at *11 (N.D. Cal. Oct. 18, 2013) (allegation that defendants entered into an agreement, without "giving any *facts* to support it is insufficient to state a claim") (emphasis in original).

respect to the drug Doxy DR.  Second, Plaintiff alleges that through its NorthStar subsidiary, McKesson itself conspired to fix prices for the drug leflunomide.  But neither set of allegations remotely supports the required inference that McKesson factiliated or even knew about the manufacturers' purported conspiracy.[6]

**Doxy DR.**  Plaintiff's allegations about Doxy DR are drawn entirely from the AG Complaint. CAC ¶¶ 10, 73-77 (citing AG Com. at 49-61).  These incorporated allegations, to the extent the Court considers them, show at most that certain manufacturers discussed among themselves whether and when to compete for McKesson's business.  Neither the AGs nor Plaintiff pleads facts suggesting that McKesson knew about these discussions, much less that McKesson facilitated or participated in the manufacturers' alleged conspiracy.  Implicit in the AG Complaint, moreover, is the premise that McKesson, like other wholesalers, fostered competition among manufacturers and awarded contracts to the lowest bidder – which was precisely why the manufacturers had to make agreements among themselves in order to thwart that pro-competitive practice.

More specifically, the AGs allege that in mid-2013, Heritage sought to enter the market for Doxy DR, which at that point was being sold only by the manufacturer Mylan Pharmaceuticals.  AG Com. ¶ 181.  One of the accounts Heritage targeted is identified by the AGs as "Wholesaler A," which Plaintiff contends, without explanation, is McKesson.  CAC ¶ 74; AG Com. ¶¶ 190-95. Heritage purportedly told Mylan that it had a "strong business relationship" with Wholesaler A and made a bid for Wholesaler A's Doxy DR business.  *Id.*  In response, Wholesaler A invited Mylan to exercise its contractual right of first refusal, which "giv[es] the incumbent manufacturer the right to beat a competitor's price and retain the business."  AG Com. ¶ 192.  Rather than exercising its right

---

[6] In discussing Plaintiffs' allegations that McKesson facilitated or knew about the alleged manufacturer conspiracy, Defendants in no way concede that facilitation or knowledge of a third party's purported antitrust violations is itself a violation of the antitrust laws.  Indeed, the law is to the contrary.  *E.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 1996 WL 167350, at *23 (N.D. Ill. 1996) ("it is improper to equate knowledge of another's practice with knowing participation in an illegal conspiracy"), *rev'd on other grounds*, 123 F.3d 599 (7th Cir. 1997); *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 16 (D.D.C. 2004) ("Knowledge alone is not sufficient to prove that any particular Defendant intended to join" the price-fixing conspiracy); *Antitrust Resource Manual*, UNITED STATES DEP'T OF JUSTICE (Nov. 2017) ("Of course, mere knowledge of the conspiracy without participation in the conspiracy does not make a defendant a member of the conspiracy"). For purposes of this motion, however, the Court need not reach the issue.

1   of first refusal, Mylan ceded its business with Wholesaler A to Heritage.  *Id.* ¶ 193.

2          None of this suggests that Wholesaler A supported or even suspected any agreement between

3   Mylan and Heritage.  Indeed, by inviting Mylan to exercise its right of first refusal, Wholesaler A

4   was encouraging a bidding competition between the two manufacturers.  The result of these

5   activities, moreover, is that Wholesaler A was able to obtain Doxy DR at a *lower* price from

6   Heritage than it had originally been paying Mylan.[7]

7          The AGs' allegations about activity surrounding Doxy DR in 2014 are similarly devoid of

8   any suggestion that McKesson was engaged in or even knew about wrongdoing.  In 2014, a third

9   manufacturer, Mayne Pharma, sought to enter the Doxy DR market, and the AGs allege that

10  Heritage successfully deterred Mayne from competing for McKesson's business.  According to the

11  AGs, when a Heritage employee learned in April 2014 that Mayne had bid for McKesson's business,

12  the Heritage employee told Mayne that Heritage was "strategically aligned" with McKesson and

13  speculated that McKesson would "probably" not move its account to Mayne.  *Id.* ¶ 226.  In

14  November 2014, Mayne nevertheless submitted a second competing bid – but soon agreed to rescind

15  the bid in exchange for Heritage's agreement to yield a different customer to Mayne.  *Id.* ¶¶ 233-35.

16         Once again, neither the AGs nor Plaintiff alleges that McKesson was aware of the

17  interactions between the manufacturers, let alone that McKesson worked to aid the manufacturers'

18  plot.  And once again, the underlying premise of those interactions is that McKesson would move its

19  business to the low bidder.  Without the threat of losing McKesson's business to a lower bidder,

20  Heritage would have had no reason to press Mayne to withdraw its competing bids.  *See id.* ¶¶ 234-

21  36.  Plaintiffs' interpretation of the AGs' Doxy DR allegations – that the manufacturers' collusive

22  behavior "would not be possible . . . [w]ithout McKesson[]," CAC ¶ 73 – finds no support in the

23  AGs' allegations themselves.  There is no factual basis in either the AG Complaint or Plaintiff's own

24  complaint for Plaintiff's conclusory assertion that McKesson facilitated the manufacturers' alleged

25  conspiracy.

26  _____

27  [7] Notably, in a securities action against Mylan based in part on the same AG allegations about
    Mylan's interactions with Heritage in 2013, the Southern District of New York dismissed on scienter
28  grounds the claim that Mylan had unlawfully agreed with Heritage to allocate the market for Doxy
    DR.  *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *17 (S.D.N.Y. Mar. 28, 2018).

1    ***Leflunomide.***  Plaintiff next accuses McKesson's subsidiary, NorthStar, of acting directly to

2    fix prices for six drugs.  Of the six, Plaintiff specifies prices for only one, leflunomide.  CAC ¶¶ 97-

3    102.  With respect to four of the other five, Plaintiff does not allege that NorthStar raised prices at

4    all.  Plaintiff claims only that NorthStar entered the market at "a collusive price level" – which

5    Plaintiff then fails to specify.  *Id.* ¶ 102.  Plaintiff's conclusory allegation that collusion occurred

6    before NorthStar entered the market falls short of Plaintiff's obligation to allege particularized facts

7    showing that NorthStar entered into an unlawful agreement with other manufacturers.  *Supra* at 8 &

8    n.4.  Nor do the AGs' allegations help Plaintiff.  The AGs do not mention these five drugs at all.

9    As to leflunomide, Plaintiff purports to draw on the AG Complaint but obscures the fact that

10   the AGs' leflunomide allegations have nothing to do with NorthStar (or McKesson).  The AGs'

11   allegations relate solely to interactions among Heritage, Apotex Corporation and Teva

12   Pharmaceuticals in 2014, a year before Plaintiff alleges NorthStar took any action with respect to

13   leflunomide.  AG Com. ¶¶ 380-89; CAC ¶ 98.

14   In contrast with the AGs' allegations, Plaintiff's leflunomide allegations relate to activity in

15   the second half of 2015 – a period about which the AGs are silent.  By July 2015, Teva had left the

16   leflunomide market.  Plaintiff does not specify which if any other manufacturers were still selling

17   leflunomide in July 2015; notably, Plaintiff does not allege that Heritage and Apotex had remained

18   in the market through this time.  All Plaintiff alleges is that in July 2015, NorthStar unilaterally

19   raised the list price of leflunomide from $1.10 to $5.20 per unit.  CAC ¶ 98.  List prices for generic

20   drugs are reported in publicly available databases.  AG Com. ¶ 60.[8]  Roughly four months after

21   NorthStar raised its leflunomide list price to $5.20, Heritage and Apotex began selling the drug

22   under the same posted list price.  CAC ¶ 98.[9]

23   This four-month time lapse alone differentiates this case from *Impax*, the one other securities

24   _____

25   [8] *See also* Medi-Span Price Rx https://www.wolterskluwercdi.com/price-rx/; Truven Red Book
     Online, https://truvenhealth.com/Portals/0/Assets/Brochures/International/INTL_12543_0413_

26   RedbookPS_WEB1.pdf.

27   [9] Plaintiff does not specify the exact dates on which Heritage and Apotex began posting this list
     price, instead providing a compressed timeline graphic that appears to put Heritage's action in mid-

