IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EVANSTON POLICE PENSION FUND,

Plaintiff,

v.

MCKESSON CORPORATION, et al.,

Defendants.

Case No. 18-cv-06525-CRB

**ORDER DENYING MOTION TO DISMISS**

This case arises out of government investigations of anticompetitive agreements in the generic pharmaceutical industry. The resulting complaint, brought by forty-nine states' Attorneys General (the "AG complaint"), alleges that the generic drug industry is rife with price-fixing and market-allocation agreements. The scandal has already resulted in congressional attention, multiple guilty pleas, and a plethora of antitrust and Securities Act lawsuits against generic drug manufacturers.

McKesson Corporation ("McKesson") is (mostly) not a generic drug manufacturer, but a generic drug wholesaler. Nonetheless, the plaintiffs in this putative class action (collectively, "Evanston") allege that McKesson must have participated in illegal anticompetitive conduct. At the very least, Evanston alleges, McKesson was aware of and profited from the illegal agreements. Evanston claims that by failing to disclose the conspiracy McKesson and its executives violated the Securities Exchange Act of 1934. McKesson has moved to dismiss the complaint for failure to state a claim. Because the Court finds that Evanston has adequately plead the required elements of its Rule 10(b) claim, including falsity, scienter, and loss causation, the motion to dismiss is denied.

## I. BACKGROUND

McKesson is a pharmaceutical wholesaler. Compl. ¶ 2 (dkt. 43). Most of its business involves buying drugs from manufacturers and reselling them to pharmacies and hospitals. Id. However, one of McKesson's subsidiaries, NorthStar Rx ("NorthStar"), does manufacture generic drugs. Id.

In the last several years, evidence has come to light of widespread anti-competitive conduct in the generic drug market. Id. ¶ 5. Investigations by Congress, the Department of Justice, and forty-nine state Attorneys General have led to multiple guilty pleas and a complaint alleging a wide-ranging price-fixing conspiracy. Id. ¶ 5, 10. The AG complaint alleges that generic drug manufacturers agreed to divide market share rather than compete on price. Id. ¶ 5. It does not name McKesson as a defendant. Id.

Evanston alleges McKesson, its former Chief Executive Officer John Hammergren, and former Chief Financial Officer James Beer, violated Section 10(b) of the Exchange Act and Rule 10b-5 by concealing the collusive activity. Id. ¶¶ 215–24. It also charges the defendants with control person liability under Section 20(a), and Hammergren with violating Section 20A by selling stock while "in possession of material non-public information." Id. ¶¶ 225–35.

The Consolidated Amended Complaint ("CAC") alleges that McKesson was a party to unlawful price-fixing agreements. McKesson ostensibly participated in anticompetitive conduct both in its role as a wholesaler and through NorthStar. The CAC seizes on the AG complaint's allegations that generic drug manufacturers Heritage Pharmaceuticals, Inc. ("Heritage"), Mayne, and Milan conspired to divide the market for Doxy DR. Because Heritage and Mayne supplied Doxy DR to McKesson, the CAC reasons McKesson must also have been a party to this agreement. Id. ¶¶ 74–77. It also alleges there is direct evidence that NorthStar colluded to fix the price of Leflunomide, and circumstantial evidence, including parallel conduct and various "plus" factors, that it conspired to fix the price of other drugs. Id. ¶¶ 97–128.

According to the CAC, McKesson benefited from the conspiracy both by charging supracompetitive prices for NorthStar's drugs, and because its wholesale business was more profitable when drug prices were high. Id. ¶¶ 57–62. Evanston argues that even if McKesson did

not directly participate in anticompetitive conduct, it made false and misleading statements covering up the manufacturer's illegal agreements. Opp'n at 16 (dkt. 53). The alleged false and misleading statements fall into six categories: claims that generic drug price inflation was driven by "supply disruption," statements touting McKesson's role as a negotiator on behalf of its purchasers, claims that the generic drug market remained competitive, descriptions of NorthStar as a "growth driver," announcements of McKesson's financial results, and statements that McKesson's earnings had been derisked. See, e.g., id. at ¶¶ 138, 155, 196.

Evanston further alleges that Hammergren and Beer made the challenged statements knowing they were false, or with deliberate recklessness. Opp'n at 24–30. Evidence of the defendant's scienter includes statements touting their knowledge of generic drug pricing and compensation arrangements tying Hammergren and Beer's stock and cash awards to McKesson's financial performance. See, e.g., Compl. ¶¶ 125–26, 185–92. Evanston also points to the executives' positions at McKesson, the magnitude of the alleged scheme, and the governmental investigations. See Opp'n at 28–29.

Eventually, generic drug prices dropped, and with them, McKesson's earnings. This development was disclosed in a series of three financial announcements from October 27, 2016, to January 25, 2017. Compl. ¶¶ 196–98, 200. In the same time period, two articles revealing the government investigations were published in Bloomberg and Reuters. Id. ¶ 199. Each of the four disclosures was followed by a significant decrease in McKesson's stock price. Id. at 196–200.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal may be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 697 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A

claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

Claims for fraud must meet the pleading standard of Federal Rule of Civil Procedure 9(b), which requires a party "alleging fraud or mistake [to] state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) "requires . . . an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted). This standard "applies to all elements of a securities fraud action, including loss causation." Or. Public Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 605 (9th Cir. 2014).

Security fraud claims must also meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), which states that the complaint "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); Tellabs, 551 U.S. at 321. The Court must dismiss any complaint that does not meet these requirements. See 15 U.S.C. § 78u-4(b)(3)(A).

The PSLRA also requires plaintiffs to state with particularity facts giving rise to a strong inference of the defendants' scienter. See 15 U.S.C. § 78u-4(b)(2). "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any

4

opposing inference of nonfraudulent intent." <u>Tellabs</u>, 551 U.S. at 314. Therefore, a court "must consider plausible, nonculpable explanations for the defendant's conduct." <u>Id.</u> at 324. "Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or deliberate recklessness [sic] made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6)." <u>Ronconi v. Larkin</u>, 253 F.3d 423, 429 (9th Cir. 2001).

