IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVANSTON POLICE PENSION FUND,<br><br>Plaintiff,<br><br>v.<br><br>MCKESSON CORPORATION, et al.,<br><br>Defendants. | Case No. 18-cv-06525-CRB<br><br>**ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Plaintiffs in this class action, led by the Evanston Police Pension Fund (the Pension Fund), are suing McKesson Corporation and two McKesson executives (collectively, McKesson) for securities fraud. The Pension Fund alleges that McKesson was aware that a price-fixing conspiracy among generic drug manufacturers had increased its profits, but it misled investors by instead attributing the company's improved performance to other factors. The Fund alleges that investors lost money when the truth came to light. The Court permitted the suit to go forward with respect to corrective disclosures on January 11, 2016 and November 3, 2016. The Court certified a class consisting of all persons and entities that acquired McKesson common stock from October 24, 2013 through November 3, 2016.

McKesson now moves for partial summary judgment, arguing that the Pension Fund cannot show loss causation with respect to the November 3, 2016 disclosure. The Court GRANTS partial summary judgment. See Fed. R. Civ. P. 56(a).

**I.     BACKGROUND**

   **A.     Factual Background**

The Pension Fund sued McKesson, former McKesson CEO John Hammergren, and former McKesson CFO James Beer for violating the Securities Exchange Act of 1934, based on the

following allegations.[1]  Compl. (dkt. 43) ¶¶ 215–24.

Starting in 2014, evidence came to light of widespread anti-competitive conduct in the generic drug market.  Id. ¶ 5.  Investigations by Congress, the Department of Justice, and forty-nine state Attorneys General have led to multiple guilty pleas and an action in the Eastern District of Pennsylvania alleging a wide-ranging price-fixing conspiracy.  Id. 5, 10.  McKesson is not a defendant in that case, see id. ¶ 5, and the Court's prior order concluded that the Pension Fund had not plausibly alleged that McKesson or Northstar participated in the conspiracy.  See Order Denying MTD (dkt. 67) at 9–13.

The Pension Fund alleges that McKesson knew (or was consciously reckless in not knowing) about the conspiracy and thus knew that the conspiracy was responsible for increasing generic drug prices and, in turn, improving McKesson's profitability.  See Compl. ¶¶ 12, 71, 128, 130.  But instead of disclosing that information to investors, McKesson attributed its performance to unrelated factors like "supply disruption" in the market.  Id. ¶¶ 46, 63–64.  McKesson's financial guidance discussed generic drug price increases without disclosing the collusion that was driving those increases.  Id. ¶¶ 171–72.  And McKesson described the market to investors as "competitive."  Id. ¶¶ 155–57, 164.  The Pension Fund alleges that McKesson made these misleading statements with scienter.  Id. ¶¶ 125–26, 185–92; Order Denying MTD at 3, 18–21.

However, by the latter half of 2015, McKesson had begun to make statements that generic drug prices had subsided.  See Motion for Summary Judgment ("MSJ") (dkt. 166) at 16 (table listing prior statements).  In a July 29, 2015 earnings call, McKesson explained: "[G]eneric pricing trends were well below the level of the prior year and below our expectations for the first quarter."  See Stulz Report (dkt. 166-5) ¶ 21.  In addition, beginning in late 2014, several generic drug manufacturers acknowledged that they had received DOJ subpoenas.  MSJ at 14 (citing various exhibits).  These investigations were covered in the press.  See generally McKesson Exhibit List (dkt. 166-1); MSJ at 14–16.  McKesson's earnings and stock price declined over this period.  See

---

[1] Because this motion for summary judgment is limited to the November 3, 2016 disclosure, earlier facts derive from allegations in the complaint.  The Court makes no findings of fact as to these events.

1  generally Stulz Report ¶ 51–65.

2      This case concerns two corrective disclosures. The first occurred January 11, 2016, when McKesson announced financial results and stated to investors (among other things) that it expected only "nominal" drug price inflation because "a subset of generic drug manufacturers" were making "a decision, for whatever reason, not to have as much price change in their portfolio as they did in first half of this year and obviously in FY15." Id. ¶ 196; see Stulz Report ¶ 21. McKesson stock declined by 10.33%. Compl. ¶ 196.