28   November and Apotex's several weeks later.  *Id.*

action in this District arising from government investigations into generic drug pricing.  In *Impax*, two competitors allegedly "'acted in perfect lock-step' by raising [drug] prices within days of each other, and shortly after an industry conference." *Fleming v. Impax Labs., Inc.*, 2018 WL 4616291, at *3 (N.D. Cal. Sept. 7, 2018).  Perhaps the alleged actions of Heritage and Apotex – whom the AGs accuse of communicating with each other and eventually agreeing to avoid competition over leflunomide during an earlier period – could be considered comparable to the manufacturers' actions in *Impax*.  AG Com. ¶¶ 383-87.  But no facts Plaintiff alleges support an inference that *NorthStar* was part of any conspiracy.  At most, Plaintiff has alleged parallel pricing actions, and "conscious parallelism [. . .] is not in itself unlawful." *Twombly*, 550 U.S. at 553-54.  This principle is foundational in antitrust law.  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) ("Allegations of . . . slow adoption of similar policies do[] not raise the specter of collusion"); *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 871-72 (7th Cir. 2015) (competitors may raise prices in a "follow the leader" fashion "not because they've agreed not to compete but because all of them have determined independently that they may be better off with a higher price"); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 443-44 (9th Cir. 1990) (proof of follow the leader pricing "is generally considered insufficient to establish a violation of the Sherman Act"); *In re Online Travel Co. Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 543 (N.D. Tex. 2014) (competitors' seriatim adoption of similar pricing strategies "is the sort of gradual pricing change rejected as unsuspicious").[10]

Plaintiff nevertheless contends that the "only explanation" for Heritage and Apotex's decision to post a list price of $5.20 for leflunomide four months after NorthStar did so is that all three manufacturers had been conspiring all along.  CAC ¶ 99.  In support, Plaintiff relies on the contention that McKesson was "strategically aligned" with Heritage.  *Id.*  This is nonsense.  The term "strategically aligned" comes from the AG Complaint:  According to the AGs, a Heritage sales

---

[10] The purported "plus factors" Plaintiff cites, CAC ¶¶ 104-121 do not support Plaintiff's conspiracy allegations either.  *See, e.g.*, *Superior Offshore Int'l, Inc. v. Bristow Grp.*, 738 F. Supp. 2d 505, 508, 513-514 (D. Del. 2010) (alleged inelastic demand, lack of reasonable substitutes, highly concentrated market and "ample opportunities to conspire under cover of legitimate business" do not "taken singly or taken together, justif[y] an inference of conspiracy").

1  executive used the term in 2014 in trying to dissuade Mayne from bidding against Heritage for

2  McKesson's Doxy DR business.  *Supra* at 11.  Neither the AGs nor Plaintiff alleges that McKesson

3  was privy to these communications.  Nor does Plaintiff plead facts suggesting that McKesson (or

4  NorthStar) recognized any such "alignment" with respect to any drug, or that McKesson's

5  relationship with Heritage was different from its relationship with any other generic drug

6  manufacturer.  And while Plaintiff states confidently that no benign explanation could account for

7  NorthStar's July 2015 price increase, Plaintiff itself alleges that Teva had exited the market in 2014,

8  and pleads no facts indicating that any other manufacturer was still selling leflunomide in July 2015.

9  "Allegations of facts that could just as easily suggest rational, legal business behavior by the

10 defendants as they could suggest an illegal conspiracy are insufficient" to plead even an antitrust

11 violation.  *Musical Instruments*, 798 F.3d at 1194 (citation omitted).  *A fortiori*, such factual

12 allegations are insufficient in the Section 10(b) context, where plaintiffs must plead purportedly

13 illegal conduct with the heightened particularity required by the PSLRA.

14        Finally, Plaintiff's leflunomide allegations fail to suggest that NorthStar was engaged in

15 illegal price fixing because Plaintiff *does not specify the price NorthStar actually charged for the*

16 *drug*.  The $5.20 price point Plaintiff cites is a list price, and Plaintiff itself notes that the publicly-

17 reported list price differs from the price manufacturers charge their customers.  CAC ¶¶ 58, 69; AG

18 Com. ¶ 60.  As Plaintiff acknowledges, manufacturers offer wholesalers discounts of varying sizes;

19 list price is a *ceiling* for manufacturers, not the final price they charge.  *Id.*  Plaintiff is silent about

20 the net price NorthStar charged for leflunomide and equally silent about the prices Heritage and

21 Apotex charged.  Because Plaintiff has not established an agreement between NorthStar and any

22 manufacturer, has not pled facts showing anything more than purportedly parallel list price increases

23 spread out over a substantial time, and has not shown even that NorthStar and its competitors

24 charged the same price, Plaintiff has failed to plead illegal conduct with respect to leflunomide.

25    C.    **Plaintiff's Claims Fail On Falsity Grounds Because Plaintiff Has Not Shown**
             **That Any Category Of Challenged Statements Was Rendered False Or**
26           **Misleading By Virtue Of Alleged Price-Fixing**

27        Plaintiff's claims further fail on falsity grounds because Plaintiff has not identified a

28 materially false or misleading statement.  Even if Plaintiff had successfully alleged that McKesson

1  participated in, facilitated or was aware of a price-fixing scheme among manufacturers – and

2  Plaintiff has not – this would be entirely distinct from a Section 10(b) claim.  Section 10(b) is not a

3  general disclosure statute and does not require companies or executives to disclose all material

4  information to the market.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *see also,*

5  *e.g.*, *Rok v. Identiv*, 2017 WL 35496, at *8 (N.D. Cal. Jan. 4, 2017).  The baseline element of a

6  Section 10(b) claim is a materially false or misleading statement.

7          Plaintiff targets four groups of statements:  (1) statements attributing generic price inflation

8  to supply disruptions; (2) statements referring to the value McKesson delivers to its customers; (3)

9  statements about NorthStar; and (4) statements of financial results.  CAC ¶ 1.  But none of these

10  statements was rendered false or misleading by virtue of the alleged conspiracy.

11          1.       **Supply disruption**

12          As set forth above, McKesson consistently disclosed the ebbs and flows of generic price

13  inflation between 2013 and 2017, advising investors of the impact those trends had on its business.

14  McKesson also provided possible reasons for inflation.  In June 2014, for example, McKesson stated

15  that "at the heart of [inflation] is our view that it is a supply disruption that is driving the price

16  increase."  CAC ¶ 142.  At the same time, McKesson repeatedly cautioned investors that it did not

17  have complete visibility into manufacturers' pricing decisions.  *Supra* at 4-5; *infra* at 24 n.16.

18          Plaintiff attacks McKesson's references to supply disruption, claiming that the statements

19  were false because, among other things, "[t]he price increases were not due to a raw material

20  shortage, spike in production costs or restrictive regulations."  CAC ¶ 80.  But when McKesson used

21  the term "supply disruption," it was referring to market phenomena broader than material shortages,

22  production costs and regulatory restrictions.  As McKesson made clear in the very statements

23  Plaintiff challenges, "supply disruption" referred both to situations in which external forces impeded

24  a manufacturer's ability to produce drugs – such as a temporary plant closure ordered by the FDA –

25  and to instances in which manufacturers exited the market on their own initiative.  CAC ¶¶ 141-42,

26  145, 148, 150, 154-55.  Plaintiff has not established that McKesson's references to such supply

27  disruptions were false.  Plaintiff pleads no facts showing that manufacturers did *not* experience or

28  report such disruptions, or that disruptions of the kind McKesson referred to did *not* drive price

1   inflation in at least some instances.

2       Indeed, Plaintiff's central antitrust theory – that manufacturers agreed to cease competing for

3   certain customers – is entirely consistent with McKesson's stated view that some manufacturers

4   were exiting the market for some drugs.  If two manufacturers agreed that one of them would stop

5   competing for McKesson's business – which is exactly what Plaintiff claims happened with Doxy

6   DR – then from McKesson's perspective, this would register as a supply disruption.  McKesson's

7   challenged statements about supply disruption are also consistent with the AGs' claim that

8   manufacturers falsely told wholesalers that they were supply-constrained in order to explain why

9   they were not bidding on particular contracts.  *Supra* at 6; AG Com. ¶¶ 213-14.[11]

10      Plaintiff asserts that McKesson should have looked behind such explanations and disclosed

11  that the real reason for rising prices was a price-fixing conspiracy.  CAC ¶ 35.  Plaintiff's claim, in

12  other words, is that McKesson should have investigated the manufacturers and accused them of

13  antitrust violations and fraud.  But under the securities laws, McKesson had no duty to do so.