## III.    DISCUSSION

### A.    Evidentiary Issues

#### 1.    Judicial Notice and Incorporation by Reference

McKesson has requested judicial notice of twenty-five documents (Exhibits 1–25) cited in its motion to dismiss. RJN (dkt. 50). It also argues that the Court may consider most of these materials "under the doctrine of incorporation by reference." RJN at 1. Evanston does not oppose McKesson's request, but maintains that the documents "cannot be noticed for the truth of the matters asserted therein." Opp'n at 5 n.5.

In reviewing a motion to dismiss, a district court is usually limited to the facts stated in the complaint. <u>Arpin v. Santa Clara Valley Transp. Agency</u>, 261 F.3d 912, 925 (9th Cir. 2001). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." <u>United States v. Ritchie</u>, 342 F.3d 903, 908 (9th Cir. 2003).

Courts may take judicial notice of facts that are "not subject to reasonable dispute" because they (1) are "generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Matters of public record may be judicially noticed, but disputed facts contained in those records may not. <u>Khoja v. Orexigen Therapeutics, Inc.</u>, 899 F.3d 988, 999 (9th Cir. 2018).

The doctrine of incorporation-by-reference "treats certain documents as though they are part of the complaint." Id. at 1002. Documents are subject to incorporation by reference if the plaintiff refers to them "extensively" or they form the basis of the complaint. Id. Unlike documents subject to judicial notice, courts may properly assume the truth of documents incorporated by reference. Id. at 1003. But "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." Id.

Exhibits 1–13 and 15–17 are transcripts of earnings calls and corporate presentations that the CAC alleges contained materially false statements or corrective disclosures. RJN at 1–3; see also, generally, Compl. Because these documents form the basis of Evanston's complaint, they are subject to incorporation by reference. See Khoja, 899 F.3d at 1005 (documents containing alleged misrepresentations and corrective disclosures form the basis of a Section 10(b) and are subject to incorporation by reference). Similarly, Exhibits 18 and 19 are news articles the CAC identifies as corrective disclosures. RJN at 3, Compl. ¶ 199. They are also subject to incorporation by reference. Khoja, 899 F.3d at 1005.

Exhibits 20–23 are excerpts from McKesson's FY 2013, 2014, 2015 and 2016 Proxy Statements. RJN at 4. The CAC cites the proxy statements as evidence that McKesson's compensation arrangements created a motive for its executives to commit fraud. See Compl. ¶¶ 185–92. This discussion spans three pages and conveys numerous facts gleaned from the proxy statements about Hammergren and Beer's compensation. Id. The Ninth Circuit has held that a document was "extensively" discussed, even though the complaint quoted it only one, because the quote was a "page and a half" long and "convey[ed] numerous facts." Khoja, 899 F.3d at 1004. The proxy statements are extensively referenced in the CAC and subject to incorporation. Similarly, Exhibit 25, the AG complaint, is cited throughout the CAC. See generally Compl. Additionally, an eighteen-page excerpt is attached to the CAC as Exhibit A. Compl Ex. A. The AG complaint is also subject to incorporation by reference.

In contrast, Exhibits 14 (McKesson's July 27, 2017 earnings call for Q1 2017) and 24 (Hammergren's SEC Forms 4 filed with the SEC between October 24, 2013 and January 25, 2017),

United States District Court
Northern District of California

are not cited in the CAC.[1]  See RJN at 3–4.  These documents not subject to incorporation by reference.  See Khoja, 899 F.3d at 1006 (SEC filings that were not extensively referenced in the complaint and "merely demonstrated that there was some financial incentive" to commit fraud not subject to incorporation by reference).  Nonetheless, both the transcript of the earnings call and the SEC filings are publicly-filed documents whose accuracy cannot reasonably be questioned and are therefore subject to judicial notice.  Wochos v. Tesla, Inc., No. 17-cv-05828-CRB, 2019 WL 1332395, at *2 (N.D. Cal. March 25, 2019).

### 2.    The AG Complaint

The parties dispute whether the CAC may rely on allegations in the AG Complaint. McKesson cites a line of cases holding that "paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)."  Mot. at 7 n.3 (citing In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig., 934 F. Supp. 2d 1219, 1226 (C.D. Cal. 2013)). Evanston responds that several other courts have considered allegations from the AG Complaint when ruling on motions to dismiss.  Opp'n at 9 n.7.  Because the Ninth Circuit has relied on comparable documents when deciding motions to dismiss Section 10(b) and antitrust claims, the Court holds it is appropriate to do so here.  See In re VeriFone Holdings, Inc. Sec. Litig., 704 F.3d 694, 706–07 (9th Cir. 2012) (relying on allegations in an SEC complaint incorporated into the plaintiff's pleadings); In re Musical Instruments and Equip. Antitrust Litig., 798 F.3d 1186, 1199 (9th Cir. 2015) (relying on allegations in an FTC complaint and settlement).

### B.    Section 10(b)

To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act, a plaintiff must plead: (1) a misrepresentation or the use or employment of any manipulative or deceptive device or contrivance; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  Stoneridge Inv. Partners, LLC v. Scientific-

---

[1]  Although the CAC alleges that Hammergren made stock sales recorded in Exhibit 24, it does not cite his SEC Forms 4 to support that allegation.  See Compl. ¶ 232–33, App. 2.

Atlanta, Inc., 552 U.S. 148, 157 (2008). "SEC Rule 10b–5 implements [Section] 10(b) by declaring it unlawful: '(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements . . . not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.'" Tellabs, 551 U.S. at 318 (quoting 17 CFR § 240.10b–5). McKesson moves to dismiss Evanston's Section 10(b) claim on the grounds that the CAC fails to adequately plead a misrepresentation, scienter, or loss causation. Mot. at 12.

### 1.    False or Misleading Statements

To prevail on a Section 10(b) claim, a plaintiff must show that the defendant made a statement that was " misleading as to a material fact." Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988) (emphasis omitted). The materiality requirement is satisfied when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. at 231–232. Moreover, "[Section] 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011). Disclosure is required only when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." Id. (citing 17 C.F.R. § 240.10b–5(b). "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." Id. at 45.