    At issue in this motion is the second corrective disclosure, which consists of two news articles that were published on November 3, 2016. The first was from Bloomberg, and its headline was "U.S. Charges in Generic-Drug Probe Said to Be Filed by Year-End." See Bloomberg Art. (dkt. 181-4, pg 151). It stated, among other things:

> The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said. . . .
>
> Charges could extend to high-level executives, according to the people.
>
> . . . While the government may bring the first cases by the end of December, the situation is fluid and timing could slip, according to the people. The investigation is likely to continue after the first cases are filed, said the people, and has the potential to mirror the antitrust division's long-running probe into auto-parts cartels.

The second article, published by Reuters, was "Drugmakers under fire for possible U.S. price fixing." Reuters Art. (dkt. 181-4, pg 171). It stated facts about the investigation and noted the effects on McKesson's bottom line: "The price erosion has been felt by drug wholesalers like McKesson Corp and Amerisource Bergen Corp, which rely on price fluctuations for part of their profit margins." Id.

    The Bloomberg and Reuters articles were covered by fourteen other news and media outlets, including The New York Times, The Wall Street Journal, The Boston Globe, and Fortune. See Feinstein Report (dkt. 176-17) ¶ 64 (citing these articles). That day, McKesson stock fell 4.6%, from $135.83 to $129.59 per share. See id. ¶ 6; MSJ at 21.

3

### B. Procedural History

On October 29, 2019, the Court denied McKesson's motion to dismiss, permitting the case to go forward, narrowed to the allegations and issues described above. See Order Denying MTD; Order Clarifying MTD (dkt. 72).

On November 16, 2020, the Pension Fund moved for class certification. See Mot. for Class Cert. (dkt. 133) at 15. McKesson did not oppose class certification in general, but argued that the class should not include investors who purchased McKesson stock after January 11, 2016. See Opp. at 2. McKesson argued that plaintiffs could not have suffered a loss after January 11, 2016 because the corrective information was then known to the market. The Court granted the motion for class certification in full because McKesson's arguments sounded less in price impact than in loss causation. See Halliburton Co v. Erica P. John Fund, Inc., 573 U.S. 258, 278 (2014) (holding that loss causation is not an issue at certification). It permitted McKesson to file the instant motion for partial summary judgment. See MSJ; Opp. (dkt. 176-6); Rep. (dkt. 189-6).

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).

In securities cases, the plaintiff bears the burden at trial to show loss causation. Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal., 730 F.3d 1111, 1121 (9th Cir. 2013). On a summary judgment motion, a defendant "without the ultimate burden of persuasion at trial . . . has both the initial burden of production and the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000) (citing 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 2727 (3d ed.1998)). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the

4

nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Id. (citing High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir. 1990). "In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." Id. (internal citation omitted). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything." Id. at 1103 (internal citation omitted). If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense. If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment. But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion. See id.

## III.   DISCUSSION

A securities fraud claim under Section 10(b) of the Securities Exchange Act of 1934 requires: (1) a misrepresentation or the use or employment of any manipulative or deceptive device or contrivance; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008). The Court concludes that the November 3, 2016 disclosure cannot give rise to loss causation.

### A.   Loss Causation

In Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 346 (2005), the Supreme Court held that loss causation in a securities case requires that "a defendant's misrepresentation (or other fraudulent conduct) proximately cause[] the plaintiff's economic loss." See 15 U.S.C. § 78u-4(b)(4) ("[T]he plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." (emphasis added)). The Court explained why an inflated purchase price coupled with a decline in price might not necessarily satisfy loss causation:

> When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed

5

> investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

Dura, 544 U.S. at 342–43.  The Court thus articulated a flexible standard.

Since Dura, the Ninth Circuit has generally followed this flexible approach.  The court has acknowledged that proximate cause does not require a plaintiff to show "that a misrepresentation was the sole reason for the investment's decline in value."  In re Daou Sys., Inc., 411 F.3d 1006, 1025 (9th Cir. 2005) (citation omitted).  And it has also explained that loss causation can exist even if the loss predates the actual disclosure.  Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal., 730 F.3d 1111, 1120 (9th Cir. 2013) ("Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.").