14  McKesson plainly had no duty, as the government investigations unfolded, to accuse *itself* of

15  participating in the wrongdoing the state AGs later alleged on the part of the manufacturers.

16  "Federal securities laws do not impose upon companies a 'duty to disclose uncharged, unadjudicated

17  wrongdoing.'"  *In re Paypal Holding, Inc. S'holder Deriv. Litig.*, 2018 WL 466527, at *3 (N.D. Cal.

18  Jan. 18, 2018) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173

19  (2d Cir. 2014)); *see also, e.g.*, *In re ITT Educ. Servs. Sec. & S'holder Deriv. Litig.*, 859 F. Supp. 2d

20  572, 579 (S.D.N.Y. 2012) ("securities laws do not impose a general duty to disclose corporate

21  mismanagement or uncharged criminal conduct") (citation omitted).  By the same token, McKesson

22  had no duty to accuse *others* of what was at the time uncharged conduct.

23      Plaintiff's attack on McKesson's supply disruption statements also fails in light of the

24  minimal particularity with which Plaintiff has alleged wrongdoing on McKesson's part.  As

25  _____

    [11] Plaintiff states in sweeping fashion that none of the drugs listed in Appendix 1 was subject to any
26  "supply or production issues to justify the price increase."  CAC ¶ 65 n.6.  In support, Plaintiff refers
    to the purported absence of certain regulatory events, including label changes, "clinical investigator
27  inspections" and "FDA notification[s] of drug shortages."  *Id.*  This leaves out the broader set of
    circumstances that McKesson characterized – and told the market it characterized – as supply
28  disruptions.

1    discussed, the complaint is largely devoid of details about particular products or price points, with

2    the limited exception of allegations about Doxy DR and leflunomide.  Even if Plaintiff had

3    sufficiently alleged wrongdoing by McKesson in connection with those two drugs – and Plaintiff has

4    not – this would not show that McKesson's statements about supply disruption *generally* were false

5    or misleading.  McKesson distributes thousands of drugs, and Plaintiff claims that dozens of drugs in

6    the marketplace during the purported class period were the subject of price inflation.  CAC ¶ 65 n.6

7    & App. 1.  In discussing the reasons for inflation generally, McKesson was not obligated to

8    enumerate reasons specific to the two drugs Plaintiffs seek to single out.  Under controlling law, a

9    defendant who provides only a partial list of reasons for a given phenomenon does not become liable

10    for failing to provide the complete list.  "[S]ection 10(b) and Rule 10b-5 prohibit only misleading

11    and untrue statements, not statements that are incomplete."  *Rigel*, 697 F.3d at 880 n.8; *see also*

12    *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) ("We

13    have expressly declined to require a rule of completeness for securities disclosures"); *Identiv*, 2017

14    WL 35496, at *8 (citing *Rigel*).[12]

15          2.    **Value to customers**

16          Plaintiff next claims that McKesson "falsely touted [its] role as a zealous negotiator of

17    generic drug prices on behalf of its wholesale business customers, particularly independent

18    pharmacies."  CAC ¶ 9.  In reality, McKesson's statements about the value it provided to its

19    customers were far more modest.  McKesson stated on several occasions that because it purchases

20    drugs at scale, it is able to realize price benefits and to pass them on to its customers.[13]  Plaintiff has

---

[12] Plaintiff also challenges McKesson's statements that generic price inflation affected only a relatively small number of drugs.  According to Plaintiff, 31 drugs were affected by May 2014, 70 drugs by May 2015 and 79 drugs by May 2016.  CAC ¶¶ 140(a), 152(a), 163(a).  Given that McKesson distributed thousands of generic drugs, Plaintiff's figures – even if accepted in the absence of particularity – represent a small percentage of McKesson's generic portfolio, just as the Company stated.  Plaintiff's attack on an opinion statement characterizing the market *generally* as competitive in the wake of industry consolidation fails for the same reasons.  *Id.* ¶ 156 ("I think that the market remains competitive").  Again, Plaintiff itself alleges anticompetitive conduct with respect to only a very small fraction of McKesson's generic drug portfolio.

[13] *Id.* ¶ 147 ("We . . . deliver significant value to the customers that have availed themselves of not only the price points that are available to McKesson because of our scale, but also to the service offering that we make available to our customers . . . ."); ¶ 153 (McKesson "buy[s] at scale in an

not shown that this was untrue – that McKesson was *not* able to obtain and offer drugs at lower prices by buying at scale.  McKesson also referred to customers who depended on the Company to source "the right products at the right price" and pointed to its "ability to help our customers do a better job in sourcing generics."[14]  Again, Plaintiff pleads no facts suggesting that customers did *not* enter into such arrangements with McKesson.

Instead, seeking to capitalize on public unhappiness with healthcare and drug prices generally, Plaintiff sets up a false dichotomy.  Plaintiff alleges that while McKesson was "supposed to serve" the interests of customers – whom Plaintiff likens to "clients" – the Company instead "acquiesced to the higher prices for its own benefit."  *Id.* ¶¶ 9, 14, 39.  But McKesson was not a fiduciary of its customers; more importantly, it never portrayed itself that way to investors.  Instead, like any distributor, McKesson needed to calibrate its actions so as to provide value both to the manufacturers from whom it bought and to the customers to whom it sold, while at the same time keeping prices low enough that customers would not choose to go with one of McKesson's competitors.  McKesson told investors precisely this, explaining that "we try to optimize our value to the generic companies in a way where we benefit and they benefit . . . . [b]ut at the same time, we have to stay extremely disciplined and diligent around making sure that our customers are also benefiting through our action in the supply chain."  *Id.* ¶ 156.  McKesson was also forthright about the fact that rising prices could benefit the Company (and its shareholders), repeatedly linking positive financial results with price inflation.  CAC ¶¶ 50-55; *supra* at 4-5.  Plaintiff's contention that McKesson "abandon[ed]" its obligations to its shareholders (CAC ¶ 66) and misled investors about the existence or effects of price inflation is undermined by the statements McKesson actually

---

extremely efficient way and [is] able to pass through the benefits of those drug prices to those independent stores who are obviously competing locally against much bigger chains"); *id.* ¶ 164 ("if we can create an opportunity for customers to benefit from sourcing their generics 100% through McKesson we can bring that market share into the market with the manufacturers and deliver real value to both our manufacturing partners as well as our pharmacy customers").

[14] *Id.* ¶ 138 ("The share of wallet we are getting from our customers who are relying more and more on our generic capabilities and now depending on us to source the right products at the right price for them, has been very helpful"); ¶ 148 (through the HealthMart franchise, which McKesson runs, independent pharmacies have  "provided [the Company with] the responsibility for negotiating their product purchases"); ¶ 161 ("independent customers . . . have become more and more reliant on McKesson's ability to help them reduce their cost and improve their performance").

1    made – and most notably by the very statements Plaintiff challenges.

2            3.    **NorthStar**

3            As discussed, Plaintiff fails to plead facts showing that NorthStar engaged in price fixing.  Of

4    the six NorthStar drugs Plaintiff identifies, Plaintiff provides particularized information only for

5    leflunomide.  And with respect to leflunomide, Plaintiff shows only that a substantial time after

6    NorthStar instituted a list price increase, two other manufacturers matched that price.

7            But even if Plaintiff had successfully alleged wrongdoing related to the six NorthStar drugs,

8    this would not equate to a Section 10(b) claim, which depends on a false or misleading statement.

9    *Supra* at 14-15.  Plaintiff challenges three statements related to NorthStar, but each deals with

10   subjects entirely distinct from Plaintiff's leflunomide allegations – and Plaintiff pleads no facts

11   showing that any of the three was false or misleading.