Evanston identifies six categories of false or misleading statements. First, statements attributing McKesson's earnings to increased generic drug prices, without acknowledging that the price inflation was the result of collusive activity. Some of these statements attributed increased prices to legitimate supply disruptions. Second, statements claiming McKesson was a zealous

8

United States District Court
Northern District of California

negotiator on behalf of its purchasers. Third, statements that the market for generic drugs was competitive. Fourth, statements that NorthStar was a growth vehicle for McKesson. Fifth, statements describing McKesson's financial results, without attributing its revenue to illegal activity. Sixth, statements that McKesson's earnings had been derisked. <u>See</u> Opp'n at 6–7. Evanston alleges these statements were materially misleading or false because McKesson either participated in, or was aware of, a conspiracy to fix prices for generic drugs. <u>Id.</u> at 17–24. It alleges these statements were false and misleading either because McKesson itself participated in unlawful price-fixing agreements, or because it was aware of such agreements in the generic pharmaceuticals industry.

### a. Participation in a Price-Fixing Conspiracy

"An impermissible conspiracy can be alleged through either direct or circumstantial evidence." <u>B&R Supermarket, Inc. v. Visa, Inc.</u>, No. 16-01150 WHA, 2016 WL 5725010, at *6 (N.D. Cal. Sept. 30, 2016) (citing <u>Musical Instruments</u>, 798 F.3d at 1193). Circumstantial evidence includes parallel conduct combined with "plus factors . . . that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." <u>Musical Instruments</u>, 798 F.3d at 1194.

The parties dispute what legal standard applies to Evanston's allegations that McKesson participated in unlawful agreements. According to McKesson, the PSLRA's heightened pleading requirement applies to both the challenged statements and Evanston's allegations of underlying misconduct. Mot. at 8. Evanston claims that allegations of underlying misconduct need only be "plausible." Opp'n at 7 n.6. It is not clear what pleading standard applies to allegations of misconduct that, if true, would render the challenged statements materially false or misleading. <u>Compare</u> <u>Gamm v. Sanderson Farms, Inc.</u>, No. 16 CV. 8420 (RMB), 2018 WL 1319157, at *3 (S.D.N.Y. Jan. 19, 2018) ("Where the plaintiffs' underlying allegation in a Rule 10b-5 case is that a defendant participated in an antitrust conspiracy, the plaintiffs must plead the facts of the alleged conspiracy with particularity." (internal alterations omitted)), <u>with</u> <u>Roofer's Pension Fund v. Papa</u>,

No. 16-2805, 2018 WL 3601229, at *11 (D.N.J. July 27, 2018) ("When a securities fraud action rests on the failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred."). However, it is unnecessary to decide this issue, because Evanston fails to sufficiently allege McKesson's participation in a price-fixing conspiracy even under the less stringent plausibility standard.

**<u>Direct Evidence of Conspiracy.</u>** Evanston pleads no direct evidence of McKesson's participation in an unlawful price-fixing agreement. Instead, it pleads direct evidence of unlawful agreements among generic drug manufacturers. The CAC alleges facts showing an illegal agreement between Heritage, Mylan, and Mayne to allocate the market for the generic drug Doxy DR. Compl. ¶¶ 73–77, Opp'n at 9–11. The conspiracy included illegal promises not to compete for McKesson's business. Compl. ¶¶ 73–77. But the more plausible inference from this evidence is that McKesson was a victim of, not a participant in, the Doxy DR conspiracy. Allegations that Heritage told other manufactures it was "strategically aligned" with McKesson, and thus likely to keep the wholesaler's business, are consistent with this interpretation. <u>See</u> Compl. ¶ 75. Heritage could have been indicating that it would offer McKesson more favorable terms than other manufacturers, or simply making baseless claims to scare off competition. Nor is it suspicious that McKesson ignored or declined certain bids, absent allegations that those bids were more favorable than competing offers. <u>See</u> Compl. ¶¶ 74–75. The CAC does not allege any other direct evidence of McKesson's participation in the Doxy DR conspiracy.

Allegations that McKesson participated in a conspiracy to fix the price of the generic drug Leflunomide are even more tenuous. Evanston alleges direct evidence of an illegal agreement in 2015 between Heritage, Teva, and Apotex to fix the price of Leflunomide. Compl. ¶¶ 97; Opp'n at 11–12. It then alleges that NorthStar raised the price of Leflunomide in 2015, and that Heritage and Apotex implemented similar price increases several months later. Compl. ¶ 98. The CAC alleges direct evidence of the 2014 conspiracy, not the 2015 conspiracy. Evanston cannot transmute direct evidence of an agreement in 2014 between Heritage, Teva, and Apotex, into direct evidence of an agreement in 2015 between NorthStar, Heritage, and Apotex.

Perhaps recognizing the dearth of direct evidence, Evanston urges in the alternative that it

has plead sufficient circumstantial evidence that McKesson participated in an antitrust conspiracy. This argument relies on evidence of parallel conduct, and five plus factors: actions against self-interest, deviation from pre-collusion behavior, state and federal investigations, a market susceptible to collusion, and participation in trade organizations. Opp'n at 12–15. Even assuming Evanston has adequately plead parallel conduct, its plus factors are insufficient to create a plausible inference of McKesson's participation in an unlawful agreement.

The Ninth Circuit found parallel conduct and a very similar set of plus factors insufficient to plead an antitrust conspiracy in In re Musical Instruments and Equipment Antitrust Litigation. In that case, the plaintiffs alleged that Guitar Center, Inc., five guitar manufacturers, and the National Association of Music Merchants conspired to "fix[ ] the minimum price at which any retailer could advertise the manufacturers' guitars and guitar amplifiers." Musical Instruments, 798 F.3d at 1189. The plaintiffs alleged parallel conduct and six "plus factors" evidencing an illegal conspiracy. Id. at 1194. The Ninth Circuit's holding that this evidence was insufficient to plead an antitrust violation is instructive in assessing Evanston's very similar plus factors.