But a few cases seem to suggest that loss causation necessarily requires the stock price to fall after the information is revealed.  See Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1062 (9th Cir. 2008) (emphasizing "careful delineation between losses caused after the company's conduct was revealed, and losses suffered before the revelation"); In re Oracle Corp. Sec. Litig., 627 F.3d 376, 392 (9th Cir. 2010) (similar).  And a few of these cases imply that loss causation may not be present "where a defendant's disclosure [only] reveals a 'risk' or 'potential' for widespread fraudulent conduct."  Metzler, 540 F.3d at 1064; see also Loos v. Immersion Corporation, 762 F.3d 880, 890 (9th Cir. 2014) (stating that "[t]he announcement of an investigation does not 'reveal' fraudulent practices to the market" because the market does not yet know for certain "what the investigation will ultimately reveal").

More recently, the Ninth Circuit has clarified that these are not bright-line rules.  In Lloyd v. CVB Financial Corp., 811 F.3d 1200, 1210 (9th Cir. 2016), the court emphasized the flexible approach the Supreme Court laid out in Dura and explained that loss causation is "context-dependent."  "[L]oss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  Id.  In Mineworkers' Pension Scheme v. First Solar Inc., 881 F.3d 750 (9th Cir. 2018), a panel examined these earlier cases and explained:

6

> Revelation of fraud in the marketplace is simply one of the "infinite variety" of causation theories a plaintiff might allege to satisfy proximate cause. When plaintiffs plead a causation theory based on market revelation of the fraud, this court naturally evaluates whether plaintiffs have pleaded or proved the facts relevant to their theory. But our approval of one theory should not imply our rejection of others. A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss. That a stock price drop comes immediately after the revelation of fraud can help to rule out alternative causes. But that sequence is not a condition of loss causation.
>
> This rule makes sense because it is the underlying facts concealed by fraud that affect the stock price. Fraud simply causes a delay in the revelation of those facts.

Id. at 754 (citations omitted). Any ostensibly restrictive rules set out in certain cases were simply "fact-specific variants of the basic proximate cause test" set out in Dura. Id. at 753–54.

Specifically, Lloyd held that, while the announcement of a fraud investigation does not necessarily serve as a corrective disclosure for purposes of loss causation, it can do so when paired with a revelation of the inaccuracy of the underlying statements. 811 F.3d at 1203. In Lloyd, CVB Financial Corporation misrepresented the health of a large loan that it had issued to a troubled real estate firm during the housing crisis. After the SEC announced a subpoena, CVB's stock declined by 22%. Id. at 1204. One month later, when CVB confessed that it had charged off the loan, its stock declined only slightly. Id. In Lloyd, this confirmation of the misrepresentation plausibly established that the earlier 22% decline in CVB's stock price was proximately caused by its fraud. Id. at 1210–11.

### B. Pension Fund's Theory of Fraud

The Court concludes that there is no proximate causal relationship between McKesson's alleged fraud and any loss shareholders suffered on November 3, 2016. See Dura, 544 U.S. at 346. As noted earlier, the November 3 articles described the Justice Department's investigation into and indictment of generic drug manufacturers. But neither the Bloomberg nor the Reuters article suggested any wrongdoing by McKesson.

The fraud alleged is that McKesson misled investors by suggesting that its profits were likely to continue because that the manufacturers' inflated drug prices were lawful. The disclosure "correcting" that fraud would be the market's discovery that those profits had subsided for good.

7

That corrective information had been disclosed before November 3. McKesson made public statements starting in the latter half of 2015 indicating that generic drug prices had begun to subside. As noted before, in a July 29, 2015 earnings call, McKesson stated: "[G]eneric pricing trends were well below the level of the prior year and below our expectations for the first quarter." See Stulz Report ¶ 21. In its January 11, 2016 disclosure, McKesson stated: "[C]onsistent with our current experience, we now expect only a nominal benefit from generic pharmaceutical pricing trends in FY17." See id. By November 3, 2016, the market knew that drug price inflation had ended. Indeed, the Reuters article itself stated the established fact that "the price erosion has been felt by drug wholesalers like McKesson Corp." Reuters Art. at 4.

A corrective disclosure must somehow provide "new information" to the market. The November 3 articles are not like the blog posts in In re BofI Holding, Inc., which "plausibly provided new information to the market" because they "required extensive and tedious research involving the analysis of far-flung bits and pieces of data," including "hundreds of Uniform Commercial Code filings, bankruptcy court documents, and other companies' registration documents." 977 F.3d 781, 797 (9th Cir. 2020). The November 3 articles did not involve "complex[] data" or "great effort . . . to locate and analyze it." Id. at 795.