12           First, Plaintiff asserts that in September 2015, McKesson referred to the need to balance its

13   NorthStar business with its larger distribution business, in which it purchased drugs from

14   manufacturers.  CAC ¶ 157.  Plaintiff also challenges McKesson's statement that NorthStar had

15   traditionally "focused on the more mature molecules."  *Id.*  But neither statement relates to

16   Plaintiff's leflunomide allegations, and Plaintiff has pled nothing suggesting that these general

17   descriptions of NorthStar's business were false or misleading.

18           Second, Plaintiff challenges a November 2015 statement in which McKesson noted that it

19   was able to provide "sourcing value" both through NorthStar and through other parts of its business.

20   *Id.* ¶ 159.  Again, nothing in Plaintiffs' complaint casts doubt on this statement or connects it with

21   leflunomide or the other five NorthStar drugs.

22           Finally, McKesson stated in June 2016 that NorthStar "continues to be a great growth

23   vehicle" and that the Company was "continu[ing] to grow [its] NorthStar portfolio."  *Id.* ¶ 164.

24   These statements cannot form the basis of a claim because Plaintiff fails to plead that NorthStar was

25   *not* in fact expanding its drug portfolio – and because generalized statements of corporate optimism

26   such as "great growth vehicle" are inactionable in any event.  *In re Cutera Sec. Litig.*, 610 F.3d

27   1103, 1111 (9th Cir. 2010).

28

### 4.  **Financial results**

Finally, Plaintiff challenges McKesson's financial statements for 13 of the 14 quarters in the purported class period.  Plaintiff excerpts revenue, gross profit and operating profit figures for each quarter, both for McKesson as a whole and for McKesson's Distribution Solutions segment.  Plaintiff does not, however, specify any inaccuracies in these figures or contend that the figures failed to reflect McKesson's actual revenue and profits for the quarters at issue.  CAC ¶ 182.

This claim fails as a matter of law.  Accurate financial statements do not become actionable simply because plaintiffs claim that a company achieved its financial results while engaging in allegedly unlawful conduct – even if plaintiffs are able to adequately plead unlawful conduct in the first place.  "Absent an allegation that [a company] reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability."  *In re Marsh & McLennan Cos., Sec. Litig.*, 501 F. Supp. 2d 452, 469-70 (S.D.N.Y. 2006); *see also, e.g.*, *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2015) (same).

Plaintiff also challenges excerpts of the Management's Discussion and Analysis section (MD&A) in 13 of the 14 class period Forms 10-Q, claiming that the "reasons given" for McKesson's financial results were false or misleading "because McKesson's financial results were materially impacted by unsustainable generic drug price hikes, including price increases driven by collusive activities."  CAC ¶ 182.  This claim fails for multiple reasons.

First, Plaintiff falls well short of the particularity requirement.  Plaintiff does not specify which parts of the excerpted discussions are false, much less why.  For example, Plaintiff excerpts the following passage from the MD&A in McKesson's October 24, 2013 Form 10-Q:

> Distribution Solutions segment's gross profit margin increased primarily due to our acquisition of PSS World Medical, an increase in buy margin, increased sales of higher margin generic drugs and a lower proportion of revenues within the segment attributed to sales to customers' warehouses.  These increases were partially offset by a decrease in sell margin and a charge related to the LIFO method of accounting for inventories.  Buy margin primarily reflects volume and timing of compensation from branded and generic pharmaceutical manufacturers.

CAC ¶ 169.  Defendants are left to guess what if any of this is supposed to be false, and what it has

1   to do with Plaintiff's claim that McKesson participated in or facilitated antitrust violations.  Plaintiff

2   has not met even the notice pleading standard here.

3   　　　Plaintiff's attack on the MD&A statements also fails because it depends on the false

4   proposition that securities defendants are required to speculate about whether various aspects of their

5   financial performance are "sustainable."  *Id.* ¶ 182.  This defect infects much of Plaintiff's

6   complaint.  Plaintiff alleges both with respect to the MD&A and with respect to the challenged

7   statements generally that Defendants are liable because they purportedly knew but failed to disclose

8   that McKesson's success was "unsustainable" insofar as it was built on collusive activity.  *E.g.*, *id.*

9   ¶¶ 12, 82, 128, 140(c).  But courts have repeatedly rejected the premise that a company has a duty to

10  speculate about whether its financial performance is sustainable – even where plaintiffs allege that

11  the performance depends on purportedly illegal activities.  *E.g.*, *Axis*, 456 F. Supp. 2d at 586-87 ("As

12  a matter of law, no statements regarding [the defendant's] accurately reported revenue and income

13  have been rendered materially misleading by failing to disclose that such income was

14  'unsustainable'"); *Marsh & McLennan*, 501 F. Supp. 2d at 471 (defendants "can not be held liable

15  for failing to make . . . speculative disclosures regarding the possibility that [revenues based on

16  allegedly anticompetitive activities] may some day be discontinued").  As a matter of law,

17  McKesson cannot be liable for purportedly failing to disclose that its financial results may not have

18  been replicable in the future.

19  　　　Finally, in addition to McKesson's financial statements and the narrative discussion in its

20  quarterly MD&As, Plaintiff challenges guidance McKesson provided at various points throughout

21  the purported class period.  Plaintiff claims that the guidance "was unrealistic, lacked a reasonable

22  basis, and failed to account for the unsustainability of McKesson's growth."  CAC ¶ 182.  Plaintiff's

23  own formulation reveals the defect in this claim.  Statements of financial guidance are

24  quintessentially forward-looking under the PSLRA. 15 U.S.C. §§ 78u-5(i)(1)(A), (C).  And under

25  the PSLRA's safe harbor provisions, such statements are inactionable save where a plaintiff has pled

26  facts supporting a strong inference that a defendant made the statements with actual knowledge of

27  their falsity.  15 U.S.C. § 78u-5(c)(1).  Plaintiff does not even purport to have met the actual

28  knowledge standard here.  "Reasonable basis" is a negligence standard far below actual knowledge;

1 "realistic" appears to be comparable.

2      Plaintiff's challenge to McKesson's guidance also fails because projections are statements of

3 opinion, and controlling law restricts liability for such statements to situations in which an opinion

4 turns out to be inaccurate and plaintiffs can establish either (1) that defendants did not honestly hold

5 the opinion at the time the statement was made, or (2) that some other factual statement "embedded"

6 in the opinion was false. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135

7 S. Ct. 1318, 1326-27 (2015). Plaintiff fails to allege any of those prerequisites here.[15]

8      **D.    Plaintiff Fails To Plead Facts Supporting A Strong Inference Of Scienter**

9      Under the PSLRA, Section 10(b) plaintiffs must "state with particularity facts giving rise to a

10 strong inference that the defendant acted" with scienter. 15 U.S.C. § 78u-4(b)(2). "A court should

11 deny a motion to dismiss 'only if a reasonable person would deem the inference of scienter cogent

12 and at least as compelling as any opposing inference one could draw from the facts alleged."

13 *Identiv*, 2017 WL 35496, at \*10 (quoting *Tellabs*, 551 U.S. at 324). In the Ninth Circuit, courts

14 evaluate scienter allegations both individually and holistically, considering "whether they create a

15 strong inference of scienter taken together." *In re NVidia, Corp. Sec. Litig.*, 768 F.3d 1046, 1056

16 (9th Cir. 2014). In this case, Plaintiff's allegations do not create the required strong inference either

17 separately or together.

18      ***Executive involvement.*** Plaintiff asserts that the Court can infer scienter because the

19 purported price-fixing scheme "involved executives at McKesson's highest levels." CAC ¶ 122

20 (capitalization altered). Plaintiff's allegations do not bear this out.

21      The executives at issue here are the two individual defendants, former CEO John

---

22 [15] *Omnicare* also provides standards for adjudicating challenges to opinion statements under an
23 omission analysis (as opposed to a false statement analysis). Under the omission analysis, plaintiffs
"must identify particular (and material) facts going to the basis for the issuer's opinion – facts about
24 the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose
omission makes the opinion statement at issue misleading." *Id.* at 1332. Assuming that *Omnicare*'s
25 omission analysis applies to Plaintiff's attack on McKesson's affirmative statements of guidance,
Plaintiff's claim would fail under that analysis too. Plaintiff alleges nothing about the "inquiry"
26 McKesson conducted in deriving its guidance, and such facts as Plaintiff provides about Defendants'
knowledge fall far short of suggesting that Defendants knew about the manufacturers' alleged price-
27 fixing scheme. *Infra* at 22-29. The *Omnicare* Court explained that meeting the omission standard is
28 "no small task for an investor." 135 S. Ct. at 1332. Plaintiff has not performed that task here.