**Actions Against Self-Interest.** NorthStar raised prices on some generic drugs and failed to undercut its competitors' pricing for others. Opp'n at 13–14. Evanston argues this would be economically irrational in a genuinely competitive market, because it foregoes an opportunity to increase market share by offering better prices. Id. Ergo, NorthStar's pricing evidences collusion. Id. But Musical Instruments rejects this syllogism for "fail[ing] to account for conscious parallelism and the pressures of an interdependent market." 798 F.3d at 1195. "[S]o long as prices can be easily readjusted without persistent negative consequences, one firm can risk being the first to raise prices, confident that if its price is followed, all firms will benefit." Id. "Follow the leader" pricing can raise prices across the board without any unlawful agreement. Id. It therefore takes "individual action [that] would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement" to suggest prior agreement. Id.

Evanston's allegations do not fall into the latter category. The CAC alleges that NorthStar raised prices on two drugs and failed to undercut prices on four others. Compl. ¶ 92. This behavior is consistent with lawful "follow the leader" pricing. NorthStar either sought to lead the market to

higher prices or was willing to be led rather than sacrifice existing favorable pricing in pursuit of increased market share. Under <u>Musical Instruments</u>, these allegations do not suffice to plead NorthStar's participation in the conspiracy. <u>Musical Instruments</u>, 798 F.3d at 1195.

**Deviations from Pre-Collusion Behavior.** Evanston next argues that decreased price, decreased market share volatility, and McKesson's increased profitability are "deviation[s] from pre-collusion behavior" demonstrating unlawful agreement. Opp'n at 14. It is true that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors . . . for no other discernible reason" may support a plausible inference of conspiracy. <u>See</u> <u>Twombly</u>, 550 U.S. at 556 n.4. But the mere "progressive adoption of similar policies" may reveal nothing "more than similar reaction to similar pressures within an interdependent market, or [lawful] conscious parallelism." <u>Musical Instruments</u>, 798 F.3d at 1196. As explained above, stability in price and market share is consistent with conscious parallelism. And as the CAC explains, McKesson's wholesale business model meant that it would profit from generic drug price inflation, regardless of whether it actually participated in illegal agreements. Compl. ¶¶ 58–61.

**Government Investigations.** McKesson also cites government investigations and Heritage executives Jeffrey Glazer and Jason Malek's guilty pleas to the Doxy DR conspiracy. Opp'n at 14. But "government antitrust investigations ordinarily carry no weight in pleading an antitrust conspiracy." <u>In re German Auto. Mfrs. Antitrust Litig.</u>, 392 F. Supp. 3d 1059, 1071 (N.D. Cal. 2019) (internal quotation marks omitted). This general rule is especially applicable here, since the CAC does not allege that either the guilty pleas or any government investigation named McKesson as a party to an unlawful agreement. <u>See generally</u> Compl. Ex. A; <u>cf.</u> <u>Musical Instruments</u>, 798 F.3d at 1196 (finding irrelevant an FTC investigation because the resulting complaint and consent decree did not allege a conspiracy or agreement to adopt collusive pricing policies).

**Susceptibility to Collusion.** McKesson argues the market for generic drugs is highly susceptible to collusion, because it is a commodity market, dominated by a few companies, and rigorously regulated. Other relevant features are its inelastic demand, high barriers to entry, and lack of viable substitutes. Opp'n at 14–15; Compl. ¶¶ 105–16. This plus factor is analogous to one considered by <u>Musical Instruments</u>: common motive to collude. The Ninth Circuit concluded that

"alleging 'common motive to conspire' simply restates that a market is interdependent (i.e., that the profitability of a firm's decisions regarding pricing depends on competitor's reactions.)." 798 F.3d at 1195. Evanston's argument that the market is susceptible to collusion boils down to an argument that the market is interdependent, creating a motive to collude. The Ninth Circuit's observation that "interdependent firms may engage in consciously parallel conduct through observation of their competitors' decisions, even absent an agreement" is therefore equally relevant in this case. Id.

**Participation in Trade Organizations.** Evanston alleges that McKesson participated in trade organizations. Compl. ¶¶ 117–21. Such allegations are insufficient evidence of an antitrust conspiracy when the complaint fails to "identify what was agreed to in the[ ] meetings." German Auto. Mfrs., 392 F. Supp. 3d at 1071–72. Without specific allegations of what McKesson agreed to at the trade organizations, Evanston has alleged "mere participation in trade organization meetings," which is not enough to constitute a meaningful plus factor supporting a finding of an antitrust conspiracy. Musical Instruments, 798 F.3d at 1196. This is true regardless of the positions McKesson executives held in the trade organizations or evidence that other companies used these meetings to execute unlawful agreements—what matters is evidence of McKesson's activity.

Even cumulatively and combined with parallel conduct Evanston's five plus factors do not adequately allege that McKesson entered an unlawful agreement. This conclusion accords with Musical Instruments, which held parallel conduct and six plus factors (five of them very similar to Evanston's) insufficient to plead an antitrust conspiracy. Id. at 1198. It also accords with the result in In re Generic Pharmaceuticals Pricing Antitrust Litigation, 386 F. Supp. 3d 477 (E.D. Penn. 2019), which dismissed an antitrust claim against McKesson alleging very similar facts. The complaint in Generic Pharmaceuticals also alleged a strong motive to collude, actions against self-interest, opportunities to conspire at trade events, and government investigations. Id. at 483–86. Judge Rufe found these allegations insufficient to state a Sherman Act claim, even assuming parallel conduct and considering several additional plus factors not alleged by McKesson. Id. at 483–87.

### b. Knowledge of Price-Fixing Conspiracy

Evanston argues that even if McKesson did not participate in an antitrust conspiracy, its

statements would still be materially false and misleading if it knew that the generic drug manufacturers were engaged in a price-fixing conspiracy. Opp'n at 16. McKesson does not appear to contest that Evanston has adequately plead the existence of unlawful agreements between generic drug manufacturers. Nor could it—the CAC alleges specific, direct evidence of unlawful agreements between those companies' executives. See, e.g., Compl. ¶¶ 74–77, Ex. A.