Nor can the loss on November 3, 2016 be construed as proximately caused by information revealed earlier. In In re Gilead Sciences Securities Litigation, 536 F.3d 1049, 1053 (9th Cir. 2008), a pharmaceutical company allegedly concealed that unlawful off-label marketing was the reason for strong demand for its main HIV drug. The company then received a warning letter from the FDA about its off-label marketing. Id. However, the stock price did not fall until three months later, when the company reported a major earnings miss due to decreased sales of the drug. Id. at 1054. Gilead held that the letter plausibly led physicians to issue fewer prescriptions, which plausibly led to the earnings miss. Id. at 1058. Here, however, no subtle causal mechanism is at work. McKesson had told investors for over a year that generic drug prices had subsided.

The Pension Fund sometimes mischaracterizes its own theory of the case. It writes:

> Defendants also misapprehend the importance of the November 3rd articles. Plaintiff does not contend that defendants concealed the fact that a DOJ investigation was occurring. Rather, it was that the

8

> investigation had uncovered evidence of collusive activities and criminal charges were imminent. As Dr. Feinstein [Pension Fund expert] explains, the articles informed market participants of the much greater likelihood that there was in fact improper collusive pricing in the generic drug space.

Opp. at 15–16 (citations omitted). But McKesson did not know (and could not have known) how the DOJ investigation was progressing or whether indictments were forthcoming. McKesson's alleged fraud consisted of its failure to reveal generic manufacturers' fraud. It does not follow that everything the manufacturers' fraud proximately caused was also proximately caused by McKesson. Even if statements about the investigation into and indictment of the manufacturers provided new information and led to a stock price decline, that decline was only tangentially related to McKesson's alleged fraud.

Indeed, there may not even be but-for causation with respect to November 3. Suppose that McKesson had never committed the alleged fraud, but instead had consistently told investors: "Generic drug prices have always been deflationary, but now our suppliers are unlawfully inflating their (and our) profit margins. We do not believe it will last." McKesson stock still might have fallen somewhat when the market received information that indictments were likely. The loss on November 3 may well have happened even if McKesson had done nothing wrong.

The Pension Fund tries to argue that this case is like Lloyd, where loss causation was adequately pleaded because there was the announcement of an investigation into CVB Bank plus later confirmation of CVB's wrongdoing. Opp. at 19 (citing Lloyd, 811 F.3d at 1203). It notes that officials of one drug manufacturer (Heritage) were indeed indicted in December 2016, thereby "confirming" the indictment timeline in the Bloomberg article. The Pension Fund is mistaken. Even if the Heritage indictments "confirmed" the vague suggestion that some indictments in the generic drug industry "may" occur "by the end of December," it confirmed nothing about McKesson. Lloyd did not hold that loss causation attaches as to one entity's alleged fraud when an investigation about other fraud is announced into some other entity and then that other entity's fraud is confirmed. The Court previously analogized this case to Lloyd and stated that "neither the disappointing financial results nor the mere announcement of an investigation would be sufficient to demonstrate loss causation." Order Denying MTD at 22. But the Court now has the benefit of

the facts and finds Lloyd's facts to be largely inapposite.

The Pension Fund's other arguments fail. The drug manufacturers' denials date to months or years before November 3, 2016, and they did not counteract the information in the market. And because the information was already in the market, it does not matter that other newspapers, analysts, or McKesson employees thought the November 3 articles were important.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS McKesson's motion for partial summary judgment. The class is hereby amended to include all persons and entities that acquired McKesson common stock from October 24, 2013 through January 11, 2016.[2]

**IT IS SO ORDERED.**

Dated: October 21, 2021

CHARLES R. BREYER
United States District Judge

---

[2] The Court's prior order may have implied that the Pension Fund needed both the January 11 and the November 3 disclosures to prove loss causation. Order Denying MTD at 22. But precisely because the November 3 articles did not disclose anything relevant to the Fund's theory of fraud, their disappearance from the case does not necessarily foreclose loss causation as to January 11. As noted above, there is no formula. First Solar, 881 F.3d at 754. The Pension Fund may use events and statements shortly before and after January 11, 2016 to establish that that the loss on that date was proximately caused by McKesson's concealment of unlawful inflation of generic drug prices. See Nuveen, 730 F.3d at 1120; In re Gilead, 536 F.3d at 1058.