1   Hammergren and former CFO James Beer.  Plaintiff utterly fails to connect Hammergren and Beer

2   with the alleged wrongdoing.  Plaintiff alleges that "McKesson's senior executives always held

3   leadership roles" in the industry group Healthcare Distribution Alliance – but then does not allege

4   that Hammergren or Beer ever held such a position and does not accuse the group of any

5   wrongdoing.  *Id.* ¶¶ 118-19.  Similarly, Plaintiff alleges that McKesson executives and employees

6   had opportunities to discuss price-fixing at multiple industry conferences – but then places Beer at

7   no such conferences and Hammergren at only one, with no indication of what he did there and no

8   suggestion that wrongdoing of any sort took place.  *Id.* ¶¶ 117, 119.  In the same vein, Plaintiff

9   quotes Hammergren's statement that McKesson's "management team" built relationships with

10  manufacturers – but alleges no facts concerning any interactions Hammergren or Beer had with

11  manufacturers.  *Id.* ¶ 121.  In stark contrast with the AG Complaint, which is built on scores of

12  allegations about interactions among specific executives at various companies, the complaint here

13  contains no facts whatsoever about conversations Hammergren or Beer (or anyone else at

14  McKesson) had with the manufacturers with whom McKesson is alleged to have conspired.  Indeed,

15  Plaintiff does not even place Hammergren or Beer at any *internal* meetings about drug pricing.

16  There is consequently no basis on which to infer that Hammergren or Beer knew about pricing or

17  bidding activity with respect to the two drugs Plaintiffs single out – or, indeed, with respect to any

18  other particular drug.

19          Plaintiff's inability to tie Hammergren and Beer to price movements dooms their effort to

20  establish that Defendants knew about the alleged price-fixing scheme.  *Impax* illustrates the point.

21  Because plaintiffs there did not allege that the individual defendants *controlled drug pricing*, Judge

22  Gilliam dismissed plaintiffs' claims on scienter grounds, holding that the complaint did not support a

23  strong inference that defendants *knew about purported price fixing*.  2018 WL 4616291, at *4.  Here,

24  Plaintiff does not allege even that Hammergren and Beer knew about the pricing of leflunomide or

25  other specific drugs, much less that they controlled that pricing.  Plaintiff's contention that

26  executives at the "highest level" were involved in a price-fixing scheme falls flat in light of these

27  pleading defects.

28          Plaintiff seeks to solve this problem with verbal trickery.  Plaintiff quotes Hammergren's and

23

1    Beer's statements about information available to McKesson as a whole and then switches the

2    relevant pronoun to create the false impression that this information was in the hands of

3    Hammergren and Beer personally.  For example, Plaintiff purports to paraphrase Hammergren's

4    answer to a question about McKesson's sourcing abilities in light of its recent acquisition of Celesio,

5    a major European distributor.  CAC ¶ 124.  Hammergren's actual statement was "I think it's fair to

6    say that *we* have been able to look carefully at the generic purchasing patterns and, as I said earlier,

7    look at it on a country-by-country basis."  Ex. 3 at 17 (emphasis added).  Plaintiff's purported

8    paraphrase of the statement is "[Hammergren] told investors that *he* had 'been able to look carefully

9    at the generic purchasing patterns . . . .'"  CAC ¶ 124 (emphasis added).  Similarly, Hammergren

10   stated during a January 2014 earnings call that "[t]he visibility *we get* through NorthStar enhances

11   *our view* of the opportunities that exist globally for us as well as some of the challenges that may

12   exist . . . ."  *Id.* ¶ 122 (emphasis added).  Plaintiff's characterization of this statement is that

13   "Hammergren acknowledged *his use* of NorthStar as a reconnaissance vehicle."  *Id.* (emphasis

14   added).  This is impermissible.  If Plaintiff wishes to base an inference of scienter on Hammergren

15   and Beer's own words, Plaintiff cannot do so by mischaracterizing those words – by simply

16   changing the pronoun "we" to "he."[16]

17        In any event, even the information held at the "we" level does not support an inference that

18   Defendants knew about the purported price-fixing scheme.  Whether or not Hammergren and Beer

19

20   [16] Plaintiff uses this misleading technique repeatedly.  *E.g., id.* ¶ 125 (Hammergren "touted that . . .
     *he* was endowed with the ability 'to look at generic manufacturers across the globe") (emphasis
21   added) *but cf.* Ex. 16 at 4 ("The ability *for us* to look at generic manufacturers across the globe and
     put them into our sourcing initiatives we think is an advantage") (emphasis added); CAC ¶ 126
22   ("Beer explained to investors that, in projecting sales growth, *he* 'extensively analyzed both the
     inflationary elements in the market place'") (emphasis added) *but cf.* Ex. 5 at 34 ("*we* extensively
23   analyze both the inflationary elements in the marketplace . . .") (emphasis added).  Plaintiff also
     mischaracterizes Hammergren and Beer's statements substantively, claiming that "Defendants told
24   investors that they knew the underlying forces driving the generics inflation."  *Id.* ¶ 128.  In reality,
     Hammergren and Beer repeatedly warned investors that they *lacked* insight into the manufacturers'
25   pricing decisions.  Ex. 4 at 18 (Hammergren: "the manufacturers don't typically tell us what they're
     going to do"); Ex. 6 at 17 (Hammergren: "Frankly, it's a little bit of a black box for us as well, and
26   we have to make educated and informed estimates as to what we think will happen"); Ex. 11 at 22
     (Beer: McKesson lacks "insight from what the manufacturers are planning to do in their
27   businesses").

28

1   knew specific details concerning generic drug pricing activities or patterns, there is a critical

2   difference between knowledge or even control of drug *pricing* and knowledge of price *fixing*.  The

3   former does not give rise to the latter.  The distinction between knowledge or control of pricing and

4   knowledge of price fixing was dispositive in *Utesch v. Lannett Co.*, 316 F. Supp. 3d 895 (E.D. Pa.

5   2018), another securities action against a manufacturer arising from the AGs' investigation.  The

6   court there dismissed plaintiffs' claims on scienter grounds, holding that "[a]lleging that [the

7   company's CEO] had authority to raise prices is not the equivalent of alleging that [he] illegally

8   price-fixed with peer companies."  *Id.* at 905.  Under this analysis, Plaintiff's claim would fail even

9   if Hammergren and Beer were personally aware of all information in McKesson's possession.

10          Indeed, the precept that knowledge of prices does not translate into knowledge of price fixing

11  is embedded in antitrust law itself.  Courts do not infer conspiracy from parallel price increases.

12  *Supra* at 13.  By the same token, participants in the marketplace cannot fairly be taxed with

13  knowledge of price fixing simply by virtue of their access to information about pricing.  *See Impax*,

14  2018 WL 4616291, at *4 (defendants' "willingness to monitor the market" does not equate to

15  knowledge of price fixing).  That is particularly clear in this case, where the list price information

16  that Plaintiff claims Hammergren and Beer had at their fingertips was also *publicly* available.  CAC

17  ¶ 127; *supra* at 12 & n.8.  The possession of information tracked by an entire industry and available

18  to any subscriber who cares to pay for it cannot support the required inference of deliberate fraud.[17]

19          ***"Magnitude" of the purported scheme.***  Plaintiff next claims that the Court should infer

20  scienter because "the schemes . . . were large in magnitude."  CAC ¶ 122 (capitalization altered).