Instead, McKesson argues that the existence of a conspiracy among generic drug manufacturers does not render any statement identified in the complaint materially misleading or false. Mot. at 14–22. McKesson also contends, both in its briefing and again at argument, that the challenged statements could not have been misleading because McKesson's executives could not have known about a conspiracy between the manufacturers when those statements were made. However, as explained below in the section on scienter, Evanston has adequately alleged that McKesson's executives were aware of price-fixing in the generic pharmaceutical industry when the challenged statements were made. The rest of this section addresses which of the six categories of challenged statements were false or misleading in light of that knowledge.

**Supply Disruptions.** The CAC alleges that McKesson executives repeatedly attributed the company's increased profitability to generic drug price increases driven by "supply disruption." See, e.g., Compl. ¶¶ 46, 63–64. McKesson executives also identified the ostensible reasons for those disruptions. For example, Beer told analysts, "[W]e continue to see the underlying drivers as some sort of supply disruption whether it's the FDA backlog, whether it's the FDA actions around a particular manufacturer's planned or line, or whether it's an individual manufacturer taking a decision around their own capacity." Id. ¶ 63. Evanston alleges that there were no supply disruptions that affected the drugs driving McKesson's increased profitability. The price increases were the result of collusive activity. Id. ¶ 152.

Evanston argues that even if there was a price-fixing conspiracy, statements regarding a supply disruption were not false for two reasons. First, the manufacturers may have experienced supply disruptions of the type McKesson described,[2] even if they were also engaged in a price-fixing

---

[2] In fact, Evanston alleges that there were no supply disruptions of the type McKesson executives described for the drugs driving the company's increased profits. See Compl. ¶ 152.

14

conspiracy. Mot. at 15. Second, if two manufacturers illegally agreed that only one of them would supply McKesson with a certain drug, that would technically be a "supply disruption." Id. at 16.

Neither argument is persuasive. "Even if a statement is not false, it may be misleading if it omits material information." Khoja, 899 F.3d at 1008–09. "[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that won't mislead investors, including disclosing adverse information that cuts against the positive information." Id. at 1009 (alterations omitted). So, in Khoja, once a pharmaceutical company released positive interim results, it was obligated to disclose new information "that diminished the weight of those results." Id. at 1015.

The duty to disclose obligated McKesson to reveal that the price increases it had announced were driven, in part, by collusive activity. Having touted the good news that supply disruptions were leading to increased prices and thus increased profits, McKesson had a duty to also disclose that some portion of its increased profits was actually due to far riskier and less sustainable unlawful agreements. And even if those unlawful agreements technically led to "supply disruptions," a reasonable investor would not interpret that phrase to encompass illegal market allocation agreements. The duty to disclose also means that McKesson is incorrect that it had no duty to accuse the generic drug manufacturers of antitrust violations.

**Value to Purchasers.** The next category of challenged statements claimed that McKesson provided value to its pharmaceutical customers by obtaining competitive prices for generic drugs. Opp'n at 6. For example, Beer told analysts at the Bank of America Merrill Lynch Health Care Conference that "we buy at scale in an extremely efficient way and are able to pass through the benefits of those drug prices to . . . independent stores." Compl. ¶ 153. Evanston argues these statements were false or misleading because in fact McKesson was acquiescing to supra-competitive prices driven by anticompetitive agreements. Id. ¶ 166.

These statements were not rendered false by the manufacturers' price-fixing conspiracy. They simply described the value of a wholesaler to independent pharmacies. Mot. at 17–19. They were not a guarantee that McKesson was obtaining the best possible price, just a description of its role in the market. Touting the benefits of this roll was misleading. Descriptions of McKesson's

1    role as a wholesaler, and the advantages of buying from a wholesaler, were accurate regardless of

2    whether or not McKesson's prices were impacted by the manufacturers' collusion.

3    **Competitive Market.**  Evanston claims statements describing the generic drug market as

4    competitive were false or misleading because that market was, in fact, rife with anticompetitive

5    conduct.  Opp'n at 6.  McKesson claims these statements were not broad claims about the overall

6    competitiveness of the generic drug market, but rather limited observations about specific aspects

7    of its business.  Reply at 8–9.  The Court finds that the relevant statements could plausibly be read

8    to speak to the overall generic drug market.  See Compl. ¶¶ 155–57, 164 ("I think that the [generic

9    drug] market remains competitive").  Claiming the generic drug market is competitive would be

10   misleading if there was in fact widespread price fixing.  See Utesch v. Lannett Co., 385 F. Supp. 3d

11   408, 420 (E.D. Penn. 2019) (holding the statement "We face strong competition in our generic [drug]

12   business" misleading given allegations "the generic pharmaceutical industry was riddled with

13   anticompetitive conduct").

14   **NorthStar.**  The fourth category of challenged statements claimed that NorthStar was a

15   "growth vehicle" and attributed its success to legitimate causes, such as launching new drugs.  Opp'n

16   at 6.  Because Evanston has not sufficiently alleged NorthStar's participation in an unlawful

17   conspiracy, it has also failed to plead that this category of statements was false or misleading.  Even

18   assuming NorthStar was able to charge higher prices thanks to other companies' unlawful collusion,

19   a general discussion of its growth and other merits would not be rendered misleading by failing to

20   disclose other companies' antitrust violations.

21   **Financial Results.**  The fifth category of challenged statements are McKesson's financial

22   results and explanations for those results.  Opp'n at 6–7.  Evanston argues these statements were

23   false because they attributed the company's positive financial results to "legitimate market forces"

24   rather than "industrywide collusion."  Opp'n at 7.  The Ninth Circuit has held that "the PSLRA's

25   falsity requirement is not satisfied by conclusory allegations that a company's class period

26   statements regarding its financial well-being are per se false based on the plaintiff's allegations of

27   fraud generally."  Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1070 (9th Cir.

28   2008).  However, explanations for financial statements may be misleading if they put the source of

16

United States District Court
Northern District of California

illegal revenue at issue without disclosing the illegality. See, e.g., In re Syncor Int'l Corp. Sec. Litig., 239 F. App'x 318, 320 (9th Cir. 2007) (statements that acknowledged legitimate income sources for defendant's overseas earnings while omitting unlawful ones were misleading).