21  Plaintiff is wrong.  Courts in the Ninth Circuit routinely reject the argument that the "magnitude" of

22  an alleged fraud supports an inference of scienter.  *City of Dearborn Heights v. Align Tech., Inc.*,

23  856 F.3d 605, 622 (9th Cir. 2017) (neither timing nor magnitude of goodwill write downs

24  _____

25  [17] Plaintiff also claims that Hammergren's and Beer's certification of financial controls under the
    Sarbanes-Oxley Act constitutes "evidence of scienter."  CAC ¶ 183.  This Court, following

26  controlling law, has repeatedly rejected that proposition.  *Rok v. Identiv, Inc.*, 2016 WL 4205684, at
    *3 (N.D. Cal. Aug. 10, 2016) (plaintiff "cannot use [defendants'] Sarbanes-Oxley certifications on

27  Identiv's SEC filings . . . to show a strong inference of scienter") (citing *Zucco Partners, LLC v.
    Digimarc Corp.*, 552 F.3d 981, 1003-04 (9th Cir. 2009); *Identiv*, 2017 WL 35496, at *15 & n.22

28  (same).

1    "establishes a strong inference of scienter or contributes strongly to such an inference"); *Gammel v.*
2    *Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1077 (C.D. Cal. 2012) (magnitude of alleged fraud
3    plays only a "minor role in the scienter analysis") (collecting authorities).

4            Magnitude is particularly irrelevant to the scienter analysis here.  The purported scheme
5    whose size Plaintiff invokes – the scheme alleged in the AG Complaint – operated at a remove from
6    McKesson.  In contrast with the breadth of the AGs' alleged scheme, Plaintiff identifies specific
7    prices or bids with respect to only two of the thousands of drugs McKesson distributes.  And in
8    neither instance does Plaintiff allege that Hammergren or Beer knew about the relevant underlying
9    facts – the list price of leflunomide in 2015 or manufacturers' bids for Doxy DR in 2014 – much less
10   that they knew that those facts were purportedly connected with antitrust violations.  The magnitude
11   of the scheme alleged by the AGs adds nothing to the scienter analysis in this case.

12           ***Compensation and other purported motives.***  Plaintiff also contends that the Court should
13   infer scienter in light of McKesson's compensation structure, under which Hammergren and Beer
14   were eligible for certain cash and stock awards based on McKesson's financial performance.  CAC
15   ¶¶ 184-192.  Such compensation arrangements are extraordinarily widespread, and courts routinely
16   reject the assertion that they support an inference of fraud.  *Rigel*, 697 F.3d at 884; *Kovtun v. VIVUS,*
17   *Inc.*, 2012 WL 4477647, at *20 (N.D. Cal. Sept. 27, 2012).  More generally, allegations concerning
18   compensation are relevant at most to establish an executive's motives with respect to reported
19   financial results, and the Ninth Circuit has long held that allegations of motive and opportunity are
20   "not independently sufficient" to establish scienter.  *E.g.*, *Intuitive Surgical*, 759 F.3d at 1062.

21           Plaintiff seeks to distinguish the compensation arrangements at issue here in two ways.  First,
22   Plaintiff states that the financial metric McKesson used as a basis for incentive compensation was
23   adjusted EPS; Plaintiff then claims that this measure "reversed out" litigation expenses and hence
24   "allowed Hammergren and Beer to implement the scheme to boost profits without the need to worry
25   about the potential litigation-related negative impact to earnings."  CAC ¶ 185.  This assertion is
26   belied by the very SEC filings on which it is based.  McKesson's proxy statements show that the
27   EPS adjustments at issue encompassed certain amortization and acquisition items as well as certain
28   reserves for specifically identified lawsuits.  *E.g.*, Ex. 20 at 31.  Over the four fiscal years at issue,

1    McKesson specified only three such lawsuits.  Ex. 20 at A-1; Ex 21 at A-1; Ex 22 at A-1; Ex. 23 at

2    A-1.  According to the proxies on which Plaintiff relies, McKesson made no adjustment for litigation

3    generally and gave no indication that amounts reserved for any future lawsuits would be excluded

4    from the calculation of adjusted EPS.  *Id.*  In any event, the inference Plaintiff asks the Court to draw

5    – that an executive would willingly risk all adverse consequences of engaging in fraud simply

6    because a litigation reserve may later be backed out of one incentive compensation metric – makes

7    little sense as a practical matter.

8          Plaintiff also seeks to distinguish McKesson's compensation arrangements from those at

9    countless other public companies by alleging that Hammergren and Beer "needed a quick and

10   dramatic earnings spike to boost McKesson's earnings" and that they responded to that purported

11   need with a "'significant pivot' to profitability in FY2014."  CAC ¶ 188.  Plaintiff lifts the term

12   "pivot" from McKesson's May 2013 earnings call – and as Plaintiff does throughout the complaint,

13   ascribes to Defendants' words a meaning utterly foreign to Defendants' actual statements.  The

14   "pivot" Hammergren referred to in May 2013 was a phenomenon affecting revenue – not earnings –

15   and was confined to a single year.  Hammergren explained that in the previous year, a record number

16   of generic drugs were launched, and that because generic drugs are priced lower than branded drugs,

17   such launches generally depress revenue.  *Supra* at 3-4; Ex. 1 at 8.  In the coming year, by contrast,

18   McKesson expected a lower rate of generic launches, which would result in "significant revenue

19   growth return."  Ex. 1 at 8.  Hammergren also explained that revenue is distinct from earnings:

20   While branded drugs produce more revenue than generic drugs, "McKesson's economics are better

21   on generic drugs."  *Id.*  Plaintiff's attempt to turn McKesson's statements about an expected return of

22   revenue in the coming year into a narrative about a "quick and dramatic earnings spike" is a

23   distortion that betrays the lack of substance in their scienter allegations.  CAC ¶ 188.

24         Finally, Plaintiff's references to Hammergren and Beer's purported financial motivations are

25   notable for what they lack.  Plaintiff alleges that Hammergren sold hundreds of millions of dollars of

26   stock during the purported class period but does not assert that any of Hammergren's stock sales was

27   unusual in timing or amount.  CAC ¶ 18.  In the absence of information about timing and amount,

28   insider selling allegations do not support an inference of scienter.  *Align*, 856 F.3d at 621 ("stock

27

1   sales by corporate insiders are suspicious only when they are dramatically out of line with prior

2   trading practices at times calculated to maximize the personal benefit from undisclosed inside

3   information") (internal quotation marks, brackets and citation omitted).  Meanwhile, the SEC filings

4   on which Plaintiff relies to compute Hammergren's stock sales show that each sale was made under

5   a Rule 10b5-1 trading plan (or was made to cover taxes on the vesting of certain stock units).  Ex.

6   24.  The use of such trading plans is relevant to *rebut* an inference of scienter.  *Metzler Inv. GmbH v.*

7   *Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008).

8        As to Beer, Plaintiff does not allege that he sold any stock at all, while at the same time

9   claiming that he *received* stock and option awards worth millions of dollars.  CAC ¶ 192.  According

10  to Plaintiff's allegations, in other words, Beer accumulated stock during the purported class period.

11  This too cuts against an inference of scienter.  *See Rigel*, 697 F.3d at 884-85 (absence of stock sales

12  supports an inference against scienter).

13       ***Holistic assessment.***  Taken together, Plaintiff's allegations do not support a strong inference

14  of scienter any more than they do taken separately.  Plaintiff does not tie Hammergren or Beer to any

15  events or actions suggesting that McKesson facilitated or participated in antitrust violations – not

16  with respect to leflunomide or Doxy DR and not with respect to any of the thousands of other drugs

17  McKesson distributes either.  Nor has Plaintiff pled facts showing that Hammergren or Beer was

18  motivated to make false or misleading statements.  The executives' compensation arrangements do

19  not suggest any such motive, and their stock sales weigh against it.