Some of McKesson's financial guidance put the source of profits from collusively priced drugs at issue by attributing revenue to "drug . . . price increases." See, e.g., Compl. ¶¶ 171–72. These portions of its financial guidance were false, because they put generic drug price increases at issue, and therefore obligated McKesson to disclose the collusion helping to drive the inflation. See Khoja, 899 F.3d at 1008–09.

But Evanston has otherwise failed to allege that the financial statements were false. Evanston does not explain why any other aspects of the lengthy financial statements excerpted in the CAC put generic drug price increases at issue (other than asserting the inappropriate inference that the fraud rendered all of McKesson's financial statements false). See Metzler, 540 F.3d at 1070. And although it asserts that the guidance was false because it was premised on the misrepresentations regarding supply disruptions, it does not adequately explain how the guidance was based on those statements. See Compl. ¶¶ 169–82, Opp'n at 22–23.

**Derisked Earnings.** The final category of challenged statements claimed that McKesson had derisked its FY17 earnings from generics inflation. These statements were essentially forward-looking. 15 U.S.C. §§ 78u-5(i)(1)(A), (C). They are therefore actionable only if the CAC pleads facts supporting a strong inference that McKesson made these statements with actual knowledge of their falsity. 15 U.S.C. §§ 78u-5(c)(1)(B). The CAC contains no allegations supporting that inference, see Compl. ¶ 163, nor does Evanston's briefing lay out any basis for such a claim, Opp'n at 23–24; see also Oracle Corp., 627 F.3d at 389 ("[T]he fact that Oracle's forecast turned out to be incorrect does not retroactively make it a representation.").

In sum, Evanston has adequately plead that the first and third categories of challenged statements were materially false and misleading, but not the second, fourth, or sixth categories. The fifth category of challenged statements, McKesson's financial results, were materially false or misleading only insofar as they referenced generic drug "price increases."

## 2. Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, 551 U.S. at 308. To demonstrate scienter, a complaint must allege that the defendants made "false or misleading statements either intentionally or with deliberate recklessness." See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009); Ronconi v. Larkin, 253 F.3d 423, 432 (9th Cir. 2001). "[M]ere recklessness or a motive to commit fraud" is not enough. Reese v. Malone, 747 F.3d 557, 569 (9th Cir. 2014), overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Tech., Inc., 856 F.3d 605, 616 (9th Cir. 2017). Rather, the complaint must allege "a highly unreasonable omission" and "an extreme departure from the standards of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." See Zucco, 552 F.3d at 991. The court must "assess all the allegations holistically," not "scrutinize each allegation in isolation." Tellabs, 551 U.S. at 326. Courts in the Ninth Circuit sometimes conduct a dual inquiry, which first considers "whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter." Verifone Holdings, 704 F.3d at 702. If not, the court asks whether the individually inadequate allegations suffice when considered as a whole. Id.

Considered as a whole, Evanston's allegations regarding the scope of the conspiracy, its importance to McKesson's bottom line, Hammergren and Beer's statements about their knowledge of the generic drug market, their positions at McKesson, and their compensation arrangements are sufficient to plead scienter. The Court therefore need not consider whether these allegations would be individually sufficient. Evanston's other allegations of scienter add little to the analysis, so they are not addressed.

**"Core Operations" Theory of Scienter.** Hammergren and Beer's statements touting their knowledge of the generics market, combined with the magnitude of the price-fixing conspiracy, its significance to McKesson's revenues, and the executive defendants' roles at the company, are sufficient to satisfy a "core operations" theory of scienter. See Dearborn Heights, 856 F.3d at 620. "[F]alsity may itself be indicative of scienter where it is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual

18

access to the disputed information, and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." Zucco, 552 F.3d at 1000 (quotation marks omitted). This standard can be satisfied by "specific admissions from top executives" about their "access to information within the company." Id.

Evanston argues that Hammergren and Beer's statements regarding their knowledge of generic drug pricing show they must have been aware that collusion was driving price inflation. The CAC alleges that McKesson touted a "huge analytics machine" that captured information on generic drug pricing and the market for generic drugs. Compl. ¶ 122. Hammergren claimed that NorthStar provided McKesson with insight into the generic drug market, including "some of the challenges that may exist, whether it's plant closures, limited supply of raw materials, or other issues that may come along." Id. McKesson executives claimed that they were "extremely intimate globally" to generic drug manufacturers, and thus positioned "to see how price is behaving," "monitor pricing trends," and "analyze[ ] . . . the inflationary elements in the market place." Id. ¶ 125–26.

It is true that evidence that a company collects and tracks data that would reveal fraud is insufficient, on its own, to establish scienter on the part of its executives. Metzler, 540 F.3d at 1068 ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud."). But Evanston alleges more than just a "general awareness of the day-to-day workings of the company's business." Id. Hammergren and Beer touted intimate knowledge of generic drug manufacturers, generic drug pricing, and challenges that might impede supply. They went on to falsely attribute generic drug price increases to non-existent supply disruptions. If Hammergren and Beer really had the intimate knowledge of generic drug pricing and conditions in the generic drug market that they claimed, it was at least deliberately reckless not to investigate the accuracy of their statements that price increases were being driven by specific, legitimate supply disruptions, rather than collusive activity. For the same reason, these statements are sufficient allegations that it was at least deliberately reckless for McKesson to ignore the falsity of its claims that the generic drug market remained competitive.

McKesson argues that Evanston mischaracterizes many of the statements touting the executives' knowledge of the generic drug market. Specifically, McKesson argues that because Hammergren and Beer used the pronoun "we" (as in, "we have been able to look carefully at the generic purchasing patterns"), their statements reveal, at most, that some branch of the company was monitoring generic pricing trends, not the executives themselves. Mot. at 23–24. The difference is immaterial. The Ninth Circuit has held that a top executive's admission that "[w]e know exactly how much we have sold in the last hour" was sufficient to demonstrate that executive's access to the relevant sales figures. Zucco, 552 F.3d at 1000 (alteration in original, emphasis added, quotation marks omitted). At the very least, whether Hammergren and Beer's statements suggest personal knowledge or just knowledge on the part of some employee at McKesson is a question of fact not appropriate for resolution on a motion to dismiss.