20       At bottom, Plaintiff's contention appears to be that because the AGs have alleged a broad

21  scheme of antitrust violations among manufacturers, Hammergren and Beer must have or should

22  have known that the purported scheme existed.  This theory fails, among other reasons, under the

23  controlling substantive scienter standard.  Plaintiffs must create a compelling inference not that

24  defendants must have or should have known that their statements were purportedly false but instead

25  that the defendants made *deliberately* false or misleading statements.  *Zucco*, 552 F.3d at 991.  The

26  facts alleged here support a strong inference that Defendants did *not* know of or act with deliberate

27  recklessness in connection with the purported scheme, and certainly did not know that the

28  challenged statements were false or misleading.  The AGs, as noted, have alleged that manufacturers

1   *hid* their scheme from wholesalers.  *Supra* at 6.  Meanwhile, neither the AGs nor Plaintiff suggests

2   that McKesson conspired with its own competitors – the two other principal wholesalers in the US

3   and the countless smaller entities that competed with them.  In the marketplace described by the AGs

4   and Plaintiff – in which there is no suggestion that wholesalers did anything but compete vigorously

5   with one another – the strongest inference is that if a collusive scheme existed at all, Defendants

6   were not aware of it.[18]

7              E.      **Plaintiff Has Not Established Loss Causation**

8          Under Section 10(b), plaintiffs bear the burden of pleading loss causation with particularity.

9   *Oregon Pub. Emp.' Ret. Fund v. Apollo Grp.*, 774 F.3d 598, 604-05 (9th Cir. 2014).  In an effort to

10  satisfy that obligation, Plaintiff cites public announcements on four dates:  January 11, 2016,

11  October 27, 2016, November 3, 2016 and January 25, 2017.  Plaintiff's allegations fail as to each.

12         ***January 11, 2016: guidance for fiscal 2017.***  On January 11, 2016, McKesson provided

13  guidance for fiscal year 2017.  CAC ¶ 196; Ex. 12 at 4.  This was a departure from McKesson's

14  normal schedule, in which the Company announced guidance in May, following the end of its fiscal

15  year on March 31.  McKesson explained that it was departing from that schedule in light of certain

16  financial trends it had witnessed in the quarter ended December 31, 2015.  *Id.* at 4.  Among other

17  things, McKesson had determined that "operating profit from generic pharmaceutical pricing trends

18  will be significantly weaker in the second half of the fiscal year . . . and therefore, our operating

19  results in the Distribution Solutions segment will be below what we expected."  *Id.* at 5.  McKesson

20  anticipated "continued weakness" in generic pricing in the next fiscal year – specifically, "only a

21  nominal benefit from generic pharmaceutical pricing trends in fiscal 2017."  *Id.*

22

23  _____

    [18] Because Plaintiff fails to create a strong inference of scienter with respect to Hammergren and
24  Beer, Plaintiff also fails to establish the necessary inference against McKesson.  While the Ninth
    Circuit has permitted the pleading of "collective scienter" under certain circumstances, those
25  circumstances are not present here.  *See NVidia*, 768 F.3d at 1063 (rejecting scienter allegations
    where plaintiffs fail to show that challenged statements were "so dramatically false . . . [as] to create
26  an inference of scienter that at least some corporate officials knew of falsity upon publication").
    (internal quotation marks omitted).  Plaintiff has not pled facts suggesting that *any* McKesson
27  employee or executive was involved in or knew about the manufacturers' purported price-fixing
    scheme, much less that any person knew that McKesson's public statements were false or
28  misleading in light of the alleged scheme.

This announcement, which is neither textually nor factually linked to alleged price fixing, is insufficient to establish loss causation. To plead loss causation, securities plaintiffs must "show a causal connection between the fraud and the loss . . . by tracing the loss back to the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (internal quotation marks and citations omitted). While plaintiffs need not show that a company *revealed* the alleged fraud, they do need to *connect* the disclosure precipitating a stock price decline with the challenged statement. *See, e.g.*, *Loos v. Immersion Corp.*, 762 F.3d 880, 888 (9th Cir. 2014) (plaintiffs plead loss causation by "alleg[ing] a plausible connection between the disappointing earnings and the alleged fraud") (discussing *In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005)); *Huang v. Higgins*, 2019 WL 1245136, at *16-17 (N.D. Cal. Mar.18, 2019). Where the disclosure that precedes a stock drop consists of adverse financial results or forecasts, plaintiffs must plead facts linking the financial setback with the alleged fraud or ending of that fraud. *Loos*, 762 F.3d at 888 (affirming dismissal where plaintiffs failed to link disappointing earnings announcements with alleged revenue recognition fraud; earnings announcements did not "reveal any information from which revenue accounting fraud might reasonably be inferred").

*Huang* illustrates this principle particularly clearly. There, plaintiffs accused a pharmaceutical company of improper off-label marketing; the disclosure that triggered the stock price drop was an announcement of lowered revenue guidance. 2019 WL 1245136, at *15. Because plaintiffs did not plead facts linking the financial setback with the challenged marketing practices, the court dismissed their claims on loss causation grounds. Plaintiffs had "fail[ed] to connect the risks of the alleged off-label marketing to a subsequent stagnation or decrease in off-label prescriptions underlying the negative financial news." *Id.* at *17. Plaintiffs also "fail[ed] to plead any specific facts related to the *scale* of off-label marketing . . . or the curtailment of [off-label] prescriptions." *Id.* (emphasis added). This latter failure too was critical. In the absence of facts indicating the scope and financial impact of the alleged fraud, plaintiffs could not demonstrate that the termination of that fraud caused the financial setback the company announced.

McKesson's January 11, 2016 announcement is similar in kind to the purported corrective disclosures that failed in *Loos* and *Huang*. As in those cases, McKesson reported disappointing

1    financial news, but nothing in its announcement signaled that the news was related to the fraud

2    Plaintiff alleges – price fixing among generic drug manufacturers.  Nor has Plaintiff itself alleged

3    facts connecting McKesson's financial announcement with the alleged fraud.  While it is true that

4    McKesson attributed its reduced expectations to diminished trends in generic drug *pricing*, in this

5    area as in others Plaintiff provides no factual support for the unwarranted leap from drug pricing to

6    price *fixing*.  Plaintiff speculates that "intensified governmental scrutiny slowed pricing inflation,"

7    CAC ¶ 131, but alleges no facts to support connecting such "scrutiny" with alleged wrongdoing on

8    McKesson's part.

9         Plaintiff's failure to connect McKesson's report of decreasing inflation with the challenged

10   conduct and statements is particularly clear with respect to the only two drugs for which Plaintiffs

11   seek to provide specific pricing or bidding information, leflunomide and Doxy DR.  Plaintiff claims

12   that NorthStar collusively raised the price of leflunomide in July 2015 but does not allege that

13   leflunomide's price had been *reduced* by January 2016, nor that any "scrutiny" of leflunomide

14   affected the price of any other drug.  Similarly, Plaintiff claims that manufacturers illegally allocated

15   the market for Doxy DR in 2014 but does not allege that either the purported market allocation

16   scheme or the termination of that scheme had any effect on McKesson's financial results.  Here, as

17   in *Huang*, Plaintiff's loss causation allegations are missing even the rudimentary information

18   necessary to support an inference that the termination of the alleged wrongdoing caused the financial

19   setback McKesson announced.  Plaintiff has not pled loss causation on the basis of McKesson's

20   January 2016 disclosure.

21        ***October 27, 2016: Unrelated developments affecting second-quarter results.***  McKesson

22   also reported disappointing financial news on October 27, 2016.  McKesson attributed its financial

23   performance to two new phenomena:  a downturn in inflation trends for *branded* pharmaceuticals

24   and the actions of a competitor that had recently undercut McKesson's pricing, forcing McKesson to

25   offer price concessions to customers in response.  CAC ¶ 197; Ex. 15 at 4.

26        This announcement is even further removed from the alleged fraud than McKesson's January

27   2016 announcement.  In January 2016, McKesson linked its results and guidance to developments in

28   generic drug pricing – though, critically, not to price fixing.  In October 2016, McKesson reported

31

1   quarterly results driven by factors entirely distinct from generic drug pricing – branded drug inflation

2   trends and the activities of a competitor.  McKesson did allude to generic pricing in the October 27

3   earnings call, but only to report that quarterly pricing trends were in line with expectations.  Ex. 15

4   at 8 (quarterly results driven in part by "expected weaker profit contribution from generic inflation

5   trends"); *id.* at 3 ("generic price inflation has been largely in line with our original assumption").

6   Plaintiff fails to plead loss causation with respect to the October 2016 announcement because

7   McKesson did not link its financial setback to alleged generic drug price fixing in that

8   announcement, and Plaintiff pleads no facts that would make that connection either.

9         Plaintiff's attempt to premise loss causation on the October 2016 announcement also fails for

10   a second, related reason.  On the subject of generic drug pricing, as noted, McKesson disclosed no

11   new information; it reported only that trends were consistent with the assumptions underlying its

12   earlier guidance.  *Id.*  The absence of new information is fatal.  *Meyer v. Greene*, 710 F.3d 1189,

13   1197-98 (11th Cir. 2013) ("corrective disclosures must present facts to the market that are new")

14   (citations omitted); *Identiv*, 2017 WL 35496, at *18 (rejecting loss causation allegations where

15   company's announcement "added no new information" on the subject of the alleged fraud) (citing

16   *Meyer*).