Finally, McKesson cites cases holding that alleging knowledge of pricing is insufficient to allege knowledge of price-fixing. Mot. at 25 (citing Fleming v. Impax Labs., Inc., No. 16-cv-06557-HSG, 2018 WL 4616291, at *4 (N.D. Cal. Sept. 7, 2018). It is true that in another Section 10(b) action arising from allegations of price-fixing in the generic drug market, Judge Gilliam held that "statements . . . regarding Defendants' willingness to monitor the market, maximize product opportunities, and exploit positive pricing," were insufficient to plead scienter. Fleming, 2018 WL 4616291, at *4. He concluded that "the more compelling inference . . . is that Defendants made a good faith but mistaken determination that price increases resulted from natural market conditions." Id. (internal alterations and quotation marks omitted). Impax is distinguishable. Hammergren and Beer's statements indicate not just a willingness to monitor the market, but access to information putting them on notice that the price increases were not driven by legitimate supply disruptions.

**Compensation Structure.** Evanston asserts that "McKesson's unique compensation structure incentivized defendants . . . to perpetuate the fraud." Opp'n at 29; Compl. ¶ 183–92. Because "it is common for executive compensation, including stock options and bonuses, to be based partly on the executive's success in achieving key corporate goals," courts generally "will not conclude that there is fraudulent intent merely because a defendant's compensation was based in part on such successes." In re Rigel Pharm., Inc. Sec. Litig., 697 F.3d 869, 884 (9th Cir. 2012).

However, a "strong correlation between financial results and stock options or cash bonuses for individual defendants may occasionally be compelling enough to support an inference of scienter." Zucco, 552 F.3d at 1004. Particularized allegations regarding the correlation between financial results and stock options or cash bonuses are necessary to plead a sufficiently strong correlation. Id. In No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., allegations of the number of additional stock options executives received thanks to improved financial performance were sufficient to show scienter. 320 F.3d 920, 944 (9th Cir. 2003).

The CAC pleads a sufficiently strong correlation between McKesson's financial performance and Hammergren and Beer's stock and cash awards to support a finding of scienter. The CAC alleges specific stock and cash award multipliers that tied Hammergren and Beer's compensation to McKesson's financial performance in 2014, 2015, 2016, and 2017. Compl. ¶ 189. It also provides tables alleging precise amounts each executive received in base salary, stock award, and cash awards for each year. The numbers Evanston pleads demonstrate that the executives' compensation from stock and cash awards far outstripped their base salaries. Id. ¶¶ 190–92. These allegations are comparable to those in America West.

McKesson takes issue with Evanston's characterization of certain aspects of the compensation arrangements that protected the executives' pay from at least some negative earnings impacts from litigation. Mot. at 26–27. But this dispute is irrelevant. The most salient allegations about McKesson's compensation arrangements are the multipliers and tables showing Hammergren and Beer's earnings. Those allegations demonstrate a "strong correlation" between financial results and Hammergren and Beer's compensation. See Zucco, 552 F.3d at 1004.

Considered as a whole, the core operations theory and Hammergren and Beers' compensation arrangements adequately allege scienter.

### 3. Loss Causation

Loss causation is the "causal connection between the material misrepresentation and the [economic] loss" faced by the plaintiff. Dura Pharm., 544 U.S. at 342. A complaint must give the defendant "notice" of this causal connection; in other words, "the complaint must allege that the

defendant's share price fell significantly after the truth became known." Metzler, 540 F.3d at 1062 (internal citations omitted). The misrepresentation need not be the "sole" reason for the decline as long as it is a "substantial cause," see In re Daou Sys., Inc., 411 F.3d 1006, 1025 (9th Cir. 2005), and the allegations, "if assumed true, are sufficient" to indicate a causal relationship between the company's "financial misstatements" and "the drop in [its] stock price," see id. at 1026. "At the pleading stage, however, the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity," rather than other factors. Loos v. Immersion Corp., 762 F.3d 880, 887 (9th Cir. 2014). The ultimate question is "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1210 (9th Cir. 2016).

The CAC identifies four corrective disclosures ostensibly demonstrating loss causation. Compl. ¶¶ 196–200. Three of the disclosures are announcements of disappointing financial results or projections, attributed in part to slowing generic drug price inflation. Compl. ¶¶ 196–97, 200. The fourth consists of two news articles, published in Bloomberg and Reuters, announcing government investigations of generic drug price-fixing. Compl. ¶ 199. Evanston alleges that all four corrective disclosures were followed by significant drops in McKesson's stock price. Compl. ¶ 196–202.

It is true, as McKesson argues, that on their own neither the disappointing financial results nor the mere announcement of an investigation would be sufficient to demonstrate loss causation. See Oracle Corp., 627 F.3d at 392 ("Loss causation requires more than an earnings miss."); Loos, 762 F.3d at 890 ("[T]he announcement of an investigation, without more, is insufficient to establish loss causation."). However, taken together, these allegations adequately plead loss causation.

This case is analogous to Lloyd v. CVB Financial Corp. The plaintiffs in Lloyd alleged that CVB had fraudulently represented "that there was no basis for 'serious doubt' about Garrett's [Lloyd's largest borrower] ability to repay its borrowings." 811 F.3d at 1202. CVB's stock fell

22% after it announced a Securities and Exchange Commission subpoena "request[ing] information regarding our loan underwriting guidelines, our allowance for credit losses and our allowance for loan loss calculation methodology, our methodology for grading loans and the process for making provisions for loan losses, and our provision for credit losses." Id. at 1204. "About a month after it announced the SEC subpoena, CVB disclosed that it was charging off millions in Garrett loans." Id. at 1210. The market hardly reacted to that "bombshell" announcement. Id. Lloyd held that this "confirm[ed] that investors understood the SEC announcement as at least a partial disclosure of the inaccuracy of the previous 'no serious doubts' statements. Id.