17         **November 3, 2016: Articles about federal investigation of manufacturers.**  Plaintiff next

18   cites two articles published on November 3, 2016.  Neither establishes loss causation.

19         The first article, which appeared in *Bloomberg Law*, does not mention McKesson at all.

20   CAC ¶ 199; Ex. 18.  The article lists manufacturers that had received subpoenas in connection with

21   the DOJ's investigation into price fixing and cites unnamed sources surmising that the government

22   could bring charges by the end of December 2016.  *Id.*  The law is clear that the announcement of an

23   investigation, standing alone, is an insufficient basis for loss causation.  *Lloyd v. CVB Fin. Corp.*,

24   811 F.3d 1200, 1210-11 (9th Cir. 2016); *Loos*, 762 F.3d at 890; *Identiv*, 2017 WL 35496, at *19.

25   Under this law, Judge Gilliam recently held in the *Impax* litigation that the very same November 3,

26   2016 *Bloomberg* article on which Plaintiff relies here – which *did* name Impax – was insufficient to

27   establish loss causation.  2018 WL 4612691, at *5.  Given that McKesson is not even named in the

28   *Bloomberg* article, Plaintiff's reliance on the article is both contrary to law and notably far-fetched.

1   The second article Plaintiff cites appeared in *Reuters News* on November 3, 2016.  CAC ¶

2   199; Ex. 19.  Like the *Bloomberg* article, the *Reuters* article relates principally to investigations of

3   manufacturers, and is therefore insufficient to show loss causation.  The article does link

4   McKesson's past financial performance with the downturn in generic drug inflation, but McKesson

5   itself had been advising investors of this link since January 2016.  *Supra* at 5 & 29-32.  Because the

6   *Reuters* article is largely concerned with third-party investigations and provided no new information

7   about McKesson, it does not satisfy Plaintiff's burden to allege loss causation.

8   **January 25, 2017: Continued developments affecting third-quarter results.**  Finally,

9   Plaintiff cites McKesson's January 25, 2017 earnings call.  As it had in October 2016, McKesson

10   cited trends in *branded* drug price inflation as a "material driver" of its financial results.  Ex. 17 at

11   12.  McKesson also reported on ongoing developments related to the second of the two phenomena

12   it had identified in October 2016 – the pricing actions of one of its competitors.  In October 2016,

13   McKesson had explained that in response to that competitor's actions, the Company had been

14   required to offer price concessions to its customers.  *Supra* at 5 & 32.   In January 2017, McKesson

15   updated investors on the next chapter of that story, reporting that while it had succeeded in retaining

16   or winning back its customers, its "prices were ultimately set at a lower level than our initial

17   expectations that were included in our previous guidance."  Ex. 17 at 4.

18   These two phenomena, as in October 2016, are distinct from the alleged price-fixing scheme.

19   Plaintiff pleads no facts suggesting that either branded drug pricing trends or the actions of

20   McKesson's competitor and the price concessions McKesson offered in response to those actions

21   were related to the alleged manufacturer conspiracy.

22   Plaintiff's loss causation allegations also fail because to the limited extent that McKesson

23   discussed generic pricing trends on January 25, 2017, the Company provided no new information

24   about those trends.  As in October 2016, McKesson noted that generic pricing trends were consistent

25   with expectations.  *Id.* at 14 (decline in generic inflation "has continued to be in line with our

26   expectations, very similar to the story of the last couple of conference calls").  In the absence of new

27

28

1   information on the relevant subject, Plaintiff has not adequately pled loss causation.  *Supra* at 32.[19]

2   **F.      Plaintiff's Section 20A Claim Also Fails**

3         Finally, the Court should dismiss Plaintiff's insider trading claim under Section 20A, which

4   Plaintiff asserts solely against Hammergren.  Section 20A of the Exchange Act provides a private

5   right of action against "[a]ny person who violates any provision of this chapter or the rules or

6   regulations thereunder by purchasing or selling a security while in possession of material, nonpublic

7   information."  15 U.S.C. § 78t–1(a).  To state a Section 20A claim, a plaintiff must plead a

8   "predicate insider trading violation of the Exchange Act."  *In re Volkswagen "Clean Diesel" Mktg.,*

9   *Sales Practices, & Prod. Liab. Litig.*, 328 F. Supp. 3d 963, 987 (N.D. Cal. 2018); *see also In re*

10  *Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1202 (C.D. Cal. 2008) ("the predicate

11  violation must be an act of insider trading, not just trading while simultaneously committing a free-

12  floating '34 Act violation").

13        Plaintiff has not pled a predicate insider trading violation here.  Plaintiff's insider trading

14  allegations are entirely conclusory.  In connection with the three sales Plaintiff targets, Plaintiff

15  alleges only that Hammergren was "in possession of material non-public information" and that he

16  "took advantage of his possession of material non-public information regarding McKesson."  CAC ¶

17  231.  Plaintiff fails to specify the baseline facts of an insider trading claim – the nature of the

18  information Hammergren allegedly possessed and the way in which Hammergren purportedly made

19  use of it.  This is fatal.  *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (affirming dismissal

20  of insider trading claim where plaintiff did not "allege specifically what information [defendant]

21  obtained, when and from whom he obtained it, and how he used it for his own advantage").

22        Strikingly, while pursuing a Section 20A claim against Hammergren, Plaintiff does not even

23  seek to show in the context of its Section 10(b) claim that Hammergren's stock sales were unusual in

24  timing or amount, which is required under a scienter analysis.  Nor could Plaintiff do so.

25  Hammergren made each sale under a Rule 10b5-1 trading plan (or to cover taxes on the vesting of

26

27  ──────────────

[19] Because Plaintiff fails, on multiple grounds, to state a claim against Defendants for primary
liability under Section 10(b), Plaintiff has also failed to state a claim for control person liability

28  under Section 20(a).  *E.g.*, *Align*, 856 F.3d at 623.

1   stock units), and this weighs *against* an inference of scienter. *Supra* at 28. These same facts defeat

2   the necessary inference under Section 20A that Hammergren sold stock based on nonpublic

3   information. *See In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 943271, at *4 (C.D. Cal. Apr.

4   6, 2009) (dismissing Section 20A claims because "10b5-1 plans negate an inference that

5   [defendants] made sales based on actual insider knowledge").

6        With respect to two of the three trades challenged, Plaintiff's claims fail for the additional

7   reason that Plaintiff does not allege that it traded contemporaneously with Hammergren, as Section

8   20A requires. For pleading purposes, Section 20A plaintiffs satisfy the contemporaneousness

9   requirement only if they allege that they bought stock on the same day as, or at most the day after, a

10  company insider sold his or her stock. *E.g.*, *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *12

11  (N.D. Cal. Feb. 27, 2018) ("trading on the same day or the day after is 'contemporaneous'");

12  *Countrywide*, 588 F. Supp. 2d at 1204 (plaintiffs must plead facts showing that they traded "on the

13  same trading day, or one trading day after, the insider's transaction"); *In re AST Research Sec. Litig.*,

14  887 F. Supp. 231, 234 (C.D. Cal. 1995) ("[t]he same day standard is the only reasonable standard

15  given the way the stock market functions"). Here, Plaintiff made only one of its three alleged

16  purchases on the same day that Hammergren sold stock, November 20, 2015. CAC ¶¶ 233-34.

17  Plaintiff made the other two purchases six days and nine days respectively after Hammergren sold

18  stock. *Id.* Lapses of six and nine days are far outside the bounds of contemporaneous trading, and

19  Plaintiff's Section 20A claims based on the latter two purchases fails for this additional reason.

20  **IV.   CONCLUSION**

21       For the reasons stated above, the Court should dismiss the complaint in its entirety.

22   DATED:  June 10, 2019

23      By:*/s/ Sara B. Brody*         
       Sara B. Brody (SBN 130222)

24

25       *Attorneys for Defendants McKesson Corporation,*
     *John H. Hammergren and James Beer*

26

27

28