Similarly, the government investigation into generic drug price-fixing, combined with McKesson's disappointing earnings, is sufficient to show that investors would have understood the investigation as a revelation of the collusive activity McKesson's fraud concealed. McKesson's disappointing financial results had already put investors on notice that falling drug prices were hurting the company's bottom line. See Compl. ¶¶ 196–97, 200. It is reasonable to infer that thanks to this context, investors would have understood the investigation as "at least a partial disclosure" of the collusive activity responsible for those pricing trends. See Lloyd, 811 F.3d at 1210. Indeed, the Reuters article explicitly tied increased scrutiny of generic drug pricing to McKesson's financial results, noting that "[g]eneric drugmakers, possibly reacting to political headwinds, reined in price hikes this year," and "[t]he price erosion has been felt by drug wholesalers like McKesson." Mot. Ex. 19. McKesson's stock price dropped yet further when the investigation was announced, showing that investors considered this revelation material. Compl. ¶ 199. This sequence of events is sufficient to show that Evanston's claimed "economic loss was caused by [McKesson's] misrepresentations" about generic drug pricing and the generic drug market. See Lloyd, 811 F.3d at 1209.

It is true that in Lloyd the disclosures occurred in the opposite order. In that case, an investigation was followed by another announcement which confirmed that the market had

23

understood the investigation as a disclosure of the fraud.  Id. at 1210.  But a recent Ninth Circuit case, Mineworkers' Pension Scheme v. First Solar Inc., 881 F.3d 750 (9th Cir. 2018), makes it clear that it would be a mistake to apply the loss causation standard so rigidly as to reject any theory that does not precisely align with the facts of previous cases.  First Solar reiterated that the standard for loss causation "requires no more than the familiar test for proximate cause."  Id. at 753.  The Ninth Circuit recognized that there are an "'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause" and "our approval of one theory should not imply our rejection of others."  Id. at 753–54 (internal citations omitted).  Based on First Solar, the Court concludes that it would be a mistake to read Lloyd to require that an investigation be announced before any other relevant disclosures.  That is just one of an "infinite variety" of theories that adequately allege loss causation.  See id. at 754.  Loss causation is also adequately alleged, when, as here, prior revelations clearly gave investors the context necessary to interpret the investigation as revealing the fraud.

### C.    Section 20(a)

Section 20(a) provides a right of action against any person "who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder."  15 U.S.C. § 78t(a).  McKesson's only argument that Evanston's control person claims should be dismissed is that Evanston has failed to plead an underlying Section 10(b) violation.  See MTD at 34 n.19.  Because Evanston has adequately pled an underlying Section 10(b) violation, the motion to dismiss the Section 20(a) claims is denied.

### D.    Section 20(a)

Section 20A of the Exchange Act provides a right of action against "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information."  15 U.S.C. § 78t-1(a).  To plead a Section 20A claim, plaintiffs must allege "a predicate insider trading violation of the Exchange Act."  In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig., 328 F. Supp. 3d 963, 987 (N.D. Cal 2018).

United States District Court
Northern District of California

Evanston has successfully pled a "predicate insider trading violation" for the same reasons it has adequately alleged its Section 10(b) claim.  The allegations giving rise to a strong inference of scienter also support an inference that Hammergren's sales of McKesson stock during the class period were made "while in possession of material, nonpublic information."  See VeriFone Holdings, 704 F.3d at 711 (reversing dismissal of Section 20A claims where district court erroneously held that plaintiffs "failed to sufficiently plead scienter").  Specifically, Hammergren was in possession of the "material, nonpublic information" that the price increases driving McKesson's profits were driven by collusive behavior, not legitimate supply disruptions, when he sold McKesson's stock.[3]  See supra Section III.B.2.

McKesson also argues that two of the three challenged trades were not made "contemporaneously" with Evanston's trades, as required to establish Section 20A claims.  MTD at 35.  The Ninth Circuit has not endorsed McKesson's preferred standard for contemporaneousness (trading "on the same day . . . or at most the day after").  Id.; see also Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1002 (9th Cir. 2002) (recognizing that the Ninth Circuit has not yet "decide[d] the length of the contemporaneous trading period for insider trading violations under Section 10(b) and Rule 10b-5").  Some courts have adopted McKesson's standard, see, e.g., In re AST Research Sec. Litig., 887 F. Supp. 231, 234 (C.D. Cal. 1995), but others have found trades contemporaneous even though they were separated by much greater lengths of time, see, e.g., In re Petco Animal Supplies Inc. Sec. Litig., 2006 WL 6829623, at *37 (S.D. Cal. Aug. 1, 2006).  The Court will follow the reasoning of the latter group and holds that, at this stage of the litigation, Evanston has adequately pled contemporaneousness as to all three

---

[3]  Citing SEC filings subject to judicial notice (but not incorporation by reference), McKesson argues that Hammergren made each sale under a Rule 10b5-1 trading plan, negating the inference that the trades were made on the basis of material, nonpublic information.  MTD at 28, 34–35; see also supra Section III.A.1.  But McKesson's own authority holds that not every 10b5-1 plan is sufficient to negate the inference that trading was made on the basis of insider knowledge.  See In re Countrywide Fin. Corp. Sec. Litig., 2009 WL 943271, at *4 (C.D. Cal. Apr. 6, 2009) (finding that "unusual 10b5-1 plan modifications" made it inappropriate to dismiss Section 20A claims on the basis of said plan).  Even if McKesson's judicially noticeable documents establish that Hammergren was trading under a Rule 10b5-1 plan, at this stage of the litigation the Court will not accept them as proof of the disputable conclusion that they rule out the possibility of trading based on nonpublic material information.  See Khoja, 899 F.3d at 999.

challenged sales.  The motion to dismiss the Section 20A claims is denied.

**II.       CONCLUSION**

For the foregoing reasons, the motion to dismiss is DENIED.

**IT IS SO ORDERED.**

Dated: October 29, 2019



CHARLES R. BREYER
United States District Judge